**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 06-81105 CIV HURLEY/HOPKINS

SENSORMATIC ELECTRONICS
CORPORATION,

      Plaintiff,

vs.

THE TAG COMPANY US LLC,
PHENIX LABEL COMPANY, and
DENNIS GADONNIEX,

      Defendants
_____/

# PLAINTIFF SENSORMATIC ELECTRONICS CORPORATION'S

# POST-TRIAL PROPOSED FINDINGS OF FACT

# AND CONCLUSIONS OF LAW

# [CORRECTED]

# TABLE OF CONTENTS

I.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  The '200 And '245 Patent Inventions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Acousto-Magnetic Electronic Article Surveillance Systems . . . . . . . . . . . . . . . . . 2

    B.    The '200 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        1.    Prosecution Of The '200 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        2.    Re-examination Of The '200 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    C.    The '245 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        1.    Prosecution Of The '245 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        2.    Re-examination Of The '245 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

IV.   Sensormatic's Infringement Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.    Claim Construction Of The '200 And '245 Patents . . . . . . . . . . . . . . . . . . . . 8

    B.    Findings Of Fact: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    C.    Conclusions Of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

V.    Invalidity Defenses And Counterclaims - General . . . . . . . . . . . . . . . . . . . . . . . . 10

VI.   Inherent Anticipation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A.    Legal Principles Governing Inherent Anticipation Analysis . . . . . . . . . . . . . . . 11

    B.    Findings Of Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        1.    The '399 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        2.    Defendants' Fish Markers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        3.    The Rejection Of Defendant Phenix's Inherent Anticipation Arguments In The Re-examinations . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        4.    A Comparison Of The Fish Markers And The Asserted Claims . . . . . . . 16

        5.    The Properties Of Arnokrome 4 In Fish Markers Were Obtained Using Hindsight . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

i

6.      Fish Marker Testing Data Unreliable . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

7.      No Evidence That The Fish Markers Practice The '399 Patent . . . . . . . 20

C.      Conclusions Of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

VII.    Public Use Or On-Sale Bar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

A.      Legal Principles Governing Public Use Or On-Sale Bar Analysis . . . . . . . . . . 24

B.      Findings Of Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

1.      The Critical Date Is August 28, 1995 . . . . . . . . . . . . . . . . . . . . . . . . . . 27

2.      Defendants Have Not Shown That Sensormatic Sold Labels
        Employing Arnokrome 4 Prior To August 28, 1995 . . . . . . . . . . . . . . . 27

3.      Defendants Have Not Shown That Labels Employing Arnokrome 4
        Were "In Public Use" Prior To August 28, 1995 . . . . . . . . . . . . . . . . . . 30

4.      Defendants Have Not Shown That Labels Employing Arnokrome
        4, Even If Sold, Offered For Sale, Or In Public Use Prior To The
        Critical Date, Embodied Each And Every Element Of Any Of The
        Asserted Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

5.      Defendants Have Not Shown That Sensormatic Sold Labels
        Employing Low Coercivity SemiVac 90 Prior To August 28, 1995 . . . . 34

6.      Defendants Have Not Shown That Labels Employing Low
        Coercivity SemiVac 90, Even If Sold, Offered For Sale, Or In
        Public Use Prior To The Critical Date, Embodied Each And Every
        Element Of Any Of The Asserted Claims . . . . . . . . . . . . . . . . . . . . . . . . 36

7.      Defendants Have Not Shown That Sensormatic Sold, Offered For
        Sale, Or Publicly Used Labels Prior To August 28, 1995 That
        Employed TCA Bias Material That Embodied Each And Every
        Element Of Any Of The Asserted Claims . . . . . . . . . . . . . . . . . . . . . . . . 36

8.      Claim-By-Claim Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

C.      Conclusions Of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

VIII.   Obviousness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

A.      Legal Principles Governing Obviousness Analysis . . . . . . . . . . . . . . . . . . . . . . 45

1.      Scope And Content Of The Art . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

2.      "Obvious To Try" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

3.      Secondary Considerations Or Objective Indicia Of Non-
        Obviousness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

4. Effect Of Re-examination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

B. Findings Of Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

 1. PTO Findings In Re-examination . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

 2. Person Of Ordinary Skill In The Art At The Time Of Filing . . . . . . . . 51

 3. Scope And Content Of The Prior Art . . . . . . . . . . . . . . . . . . . . . . . . . . 51

  a) The '033 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

  b) The MagneDur 20-4 Datasheet . . . . . . . . . . . . . . . . . . . . . . . . . 51

  c) The '399 And '824 Patents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

  d) The Bozorth Text . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

 4. Differences Between The Prior Art And The Asserted Claims . . . . . . . . 53

 5. Objective Indicia Of Non-Obviousness . . . . . . . . . . . . . . . . . . . . . . . . . 57

C. Conclusions Of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

IX. Enablement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

A. Legal Principles Governing Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

B. Findings Of Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

 1. Defendants' Contentions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

 2. Defendants Presented No Evidence That The Asserted Claims Of
  The '245 Patent Are Not Enabled . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

 3. The Original Examiner During the '200 Patent Prosecution
  Rejected The Precise Enablement Argument Made Here By
  Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

 4. Neither The Trade Names Nor The Specific Preferred
  Embodiments Would Have Been Necessary To Allow A Person Of
  Ordinary Skill In The Art At The Time Of The Filing Of The '200
  Patent To Make And Use The Claimed Inventions Without Undue
  Experimentation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

 5. The Three Preferred Embodiments Also Would Have Allowed A
  Person Of Ordinary Skill In The Art To Practice The Asserted
  Claims Of The '200 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

 6. A Person Of Ordinary Skill In The Art Would Have Been Able To
  Practice The Asserted Claims Specifying Magnetic Properties Of
  The Final Marker Without Undue Experimentation . . . . . . . . . . . . . . . . 73

       7.     Claim-By-Claim Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

   C.    Conclusions Of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

       1.     '200 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

       2.     '245 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

X.    Fraudulent Inventorship . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

   A.    Legal Principles Governing Fraudulent Inventorship Analysis . . . . . . . . . . . . . 76

   B.    Findings Of Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

       1.     Mr. Dennis Gadonniex Did Not Conceive Of Any Of The Claimed
            Inventions Of The Asserted Claims Of The '200 Or '245 Patents . . . . . 77

       2.     There Was No Intent To Deceive The PTO By Omitting Mr.
            Gadonniex As An Inventor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

   C.    Conclusions Of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

XI.   Inequitable Conduct Defenses And Counterclaims . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

   A.    Legal Principles Governing Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

   B.    Alleged Failure To Disclose References Material To Original Claim 4 Of
       The '200 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

       1.     Findings Of Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

           a)    The Only Reference That Formed A Basis For Rejection
                 During The Re-exam Was The '033 Patent . . . . . . . . . . . . . . . . . 85

           b)    Defendants' Cited Prior Art References Are Cumulative Of
                 The Prior Art Cited In The '200 Patent Prosecution . . . . . . . . . . 86

               (i)     The '033 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

               (ii)    The '399 And '824 Patents . . . . . . . . . . . . . . . . . . . . . . 88

               (iii)   The '021 And '770 Patents . . . . . . . . . . . . . . . . . . . . . . 88

               (iv)   The O'Handley Article . . . . . . . . . . . . . . . . . . . . . . . . . 89

           c)    The Inventions Of The '200 Patent Were Made Prior To
                 The Filing Date Of The '770 And '021 Patents . . . . . . . . . . . . . 89

           d)    Defendants Have Not Shown That The Inventors Or
                 Prosecuting Attorney Knowingly Withheld These
                 References With The Intent To Deceive The PTO . . . . . . . . . . 91

               (i)     The '033 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

iv

|  |  | (ii) | The '399 And '824 Patents . . . . . . . . . . . . . . . . . . . . . . . 95 |
|  |  | (iii) | The '021 And '770 Patents . . . . . . . . . . . . . . . . . . . . . . 96 |
|  |  | (iv) | The O'Handley Article . . . . . . . . . . . . . . . . . . . . . . . . 96 |

2.   Conclusions Of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

     a)   '200 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

     b)   '245 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

C.   Alleged Failure To Disclose Documents Showing Prior Sale Of Markers With Low Coercivity Bias Elements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

   1.   Findings Of Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

     a)   Defendants Did Not Adequately Plead Their Inequitable Conduct Defenses And Counterclaims Based On Failure To Disclose Prior Sales Or Public Use Of Markers with Arnokrome 4 Or TCA Bias Materials . . . . . . . . . . . . . . . . . . . 102

     b)   Defendants Have Not Shown That The Inventors Or Prosecuting Attorney Knew Of Sales Or Public Use Of Markers With Low Coercivity Bias Elements Prior To August 28, 1995 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

     c)   Disclosure Of Prior Commercial Sales Or Public Use Of Markers With Low Coercivity Bias Materials Would Have Been Cumulative Of The Prior Art Cited During Prosecution Of The '200 And '245 Patents . . . . . . . . . . . . . . . 104

   2.   Conclusions Of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

     a)   Defendants Failed Adequately To Plead Inequitable Conduct Defenses Or Counterclaims Based On Failure To Disclose Alleged Prior Sales Of Markers With Arnokrome 4, TCA Or SemiVac 90 Bias Materials . . . . . . . . . . . . . . . . . . . 105

     b)   '200 And '245 Patents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

D.   Alleged Failure To Disclose References Material To Original Claim 9 Of The '200 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

   1.   Findings Of Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

     a)   Original Claim 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

     b)   Figure 5 Of The '033 Patent Does Not Show Saturation Of The Bias Material In Fields Of Less Than 350 Oe As Required By Original Claim 9 Of The '200 Patent . . . . . . . . . 108

     c)   Defendants Have Not Shown That The Inventors Or

Prosecuting Attorney Knowingly Withheld Figure 5 Of The
'033 Patent With The Intent To Deceive The PTO . . . . . . . . . 108

2.      Conclusions Of Law  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

a)     '200 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

b)     '245 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

XII.    Permanent Injunction For Patent Infringement  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

A.      Findings Of Fact  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

B.      Conclusions Of Law  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

1.      Sensormatic Faces A Threat Of Irreparable Harm  . . . . . . . . . . . . . . . 112

a)     Sensormatic And TAG Are Direct Competitors In A Two-
Supplier Market . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

b)     There Is A Risk Of Irreparable Harm To Sensormatic's
Reputation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

2.      There Is No Adequate Remedy At Law . . . . . . . . . . . . . . . . . . . . . . . . . 115

3.      The Balance Of Hardships Favors Injunctive Relief . . . . . . . . . . . . . . . 116

4.      Permanent Injunction Would Not Harm Public Interest  . . . . . . . . . . . 118

XIII.   TAG's Misappropriation Of Sensormatic's Trade Secrets  . . . . . . . . . . . . . . . . . . . . . . 119

A.      Findings Of Fact  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

1.      Sensormatic's Research And Development Of Acousto-magnetic
EAS Labels  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

2.      TAG's Goal Of Copying Sensormatic's AM EAS Labels  . . . . . . . . . . 119

3.      Sensormatic's Specifications Are Highly Valuable . . . . . . . . . . . . . . . . 119

4.      Sensormatic's Specifications Are Kept Confidential  . . . . . . . . . . . . . . 121

5.      TAG Acquired And Substantially Copied Sensormatic's
Specifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

6.      TAG Disclosed The Copied Specifications And Used Them To
Develop Its Own Label  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

7.      TAG's Copying, Disclosure And Use Of Sensormatic's Bias
Specifications Gave It A Head Start Of Two Years In Developing
The Series 58 Label . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

8.      TAG Profited From Its Head Start . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

vi

B.     Conclusions Of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

    1.     Sensormatic's Specifications Are Trade Secrets . . . . . . . . . . . . . . . . . 128

    2.     TAG Misappropriated Sensormatic's Specifications By Acquiring The Specifications By Improper Means . . . . . . . . . . . . . . . . . . . . . . . 130

    3.     TAG Misappropriated Sensormatic's Specifications By Disclosing Them Without Consent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

    4.     TAG Misappropriated Sensormatic's Specifications By Using Them To Get A Head Start In The AM Label Business . . . . . . . . . . . 132

    5.     Sensormatic Is Entitled To Head Start Damages For TAG's Unjust Enrichment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

    6.     Sensormatic Is Entitled To Injunctive Relief Preventing Future Misappropriation By TAG . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

XIV.   Mr. Gadonniex's Breach Of Contract, Breach Of Fiduciary Duty, And Misappropriation Of Trade Secrets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

A.     Findings Of Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

    1.     Mr. Gadonniex's Contractual And Fiduciary Obligations To Sensormatic . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

    2.     Mr. Gadonniex's Retention, Disclosure, And Use Of Sensormatic Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

B.     Conclusions Of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

    1.     Misappropriation Of Trade Secrets . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

        a)     Mr. Gadonniex's Backup Tapes Contained Sensormatic Trade Secrets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

        b)     Mr. Gadonniex Misappropriated Sensormatic's Trade Secrets By Acquiring Them By Improper Means . . . . . . . . . . 141

        c)     Mr. Gadonniex Misappropriated Sensormatic's Trade Secrets By Disclosing Them . . . . . . . . . . . . . . . . . . . . . . . . 142

        d)     Mr. Gadonniex's Misappropriation Harmed Sensormatic And Injunctive Relief Is Appropriate . . . . . . . . . . . . . . . . . . 143

    2.     Breach Of Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

        a)     Mr. Gadonniex's Employment Agreement Is Valid And Enforceable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

        b)     Mr. Gadonniex Materially Breached The Employment Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

        c)    Mr. Gadonniex's Material Breaches Of The Employment Agreement Have Damaged And Will Continue To Damage Sensormatic Unless An Injunction Is Entered . . . . . . . . . . . . . 145

        d)    Sensormatic Is Entitled To Attorneys' Fees  . . . . . . . . . . . . . . 145

   3.    Breach Of Fiduciary Duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

        a)    Mr. Gadonniex Had A Fiduciary Duty To Sensormatic  . . . . . . 146

        b)    Mr. Gadonniex Breached His Fiduciary Duty To Sensormatic . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

        c)    Mr. Gadonniex's Breach Harmed Sensormatic, And Sensormatic Is Entitled To Injunctive Relief . . . . . . . . . . . . . . 147

XV.  TAG Aided And Abetted The Breach Of Fiduciary Duty By Mr. Dennis Gadonniex And Mr. Norman Hansen And Violated FDUTPA . . . . . . . . . . . . . . . . . . . 148

   A.    Findings Of Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

      1.    Mr. Gadonniex's Breach Of His Fiduciary To Sensormatic  . . . . . . . . . 148

      2.    Mr. Hansen's Breach Of His Fiduciary Duty To Sensormatic  . . . . . . 148

      3.    TAG's Knowledge Of The Fiduciary Duties Owed By Mr. Gadonniex And Mr. Hansen  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

      4.    TAG Encouraged And Paid For Mr. Hansen's And Mr. Gadonniex's Review And Disclosure Of Sensormatic Documents . . . . 150

   B.    Conclusions Of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

      1.    Aiding And Abetting Breach Of Fiduciary Duty . . . . . . . . . . . . . . . . . . 151

        a)    Mr. Hansen And Mr. Gadonniex Breached Their Fiduciary Duties To Sensormatic . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

        b)    TAG Knew Of Mr. Hansen's And Mr. Gadonniex's Breach Of Fiduciary Duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

        c)    TAG Substantially Assisted And Encouraged The Breach . . . . 152

        d)    Sensormatic Was Harmed, And Injunctive Relief Is Appropriate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

      2.    TAG Violated FDUTPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

XVI.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

**I.      Introduction**

1.      Plaintiff Sensormatic Electronics Corporation ("Sensormatic"), by and through its counsel, hereby submits its Post-Trial Proposed Findings of Fact and Conclusions of Law and requests that the Court adopt the same.

2.      Sensormatic has brought this lawsuit against Defendants The TAG Company US LLC ("TAG") and Phenix Label Company ("Phenix") for infringement of various claims of two of Sensormatic's patents, U.S. Patent No. 5,729,200 ("the '200 patent") and U.S. Patent No. 6,181,245 ("the '245 patent").  Sensormatic seeks permanent injunctive relief against TAG and Phenix.

3.      Defendants have brought counterclaims for invalidity and unenforceability of the '200 and '245 patents.

4.      In addition to its patent infringement claims, Sensormatic has brought claims against TAG and former employee Dennis Gadonniex for misappropriation of trade secrets in violation of the Florida Uniform Trade Secrets Act; against Mr. Gadonniex for breach of contract and breach of fiduciary duty; and against TAG for aiding and abetting breach of fiduciary duty and violations of the Florida Deceptive and Unfair Trade Practices Act. Sensormatic seeks unjust enrichment relief for TAG's misappropriation of trade secrets, permanent injunctive relief for the remaining claims, and attorneys' fees for the breach of contract claim.

**II.     Background**

**A.      The Parties**

5.      Sensormatic is a Nevada corporation with its principal place of business at One Town Center Road, Boca Raton, FL 33486.  Sensormatic designs and manufactures Electronic Article Surveillance ("EAS") systems, which are typically used to detect and deter shoplifting in retail stores. (PX 786, '200 patent, col. 11:14-16)  This case involves disposable acousto-magnetic ("AM") EAS labels, which are affixed to merchandise.

6.      TAG is a limited liability company organized under the laws of Florida and with

1

its principal place of business at 6278 North Federal Highway #318, Fort Lauderdale, FL 33308. TAG sells AM EAS labels known as the Series 58 labels.

7.       Phenix is a Kansas corporation with its principal place of business at 11610 South Alden Street, Olathe, KS 66062.  Phenix manufactures AM EAS labels for sale by TAG.

8.       Defendant Dennis M. Gadonniex resides at 7003 Honeysuckle Trail, Bradenton, Florida 34202.  Mr. Gadonniex has been a consultant for TAG and is a former employee of Sensormatic.

### B.       Procedural History

9.       Sensormatic filed this lawsuit against TAG and Phenix on November 29, 2006, alleging patent infringement of multiple Sensormatic patents.

10.      On June 12, 2007 (DE 45), Sensormatic amended its complaint to add Mr. Gadonniex as a defendant and to add claims against TAG for misappropriation of trade secrets and deceptive and unfair trade practices.

11.      On August 12, 2008, the first day of trial in this case, the parties stipulated that Defendants have infringed the asserted claims of the '200 and '245 patents.  (DE 316)

12.      The Court held a bench trial in this matter from August 12, 2008 through August 28, 2008 and October 7, 2008 through October 9, 2008.

## III.    The '200 And '245 Patent Inventions

### A.       Acousto-Magnetic Electronic Article Surveillance Systems

13.      A variety of different EAS systems are commercially available, including Radio Frequency ("RF") systems, Harmonic systems, and Acousto-Magnetic systems.  (Patterson, Tr. 122:25-125:5)

14.      This case involves Acousto-Magnetic systems.  A typical AM EAS system consists of two components:  (1) "markers" or "labels," which are affixed to retail products and designed to interact with a magnetic field placed at the store exit, and (2) "pedestals," which both create the field and detect "markers" or "labels" that have not been deactivated by the checkout clerk.  (PX 786, '200 patent, col. 1:16-33; Patterson, Tr. 102:3-21; Sensormatic Dem. 6)

15.     Markers have magnetic properties that cause an alarm to sound if they are brought into the electromagnetic field – or "interrogation zone" – created by the pedestals without first being deactivated.  (PX 786, col. 1:17-20; Patterson, Tr. 104:2-20)  An AM EAS marker is typically deactivated at a store's checkout counter by a deactivation device or demagnetization pad that alters the magnetic properties of the marker.  After deactivation, a marker will no longer be detected by the pedestals.  (PX 786, col. 1:23-26; Patterson, Tr. 112:22-114:1)

16.     AM markers consist of a "resonator" element and a "bias" element, which sit together inside of a plastic housing.  (PX 786, col. 1:27-33; Patterson, Tr. 105:5-23)

17.     The resonator element is formed from a magnetostrictive metallic material with "soft" magnetic properties.  "Soft" magnetostrictive materials cannot hold a magnetic charge, but will resonate (or vibrate) at a particular frequency when exposed to the alternating magnetic field created by the pedestals.  (PX 786, col. 1:45-50; Patterson, Tr. 106:1-14, 106:24-107:10; Sensormatic Dem. 8)

18.     The bias element, on the other hand, is formed from a metallic material with "semi-hard" magnetic properties.  Semi-hard magnetic materials will hold a magnetic charge after exposure to a magnetic field, but are more easily magnetized and demagnetized than "hard" magnetic materials (e.g., permanent magnets).  (PX 786, col. 1:53-59; Patterson, Tr. 105:9-19)

19.     "Coercivity" is the measure of the strength of an opposing magnetic field (measured in Oersted or Oe) that is needed to reduce the magnetization of a metal, such as the bias element, from full magnetization to zero in the presence of the field.  (Patterson, Tr. 121:3-6)

20.     AM markers work because of the interaction between the bias and resonator elements.  When the bias element is fully magnetized, it causes the resonator to vibrate at a frequency detectable by the pedestals in response to an alternating magnetic field generated by the pedestals.  (PX 786, col. 1:60-2:5; Patterson, Tr. 111:18-112:21)  Industry standard frequency is 58 kHz.  (Bulson, Tr. 2312:24-25)

21.     When the bias element is demagnetized, the resonator will vibrate at a higher

3

frequency than can be detected by the pedestals.  The magnetized bias element, in effect, tunes the resonator to the proper frequency.  (PX 786, col. 1:60-2:5; Patterson, Tr. 113:22-114:13)

22.     The checkout clerk deactivates the AM marker by exposing it to a deactivation pad.  The pad in turn demagnetizes the bias element by subjecting it to a specific type of AC magnetic field.  (PX 786, col. 2:6-13; Patterson, Tr. 112:24-113:9)  Once the bias is demagnetized, the marker is deactivated and can pass through the interrogation zone without alerting the pedestals or embarrassing the paying customer.  (Patterson, Tr. 114:5-13)

23.     AM EAS systems were first patented in 1985 by engineers at Allied Corporation. (Patterson, Tr. 125:19-25; PX 93, '489 patent)  Allied subsequently formed a joint venture with Sensormatic called Identitec, which Sensormatic later purchased.  (Patterson, Tr. 126:1-22) Identitec was the first company to commercialize AM EAS systems.  (Patterson, Tr. 126:6-8)

**B.     The '200 Patent**

24.     Soon after Dr. Kevin Coffey arrived at Sensormatic in the fall of 1995, he and Dr. Richard Copeland came up with the idea of utilizing a low coercivity bias material that exhibited "abrupt characteristics."  (DX 155, 11/28/95 Coffey memo at 3; DX 256, Invention Disclosure (Ex. A) at 3 ("new abrupt magnet"); PX 786, col. 4:45-59; Coffey, Tr. 351:5-352:6, 389:24-390:3; Copeland, Tr. 1445:3-24)  The abrupt magnetization and demagnetization characteristics of the label were designed to allow "label activation and label deactivation" with "much lower field levels." (DX 256, Invention Disclosure (Ex. A) at 5)

25.     Their idea was first memorialized in Dr. Coffey's November 28, 1995 memorandum (DX 155).  On February 23, 1996, an invention disclosure was submitted that listed a conception date of November 1, 1995 and a first reduction to practice date of January 18, 1996.  (DX 256, Ex. A)

26.     On August 28, 1996, Drs. Coffey and Copeland filed an application for what became the '200 patent.  (PX 786)  The '200 patent was granted on March 17, 1998.  (*Id.*)

27.     The specification or written description of the '200 patent discloses three preferred embodiments of the invention, differentiated by the type of bias material in the label.

The three bias materials are:

    (1)      MagneDur 20-4, available from Carpenter Technology Corporation;

    (2)      Metglas 2605SB1, made by AlliedSignal, Inc. and then processed according to procedures set forth in the '200 specification; and

    (3)      Vacozet, available from Vacuumschmeltze GmbH.

(PX 786, col. 6:1-4, 8:22-58, 9:44-49)

28.      In addition, the '200 specification explained that "it is contemplated to employ other materials for the biasing element 16, including, for example, other materials having characteristics like those shown in FIGS. 4, 5, 6, 9 and 10." (PX 786, col. 10:34-38)

29.      The '200 patent referred to resonators such as Metglas 2628CoA or "as-cast" Metglas 2826MB, both available from AlliedSignal, Inc. (PX 786, col. 10:39-43, 6:6-25)

### 1.      Prosecution Of The '200 Patent

30.      The '200 patent application disclosed four prior art references, each of which are cited on the face of the patent:  the Anderson '489 patent, the Anderson '490 patent, the Liu '140 patent and the Lian '230 patent.  (PX 786)

31.      The Examiner initially rejected all 47 claims in the '200 application pursuant to 35 U.S.C. §112, first paragraph.  (PX 86, May 16, 1997 Office Action)  Sensormatic "traversed" and argued that the rejection was incorrect because, among other things, persons of ordinary skill in the art could make the claimed material based upon the desired properties that are specified in the '200 patent's claims.  (PX 86, Aug. 22, 1997 Response to Office Action)  The Examiner subsequently withdrew his rejection and allowed all 47 claims as originally written, with a few minor edits to the specification.  (PX 86, Sept. 25, 1997 Notice of Allowability)

### 2.      Re-examination Of The '200 Patent

32.      On December 1, 2005, the firm of Defendants' testifying expert, Dr. Gordon Fish, (acting on behalf of Defendant Phenix) filed a 77-page Request for Re-examination with the PTO.  (PX 922, Dec. 1, 2005 Request for Re-examination; Fish, Tr. 2098:17-25)

33.      In this filing, Dr. Fish's firm argued that all 47 claims of the '200 patent were

5

either anticipated by or obvious in light of numerous references.  (PX 922, Request for Re-Examination pp. 1-6)

34.     On February 9, 2006, the PTO granted Defendants' Request for Re-examination, finding that there was "a substantial new question of patentability . . . with respect to the instant claims" under 35 U.S.C. § 102/103.  (PX 922, Feb. 9, 2006 Office Action p. 3)  The three Examiners did not explain which of the cited references created a substantial new question of patentability, or why such references did so.  (*Id.*)  The PTO grants requests for re-examination 97% of the time.  (PX 920 at 121)

35.     The PTO rejected original Claim 4. (PX 922, Nov. 9, 2006 Office Action)  Rather than traverse the rejection, Sensormatic amended claim 4 to include the additional limitation set forth in dependent claim 5 and cancelled claim 5.  (PX 922, Jan. 3, 2007 Summary of Interview; Response to Nov. 9, 2006 Office Action)

36.     On June 4, 2007 and again on November 9, 2007, the PTO issued an Intent to Issue a Re-examination Certificate.  (PX 922)

37.     On Feb. 12, 2008, the PTO issued a Re-examination Certificate.  (PX 816)  In all, 42 of the 47 claims withstood re-examination as originally written; two claims were cancelled; and three claims were amended.  (*Id.*)

**C.     The '245 Patent**

38.     The '245 patent is a continuation-in-part ("CIP") of the '200 patent.  (PX 788)

39.     The CIP application for the '245 patent was filed on August 15, 1997.  (PX 788)  It claimed priority to the '200 patent.  The '245 patent issued on January 30, 2001.  (*Id.*)

40.     The specification or written description of the '245 patent is largely the same as the '200 patent specification, except for the addition of specific chemical compositions for the MagneDur 20-4, Metglas 2605SB1 and Vacozet bias materials.  (PX 788, col. 6:14-16, 8:39-44, 9:62-64)

**1.     Prosecution Of The '245 Patent**

41.     In the application for what became the '245 patent, the inventors disclosed the

6

same four prior art references on the face of the '200 patent.  (PX 87)  The Examiner added the Gadonniex '770 patent (which had issued after the '200 patent issued and after the '245 application was filed) to the list of pertinent art, though he did not reject any of the claims on the basis of that patent.  (PX 87, June 16, 2000 Office Action)

42.     On June 16, 2000, the Examiner rejected all of the '245 patent claims based on the judicially created doctrine of double patenting in light of the '200 patent  (PX 87, June 16, 2000 Office Action)  Sensormatic subsequently filed a "terminal disclaimer" (which defeats a double-patenting rejection based on commonly-owned patents for period of common ownership) to overcome the double patenting rejection pursuant to 37 C.F.R. § 1.321(c).  (PX 87, Aug. 11, 2000 Sensormatic Amendment and attached Terminal Disclaimer)

43.     The Examiner withdrew the rejection and allowed all 19 claims as originally written, with a few minor edits to the specification.  (PX 87, Aug. 30, 2000 Notice of Allowability)

## 2.     Re-examination Of The '245 Patent

44.     On December 14, 2005, Dr. Fish's firm acting on behalf of Defendant Phenix filed a 64-page Request for Re-examination with the PTO.  (PX 923, Dec. 14, 2005 Request for Re-examination)

45.     Dr. Fish's firm asserted that all 19 claims of the '245 patent were either anticipated by or obvious in light of the same references they had asserted in the '200 patent re-exam proceedings as well as three additional references.  (PX 923, Dec. 14, 2005 Request for Re-examination pp. 1-7)

46.     On March 6, 2006, the PTO granted Defendants' Request for Re-examination, finding that the cited references raised "a substantial new question of patentability . . . with respect to the instant claims" under 35 U.S.C. § 102/103.  (PX 923, March 2, 2006 Office Action)  The Examiners did not explain which of the reference(s) in particular created a substantial new question of patentability, or why such references did so.  (*Id*.)

47.     On July 20, 2007, the PTO issued a Notice of Intent to Issue Ex Parte Re-

examination Certificate.  (PX 923)  The PTO issued the Re-examination Certificate on March 4, 2008.  (PX 815)  In all, 16 of the 19 original claims withstood re-examination as originally written, two claims were amended, and one was cancelled.  (PX 815)

## IV.   Sensormatic's Infringement Claims

48.   Sensormatic contends that Defendants' Series 58 labels infringe Claims 2, 6, 10, 11, 18, 19, 20, 27, 28, and 43 of the '200 patent, and Claims 1, 2, 4, 7, 9, 14, 15, and 17 of the '245 patent (together, "the asserted claims").  (DE 300, Stipulation on Limiting Asserted Claims and Replevin)

49.   Sensormatic bears the burden of proof to establish infringement by a preponderance of evidence.  *Kegel Co. v. AMF Bowling, Inc.*, 127 F.3d 1420, 1425 (Fed. Cir. 1997).

50.   Determination of literal infringement involves a two-step analysis.  *Ultra-Tex Surfaces, Inc. v. Hill Bros. Chem. Co.*, 204 F.3d 1360, 1363 (Fed. Cir. 2000).  First, each claim must be properly construed, which is an issue of law for the court.  *Markman v. Westview Instruments*, 517 U.S. 370, 384 (1996); *Vitronics* Corp. *v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Second, each properly construed claim is compared with Defendants' Series 58 Labels and their use to determine whether the claims read on the allegedly infringing or accused products.  *Id.* at 1581-82.

### A.   Claim Construction Of The '200 And '245 Patents

51.   The parties have stipulated to the following constructions of certain claim terms:

- "magnetomechanical electronic article surveillance system of the type which radiates a marker interrogation signal in the form of intermittent bursts at a predetermined frequency" means an EAS system that generates an alternating electromagnetic field as a pulsed interrogation signal at a predetermined frequency.

- "resonance characteristic that is substantially unchanged" means a resonant frequency that is largely unchanged, or has no appreciable change.

(DE 287)

52.   The parties disputed the construction of four other terms.  For the reasons set

8

forth in the Court's Order Construing Disputed Claim Terms dated July 31, 2008, the Court has

construed those terms as follows:

- "fully magnetized" means that the biasing element exhibits virtually no further increase in its magnetization level retained when the applied magnetic field is further increased;

- "full magnetization level" means the level of magnetization at which the biasing element is "fully magnetized", as that term is defined above;

- "DC magnetic field Ha required to achieve saturation" means that DC magnetic field strength, the application of which causes the biasing element to become "fully magnetized," as that term is defined above; and

- "deactivation-field-dependent resonant-frequency-shift characteristic having a slope that exceeds [100, 200] Hz/Oe" refers to the maximum value of the slope attained by a curve properly fitted to data points representing measured resonant frequency as a function of the peak amplitude of an applied AC demagnetization field.

(DE 304 at 8)

### B.    Findings Of Fact

53.    At the beginning of trial, the parties stipulated that Defendants, by making, using,

offering for sale, and/or selling acousto-magnetic Series 58 labels in the United States from 2006

to the present, have practiced the asserted claims.  (DE 316).

54.    The Court therefore finds that Defendants, by making, using, offering for sale,

and/or selling acousto-magnetic Series 58 labels in the United States from 2006 to the present,

have practiced Claims 2, 6, 10, 11, 18, 19, 20, 27, 28, and 43 of the '200 patent, and Claims 1, 2,

4, 7, 9, 14, 15, and 17 of the '245 patent.

### C.    Conclusions Of Law

55.    TAG's and Phenix's acts in making, using, offering to sell, and/or selling

acousto-magnetic Series 58 labels in the United States from 2006 to the present here infringed

Claims 2, 6, 10, 11, 18, 19, 20, 27, 28, and 43 of the '200 patent under 35 U.S.C. § 271 without

authority to do so.

56.    TAG's and Phenix's acts in making, using, offering to sell, and/or selling

acousto-magnetic Series 58 labels in the United States from 2006 to the present have infringed

Claims 1, 2, 4, 7, 9, 14, 15, and 17 of the '245 patent under 35 U.S.C. § 271 without authority to do so.

**V.     Invalidity Defenses And Counterclaims - General**

57.     Claims of an issued patent are presumed valid.  35 U.S.C. § 282.

58.     "A party seeking to establish that particular claims are invalid must overcome the presumption of validity in 35 U.S.C. § 282 by clear and convincing evidence."  *State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1067 (Fed. Cir. 2003).

59.     "Clear and convincing evidence has been described as evidence which proves in the mind of the trier of fact 'an abiding conviction that the truth of [the] factual contentions are [sic] highly probable.'"  *Intel Corp. v. United States Int'l Trade Comm'n*, 946 F.2d 821, 830 (Fed. Cir. 1991) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).

60.     Invalidity analysis must be performed on a claim-by-claim basis.  *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1370 (Fed. Cir. 2003).  "'[E]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; [and] dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim.' . . .  Where claims differ in scope in an aspect material to the analysis, those claims must be addressed individually."  *Id.* at 1370-71 (quoting 35 U.S.C. § 282).

61.     "[A] party challenging the validity of a claim, absent a pretrial agreement or stipulation, must submit evidence supporting a conclusion of invalidity as to *each* claim the challenger seeks to destroy."  *Shelcore, Inc. v. Durham Indus., Inc.*, 745 F.2d 621, 625 (Fed. Cir. 1984) (emphasis in original).

62.     The parties have stipulated that the Court needs to address the validity of only the 18 asserted claims.  (DE 300, ¶ 6)

63.     Findings of fact and conclusions of law for each invalidity defense and/or counterclaim are set forth separately below.

## VI.    Inherent Anticipation

### A.    Legal Principles Governing Inherent Anticipation Analysis

64.    "Anticipation requires a showing that each element of the claim at issue, properly construed, is found in a single prior art reference." *Zenith Elecs. Corp. v. PDI Commun. Sys.*, 522 F.3d 1348, 1363 (Fed. Cir. 2008).  To anticipate, a single prior art reference "must disclose each and every feature of the claimed invention, either explicitly or inherently."  *Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*, 471 F.3d 1369, 1375 (Fed. Cir. 2006) *cert. denied,* 128 S.Ct. 146 (2007).

65.    Although a prior art reference is viewed in light of the knowledge of one of ordinary skill in the art of the claimed invention, such knowledge "does not grant a license to read into the prior art reference teachings that are not there."  *Motorola, Inc. v. Interdigital Tech. Corp.*, 121 F.3d 1461, 1473 (Fed. Cir. 1997).  "An expert's conclusory testimony, unsupported by the documentary evidence, cannot supplant the requirement of anticipatory disclosure in the prior reference itself."  *Id.*

66.    Anticipation, including whether or not an element is inherent in the prior art, is a question of fact.  *Eli Lilly*, 471 F.3d at 1369.  Defendants bear the burden of proving anticipation by clear and convincing evidence.  *State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1067 (Fed. Cir. 2003).

67.    Defendants' anticipation argument is based solely upon the doctrine of inherent anticipation.   (Fish, Tr. 2201:16-22)

68.    To show inherent anticipation, Defendants must demonstrate that each and every claim limitation is "*necessarily present* in the prior art, not merely probably or possibly present." *Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.*, 344 F.3d 1186, 1192 (Fed. Cir. 2003) (emphasis added).

69.    For example, in *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1373 (Fed. Cir. 2002), the asserted patent had a requirement for a fluid flow rate.  The Federal Circuit held that a prior art Japanese patent did not inherently anticipate because while "it is

11

possible that the detection means could under some circumstances … effectively equalize the flow rates as well, it is also possible for that not to be the case.  Because anticipation by inherent disclosure is appropriate only when the reference discloses prior art that must *necessarily* include the unstated limitation[s], the Japanese patent cannot inherently anticipate the claims."  *Id.* (emphasis added).

70.    Anticipation by inherency "may not be established by probabilities or possibilities."  *MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d at 1365 (Fed. Cir. 1999); *see also Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 244 F.3d 1365, 1376 (Fed. Cir. 2001). "Occasional results are not inherent" and the "mere fact that a certain thing *may* result from a given set of circumstances is not sufficient."  *MEHL/Biophile*, 192 F.3d 1362,1365 (emphasis in original); *accord Electro Medical Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1052 (Fed. Cir. 1994).

## B.    Findings Of Fact

71.    Dr. Fish contended that 17 out of 18 of the asserted claims of the '200 and '245 patents (all except claim 18 of the '200 patent) are inherently anticipated by U.S. Patent No. 5,527,399 issued to Manning et al. ("'399 patent").  For the reasons discussed below, this Court finds that Defendants have not proven their contentions on these claims by clear and convincing evidence.

### 1.    The '399 Patent

72.    The '399 patent, issued on June 18, 1996, is a continuation-in-part of U.S. Patent No. 5,431,746 and is assigned to The Arnold Engineering Company ("Arnold").  (DX 14)

73.    The '399 patent is directed to methods for preparing semi-hard magnetic strips within a certain range of thickness and carbon content.  (DX 14, abstract)  It teaches a method of "manufacturing an alloy having a carbon content below about 0.5 weight percent to the desired thickness and then subjecting the strip to a carburizing step to raise the carbon content in the strip" and a method of "controlling the chemistry of the initial alloy and controlling the processing of that alloy until the desired thickness and requisite magnetic properties are

12

obtained." (*Id*.)

74.     The claims of the '399 patent are directed not to EAS markers, but rather to different methods for producing a thin semi-hard magnetic strip.  (DX 14, col. 11:62-12:61)  The '399 patent does teach, however, that the magnetic strips resulting from the claimed methods may be used as the bias element in AM EAS and harmonic anti-theft systems.  (DX 14, col. 1:30-32 (referencing patents describing markers for EAS systems))

75.     The '399 patent teaches two broad processing methods:  a carburization process and a non-carburization process, each of which has a number of steps.  (Manning, Tr. 1091:14-24, 1104:25-1105:6, 1110:11-20; *see* Sensormatic Dems. 200, 201)  These steps may be performed at a "wide range" of temperatures and for various amounts of time.  (Coffey, Tr. 2442:11-23; DX 14, col. 3:50-8:49)  Varying the times and temperatures in each of the steps could "affect the magnetic properties" of the resulting magnetic material.  (Manning, Tr. 1105:13-17, 1110:21-25; Fish, Tr. 2210:2-11)  Thus, the '399 patent discloses a "broad universe of materials," including "a thousand different possible chemical combinations" and "broad ranges of processing techniques" that will "impact the magnetic properties of the ultimate material." (Fish, Tr. 2209:14-2210:1)

76.     The '399 specification states that "[t]he magnetic properties of the finished magnetic strip prepared by the processes set forth herein are such that it has typical coercive levels, Hc, of from about 20 to about 100 oersteds, the exact level being application specific." (DX 14, col. 8:37-40)

77.     As for EAS marker applications in particular (including AM and harmonic EAS markers), the '399 patent specification states that the "[p]referred levels of Hc [coercivity]" are "from at least 35 to about 70 oersteds, more preferably from at least 40 to about 65 oersteds, and even more preferably about 45 to about 60 oersteds."  (DX 14, col. 8:40-45)

78.     The '399 patent contains three different examples, and lists the coercivity of the resulting materials in each of the examples.  (DX 14, col. 3:50-10:61; Coffey, Tr. 2444:9-17; Sensormatic Dem. 76)  Examples 1 and 2 are examples of the carburization process.  (DX 14,

13

col. 9:63-10:67)  Table I of the '399 patent contains results from Examples 1 and 2 of the '399

patent as well as materials not processed according to the '399 patent and used for "control

purposes."  (DX 14, col. 10:37-67; Coffey, Tr. 2507:4-2508:4, 2508:24-2509:12)  Example 3 is

an example of the non-carburization process.  (DX 14, col. 11:27-63)

79.     The '399 patent is silent as to the "abrupt" characteristics claimed in the '200 and

'245 patents, such as the slope of the deactivation-field-dependent resonant-frequency shift,

strength of DC magnetization field required to magnetize the bias to saturation, strength of

applied AC magnetic field required to cause the magnetization level to drop below 95% of full

magnetization level, etc.  (DX 14; Coffey, Tr. 508:19-509:2, 510:11-17; Fish, Tr. 2088:16-

2090:7)

### 2.     Defendants' Fish Markers

80.     Defendants' expert Dr. Fish (Phenix's patent agent) testified about three markers

that were created at his suggestion.  Those are markers M11, M12 and M13 ("Fish Markers").

These markers each contained an Arnokrome 4 bias material and a Metglas 2826 MB resonator.

(Fish, Tr. 1974:16-1975:6)

81.     M11, M12 and M13 had coercivities of 40 Oe, 23 Oe and 18 Oe, respectively.

(DX 374)  None of the examples in the '399 patent had materials with these coercivities.

(Coffey, Tr. 2446:1-4; DX 14; Sensormatic Dem. 76)

82.     Dr. Fish has no firsthand knowledge of how the Arnokrome 4 materials in the

markers were processed.  (Fish, Tr. 2212:2-8)

### 3.     The Rejection Of Defendant Phenix's Inherent Anticipation Arguments In The Re-examinations

83.     In the Requests for Re-examination, defendant Phenix argued that the claims of

the '200 and '245 patents were inherently anticipated by the '399 patent.  (PX 922, Dec. 7, 2005

Request for Re-examination at 39-49; PX 923, Dec. 12, 2005 Request for Re-examination at 34-

39; Fish, Tr. 2201:23-25)

84.     The three examiners at the PTO rejected all of Phenix's inherent anticipation

arguments. (Fish, Tr. 2202:4-6; PX 922, April 24, 2007 Office Action at 6-7, 15-16, 18-19; PX 923, May 10, 2007 Office Action at 8-9 and July 20, 2007 Office Action at 3-4)  For instance, with respect to claim 1 of the '200 patent, the Examiners found the '399 patent to "Manning *does not provide for any teaching or suggestion* with respect to having a marker with a deactivation-field-dependent resonant-frequency-shift characteristic having a slope that exceeds 100 Hz/Oe." (PX 922, April 24, 2007 Office Action at 7 (emphasis added))  The Examiners explained:

> The '399 patent is *devoid of any teaching* of what processed [sic] was used to make the material and/or using the same process of the '200 patent and thus the Examiner notes that whether or not the same material is present, the *same material which was processed differently may not inherently have the same magnetic characteristics* and thus one of ordinary skill in the art would not presume that the same element would have the same exact magnetic characteristic if the same process was not used.

(*Id.* at 9-10 (emphasis added); *accord* PX 923, May 10, 2007 Office Action at 8-9)

85.     At the time that the PTO rejected these inherent anticipation arguments, it possessed the data submitted by Phenix to the European Patent Office ("EPO") in connection with its inherent anticipation argument made in opposition proceedings in the EPO.  (Fish, Tr. 2206:13-18; PX 922, Jan. 9, 2007 submission at 13; PX 923, Jan. 11, 2007 communication)  The test data and associated affidavit are found at pages 539-559 of PX 922.

### 4.     A Comparison Of The Fish Markers And The Asserted Claims

86.     Both Dr. Fish and Dr. Coffey testified about data that compared the Fish Markers to the operative limitations of the asserted claims.  The table to the right, used at trial, summarizes this comparison.  (Sensormatic Dem. 73; Coffey, Tr. 2422:12-2423:10)

| ASSERTED CLAIM | OPERATIVE LIMITATIONS | M11 (40 Oe) | M12 (23 Oe) | M13 (18 Oe) |
|---|---|---|---|---|
| **200 Patent** | | | | |
| Claim 2 | slope > 200 Hz/Oe | No | | |
| Claim 6 | coercivity < 40 Oe / 95% mag < 4 Oe | No | | |
| Claim 10 | saturation < 350 Oe / 95% mag < 4 Oe | No | No | |
| Claim 11 | saturation < 200 Oe / 95% mag < 4 Oe | No | No | |
| Claim 18 | 95% mag < 12 Oe / 5% mag < 100 Oe | No | No | No |
| Claim 19 | 95% mag < 4 Oe / 5% mag < 30 Oe | No | | |
| Claim 20 | 1.5 kHz shift = 50 Oe | | | |
| Claim 27 | 95% mag < 4 Oe / 50% ↑ amplitude = 25 Oe | No | | |
| Claim 28 | 95% mag < 4 Oe / 75% ↑ amplitude = 30 Oe | No | | |
| Claim 43 | Resonance characteristic substantially unchanged at 4 Oe | | | |
| **245 Patent** | | | | |
| Claim 1 | coercivity < 55 Oe / slope > 100 Hz/Oe | No | | |
| Claim 2 | coercivity < 55 Oe / slope > 200 Hz/Oe | No | | |
| Claim 4 | coercivity < 40 Oe / slope > 100 Hz/Oe | No | | |
| Claim 7 | saturation < 350 Oe / 5% mag < 150 Oe | No | No | |
| Claim 9 | saturation < 200 Oe / 95% mag < 4 Oe / 5% mag < 150 Oe | No | No | |
| Claim 14 | Resonance characteristic substantially unchanged at 4 Oe | | | |
| Claim 15 | Resonance characteristic substantially unchanged at 20 Oe | No | No | No |
| Claim 17 | Resonance characteristic substantially unchanged at 12 Oe | | No | No |

87.     Dr. Fish admitted that for "many of the asserted claims, fewer than all three markers read on that claim."  (Fish, Tr. 2208:18-2209:4)

88.     The only difference between Dr. Fish and Dr. Coffey in this comparison of the data to the claims is whether Fish Markers M11 and M12 met the limitation requiring "saturation" on the DC magnetization curve before 200 or 350 Oe, found in claims 10 and 11 of the '200 patent and claims 7 and 9 of the '245 patent.

89.     In its Order Construing Disputed Claim Terms (DE 304), the Court previously defined "DC magnetic field Ha required to achieve saturation" to be "DC magnetic field strength, the application of which causes the biasing element to become 'fully magnetized,' as that term is defined above."  (DE 304 at 8)  The Court defined "fully magnetized" as meaning "that the biasing element exhibits virtually no further increase in its magnetization level retained when the applied magnetic field is further increased."  (*Id.*)

90.     Dr. Fish relied upon data that went only to 200 Oe.  (DX 374, Ex. 4)  That was insufficient to show that there was "virtually no further increase" in the magnetization level of M11 and M12 at 200 Oe or 350 Oe.  (Coffey, Tr. 2426:7-20)  The underlying data that were used for Dr. Fish's charts included data points up to 500 Oe.  (Coffey, Tr. 2433:1-14; Sensormatic Dems. 74-75)  Based upon these data, as well as the data in the charts submitted by Dr. Fish, it is evident that M11 and M12 had not achieved saturation at less than 200 or 350 Oe.

16

They had not reached the point where there was "virtually no further increase" in their magnetization levels.  (Coffey, Tr. 2434:16-2435:17)

91.     As a result, markers M11 and M12 do not meet the "saturation" limitations in claims 10 and 11 of the '200 patent and claims 7 and 9 of the '245 patent.

92.     As to 15 of the 18 asserted claims, Dr. Fish's testing data demonstrates that one or more of the Fish Markers does **not** read on the asserted claim.  There are only three asserted claims where all three of the Fish Markers read on the asserted claim (claims 20 and 43 of the '200 patent and claim 14 of the '245 patent).  Dr. Fish admitted that none of the Fish Markers reads on two of the claims (claim 18 of the '200 patent and claim 15 of the '245 patent).

### 5.     The Properties Of Arnkrome 4 In Fish Markers Were Obtained Using Hindsight

93.     After Drs. Copeland and Coffey conceived of the '200 and '245 patent inventions, Dr. Copeland tested then-available Arnkrome 4 material to determine whether it had the necessary abrupt characteristics to work as the bias element in a low energy marker.  Dr. Copeland concluded that it did not.  On May 20, 1996, he wrote a letter to Neil Manning of Arnold saying:

> We conclude that this material, although low Hc, is too gradual in the magnetization/demagnetization characteristics.  You must work on this further to improve the low field ac stability and the dc magnetization specifications.

(DX 145 p. 2)

94.     Sensormatic concluded that Arnkrome 4 bias material did not have sufficiently abrupt characteristics to meet Sensormatic's requirements. (Coffey, Tr. 2454:18-22, 2455:8-2456:9; Copeland, Tr. 1479:3-11, 1481:10-19, 1483:4-1486:14)

95.     Eight years later, in 2004, Defendant TAG asked Arnold to process a new Arnkrome 4 to have characteristics just like those shown in Sensormatic's patent.  In a February 27, 2004 email, TAG consultant Norm Hansen, writing about Arnkrome 4, asked Arnold to "perform an experiment to obtain a curve similar to the attachment for the material that was sent."  (PX 41)  The curve that was attached was Figure 5 of the '200 patent. (*Id.*)

96.     Mr. Nelson of Arnold testified that he knew that "Phenix was attempting to invalidate Sensormatic patents" and "provided material to Phenix to aid them in their efforts to invalidate Sensormatic patents."  (Nelson, Tr. 966:23-967:4)

97.     Thus, in 2006, Arnold conducted a significant amount of processing in an attempt to provide the desired results to Phenix.  This included "changes to the material processing," in an attempt to yield a different "deactivation loop."  (PX 195, 3/15/06 Bulson memo; PX 547, 4/4/06 Hibshman email)  Mr. Nelson of Arnold explained that they were taking Arnokrome 4 "to a level that it has never been to before."  (PX 17)  Mr. Nelson testified that Arnold varied "different factors in the manufacturing process," including varying the "times and temperatures of the various annealing processes" on the Arnokrome 4 material.  (Nelson, Tr. 985:19-986:5) As a result, the "Arnokrome 4 [that Arnold] sold to Phenix changed over the course of 2005 and 2006."  (Nelson, Tr. 988:8-10)

98.     Near the end of this process, Mark Hibshman of Phenix wrote to Dr. Fish on November 9, 2006 that "I know there is a question if it can be used or not but it really has the results you are looking for."  (DX 264)  Mr. Hibshman testified that this was referring to the Arnokrome 4 used in the Fish Markers.  (Hibshman, Tr. 737:14-738:6)

99.     The differences between Arnokrome 4 as it existed in 1996 and after the processing requested by Defendants is seen by comparing Dr. Fish's results for M12 and the results for and test sample S-12 in Dr. Copeland's 1996 memo (DX 145, Fig. 4), both of which

have the same coercivity (23 Oe).  This comparison shows significantly different characteristics.



(Sensormatic Dem. 531)

100.    Defendants have failed to prove that the Arnokrome 4 used in Fish Markers is  the same as what was available in 1996.

### 6.    Fish Marker Testing Data Unreliable

101.    The testing data Defendants rely upon to show inherent anticipation by the Fish Markers are unreliable.

102.    The testing of the shift in the frequency and amplitude of markers M11, M12 and M13 is shown in Exhibits 1 through 3 of DX 374.  The data are unreliable.  In Exhibit 3 (for M13), there are "large discontinuous jumps" in "some of the data points" that reflect "measurement errors."  (Coffey, Tr. 2436:18-24, 2437:11-17)  By contrast, the data in Figure 11 of the '200 patent (PX 786) do not jump erratically and thus do not show the measurement errors that we saw in the Fish data."  (Coffey, Tr. 2439:18-24)

103.    Similarly, the Fish data with respect to the effect of a demagnetization field on the bias, reflected in Exhibit 6 of DX 374 for M12, are "not reliable."  (Coffey, Tr. 2440:1-8)  An "obvious measurement error" in these data is that they show a stronger demagnetization field causing the magnetization to "jump back up," which should not happen.  (Coffey, Tr. 2440:13-2441:15)  Dr. Coffey explained that where you have a single measurement error of

19

"approximately 20 percent of the total magnetization of the sample," you cannot "reliably make any conclusions about small things like five percent based on this data." (*Id.*)

### 7.    No Evidence That The Fish Markers Practice The '399 Patent

104.    Defendants did not provide clear and convincing evidence that the resonator and bias materials found in the Fish Markers M11, M12 and M13 practiced the '399 patent.

105.    The Fish Markers used Metglas 2826MB as the resonator.  (Fish, Tr. 2214:14-18) The '200 patent also references 2826MB as one of two possible resonator materials.  (PX 786, col. 10:39-43)

106.    But the '399 patent does not discuss 2826MB or any other specific resonator material that should be used.  (DX 14, col. 9:27-29)  Instead, the '399 patent says simply that resonator materials would be "known to those in the art . . . such as those materials" in U.S. Patent Nos. 4,510,489 ("'489 patent") and 5,351,033 ("'033 patent").  (*Id.*)

107.    The '033 patent does not identify a resonator material.  (DX 12)

108.    The '489 patent does not identify any particular commercially-available resonator material such as 2826MB.  (Fish, Tr. 2218:24-2219:2) Table 1 of the '489 patent does contain the nominal chemical compositions for five different potential resonator materials, each in an "as cast" or "annealed" state.  (PX 93, col. 7, table 1)  In this way, the table shows "ten possible resonator materials that could be used."  (Fish, Tr. 2218:13-16)  One of the ten compositions listed is 2826MB.  (Fish, Tr. 2218:21-23)  Dr. Fish offered no reason why he used 2826MB in the Fish Markers the composition of rather than the other nine possible resonator materials, other than the fact (known only in hindsight) that the '200 patent references 2826MB.

109.    The bias material used in the Fish Markers is Arnokrome 4.  (Fish, Tr. 1978:1-6) However, there is no evidence that the Arnokrome 4 used in the Fish Markers M11, M12 and M13 was processed according to the '399 patent.

110.    Dr. Fish testified that he had no personal knowledge as to how the bias material used in the Fish Markers M11, M12 and M13 was actually processed.  (Fish, Tr. 2212:2-8)  Dr. Fish did not know whether or not Arnold used the carburization or the non-carburization process

20

to achieve the bias material used in the Fish Markers.  (Fish, Tr. 2212:21-25)  Nor did Dr. Fish have personal knowledge of the specific processing steps used in making the bias material. (Fish, Tr. 2213:1-10)  Instead, Dr. Fish relied upon the testimony of Mr. Nelson and Dr. Manning of Arnold.  (*Id.*)

111.    Mr. Nelson is the general manager of Arnold's rolled products business unit. (Nelson, Tr. 882:15-883:3)  He has no technical degree.  (Nelson, Tr. 961:13-14)  While Mr. Nelson initially testified that Arnokrome 4 is produced pursuant to the '399 patent "from what [he] understand[s]" (Nelson, Tr. 971:21-24), he admitted through impeachment that he was "not that familiar with the teaching of the patent."  (Nelson, Tr. 972:22-973:15)

112.    Dr. Manning testified that the '399 patent covers Arnokrome 4 (Manning, Tr. 1050:1-4), but limited that opinion in cross examination to processing that occurred while he was at Arnold.  Dr. Manning left Arnold in December 2004.  (Manning, Tr. 1130:13-18)  He has no personal knowledge "about processing performed by Arnold after December 2004" and does not know if Arnold "changed any of its ways to process Arnokrome 4" after that time.  (Manning, Tr. 1130:19-1131:1)  Dr. Manning has "no personal knowledge about the processes used in 2005 or 2006 by Arnold to process particular coils of Arnokrome 4."  (Manning, Tr. 1131:8-11)

113.    Dr. Manning testified that "[i]f Arnold did change a process in 2006 with respect to the processing of Arnokrome 4," he could not "testify one way or another about whether the process used at that point fell within the '399 patent."  (Manning, Tr. 1131:2-7)  The evidence demonstrated that in fact Arnold did "change a process" for making Arnokrome 4 in 2006.  (PX 547, 4/4/06 Hibshman email)  Mr. Nelson testified that Arnold "varied the heat treatments in order to change the magnetic properties" of Arnokrome 4."  (Nelson, Tr. 988:8-16)

114.    The Court sustained Sensormatic's objection to the admissibility of a memo by Arnold employee Michael Nakonechny, who did not testify in Court.[1]  (Tr. 937:16-940:17)

---

[1] While the Nakonechny memo was one of the documents in the European EPO file that was submitted to the PTO during the re-examination, and was admitted into evidence as part of the re-examination file history (PX 922; PX 923), it was not admitted for the truth of the matter.  When allowing the re-examination file history in, the Court was clear that it represented "an accurate copy of the file history, this is what the examiner said." (Tr. 2164:18-2165:1)

(continued...)

## C.      Conclusions Of Law

115.     Defendants have not shown by clear and convincing evidence that any of the 18 asserted claims of the '200 or '245 patents are inherently anticipated by the '399 patent for several reasons.

116.     First, the evidence does not show that any of the abrupt characteristics claimed in the '200 and '245 patents are "necessarily present" in the '399 patent. *Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.*, 344 F.3d 1186, 1192 (Fed. Cir. 2003).  In fact, as to 15 out of the 18 asserted claims (all but claims 20 and 43 of the '200 patent and claim 14 of the '245 patent), one or more of the Fish Markers do not read on the asserted claim.

117.     The '399 patent discloses a "genus" with a "broad universe of materials" and "broad ranges of processing techniques." (Fish, Tr. 2209:14-2210:1)  The Fish Markers employ specific materials that Dr. Fish alleges fall within this broad range.  The broad '399 disclosure does not include a disclosure of the specific Fish Markers:  "A prior art reference that discloses a genus still does not inherently disclose all species within that broad category." *See Corning Glass Works v. Sumimoto Elec. USA, Inc.*, 868 F.2d 1251, 1262 (Fed. Cir. 1989) ('Under [defendant's] theory, a claim to a genus would inherently disclose all species.  We find [this] argument wholly meritless….')." *Metabolite Labs., Inc. v. Lab Corp.*, 370 F.3d 1354, 1367 (Fed. Cir. 2004).  "It is well established that the disclosure of a genus in the prior art is not necessarily a disclosure of every species that is a member of that genus." *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 999 (Fed. Cir. 2006).

118.     The decision in *Titanium Metals Corp. v. Banner*, 778 F.2d 775, 782 (Fed. Cir. 1985), is inapposite.  In that case, the Court explained that "when, as by a recitation of ranges or otherwise, a claim covers several compositions, the claim is 'anticipated' if *one* of them is in the

---

(…continued)

And testimony by Mr. Nelson made it clear that the first draft of the Nakonechny memo was prepared by Mark Hibshman, an employee of Defendant Phenix.  (Nelson, Tr. 932:9-933:11)  In any event, the opinion in the Nakonechny memo concerning whether the processing of the Arnokrome 4 was according to the '399 patent is of little value.  The memo does not contain the detailed times and temperatures within each step that are necessary to see if the '399 patent was followed.

prior art." *Id.* (citations omitted).  Here, the issue is the opposite – whether a broad genus in the prior art can anticipate a narrower species or smaller genus.  The law is that it does not.   In *Atofina v. Great Lakes Chem. Corp.,* 441 F.3d 991, 999 (Fed. Cir. 2006), the Federal Circuit distinguished *Titanium Metals* on precisely this ground:  "*Titanium Metals* stands for the proposition that an earlier species reference anticipates a later genus claim, not that an earlier genus anticipates a narrower species."

119.    The fact that some, but not all, of the three Fish Markers purportedly read on some of the asserted claims shows that limitations of those claims are *not inherent*.  "Occasional results are not inherent." *MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999).  "[The] mere fact that a certain thing *may* result from a given set of circumstances is not sufficient." *Id.* (emphasis in original); *accord Electro Medical Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1052 (Fed. Cir. 1994).

120.    Second, the Fish Markers do not inherently anticipate any of the asserted claims because of the impermissible use of hindsight in constructing the Fish Markers.  Where the prior art is a genus, it is impermissible to use hindsight to pick undisclosed species within that genus to claim inherent anticipation.  *See Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1348 (Fed. Cir. 2004) ("Apotex did not sufficiently convince the district court that the deviations from the example provided by the '320 patent … were not the result of impermissible hindsight."); *Wesley Jessen Corp. v. Bausch & Lomb, Inc.*,  209 F. Supp. 2d 348, 393 (D. Del.  2002) (citation omitted) (Substitutions in an example of prior art patent "made with the benefit of hindsight, would not be recognized by persons of ordinary skill as 'necessarily present in the Keogh patent.'")

121.    Defendants used hindsight in the requested processing of the Fish Markers, including specifying the desired characteristics using Figure 5 of the '200 patent and referring to the "results you are looking for." (PX 41; DX 264)

122.    The comparison of the properties of marker M12 with Arnokrome 4 bias material processed in 2006 and bias material S-12 tested back in 1996 (both with the same coercivity, 23

23

Oe) shows the extent to which Defendants changed the processing in an attempt to replicate the properties set forth in the '200 patent.

123.    For this same reason, Defendants' argument that the asserted claims are anticipated if Series 58 markers with the 2006 Arnokrome 4 bias material infringe those claims is inaccurate.  The parties stipulated that Series 58 markers "have practiced" the asserted claims. (DE 316, ¶ 1)  The Series 58 markers included Arnokrome 5 bias material from 2006 to the present (though for a period in 2006 some were made with Arnokrome 4 bias as well). (Hibshman, Tr. 725:14-726:5, 727:1-22; Bulson, Tr. 2356:11-20, 2418:3-9)

124.    Further, even if Series 58 markers made with Arnokrome 4 infringe the asserted claims, that does not establish that the '399 patent inherently anticipates the claims.  The evidence established that the Arnokrome 4 processed for Defendants was substantially different than the Arnokrome 4 available in 1996.  (Compare DX 145, Fig. 4 and DX 374, Exhibit 6)  But even if the 2006 Arnokrome 4 was identical to the 1996, that would not be enough to establish anticipation due to the differing burdens of proof.  "[M]ere proof that the prior art is identical, in all material respects, to an allegedly infringing product cannot constitute clear and convincing evidence of invalidity."  *Zenith Elecs. Corp. v. PDI Commun. Sys.*, 522 F.3d 1348, 1363 (Fed. Cir. 2008).

125.    Third, because the data submitted by Dr. Fish was not reliable, that data cannot furnish the basis for any conclusion concerning inherent anticipation.

126.    Finally, Defendants have failed to show by clear and convincing evidence that the Fish Markers employ a resonator material disclosed by the '399 patent or employ a bias material made in accordance with processes disclosed in the '399 patent.

**VII.    Public Use Or On-Sale Bar**

    **A.    Legal Principles Governing Public Use Or On-Sale Bar Analysis**

127.    A claim is invalid if a product embodying each and every limitation of the claimed invention was "in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."  35 U.S.C. § 102(b).  "The date exactly

one year prior to the date of application for the patent is known as the critical date." *Scaltech, Inc. v. Retec/Tetra, L.L.C.,* 269 F.3d 1321, 1327 (Fed. Cir. 2001).

128.    "The ultimate determination of whether a patent is invalid under § 102(b) due to application of an on-sale bar is a question of law. . . .This ultimate determination is "based upon underlying factual considerations." . . . . In order to overcome the presumption of validity, such underlying facts supporting a determination of invalidity must be proven by clear and convincing evidence." *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d 1253, 1257 (Fed. Cir. 2001) (quotations and citations omitted).

129.    Defendants must prove that two conditions were satisfied prior to the critical date. *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67-68 (1998).  "First, the [claimed invention] must [have been] the subject of a commercial offer for sale." *Id.*  "Second, the invention must [have been] ready for patenting." *Id.*  "[The second] condition may be satisfied in at least two ways:  by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Id*.

130.    When the asserted basis of invalidity is a public use or on-sale bar, the court should determine 'whether the subject of the barring activity met each of the limitations of the claim, and thus was an embodiment of the claimed invention.'" *Dana Corp. v. American Axle & Mfg., Inc.,* 279 F.3d 1372, 1375 (Fed. Cir. 2002) (citation omitted).

131.    "The on-sale bar is evaluated on a claim-by-claim basis, so that some of the claims of a patent may be found to be barred while others are not." *Allen Eng'g Corp. v. Bartell Indus.*, 299 F.3d 1336, 1353 (Fed. Cir. 2002).

132.    If a prior sale or public use is "primarily for experimentation rather than commercial gain, then the sale is not invalidating under § 102(b)." *Electromotive Div. of Gen. Motors Corp. v. Transportation Sys. Div. of Gen. Elec. Co.,* 417 F.3d 1203, 1210 (Fed. Cir 2005).

133.    "'[A] bona fide effort to bring [the] invention to perfection, or to ascertain

whether it will answer the purpose intended' does not constitute a 'public use.' . . . [T]he focus of the test is whether the use was truly experimental or in fact commercial." *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 998 (Fed. Cir. 2007) (citation omitted). "[T]he question is . . . whether the primary purpose of the inventor at the time of the sale, as determined from an objective evaluation of the facts surrounding the transaction, was to conduct experimentation." *Allen Eng'g Corp. v. Bartell Indus.*, 299 F.3d 1336, 1354 (Fed. Cir. 2002)

134.    "[V]arious objective indicia may be considered in determining whether the inventors engaged in experimentation." *Electromotive Div. of Gen. Motors Corp. v. Transportation Sys. Div. of Gen. Elec. Co.,* 417 F.3d 1203, 1212 (Fed. Cir 2005). These factors include: "(1) the necessity for public testing; (2) the amount of control over the experiment retained by the inventor; (3) the nature of the invention; (4) the length of the test period; (5) whether payment was made; (6) whether there was a secrecy obligation; (7) whether records of the experiment were kept; (8) who conducted the experiment; (9) the degree of commercial exploitation during testing; (10) whether the invention reasonably requires evaluation under actual conditions of use; (11) whether testing was systematically performed; (12) whether the inventor continually monitored the invention during testing; and (13) the nature of the contacts made with potential customers. . . .  This list is not exhaustive, and all of the experimentation factors may not apply in a particular case." *Id.* at 1213.

135.    If the patent challenger makes a prima facie case of public use, the patentee "must simply produce sufficient rebuttal evidence [of experimental use] to prevent the party challenging the patent's validity from meeting its burden of proving by clear and convincing evidence that the invention was in public use." *Lisle Corp. v. A. J. Mfg. Co.*, 398 F.3d 1306, 1316 (Fed. Cir. 2005) (affirming jury instruction that required patentee to come forward with "evidence" of experimental use, rather than "convincing evidence."). A "party challenging a patent's validity has the burden of proving by clear and convincing evidence that the patent is invalid, and that . . . burden does not shift at any time to the patent owner." *Id.*

B.      **Findings Of Fact**

136.    Defendants contend that all of the '200 and '245 patent claims are invalid because, prior to the critical date, Sensormatic sold or publicly used labels within the United States that embodied each and every element of each of the asserted claims of both the '200 and '245 patents.  (*See* DE 276, Defendants' Answer and Counterclaims to Plaintiff's Fourth Amended Complaint, Defenses 3(b), 4(b), First and Second Counterclaims; Opening, Tr. 17-23; Closing, Tr. 2754:10-24)

137.    Defendants argued at trial that the sale of labels employing Metglas 2605 TCA or Arnokrome 4 bias materials constituted a public use or sale of the claimed inventions.  (Closing, Tr. 2754:10-24)  Defendants also offered evidence concerning SemiVac 90 bias material, apparently in support of another on-sale bar theory.  The Court will therefore address Defendant's on-sale bar or public use defenses with respect to labels allegedly containing Arnokrome 4, TCA, and SemiVac 90.

        1.      **The Critical Date Is August 28, 1995**

138.    The "critical date" for both the '200 and '245 patents is August 28, 1995, one year prior to the filing date of the '200 patent.  (PX 786)  Defendants do not dispute that the effective filing date of the '245 patent is the filing date of the '200 patent for purposes of their on-sale bar allegations.  (*See* DE 276, Answer to Fourth Amended Complaint, Second Counterclaim ¶ 12)[2]

        2.      **Defendants Have Not Shown That Sensormatic Sold Labels
                Employing Arnokrome 4 Prior To August 28, 1995**

139.    The parties do not dispute that a semi-hard magnetic material bearing the trade name Arnokrome 4 existed and was commercially available from Arnold prior to the critical date.  Nor do the parties dispute that Sensormatic purchased material bearing the trade name Arnokrome 4 for testing purposes prior to the critical date.

_____

[2] Defendants mistakenly assert in their Answer that the priority date for the '200 Patent is August 25, 1996.  The priority date of the '200 Patent is the August 28, 1996 filing date.

27

140.    The parties do dispute whether Sensormatic ever sold labels with Arnokrome 4 before August 28, 1995.  The sale of *labels* incorporating the bias material is critical because the asserted '200 and '245 patent claims are for markers (labels) or methods of deactivating and activating markers, not simply bias materials.  (PX 786; PX 788)

141.    Defendants rely on the testimony of Kathie Bulson, TAG Company's Senior Vice President, who is a former Sensormatic employee.  Ms. Bulson testified that labels using Arnokrome 4 bias material were sold to Sensormatic customers in early to mid 1994.  (Bulson, Tr.  2351:20-25, 2353:4-5)

142.    Ms. Bulson did not offer documentary support for her contention that Arnokrome 4 had been approved for use in labels to be sold.  (Bulson, Tr.  2396:2-5)  Ms. Bulson testified that she was not involved in the decision to approve Arnokrome 4 for use in labels.  She testified that for Arnokrome 4 to have been approved for use in labels to be sold, it would first have had to be approved by Mr. Patterson's group. (Bulson, Tr.  2353:17-23, 2395:22-2396:1)

143.    Without a final specification, a bias material cannot be used in labels to be sold to Sensormatic customers.  (Patterson, Tr.  2523:1-4; Copeland, Tr. 1379:19-20)  No final specification was ever approved for Arnokrome 4.  (Patterson, Tr. 2524:5-10)  Mr. Patterson testified that Arnokrome 4 was never used in Sensormatic labels that were sold or offered for sale.  (Patterson, Tr. 2524:5-10)  Dr. Copeland also testified that to the best of his knowledge Arnokrome 4 labels were not sold.  (Copeland, Tr. 1453:19-22)

144.    Mr. Patterson and Dr. Copeland's testimony, along with the documentary evidence, establish that from 1993 through 1995 Sensormatic evaluated Arnokrome 4 for potential use in labels, but the material had many problems related to its magnetic and other properties.  (Copeland, Tr. 1488:16-1489:3, 1526:3-1527:6; DX 189, Dec. 8, 1993 memo from Copeland stating "[f]irst pilot material [of Arnokrome 4] received at the beginning of December . . . .  Test results show this material to be at or below the low limit specification for remanent flux. . . .  The specification release will be delayed until these issues about Arnold's capabilities are finalized"; DX 187, Feb. 4, 1994 Krishnasamy memo noting that Arnokrome 4 was still in

28

developmental stage; DX 137, June 10, 1994 memo from Patterson stating "Arnold Engineering still cannot meet our mechanical specifications" for Arnokrome 4; DX 296, Apr. 4, 1995 presentation stating Arnokrome 4 is "where we are heading this coming fiscal year").

145.     During this time, Sensormatic projected future purchases of Arnokrome 4 and purchased some quantities for experimentation.  Defendants rely on Sensormatic documents concerning projected purchases of Arnokrome 4 as support for their contention that Arnokrome 4 was being used in labels sold to the public.  (*See, e.g.*, DX 271, Dec. 3, 1994 "Bias Commitments" showing commitment to 22,500 lbs. of Arnokrome 4; DX 281)  Ms. Bulson admitted, however, that the bias commitments do not represent what materials Sensormatic actually purchased, or represent sales of labels with Arnokrome 4 bias materials.  (Bulson, Tr. 2397:21-25, 2398:11-15)  Other similar documents show zero demand for Arnokrome 4.  (*See, e.g.*, PX 960, September 1994 document showing zero demand for Arnokrome 4 from September 1994 through June 1995)

146.     Defendants relied on documents indicating that Arnokrome 4 had been "issued to production."  But the testimony established that within Sensormatic "issued to production" meant a material was sent to the production department only for evaluation and testing.  Only if the product ultimately met specifications could it then be put on the market.  (Copeland, Tr. 1378:13-1379:6)

147.     Defendants also rely on a May 31, 1995 Arnold Engineering document titled "Visit to Sensormatic Electronics Corporation."  (DX 156)  Page 2 of the document says the "status" of Arnokrome 4C is "Commercial," while the "status" of Arnokrome 4D is "Development."  (DX 156)  Former Arnold employee Mr. Manning testified that the designation "commercial" meant that the materials were being offered by Arnold for sale to Sensormatic (Manning, Tr. 1119:20-1120:13).  Mr. Manning had no knowledge of when Arnold actually sold Arnokrome 4 to Sensormatic.  (Manning, Tr. 1119:20-1120:13)  DX 156 says nothing about whether Sensormatic was selling *labels* employing Arnokrome 4C or 4D.

148.     Instead, a document relating to the preparation of the May 31 presentation in DX

29

156 reveals that as of May 19, 1995 Arnold still had not received "feedback on the final production approvals of Arnokrome 4." (PX 924)  The results Arnold was awaiting, namely the Sensormatic Manufacturing Engineering Department's final evaluation of Arnokrome 4, are presented in a May 4, 1995 memorandum, in which Sensormatic concluded that "Arnokrome IV is not a replacement for existing bias material." (PX 927)

149.   Mid 1995, Sensormatic had to throw away the Arnokrome 4 it had purchased, and pay a cancellation fee to Arnold.  (Patterson, Tr. 2546:4-2547:23; PX 928 ("Arnokrome IV cancellation fee of $105,000"))

150.   Defendants have not proven by clear and convincing evidence that Sensormatic sold labels employing Arnokrome 4 material prior to the critical date.

### 3.   Defendants Have Not Shown That Labels Employing Arnokrome 4 Were "In Public Use" Prior To August 28, 1995

151.   Sensormatic sent some labels using Arnokrome 4 to customers for test purposes. (Patterson, Tr. 2525:12-18)  Defendants contend that this use of Arnokrome 4 constitutes "public use" for purposes of 35 U.S.C. § 102(b).  Sensormatic contends that there is insufficient evidence that any such testing took place before the critical date.  Sensormatic also contends that the testing of Arnokrome 4 labels was experimental, not commercial, and was not therefore an invalidating public use.  As discussed below, Sensormatic also contends that any public use of Arnokrome 4 labels would not be invalidating because defendants failed to prove that such labels embodied the claimed invention.

152.   Mr. Patterson could not identify when these Arnokrome 4 tests took place more specifically than "'94, '95 time frame." (Patterson, Tr. 2550:16-24)  No one else testified concerning these tests.  Defendants have not shown by clear and convincing evidence that the tests took place before the critical date of August 28, 1995.

153.   Sensormatic presented convincing evidence that, even if testing of Arnokrome 4 labels occurred prior to the critical date, and even if those labels embodied the asserted claims, the use was experimental rather than commercial.  Below is an analysis of relevant objective

criteria showing that Sensormatic was engaged in experimentation.

154.     *Necessity for public testing; whether the invention reasonably requires evaluation under actual conditions of use*:  Public testing of the Arnokrome 4 labels was necessary, as was evaluation under actual conditions of use.  Mr. Patterson testified that without testing in customer sites Sensormatic could not know what kind of issues the customer would have.  It was necessary to test whether issues that appeared in the laboratory are really issues in the field. Store clerks who behave one way in the laboratory might behave differently in the actual store, facing a long line of customers, which could affect the performance of the labels.  (Patterson, Tr. 2526:16-2527:1, 2528:8-13)

155.     *Who conducted the experiment; the amount of control over the experiment retained by the inventor; whether the inventor continually monitored the invention during testing:*  Sensormatic conducted and retained control over the experiment with Arnokrome 4 labels.  The Arnokrome 4 test labels were controlled lots.  (Patterson, Tr. 2525:14-15)  While there were thousands of Arnokrome 4 labels, this number is "trivial" in comparison with the hundreds of thousand, millions, or even billions of labels Sensormatic produces when labels are being produced for commercial purposes.  (Patterson, Tr. 2551:15-18, 2568:6-14)  Sensormatic employees placed the labels on products in the retail setting, and monitored how they performed. Sensormatic would bring samples of the labels back to the lab for evaluation.  (Patterson, Tr. 2556:21-2557:9)

156.     *Whether payment was made/ the degree of commercial exploitation during testing*:  Sensormatic was not paid for the Arnokrome 4 labels used in tests, but gave them to the participating customers. (Patterson, Tr. 2525:3-6)  There was no evidence that Sensormatic was in any way commercially exploiting the labels containing Arnokrome 4 bias materials during these tests.

157.     *Whether there was a secrecy obligation*:  When conducting tests on a customer's site Sensormatic typically executed a field test agreement or nondisclosure agreement with the customer.  (Patterson, Tr. 2548:7-10)  To the best of Mr. Patterson's knowledge that practice was

followed with respect to the testing of Arnokrome 4.  (Patterson, Tr. 2570:19-2571:8)

158.    *Whether records of the experiment were kept*:  Mr. Patterson testified that, although he no longer has copies of testing records, records of the testing were kept at the time, and that he saw the results.  (Patterson, Tr. 2557:21-24, 2558:10-18)

159.    *The nature of the contacts made with potential customers:*  Sensormatic's customers were aware of the fact that the Arnokrome 4 labels were experimental, that they were not paying for them, and that there may be problems with them.

160.    These objective criteria establish that Sensormatic's use of labels containing Arnokrome 4 bias material at customer sites before the critical date was an effort to determine whether they would answer the purpose intended.  Sensormatic's use of the labels was truly experimental, rather than commercial.

161.    Defendants have not shown by clear and convincing evidence that labels using Arnokrome 4 bias material were in public use prior to the critical date.

**4.      Defendants Have Not Shown That Labels Employing Arnokrome 4, Even If Sold, Offered For Sale, Or In Public Use Prior To The Critical Date, Embodied Each And Every Element Of Any Of The Asserted Claims**

162.    Even if Defendants had shown that labels with Arnokrome 4 had been sold, offered for sale, or in public use prior to the critical date, Defendants did not prove that those labels embodied each and every element of any of the asserted claims.

163.    Defendants offered some evidence concerning the coercivity of Arnokrome 4 material available in the mid-1990s.  None of the asserted claims concern only labels with low coercivity bias material, and thus such proof cannot establish an on sale or public use bar.

164.    Defendants did not offer clear and convincing evidence that labels allegedly sold or in public use before the critical date exhibited any of the "abrupt" characteristics found in the limitations of the asserted claims of the '200 and '245 patents.

165.    Defendants offered no claim-by-claim analysis comparing the properties of labels sold or in public use by Sensormatic before the critical date to the limitations of the asserted

claims.  Defendants' expert Dr. Fish spoke generally about the law concerning the on sale bar in the context of inequitable conduct.  But he did not identify any on sale bar analysis in his expert reports.  (Fish, Tr. 2230:9-15).  He did not offer any analysis of whether products allegedly sold or in public use before the critical date met the limitations of any asserted claims.  (Fish, Tr. 2040:3-24, 2042:10-19, 2044:16-2045:1, 2052:25-2053:8, 2064:9-10)  Similarly, while Ms. Bulson testified concerning alleged sales of labels using Arnokrome 4, she offered no testimony as to the properties of the labels or that bias material, or whether they met the limitations of the asserted claims.

166.    The evidence showed that Arnokrome 4 in the mid-1990s did *not* exhibit abrupt characteristics.  For instance, as discussed above, in May of 1996, Dr. Copeland experimented with Arnokrome 4 to determine whether it could be used as the bias element in a low energy, abrupt bias marker.  He concluded it could not because it was "too gradual."  (DX 145, p. 2, May 20, 1996 memo from Copeland to Manning saying the Arnokrome 4S samples were "too gradual"; Copeland, Tr. 1484:19-25, Arnokrome 4 was not saturated until 500 Oe, which makes it a gradual material; Copeland, Tr. 1485:11-21, Arnokrome 4 did not remain saturated in low fields and then fall off rapidly, as abrupt material would)

167.    Defendants point to the markers made for this litigation under Dr. Fish's supervision, which contain Arnokrome 4, as evidence of the properties of Arnokrome 4.  As discussed above, Arnokrome 4 has variable magnetic properties that depend on its processing.  Moreover, Arnold changed the magnetic properties of Arnokrome 4 that it sold to Phenix over time by varying the physical characteristics and heat treatments of the material.

168.    One cannot therefore derive the properties of Arnokrome 4 purchased by Sensormatic in the mid-1990s from the properties of Arnokrome 4 used by Dr. Fish in 2006.

169.    Documents concerning Defendants' use of Arnokrome 4 show the claimed abrupt properties are not necessarily found in Arnokrome 4, and are difficult at best to obtain in that material.  Defendants and Arnold struggled in 2006 to develop a version of Arnokrome 4 that defendants could contend met the limitations of the asserted claims.  (*See, e.g.,* PX 41, Feb. 27,

33

2004 email from Hansen to Manning asking if Arnold could create Arnokrome 4 with abrupt properties of Figure 5 of the '200 patent; PX 17, March 2, 2006 Arnold email to Phenix stating "we are taking this material to a level that it has never been to before"; PX 547, April 4, 2006 Phenix email to Krom stating Arnold is "going to change a process which should yield a similar de-activation loop of AK5"; PX 179, June 8, 2006 Arnold email to Phenix stating "loop has been squared up since the first attempt").

170.   Defendants have not shown by clear and convincing evidence that labels employing Arnokrome 4, even if on sale or in public use prior to August 28, 1995, embodied each and every limitation of any of the asserted claims.

### 5.   Defendants Have Not Shown That Sensormatic Sold Labels Employing Low Coercivity SemiVac 90 Prior To August 28, 1995

171.   Defendants next contend that Sensormatic sold labels before the critical date that used SemiVac 90 bias material and that embodied the asserted claims of the '200 and '245 patents.

172.   Sensormatic does not dispute that it sold labels with SemiVac 90 bias material, but contends those labels contained high coercivity SemiVac 90.  Sensormatic contends that Defendants have failed to prove by clear and convincing evidence that Sensormatic sold labels containing low coercivity (less than 55 Oe) SemiVac 90 prior to the critical date.

173.   As discussed above, Sensormatic required a final specification before a bias material could be used in labels to be sold to Sensormatic customers.  (Patterson, Tr. 2523:1-4; Copeland, Tr. 1379:19-20)  The final specification for SemiVac 90 bias material was dated February 20, 1995, before the August 28, 1995 critical date.  (PX 929)  But that specification required high coercivity SemiVac 90 – in the range of 60 to 100 Oe, not less than 55 Oe as required by certain claims of the '200 and '245 patents.  (PX 929 p. 2)  Thus, SemiVac 90 that was approved and sold before the critical date would have been high coercivity SemiVac 90.

174.   The SemiVac 90 actually used in markers had coercivity consistent with the specified range of 60 to 100 Oe.  (Copeland, Tr. 1462:4-10; *see also* PX 786, col. 2:14-18, labels

34

typically had coercivities in the range of 70 to 80 Oe)

175.    Defendants rely on documents from the spring of 1994 showing coercivity values for SemiVac 90 less than 55 Oe.  These documents concern SemiVac 90 that was in testing and evaluation, but had not been approved for use in labels to be sold.

176.    For example, DX 250 at page 4 indicates that in March of 1994, 50 Oe SemiVac 90 was "issued to production."  As discussed above, however, "issued to production" at Sensormatic meant only that material was sent for production *testing,* not produced for sale to customers.  (Copeland, Tr. 1366:21-1367:10)  In fact, the first page of DX 250 explains that SemiVac 90 was "tested in Incoming Inspection and a trial production was conducted.  The results are described below."  (DX 250)

177.    Similarly, in April of 1994 Sensormatic's preliminary specification for SemiVac 90 called for coercivities between 40 and 100 Oe.  (DX 247)  But the same exhibit made clear that further testing was required before Sensormatic would issue a final specification.  *Id.* ("Sensormatic will issue a final specification only after completing this evaluation.")  Materials shipped pursuant to this specification were used for evaluation.  (Copeland, Tr. 1466:1-8)

178.    Although these documents indicate that some SemiVac 90 in 1994 may have had coercivity less than 55 Oe, they do not show that Sensormatic sold labels with that lower coercivity SemiVac 90.

179.    Sensormatic's testing of SemiVac 90 was not complete, and SemiVac 90 was not released for use in AM labels, until January 1995.  (PX 933, Jan. 24, 1995 email from Bob DiMarzio: "SemiVac can be released for use.")  The first specification for SemiVac 90 after it was released for use required 60 to 100 Oe coercivity.  (PX 929, p. 2 (Feb. 20, 1995 first commercial SemiVac 90 specification shows 60-100 Oe; Copeland Tr. 1361:22-1362:9)

180.    Defendants have not shown by clear and convincing evidence that labels containing SemiVac 90 having coercivities less than 55 Oe were sold or offered for sale prior to August 28, 1995.

6.      **Defendants Have Not Shown That Labels Employing Low Coercivity
SemiVac 90, Even If Sold, Offered For Sale, Or In Public Use Prior
To The Critical Date, Embodied Each And Every Element Of Any Of
The Asserted Claims**

181.    Defendants have offered no evidence that the labels allegedly sold by Sensormatic

with low coercivity SemiVac 90 embodied each and every element of any of the asserted claims.

182.     Defendants offered no claim by claim analysis of whether labels allegedly sold

with SemiVac 90 bias material before the critical date met all the limitations of any asserted

claims.

183.    In fact the evidence of record shows that SemiVac 90 did not exhibit the abrupt

characteristics of the asserted claims.  (PX 382 p. 1, Feb. 28, 1996 memo from Coffey to

Patterson saying current SemiVac 90 does not meet new abrupt bias specifications; Coffey, Tr.

390:12-15, Dr. Coffey and his colleagues knew SemiVac 90 did not exhibit abrupt magnetization

changes because they measured it.)

184.    In fact, Figure 2 of the '200 patent, labeled "Prior Art," depicts actual data from a

marker utilizing SemiVac 90 as the bias material.  Figure 2 shows that SemiVac 90 has a

demagnetization curve that is not abrupt.  (PX 786, Copeland, Tr. 1468:23-1469:10)  SemiVac

90 was a gradual, not an abrupt, material.  (Copeland, Tr. 1470:9-10)

185.    Defendants have not shown by clear and convincing evidence that labels

employing SemiVac 90, even if sold prior to August 28, 1995, embodied each and every

limitation of any of the asserted claims.

7.      **Defendants Have Not Shown That Sensormatic Sold, Offered For
Sale, Or Publicly Used Labels Prior To August 28, 1995 That
Employed TCA Bias Material That Embodied Each And Every
Element Of Any Of The Asserted Claims**

186.    Defendants next contend that Sensormatic sold labels before the critical date that

used Metglas 2605 TCA ("TCA") bias material that embodied the asserted claims of the '200

and '245 patents.

187.    Sensormatic admits that prior to August 24, 1995 it sold AM EAS labels utilizing

36

one form of "TCA 2605," where that term was defined as "any or all of the alloys variously denominated in product sales information as Metglas TCA, 2605 TCA, 2605 STCA, 2605 SB1, 2605 S2 or other like re-chrystallized iron-boron-silicon based amorphous metal alloy, sold by the Metglas Products business unit of Allied Signal, Inc."  (PX 961 p. 3 (definition); DX 367 p. 4 (admission))

188.    Sensormatic also admits that "an AM EAS marker containing the form of Metglas TCA 2605 disclosed in the '200 patent, when coupled with the resonator material disclosed in the '200 patent, satisfies all limitations of claim 1 of the '200 patent, as depicted in Figure 7 of the '200 patent."  (DX 367 p. 5, Admission 5)

189.    These admissions taken together do not amount to an admission that TCA embodying the asserted claims was on sale before the critical date.  The definition of "TCA 2605" in defendants' requests for admission is broad and covers many different materials.  The TCA 2605 that Sensormatic admits to selling (Admission 4) need not be the same TCA 2605 that Sensormatic admits satisfies the limitations of claim 1 (Admission 5).  The TCA 2605 that Sensormatic refers to in Admission 5 is that depicted in the '200 patent, namely SB1.  Even defendants did not contend that labels containing SB1 were ever sold.

190.    In any event, it is irrelevant with certain markers were sold that met the limitations of claim 1, because claim 1 is not an asserted claim.

191.    Sensormatic denies that the labels it sold containing TCA bias material met the claim limitations concerning either low coercivity or abrupt characteristics.

192.    Defendants failed to put forth a claim by claim analysis showing that any labels containing TCA met each limitation of each (or of any) claim.

193.    As is discussed above, Sensormatic required a final specification before a bias material could be used in labels to be sold.  The only specification for TCA bias material was for higher coercivities of 65 +/- 15 Oe.  (DX 274)  Dr. Copeland testified that he would have expected the actual range of coercivities of the TCA to be centered on 65, and tighter than the range specified.  (Copeland, Tr. 1495:4-9)

37

194.    Defendants rely on the testimony of defendant Mr. Dennis Gadonniex to establish that Sensormatic sold labels containing TCA with coercivity below 55 Oe.  Mr. Gadonniex admitted that the specification required TCA bias material to have a coercivity of 65 +/- 15 Oe.  (Gadonniex, Tr. 1601:24-1602:2)  He testified, however, that in 1994 the coercivities of TCA bias material were "all over the place. . . . between 30 and 80."  (Gadonniex, Tr. 1614:1-4)

195.    Defendants attempt to corroborate Mr. Gadonniex's testimony with PX 700, a document purportedly showing coercivity values for TCA.  PX 700 cannot establish the coercivity of any TCA bias materials included in labels sold before August 28, 1995, because it is undated, and Mr. Gadonniex testified he had no way of dating the document.  (PX 700; Gadonniex, Tr. 1804:7-9)

196.    Mr. Gadonniex testified that the purpose of the testing he did of TCA bias materials was to ensure compliance with specifications.  (Gadonniex, Tr. 1803:17-19)  He also admitted that all but 17 of the 75 samples reflected in PX 700 were out of specification.  (Gadonniex, Tr. 1804:19-1805:5)  His testimony that the material was used in labels sold to customers, despite the fact that the overwhelming majority of that material was out of specification, is not credible.

197.    Dated documentary evidence from before the critical date indicates that the coercivity of TCA bias materials tested was above 55 Oe, rather than below 55 Oe as required by certain claims of the '200 and '245 patents.  (PX 521H at TAG-0000525, "Average values of remnant flux and coercivity are 41 maxwells and 60 Oe, respectively")

198.    For the reasons discussed below, the Court finds that Mr. Gadonniex's testimony concerning the coercivity of TCA bias materials in labels sold to Sensormatic customers before the critical date, uncorroborated by dated documents, lacks credibility and is not reliable.

199.    Even if Sensormatic had sold labels containing TCA with coercivity below 55 Oe before the critical date, defendants have not shown that such labels would have embodied all of the limitations of the any of the asserted claims.  None of the asserted claims claim only the coercivity of the bias material.

38

200.     With respect to the "abruptness" limitations of the asserted claims, Mr. Gadonniex's testimony is the sole basis for defendants' contention that labels containing TCA bias met any of the limitations before the critical date.  (Closing, Tr. 2763:16-18, Defense counsel states "Mr. Gadonniex is the only witness on either side that presented any . . . testimony" concerning whether TCA bias material read on all of the claims; Tr. 2763:19-22, TCA on sale bar argument "stands and falls" on whether Mr. Gadonniex has spoken to the issue, and his credibility)

201.     Mr. Gadonniex's testimony concerning the "abruptness" of labels was that he monitored the TCA production line and was looking at "basically the abruptness of the material as related to deactivation."  (Gadonniex, Tr. 1615:15:-17, 1616:18-21)  He claimed the tests were the same kind of AC and DC demagnetization tests as in the '200 patent.  (Gadonniex, Tr. 1617:22-1618:2)

202.     This testimony is insufficient to establish that TCA labels sold before the critical date met the limitations of the asserted claims.  The asserted claims do not require merely some general "abruptness," but instead specify particular characteristics that labels or bias materials must have.

203.     Mr. Gadonniex did not testify that labels containing TCA met the following limitations concerning saturation:

"wherein said biasing element is formed of a semi-hard magnetic material having a DC magnetization field characteristic such that a DC magnetic field Ha required to achieve saturation of said biasing element is less than 350 Oe" (PX 786, '200 Patent claim 10; PX 816 p. 3 ('200 Patent *Ex Parte* Reexamination Certificate col. 2:13-29); PX 788, '245 Patent claim 7)

"wherein said DC magnetization field characteristic is such that said DC magnetic field Ha required to achieve saturation of said biasing element is less than 200 Oe." (PX 786, '200 Patent claim 11; PX 788, '245 Patent claim 9)

204.     Mr. Gadonniex offered no evidence that the labels containing TCA met the following limitations concerning low field stability:

"wherein said biasing element has an AC demagnetization field characteristic such that when said biasing element is in a fully magnetized condition and is exposed to an AC field Hms having a peak amplitude of 4 Oe, said biasing element remains

39

magnetized at a level that is at least 95% of a full magnetization level" (PX 786, '200 patent claims 5, 10, 15, 26; PX 788, '245 patent claim 8)

"wherein said AC demagnetization field characteristic of said biasing element is such that when said biasing element is in a fully magnetized condition and is exposed to an AC field Hms having a peak amplitude of 12 Oe, said biasing element remains magnetized at a level that is at least 95% of a full magnetization level." (PX 786, '200 patent claim 18)

"said marker has a resonance characteristic that is substantially unchanged when said marker is exposed to an AC field having a peak amplitude of 4 Oe or less." (PX 786, '200 patent claim 43; PX 788, '245 patent claim 14)

"said marker has a resonance characteristic that is substantially unchanged when said marker is exposed to an AC field having a peak amplitude of 12 Oe or less." (PX 788, '245 patent claim 17)

"said marker has a resonance characteristic that is substantially unchanged when said marker is exposed to an AC field having a peak amplitude of 20 Oe or less." (PX 788, '245 patent claim 15)

205.   Mr. Gadonniex did not testify that labels containing TCA met the following limitations concerning demagnetization:

"wherein said biasing element is formed of a semi-hard magnetic material having an AC demagnetization field characteristic such that an AC demagnetization field Hmd having a peak amplitude of less than 150 Oe, when applied to said biasing element with said biasing element being in a fully magnetized condition, demagnetizes said biasing element to a level that is no more than 5% of a full magnetization level." (PX 786, '200 patent claim 14; PX 788, '245 patent claim 7)

"wherein said AC demagnetization field characteristic of said biasing element is such that an AC demagnetization field Hmd having a peak amplitude of less than 100 Oe, when applied to said biasing element with said biasing element being in a fully magnetized condition, demagnetizes said biasing element to a level that is no more than 5% of a full magnetization level." (PX 786, '200 patent claim 17)

wherein said AC demagnetization field characteristic of said biasing element is such that an AC demagnetization field Hmd having a peak amplitude of less than 30 Oe, when applied to said biasing element with said biasing element being in a fully magnetized condition, demagnetizes said biasing element to a level that is no more than 5% of a full magnetization level" (PX 786, '200 patent claim 19)

206.   Mr. Gadonniex did not testify that labels containing TCA met the following limitation concerning target resonant frequency shift:

"said marker has a deactivation-field-dependent resonant-frequency-shift characteristic such that exposing said marker to an AC deactivation field having a peak amplitude no higher than 50 Oe shifts the resonant frequency of said marker from said target resonant frequency by at least 1.5 kHz" (PX 786, '200 patent claim 20)

207.    Mr. Gadonniex did not testify that labels containing TCA met the following limitations concerning A1 output signal reduction:

> "wherein said marker has a deactivation-field-dependent output signal characteristic such that exposing said marker to an AC deactivation field having a peak amplitude no stronger than 35 Oe causes an A1 output signal generated by said marker to be reduced in level by at least 50% relative to an A1 output signal generated by said marker prior to exposing said marker to said deactivation field (where an A1 output signal is a signal generated by the marker at a point in time 1 msec after termination of an interrogation signal pulse applied to the marker)" (PX 786, '200 patent claim 25)

> "wherein said deactivation-field-dependent output signal characteristic of said marker is such that exposing said marker to an AC deactivation field having a peak amplitude no higher than 25 Oe causes an A1 output signal generated by said marker to be reduced in level by at least 50% relative to an A1 output signal generated by said marker prior to exposing said marker to said deactivation field." (PX 786, '200 patent claim 27)

> "wherein said deactivation-field-dependent output signal characteristic of said marker is such that exposing said marker to an AC deactivation field having a peak amplitude no higher than 30 Oe causes an A1 output signal generated by said marker to be reduced in level by at least 75% relative to an A1 output signal generated by said marker prior to exposing said marker to said deactivation field." (PX 786, '200 patent claim 28)

208.    Mr. Gadonniex did not testify that labels containing TCA met the following limitations concerning marker deactivation:

> "deactivating said EAS marker by exposing said marker to an AC field having a peak amplitude of less than 150 Oe" (PX 786, '200 patent claim 37; PX 788, '245 patent claim 13)

> "said deactivating step is accomplished by exposing said marker to an AC field having a peak amplitude of less than 100 Oe." (PX 788, '245 patent claim 16)

> "said deactivating step is accomplished by exposing said marker to an AC field having a peak amplitude of less than 30 Oe." (PX 786, '200 patent claim 42)

209.    Mr. Gadonniex conceded that he had no data concerning any properties of TCA other than coercivity.  (Gadonniex, Tr. 1813:7-1814:2, 1814:3-16)

210.    Mr. Gadonniex's testimony therefore failed to address at least one limitation of each of claims 6, 10, 11, 18, 19, 20, 27, 28 and 43 of the '200 patent, and claims 7, 9, 14, 15, and 17 of the '245 patent.  Because Defendants concede that their on sale bar defense related to TCA labels stands and falls on Mr. Gadonniex's testimony, Defendants have failed to prove by clear

and convincing evidence that labels containing TCA bias material before the critical date met the limitations of these claims.

211.    The only testimony by Mr. Gadonniex relating to a particular abruptness limitation was the requirement that the label have a "deactivation-field-dependent resonant-frequency-shift characteristic having a slope that exceeds" 100 Hz/Oe or 200 Hz/Oe.  Among the asserted claims, that limitation is found only in '200 patent claim 2, and '245 patent claims 1, 2, and 4.

212.    The extent of Mr. Gadonniex's testimony with respect to these claims was as follows:

> A.    For some TCA that was around 30 oersteds.  We were probably getting over 100 hertz per oersted change.
>
> Q.    In terms of abruptness?
>
> A.    In terms of abruptness, sometimes 200.
>
> Q.    And how about the TCA labels with coercivity of, say, 40?
>
> A.    Probably about a hundred.  About a hundred.

(Gadonniex, Tr. 1620:13-19)

213.    Again, Mr. Gadonniex's assertions were not backed by data.  Figure 3 of the patents depicts the slope of the deactivation-field-dependent resonant-frequency-shift characteristic.  (PX 786; PX 788)  Mr. Gadonniex admitted that he had not shown "any data resembling figure three of the patent for TCA data -- for TCA bias strips for '94, 1995," "[o]r for labels using TCA bias strips."  (Gadonniex, Tr. 1813:7-1814:2)

214.    Even if the Court were to credit Mr. Gadonniex's testimony, a bare statement of what the slope "probably" was does not constitute clear and convincing evidence that the slope and coercivity limitations of '200 patent claim 2 or '245 patent claims 1, 2, and 4 were in fact met by labels using TCA bias before the critical date.

215.    In any event, the Court finds that Mr. Gadonniex's testimony was not credible or reliable.  Cross examination revealed that many of Mr. Gadonniex's statements on direct

42

examination were inaccurate, false, or directly contradicted by his deposition testimony.

216.    For example, Mr. Gadonniex testified on direct examination that he had made two backup tapes at Sensormatic, one in 1994 and one in 1995, and that he had used the earlier tape to perform work for TAG.  (Gadonniex, Tr. 1692:2-9)  Mr. Gadonniex first admitted that he had been incorrect about which tape he had used.  (Tr. 1713:23-1714:4).  On cross examination, he continued to insist that he was "sure" that he had made the tapes in 1994 and 1995.  (Gadonniex, Tr. 1714:24-1715:1)  But on the next page of testimony Mr. Gadonniex admitted that he could not remember whether the tapes had in fact been made in 1994 and 1995.  (Gadonniex, Tr. 1715:25-1716:7)  When he was shown that the tapes were dated 1995 and 1996, Mr. Gadonniex admitted "that is why we write things down."  (Gadonniex, Tr. 1717:21-22)

217.    On direct examination, Mr. Gadonniex testified that he had forwarded to TAG's Ms. Bulson "less than one percent" of the material on his backup tape.  (Gadonniex, Tr. 1672:6-12)  On cross examination, Mr. Gadonniex was impeached with his deposition testimony that he had sent Ms. Bulson "a copy of the first tape."  (Gadonniex, Tr. 1744:18-1745:7)

218.    On direct examination, Mr. Gadonniex told the Court that before he handed material from the backup tape over to TAG, he reviewed the material to decide which might be considered proprietary.  (Gadonniex, Tr. 1673:25-1674:6)  But on cross examination, he admitted that he had in fact done no such review until after the lawsuit was filed, long after he turned over the material to TAG.  (Gadonniex, Tr. 1743:13-18)

219.    On direct examination, Mr. Gadonniex testified that he had personal knowledge about each of the entries on a timeline he had created, and on which defendants rely in support of their on sale bar defense.  (PX 521G at TAG-0000494; Gadonniex, Tr. 1685:5-1685:7)  For example, Mr. Gadonniex testified that he himself had taken the measurements shown in the second entry on the timeline.  (Gadonniex, Tr. 1685:10-19).  He later confirmed under oath that he had personal knowledge concerning the labels described in that entry.  (Gadonniex, Tr. 1687:3-7)

220.    But then Mr. Gadonniex realized that this testimony he had given under oath was

43

impossible, because he had not even started working at Sensormatic at the time those measurements had been made.  (Gadonniex, Tr. 1688:14-23, 1808:8-23)

221.   Even after realizing this error concerning the first two entries on the timeline, Mr. Gadonniex continued to insist he had personally taken the measurements in the third entry, which concerned TCA coercivities.  (Gadonniex Tr. 1687:20-1688:1, 1689:1-3, 1810:11-14)  On cross examination Mr. Gadonniex was confronted with the fact that the measurements in the third entry had been made the first day that Mr. Gadonniex started work at Sensormatic, and at the time he had no experience at all with acousto-magnetic label technology.  Mr. Gadonniex conceded he might also have misremembered having personal knowledge of those data, too.  (Gadonniex, Tr. 1810:15-1811:22; *n.b.* "misremembered" is transcribed as "misread")

222.   As mentioned above, Defendants concede that the TCA on sale bar defense "stands and falls" on Mr. Gadonniex's credibility.  (Closing, Tr. 2763:19-22)  In addition to defendants' failure of proof described above, the TCA on sale bar defense fails because Mr. Gadonniex's testimony lacked credibility.

223.   Defendants have not shown by clear and convincing evidence that labels employing TCA, even if sold prior to August 28, 1995, embodied each and every limitation of any of the asserted claims.

### 8.   Claim-By-Claim Findings

224.   Defendants have failed to show by clear and convincing evidence that a label exhibiting each and every limitation of any of asserted Claims 2, 6, 10, 11, 18, 19, 20, 27, 28 and 43 of the '200 patent or of asserted Claims 1, 2, 4, 7, 9, 14, 15 and 17 of the '245 patent was in public use or on sale in this country more than one year prior to August 28, 1996.

### C.   Conclusions Of Law

225.   Defendants have not carried the burden of demonstrating by clear and convincing evidence that labels embodying each and every limitation of any of the asserted claims of the '200 and '245 patents were on sale or in public use prior to the critical date of August 28, 1995.  Indeed, Defendants have failed even to offer a claim-by-claim analysis in support of their on-sale

bar allegations.

## VIII.   Obviousness

### A.   Legal Principles Governing Obviousness Analysis

226.    A claim is invalid if the subject matter of the claimed invention "as a whole would have been obvious at the time the invention was made to a person of ordinary skill in the art to which said subject matter pertains."  35 U.S.C. § 103(a).

227.    "[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art. . . . [I]nventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known."  *KSR Int'l Co. v. Teleflex Inc.*, 127 S.Ct. 1727, 1741 (2007).  Even after *KSR*, the Federal Circuit has warned that courts "must still be careful not to allow hindsight reconstruction of references to reach the claimed invention without any explanation as to how or why the references would be combined to produce the claimed invention."  *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1374 n.3 (Fed. Cir. 2008).

228.    Obviousness is a question of law, based on underlying factual findings that must be proven by clear and convincing evidence.  *Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 767 (Fed. Cir. 1988).

229.    "The factual determinations underpinning the legal conclusion of obviousness include:  1) the scope and content of the prior art; 2) the level of ordinary skill in the art; 3) the differences between the claimed invention and the prior art, and 4) evidence of secondary factors, also known as objective indicia of non-obviousness."  *Eisai Co. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353, 1356 (Fed. Cir. 2008).

230.    As with other invalidity issues, obviousness must be examined on a claim-by-claim basis.  *See Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1370 (Fed. Cir. 2003) ("Th[e] grouping of claims is contrary to law, which requires that 'each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid

45

independently of the validity of other claims; . . . .'"); *Shelcore, Inc. v. Durham Indus., Inc.*, 745 F.2d 621, 625 (Fed. Cir. 1984) ("[A] party challenging the validity of a claim, absent a pretrial agreement or stipulation, must submit evidence supporting a conclusion of invalidity of *each* claim the challenger seeks to destroy.") (emphasis in original).

### 1.    Scope And Content Of The Art

231.    A reference is not prior art where it is dated after the earlier date of invention of the asserted claims.  "To antedate (or establish priority) of an invention, a party must show either an earlier reduction to practice, or an earlier conception followed by a diligent reduction to practice." *Purdue Pharma L.P. v. Boehringer Ingelheim Gmbh*, 237 F.3d 1359, 1365 (Fed. Cir. 2001).  "Where a party seeks to show conception through oral testimony of an inventor, it must produce independent evidence corroborating that testimony."  *Id.*

232.    In addition, obviousness under 35 U.S.C. § 103 cannot be based upon properties that are merely inherent in a prior art patent unless there is evidence that persons of ordinary skill in the art knew of these inherent properties.  "'That which may be inherent is not necessarily known.  Obviousness cannot be predicated on what is unknown.'  Such a retrospective view of inherency is not a substitute for some teaching or suggestion supporting an obviousness rejection." *In re Rijckaert*, 9 F.3d 1531, 1534 (Fed. Cir. 1993) (citations omitted).  *See* MPEP § 2141.02 ("Obviousness cannot be predicated on what is not known at the time an invention is made, even if the inherency of a certain feature is later established.")

### 2.    "Obvious To Try"

233.    In *KSR*, the Supreme Court explained that "[w]hen there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp.  If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense.  In that instance the fact that a combination was obvious to try might show that it was obvious under § 103."  *KSR Int'l Co. v. Teleflex Inc.*, 127 S.Ct. 1727, 1742 (2007).

46

234.     However, Federal Circuit opinions following *KSR* have emphasized that the discussion of "obvious to try" in KSR is limited by its very language to situations where there are a "finite number of identified, predictable solutions."  In *Ortho-McNeil Pharmaceutical, Inc. v. Mylan Laboratories, Inc.,* 520 F.3d 1358, 1364 (Fed. Cir. 2008), the Federal Circuit stated: "*KSR* posits a situation with a finite, and in the context of the art, *small or easily traversed, number of options* that would convince an ordinarily skilled artisan of obviousness.  (emphasis added).

235.     In *Takeda Chem. Indus. v. Alphapharm Pty., Ltd.,* 492 F.3d 1350, 1359 (Fed. Cir. 2007), *cert. denied,* 128 S.Ct. 1739 (2008), the Federal Circuit rejected application of the "obvious to try" standard:

> The *KSR* Court recognized that "[w]hen there is a design need or market pressure to solve a problem and there are a *finite number of identified, predictable solutions*, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp." *KSR*, 127 S.Ct. at 1732.  In such circumstances, "the fact that a combination was obvious to try might show that it was obvious under § 103." *Id.* That is not the case here. *Rather than identify predictable solutions* for antidiabetic treatment, the *prior art disclosed a broad selection* of compounds any one of which could have been selected as a lead compound for further investigation.  Significantly, the closest prior art compound (compound b, the 6-methyl) exhibited negative properties that would have directed one of ordinary skill in the art away from that compound.  Thus, this case fails to present the type of situation contemplated by the Court when it stated that an invention may be deemed obvious if it was "obvious to try."  The evidence showed that it was not obvious to try.

236.     Recently, in *Abbott Laboratories v. Sandoz, Inc.*, No. 2007-1300, 2008 U.S. App. LEXIS 21880, at *28-29 (Fed. Cir. Oct. 21, 2008), the Federal Circuit explained that "[t]he Court in *KSR* did not create a presumption that all experimentation in fields where there is already a background of useful knowledge is 'obvious to try,' without considering the nature of the science or technology.  The methodology of science and the advance of technology are founded on the investigator's educated application of what is known, to intelligent exploration of what is not known.  Each case must be decided in its particular context, including the characteristics of the science or technology, its state of advance, the nature of the known choices, the specificity or generality of the prior art, and the predictability of results in the area of interest."

47

### 3.      Secondary Considerations Or Objective Indicia Of Non-Obviousness

237.    Secondary considerations or objective indicia of non-obviousness include, among

other things, "commercial success, long-felt but unresolved need, failure of others, copying and

unexpected results." *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 662-63 (Fed. Cir. 2000) (citing

*Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966)).

238.    "Evidence of secondary considerations may often be the most probative and

cogent evidence in the record.  It may often establish that an invention appearing to have been

obvious in light of the prior art was not." *Ruiz*, 234 F.3d at 667 (citation omitted).  Objective

indicia of non-obviousness is "not just a cumulative or confirmatory part of the obviousness

calculus but constitutes independent evidence of nonobviousness." *Ortho-McNeil*

*Pharmaceutical, Inc. v. Mylan Laboratories, Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008).

239.    Evidence of secondary considerations "should when present always be considered

as an integral part of the analysis." *W.L. Gore & Assocs. v. Garlock, Inc.*, 721 F.2d 1540, 1555

(Fed. Cir. 1983).  "'[A] nexus between the merits of the claimed invention and evidence of

secondary considerations is required in order for the evidence to be given substantial weight in

an obviousness decision.'" *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1327 (Fed. Cir.

2008) (citations omitted).

240.    The satisfaction of a long-felt need in an industry by an invention where others

have tried and failed to solve that need is a strong indication of non-obviousness.  "Our case law

supports [the] view that such evidence of failed attempts by others could be determinative on the

issue of obviousness.  For example, in *Alco Standard Corp. v. Tennessee Valley Authority* [808

F.2d 1490, 1500-01 (Fed. Cir. 1986)], this court held that when evidence in the record fully

supports a finding that others in the industry failed to solve the problem, then objective

considerations 'may ... establish that an invention appearing to have been obvious in light of the

prior art was not.'" *Advanced Display Systems, Inc. v. Kent State University,* 212 F.3d 1272,

1285 (Fed. Cir. 2000).  "That many others, including Dennison, had tried for years and failed to

create a superior cable tie is virtually irrefutable evidence that the superior tie of the patents in

48

suit would not have been obvious to those skilled in the art when it was invented." *Panduit Corp.*

*v. Dennison Mfg. Co.,* 774 F.2d 1082, 1099 (Fed. Cir. 1985).

241.    Another indicium of non-obviousness is commercial success resulting from the invention.  "The human, real world story in evidence here not only reflects the inadequacy of the prior art, but compels a conclusion of nonobviousness of the claimed inventions in suit.  As above indicated, the cable tie of the patents in suit was an outstanding commercial success, selling at over $50 million a year by 1984 and becoming, early on, the unquestioned leading tie on the market." *Panduit Corp. v. Dennison Mfg. Co.,* 774 F.2d at 1099.

242.    Another indicium of non-obviousness is that someone copied the invention. "Copying is an indicium of nonobviousness, and is to be given proper weight.  *Windsurfing Int'l, Inc. v. AMF, Inc.,* 782 F.2d 995, 1000 (Fed. Cir. 1986) … ('the district court correctly noted that copying the claimed invention, rather than one within the public domain, is indicative of non-obviousness.')."  *Diversitech Corp. v. Century Steps, Inc.,* 850 F.2d 675, 679 (Fed. Cir. 1988) (citation omitted).

243.    Finally, licensing of the invention by others is an indicium of non-obviousness because it is a recognition of the validity of the invention. *See B&H Mfg. v. Foster-Forbes Glass Co.*, 26 U.S.P.Q. 2d 1066 (N.D. Ind. 1993) ("the licensing agreements are objective evidence that the patents were non-obvious.")

### 4.    Effect Of Re-examination

244.    "When the party asserting invalidity relies on references that were considered during examination or Re-examination, that party 'bears the added burden of overcoming the deference that is due to a qualified government agency presumed to have done its job.'" *Pharmastem Therapeutics, Inc. v. Viacell, Inc.,* 491 F.3d 1342, 1366 (Fed. Cir. 2007), *cert. denied,* 128 S.Ct. 1655 (2008) (citation omitted)

245.    Meeting the burden of "showing, by clear and convincing evidence, the invalidity of the claims" is "especially difficult when the prior art was before the PTO examiner during prosecution of the application." *Hewlett-Packard Co. v. Bausch & Lomb,* 909 F.2d 1464, 1467

(Fed. Cir. 1990) (citations omitted)

**B.**     **Findings Of Fact**

**1.**     **PTO Findings In Re-examination**

246.     In the requests for re-examination of the '200 and '245 patents, Defendant Phenix argued to the PTO that the claims of the '200 and '245 patents were obvious under Section 103. (PX 922, Dec. 7, 2005 Request for Re-examination pp. 5-6; PX 923, Dec. 12, 2005 Request for Re-examination at pp. 5-6; Fish, Tr. 2109:1-4, 2151:3-7)

247.     Ultimately, the obviousness arguments were rejected as to all 18 of the asserted claims in this lawsuit.  (*See* Fish, Tr. 2109:5-14; PX 815; PX 816)

248.     Out of the 18 asserted claims in this lawsuit, 17 of those claims withstood re-examination without any changes.  One claim -- claim 10 of the '200 patent -- was amended, but not due to any obviousness challenge.  (PX 815; PX 816)

249.     During the course of the re-examinations, there were a number of office actions. (PX 922; PX 923)  The Notice of Intent to Issue an Ex Parte Re-examination Certificate was filed on June 4, 2007 in the '200 Re-examination and on July 20, 2007 in the '245 Re-examination.  (*Id.*)  Dr. Fish agreed that "[u]p until June and July, 2007, [the] PTO was substantively considering the re-examination issues."  (Fish, Tr. 2154:15-17)

250.     The *KSR* opinion was issued by the Supreme Court on April 30, 2007 – while the PTO was still "substantively considering" the patents in the re-examination.  *KSR Int'l Co. v. Teleflex Inc.*, 127 S.Ct. 1727, 1741 (2007).  Dr. Fish acknowledges that the PTO examiners "undoubtedly were aware" of the *KSR* opinion.  (Fish, Tr. 2155:5)

251.     The Deputy Commissioner of the PTO issued a memorandum to examiners a few days after the *KSR* opinion concerning points to be "noted" from *KSR* until guidance was issued. (Fish, Tr. 2155:8-2156:25)  On October 10, 2007, the PTO issued the formal guidelines to the examiners.  (Federal Register, Vol. 72, No. 195, Oct. 10, 2007, Notices 57529; Fish, Tr. 1945:17-1946:5; *see* Sensormatic Dem. 72)

252.     In the end, Dr. Fish acknowledged that he could not "testify what examiners in

50

the PTO did." (Fish, Tr. 2152:6)  Thus, Defendants have not shown that the examiners in the re-examination did not consider *KSR* in connection with the obviousness arguments in the re-examination.

### 2.     Person Of Ordinary Skill In The Art At The Time Of Filing

253.     The Court finds that a person of ordinary skill in the relevant art at the time of the filing of the '200 patent: 1) had at least a master's degree and several years' experience in magnetic materials, measurements, and electronic article surveillance system design; 2) had a doctoral degree with knowledge of magnetic materials, measurements, and electronic article surveillance system design; or 3) been a patent professional with at least ten years' experience in drafting, prosecuting, and analyzing patents in the magnetic materials and electronic article surveillance system arts.  (Fish, Tr. 1861:1-15)  The masters or doctoral degrees would be in at least one of the fields of physics, electrical engineering, metallurgy, or materials science.  (*Id.*)

### 3.     Scope And Content Of The Prior Art

254.     Dr. Fish's claim-by-claim analysis on obviousness of the asserted claims was based upon the alleged inherent properties of the Manning '399 and '824 patents.  (Fish, Tr. 2026:10-2027:8)  In addition, Dr. Fish made general reference to the '033 patent and the MagneDur datasheet.  (Fish, Tr. 2027:9-20)  Dr. Fish also referred to a graph from the Bozorth text. (Fish, Tr. 1897:9-1901:5)

255.     Dr. Fish did not give any claim-by-claim testimony that the asserted claims were obvious in light of the '033 patent, Magne-Dur datasheet or the Bozorth text.

#### a)     The '033 Patent

256.     The '033 patent is prior art to the '200 and '245 patents under 35 U.S.C. § 102(a) because the patent was issued before the invention of the '200 and '245 patents.  (DX 14; DX 17)

#### b)     The MagneDur 20-4 Datasheet

257.     Dr. Fish did not in his expert report disclose reliance on the MagneDur 20-4 datasheet as prior art in support of his obviousness opinions.  (Fish, Tr. 2234:1-2235:18)  This

51

Court thus will not consider Dr. Fish's testimony regarding the MagneDur 20-4 datasheet with regard to obviousness.

258.    In any event, the MagneDur 20-4 datasheet (PX 91) is not prior art to the '200 and '245 patents.  The MagneDur 20-4 datasheet is dated August 1, 1996.  (*Id.*)

259.    The conception of the '200 and '245 inventions was in November 1995, and first reduction to practice was in January 1996.  (Coffey, Tr. 383:16-24, 395:9-18; Copeland, Tr. 1425:20-1427:21)  Corroboration of these conception and first reduction to practice dates is found in Dr. Coffey's November 28, 1995 memo (DX 155) and the February 23, 1996 invention disclosure (DX 256, Ex. A).

260.    In the re-examinations, Drs. Coffey and Copeland filed a Declaration of Prior Invention under 37 C.F.R. §1.131, describing the November 1995 conception date and the January 1996 reduction to practice date.  (DX 256; PX 923, May 2, 2006 Declaration)  Phenix filed a 30+ page reply to these declarations in which Phenix made arguments to the PTO as to why the patent owner should not be entitled to an earlier date for all of its claims.  (PX 922, June 9, 2006 Reply; PX 923, July 1, 2006 Reply)

261.    The PTO largely rejected Phenix's arguments.  The PTO found that the declarations of prior invention were "sufficient to overcome" the MagneDur reference with respect to all of the asserted claims of the '200 and '245 patents.  (PX 922, Nov. 9, 2006 Office Action at 2; PX 923, May 10, 2007 Office Action at 2)  Thus, the PTO found that the Declaration of Prior Invention established an invention date for the asserted claims of the '200 and '245 patents that predates the August 1, 1996 MagneDur 20-4 datasheet.

262.    The testimony at trial supports that Drs. Coffey and Copeland conceived of and reduced to practice the inventions in the asserted claims of the '200 and '245 patents long before the August 1, 1996 MagneDur 20-4 datasheet.   (Coffey, Tr. 383:16-24, 395:9-18; Copeland, Tr. 1425:20-1427:21; DX 155; DX 256; DX 207)

263.    Because the invention of the '200 and '245 patents was before the MagneDur 20-4 datasheet, that document does not constitute prior art to the '200 and '245 patents.

c)    The '399 And '824 Patents

264.    The '399 patent and the '824 patent are prior art to the '200 and '245 patents under 35 U.S.C. § 102(e)(2) because they were based upon an application that predated the invention of the '200 and '245 patents. (DX 12)

265.    However, the properties that Dr. Fish contends were inherent in the '399 patent were not known to a person of ordinary skill in the art in 1995-1996.  Dr. Coffey explained that he had not seen any evidence that "a person of ordinary skill in the art knew of the properties that Dr. Fish claims were inherent in Arnokrome 4."  (Coffey, Tr. 2468:5-9)  Similarly, Dr. Copeland testified that he was not aware of anyone who had "thought about" EAS markers in terms of "abruptness properties."  (Copeland, Tr. 1418:7-11)

266.    The only evidence concerning the properties of Arnokrome 4 in 1995 or 1996 (other than coercivity) demonstrates that it was a gradual material that did not meet the Sensormatic demagnetization and magnetization requirements developed after the conception of the '200 and '245 inventions.  (DX 145; Coffey, Tr. 2454:18-22, 2455:8-2456:9; Copeland, Tr. 1479:3-11, 1481:10-19, 1483:4-1486:14)

d)    The Bozorth Text

267.    The Bozorth text is a prior printed publication under 35 U.S.C. § 102(a).  (DX 39)

4.    Differences Between The Prior Art And The Asserted Claims

268.    Dr. Fish admitted that the primary reference that he relied upon - the '399 patent - does not discuss any of the particular abrupt characteristics that are set forth in the asserted claims, including the frequency shift characteristic, the low field stability, the AC demagnetization characteristic, the DC magnetization field characteristic, or the level of amplitude shift.  (Fish, Tr. 2088:16-2090:7)

269.    In fact, none of the prior art references discussed by Dr. Fish ('399 patent, '824 patent, and '033 patent) discusses any of the abrupt characteristics set forth in the asserted claims of the '200 and '245 patents.  (Coffey, Tr. 466:19-467:2; DX 12; DX 14; DX 17)

270.    Before Dr. Coffey joined Sensormatic, there was no consideration of abrupt

53

properties of a bias material as relevant characteristics, and Sensormatic had not specified abrupt characteristics to bias suppliers.  (Copeland, Tr. 1418:7-17; Coffey, Tr. 388:24-389:12)  Even Mr. Gadonniex testified that he did not recognize "abruptness" as a "good thing" or "positive attribute" until after Dr. Coffey came to Sensormatic.  (Gadonniex, Tr. 1620:25-1621:11, 1627:13-16)

271.    Thus, unlike *KSR*, there were not a "finite number" of options to try.  To the contrary, the use of abrupt properties in EAS markers was not even recognized as an option at the time of the invention of the '200 and '245 patents.  Dr. Coffey wrote in November 1995 that Sensormatic had specified the magnetic properties of the bias material "in terms of magnetic moment (nWeber) and coercivity (Oe)."  (DX 155)  Prior to that time, Sensormatic did not specify magnetization or demagnetization properties or even look at the demagnetization field versus remanent magnetization.  (Coffey, Tr. 360:10-24)

272.    There is no evidence that there were any labels with "abrupt" magnetization and demagnetization characteristics prior to the invention.  After the invention, Sensormatic tested labels with its existing SemiVac 90 bias material and found that they did "not exhibit the abrupt magnetization changes described in" the later '200 patent disclosure.  (Coffey, Tr. 428:5-24, 429:14-18; PX 382; Copeland, Tr. 1299:16-22, 1304:11-1305:10)

273.    The invention developed by Drs. Coffey and Copeland was to specify various "abrupt" magnetization and demagnetization characteristics that would improve the properties of the label.  (DX 155 at 3; DX 256 p. 12, Invention Disclosure (Ex. A) at 3 ("new abrupt magnet"); Coffey, Tr. 351:5-352:6, 389:24-390:3)

274.    Because abrupt magnetization and demagnetization characteristics in bias materials for EAS applications were not known in 1995-1996, the use of these characteristics in EAS labels was not a "predictable" variation, as discussed in the PTO Guidelines.  *See* Fed. Reg., Vol. 72, No. 195, Oct. 10, 2007, Notices 57529.  Instead, the invention resulted from the combination of Dr. Coffey's "in depth understanding of magnetic materials" and Dr. Copeland's "understanding of Ultramax labels, acousto-magnetic labels." (Coffey, Tr. 389:5-12)

54

275.    Dr. Fish claimed Figures 4 and 5 of the '200 and '245 patents were obvious in light of a graph from the Bozorth textbook.  (Fish, Tr. 1899:24-1901:15)

276.    The evidence at trial demonstrated that the Bozorth graph shows something very different than the demagnetization and magnetization characteristics in the '200 and '245 patents.  Dr. Coffey explained the Bozorth graph showed magnetization values with a magnetic field applied, whereas the demagnetization curve in Figure 4 of the '200 and '245 patents shows magnetization values only at remanance, or with no magnetic field applied.  (Coffey, Tr. 2462:9-2464:5; Sensormatic Dem. 86)  This difference is significant because the marker on a shelf in a store is in a remanence condition, with no magnetic field being applied.  (Coffey, Tr. 2464:6-18)  The same is true with respect to Figure 5 of the '200 patent.  (Coffey, Tr. 2464:21-2465:25; Sensormatic Dem. 87)

277.    Dr. Fish's hindsight-based reconstruction of the facts to equate B-H loops with abrupt characteristics is contrary to the evidence.  As Dr. Coffey explained, there were no patent publications or memos before 1995 concerning "the desirability of square BH loops in the performance of markers" or that "square BH loops would affect the behavior of demagnetization slope for an EAS marker." [3]   (Coffey, Tr. 2467:9-24)

278.    Dr. Coffey concluded that there was no evidence, much less clear and convincing evidence, that a person of ordinary skill in the art at the time of the invention would find the specific abrupt properties in the asserted claims obvious based upon a general knowledge of B-H loops:

> Q.    In your opinion, without the benefit of hindsight, would the person of ordinary skill in the art in 1995 or '96 have understood that square BH loops lead to desirable magnetization and demagnetization characteristics for acousto-magnetic EAS markers?

---

[3] There is some discussion of the desirability of squareness of B-H loops in EAS systems in the later Manning '460 patent. (PX 778)  But the application date of the '460 patent was May 8, 1996, several months after the conception and reduction to practice (and therefore the invention date) of the inventions of the '200 and '245 patents, and months after Dr. Copeland informed Arnold (where Dr. Manning worked) of the particular abrupt properties that Sensormatic sought.  (Copeland, Tr. 1428:22-1429:22)  In any event, Defendants may not rely upon the '460 patent as prior art since they failed to give the required notice under 35 U.S.C. § 282 of an intent to rely upon this patent as prior art.

A.     No.

Q.     In your opinion would the person of ordinary skill in the art 1995, '96, prior to your invention have developed specific properties in the asserted claims with routine engineering optimization?

A.     No.

(Coffey, Tr. 2468:10-20)

279.     Dr. Fish also testified that there is a direct relationship between the squareness of the B-H loop and coercivity.  (Fish, Tr. 1950:18-24)  He provided no data to support this assertion.

280.     This testimony is irrelevant.  None of the asserted claims of the '200 and '245 patents (in fact, none of the claims, whether asserted or not asserted) are directed to the squareness of B-H loops.

281.     As to the particular abrupt characteristics that are found in the asserted claims of the '200 and '245 patents, the data at trial established that there is not a direct relationship between coercivity and these characteristics.  A comparison of two different variants of Arnokrome 4, both with a coercivity of 23 Oe, shows that the 1996 variant S-12 (DX 145) and the 2006 variant used by Dr. Fish in M-12 (DX 374) have vastly different demagnetization and magnetization characteristics.  (DX 145, Fig. 4; DX 374, Ex. 6; Sensormatic Dem. 531)

282.     Similarly, Dr. Coffey's November 28, 1995 memorandum describes two different samples with "similar coercivity" but significantly different magnetization and demagnetization characteristics.  (DX 155)

283.     In addition, there are several examples in the record of abrupt materials with high coercivity.  The Arnokrome 5 samples tested by Sensormatic in January 1996 had a coercivity of 64 Oe yet "satisf[ied] [Sensormatic's] requirements" set forth on the "DC magnetization and AC demagnetization" tests.  (DX 154)  These tests are the same as those described in the '200 patent.  (Coffey, Tr. 2479:22-2480:6)  The material from Carpenter tested in December 1995 had a coercivity of 66 Oe yet displayed abrupt characteristics.  (DX 207; Copeland, Tr. 1431:10-25)

284.     Dr. Coffey explained that "coercivity and abruptness are very different properties,

56

not the same" and that if a material is low coercivity that does not necessarily mean it is abrupt. (Coffey, Tr. 358:6-7, 544:6-8)  The data presented at trial support this view.

285.    In sum, the evidence demonstrates a significant difference between the inventions set forth in each of the asserted claims and the prior art relied upon by Dr. Fish.

### 5.    Objective Indicia Of Non-Obviousness

286.    Dr. Fish failed to consider the objective indicia, or secondary considerations, of non-obviousness in rendering his opinion.  (Fish, Tr. 2076:20-24)

287.    The following objective indicia weigh in favor of finding that the inventions of the asserted claims of the '200 and '245 patents were not obvious:  (1) solving a long-felt, but unresolved need that others tried and failed to solve; (2) commercial success; (3) copying by others; and (4) licensing by others.

288.    There was a long-felt but unresolved need for the inventions prior to their conception in November 1995.  Prior to that time, AM labels were "high energy," using bias materials having a coercivity of 60 to 100 Oe in order to prevent inadvertent demagnetization when in contact with "incidental magnetic fields" such as those on "batteries, saw blades" and "electronic forklifts."  (Patterson, Tr. 131:4-132:24)  The problem with the accidental demagnetization is that it led to "labels that don't work at all" or "wounded labels" that are "partially demagnetized" and thus are "unreliable" because they may or may not set off the alarm at the pedestal.  (Patterson, Tr. 133:3-9)

289.    However, the high energy labels with high coercivity bias elements did not deactivate reliably.  The labels had to be within a very close range of the demagnetization pad in order to deactivate. (Patterson, Tr. 134:15-135:5; Copeland, Tr. 1442:2-16)  As a result, when the high energy labels were used in "source tagging," or placing labels inside the packaging, there were false alarms due to "tags not properly deactivated."  (Patterson, Tr. 135:15-23)

290.    Sensormatic looked at addressing the problems with reliable deactivation with the use of lower coercivity bias material that could deactivate at a greater distance from the pads. (DX 139; Patterson, Tr. 136:18-137:8)  However, prior to Dr. Coffey's arrival at Sensormatic in

fall 1995, Sensormatic was not able to make labels with low coercivity bias material that functioned properly. (Patterson, Tr. 137:9-15) The labels with low coercivity bias material would deactivate more reliably but would be subject to demagnetization by accidental demagnetization by magnets from forklifts or from other labels. (DX 139; Patterson, Tr. 141:21-142:21) Sensormatic "experimented with many labels and many materials" in order to obtain a low coercivity bias material that did not have the problems with accidental demagnetization, spending "eight to ten man years of effort working on that particular problem," but these efforts failed. (Patterson, Tr. 144:1-11)

291.    Drs. Coffey and Copeland solved the problem by utilizing markers and bias materials with abrupt magnetic characteristics. (Patterson, Tr. 146:12-147:12; Copeland, Tr. 1444:10-24)

292.    Sensormatic's labels exhibiting the abrupt characteristics of the asserted claims of the '200 and '245 patents have been commercially successful. Sensormatic has shifted entirely to abrupt, low energy AM labels. (Patterson, Tr. 152:2-152:13) Sensormatic has sold "between five and seven billion" labels that embody the invention. (Patterson, Tr. 152:9-23) The inventions of the '200 and '245 patents have "contributed to the success of the Ultramax labels" "because of the enhanced performance." (Patterson, Tr. 153:1-11) "The problems of the early '90's were solved by this invention to a large extent." (Patterson, Tr. 153:10-11) The invention of the '200 and '245 patents helped Sensormatic compete with other types of EAS markers and helped make Sensormatic "the leader in the whole electronic surveillance industry in the USA." (Patterson, Tr. 153:20-25)

293.    Another indicium of non-obviousness is copying. The evidence is overwhelming that Defendants copied the inventions of the '200 and '245 patents as reflected in the magnetic properties section of the bias specifications. Defendant TAG's report to its 20% owner explained that TAG's new label is a "replica of the ULTRA-Strip AM Label produced by Tyco and sold by ADT." (PX 592) A number of the magnetic properties relevant to the inventions that were contained in Tag's initial bias specification were identical to those in Sensormatic's

bias specification, including DC magnetization test, low field stability and high field demagnetization.  (Krom, Tr. 1206:11-16; *compare* PX 38 *with* PX 463; *see* Sensormatic Dem. 305)  Kathy Bulson, TAG's corporate representative, admitted that the "best way" to move towards TAG's goal of meeting the performance of the Sensormatic label "was to copy a Sensormatic specification."  (Bulson Dep. 10/17/07 163:22-164:5; *see also* Krom, Tr. 1204:4-12)

294.    Finally, another indicium of non-obviousness is licensing.  Sensormatic licensed the '200 and '245 patents to Wallace in 1997.  (Patterson, Tr. 154:5-12; PX 55, Feb. 10, 1997 license agreement)  The agreement was later terminated after Wallace was taken over by another entity.  (Patterson, Tr. 154:13-19)

C.      **Conclusions Of Law**

295.    The Court concludes, based on the above findings, that none of the inventions of asserted claims 2, 6, 10, 11, 18, 19, 20, 27, 28 and 43 of the '200 patent or asserted claims 1, 2, 4, 7, 9, 14, 15 and 17 of the '245 patent would have been obvious to a person of skill in the art at the time the inventions were made.  Thus, none of the asserted claims of either the '200 or '245 patent is invalid under 35 U.S.C. § 103(a).

IX.     **Enablement**

A.      **Legal Principles Governing Analysis**

296.    Under the first paragraph of Section 112 of the Patent Act, a patent's specification must "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same . . . ."  35 U.S.C. § 112, ¶ 1.

297.    The Federal Circuit has interpreted the first paragraph of Section 112 of the Patent Act to include both a "written description" and an "enablement requirement".  *See University of Rochester v. G.D. Searle & Co., Inc.*, 358 F.3d 916, 924 (Fed. Cir. 2004).  Because Defendants presented no evidence or argument at trial regarding the written description requirement, this Court limits its § 112 analysis to the question of enablement.

59

298.    Enablement is a question of law based on underlying facts. *Falkner v. Inglis*, 448 F.3d 1357, 1363 (Fed. Cir. 2006), *cert. denied,* 127 S.Ct. 1151 (2007). Defendants bear the burden of proving the underlying facts by clear and convincing evidence. *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1318 (2007), *cert. denied*, 128 S.Ct. 2430 (2008).

299.    "The enablement requirement is often more indulgent than the written description requirement. The specification need not explicitly teach those in the art to make and use the invention; the requirement is satisfied if, *given what they already know*, the specification teaches those in the art enough that they can make and use the invention without 'undue experimentation.'" *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1334 (Fed. Cir. 2003) (emphasis added).

300.    Whether undue experimentation is required is a "conclusion reached by weighing many factual considerations . . . includ[ing] (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims." *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

301.    As the Federal Circuit has "repeatedly explained," "a patent applicant does not need to include in the specification that which is already known to and available to one of ordinary skill in the art. . . .  [It] thus [has] noted that 'not every last detail is to be described, else patent specifications would turn into production specifications, which they were never intended to be.'  Unless there is evidence to the contrary, therefore, the lack of certain production details does not indicate failure of enablement." *Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1156 (Fed. Cir. 2004) (citations omitted).

302.    In order to invalidate a claim on lack of enablement grounds, Defendants must show "that all of the disclosed alternative modes are insufficient to enable the claims, because 'the enablement requirement is met if the description enables any mode of making and using the invention.'" *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1361 (Fed. Cir. 1998)

60

(quoting *Engel Indus., Inc. v. Lockformer Co.*, 946 F.2d 1528, 1533 (Fed. Cir. 1991)).  "The law makes clear that the specification need teach only one mode of making and using a claimed invention."  *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1335 (Fed. Cir. 2003).

### B.      Findings Of Fact

#### 1.      Defendants' Contentions

303.      Defendants contended at trial that all of the asserted claims of the '200 and '245 patents are invalid for failure to comply with the enablement requirement of 35 U.S.C. § 112, first paragraph.

304.      Specifically, Defendants asserted that the preferred embodiments set forth in each of the patent's specification were not enabling because: (1) the specification identifies the relevant bias materials by trade name only, (2) the trade names at issue do not refer to so-called "invariant" materials, and (3) the specification does not set forth the steps for processing the bias materials to obtain the desired magnetic properties.

305.      Neither Defendants nor their experts provided a claim-by-claim analysis of Defendants' enablement contentions.  (*See* Fish, Tr. 2189:21-23)

306.      As discussed earlier, the specification of the '200 patent discloses three different preferred embodiments, differentiated by the type of bias material.  The three bias materials are: (1) MagneDur 20-4 having a coercivity of about 20 Oe, (2) Vacozet having a coercivity of 22.7 Oe, and (3) Metglas 2605SB1 having coercivity levels of 19 and 21 Oe.  (*See supra* Section III.B.; PX 786)  The '200 patent specification does not provide the chemical compositions of the three bias materials.  (*Id.*)

307.      The specification of the '245 patent discloses the same three preferred embodiments and bias materials.  (*See supra* Section III.B.; PX 788)  The '245 patent also discloses the chemical compositions of each of the three bias materials.  (*Id.*)

#### 2.      Defendants Presented No Evidence That The Asserted Claims Of The '245 Patent Are Not Enabled

308.      Defendants put on their non-enablement defense principally through their

technical expert Dr. Gordon Fish.

309.    Dr. Fish admitted during cross examination that he had not disclosed in his expert
reports an opinion that the asserted claims of the '245 patent are invalid for failure to satisfy the
enablement requirement of 35 U.S.C. § 112, first paragraph.  (Fish, Tr. 2127:16-21)

310.    As a result, this Court struck Dr. Fish's testimony to the extent it included
opinions and evidence that any of the asserted claims of the '245 patent are invalid on non-
enablement grounds.  Defendants adduced no additional evidence at trial regarding lack of
enablement and the asserted claims of the '245 patent.

> ### 3.    The Original Examiner During The '200 Patent Prosecution Rejected
> The Precise Enablement Argument Made Here By Defendants

311.    During the original prosecution of the '200 patent, the Examiner initially rejected
all 47 claims in the application pursuant to 35 U.S.C. §112, first paragraph.  (PX 86, May 16,
1997 Office Action)  The Examiner explained:

> [The claims] contain[] subject matter which was not described in the
> specification in such a way as to enable one skilled in the art to which
> it pertains, or with which it is most nearly connected, to make and/or
> use the invention.  The materials used in the construction of the
> markers disclosed in this application are specified only in terms of
> trade names:  'MagneDur 20-4,' 'Vacozet,' 'Metglas 2605SB1,'
> Metglas 2628CoA,' and Metglas '2826 MB' specifically.  The
> specification does not disclose the composition of these materials, nor
> is any evidence offered that they in fact have the recited magnetic
> properties, especially since it is not clear that these terms refer to a
> specific invariant material as opposed to a class of materials.
> Evidence is needed as to what was the composition encompassed by
> these terms at the time of the invention and that these compositions
> have the recited properties.

(*Id.*)

312.    Sensormatic traversed the rejection.  It argued that not only would a person of
skill in the art understand that the trade names referred to particular commercially-available
alloys, but also the disclosure of desired magnetic characteristics would enable a person of
ordinary skill in the art to practice the invention:

> More fundamentally, the teachings of the present application as to the
> necessary characteristics of the material to be used for the 'abrupt'
> bias element, would enable those of ordinary skill to obtain the

> required material from commercial suppliers of metal alloys, simply by specifying the characteristics taught by the present application, and without indicating a particular commercial designation or a particular composition. Neither the alloy designations included in the specification, nor the actual chemical compositions of the alloys, are necessary to enable those of ordinary skill to practice the claimed invention.

(PX 86, Aug. 22, 1997 Response to Office Action)

313.    The Examiner withdrew the rejection and allowed all of the claims as originally written.  (PX 86, Sept. 25, 1997 Notice of Allowability)[4]

### 4.    Neither The Trade Names Nor The Specific Preferred Embodiments Would Have Been Necessary To Allow A Person Of Ordinary Skill In The Art At The Time Of The Filing Of The '200 Patent To Make And Use The Claimed Inventions Without Undue Experimentation

314.    Many of the asserted claims set forth specific magnetic properties of the bias material.  (PX 786, cols. 11-16)  Others set forth specific magnetic properties of the marker, which includes the bias and resonator.  (*Id.*)

315.    The evidence at trial showed that a person of ordinary skill in the field of magnetics or materials science in August 1996 would have known how to obtain these  magnetic properties without undue experimentation either by processing an alloy him- or herself, or by specifying the magnetic characteristics to commercial suppliers of such alloys with expertise in such processing.

316.    Neither the trade names disclosed in the preferred embodiments, nor the chemical compositions of those alloys, would have been necessary to enable those of ordinary skill in the art to practice the inventions of the asserted claims of the '200 patent.  As Dr. Coffey testified:

Q.    And how is it that a person of ordinary skill in the art at the time in 1996 could make the markers with the desired properties spelled out in the asserted claims?

A.    They would take the description of the bias material properties that was provided in the specification of the '200 and they would go to these or other vendors and request samples of materials having these properties.

(Coffey, Tr. 537:23-538:4; *see also* Coffey, Tr. 2470:25-2471:25 (testifying that trade names are not

---

[4] Notably, the Examiner in the original '245 patent prosecution did not at any time reject any claims of the '245 patent based on 35 U.S.C. § 112, first paragraph.  (*See generally* PX 87, '245 patent file history)

necessary and that Carpenter in 1995 was able to provide materials exhibiting abrupt properties without undue experimentation); Coffey, Tr. 409:18-410:9 (testifying that chemical compositions are not necessary))

317.    Defendants' own technical expert, Dr. Fish, admitted that, "[i]f the specification spells that out, spells out what [the magnetic] properties are, and those can be achieved by the manufacturer, yes, that would be enabled."  (Fish, Tr. 1874:20)

318.    The '200 patent specification spells out in detail the desired magnetic properties of the bias and marker in the claims, the text and the figures.  The claims themselves specify numerically the desired magnetic properties.  (PX 786, cols. 11-16)  The figures of the '200 patent provide pictoral representations of the different magnetic properties.  For instance, Figure 3 shows desired frequency and amplitude shift characteristics of an abrupt marker.  (PX 786)  Figures 4 and 5 show desired magnetization and demagnetization characteristics of an abrupt bias material.  (PX 786)

319.    The evidence at trial showed that a person armed with these figures and the desired magnetic properties could simply have provided that information to magnetic materials vendors, who, using existing knowledge of how to process magnetic materials, could process materials to the desired properties without undue experimentation.  As Dr. Coffey testified:

> I know this is sufficient to enable others to practice this invention because that is how we practiced it.  That is what we did.  We took what we wanted and find [sic] abrupt properties and went out to vendors and said hey, we need this stuff, these types of properties, please give us some samples.  And without any great painful effort in the cases of the Magne-Dur and the Vacozet, we assembled them into labels and had the invention described in the '200 Patent.

320.    (Coffey, Tr. 457:3-11; *see also* Coffey, Tr. 460:7-13, 537:23-538:4; Copeland, Tr. 1392:15-24 ("Court:  Your view is that there are suppliers, that there are vendors who do this, and this is within their field of expertise, so you are simply saying you take these two products, and then you take them to a third party, and what is it you tell the third party to do?  A. We give them direction as to what the end properties need to be, and then they have to, you know, figure out how they adapt their processes for that material to obtain that."))

321.     At the time the '200 patent application was filed, it was customary in the EAS industry for EAS marker manufacturers (such as Sensormatic) to obtain bias and resonator materials from third-party vendors by specifying desired magnetic properties rather than the processing steps and chemical compositions necessary to obtain those properties.  As Dr. Copeland testified:

> Q.     Is it typical to specify desired properties to a vendor, or do you specify processes the vendor would have to undertake to obtain those properties.
>
> A.     It is typical with all our magneto-magnetic [sic] suppliers to present a technical specification defining the characteristics of the material, but not the processes.
>
> Q.     Is it their job and know-how to process the material to obtain those characteristics?
>
> A.     Yes, that is correct.

(Copeland, Tr. 1418:20-1419:4)  The materials specifications that Sensormatic provided to vendors at the time did not set forth processing steps or chemical compositions, but instead specified the desired magnetic properties.  (Copeland, Tr. 1419:14-1420:4)

322.     Vendors at the time likewise advertised their ability to "tailor" magnetic properties to customers' magnetic properties specifications.  Carpenter Technologies MagneDur 20-4 datasheet states:  "MagneDur 20-4 alloy is usually produced to a magnetic property specification."  (PX 91)  Similarly, an Arnokrome 4 product information sheet dated February 2, 1997 advertises:  "[b]y controlling the heat treatment, the magnetic properties obtained can be tailored to the specific requirements of the application."  (PX 2)

323.     It was thus well known in the art at the time the '200 patent was filed how to process materials to obtain the magnetic properties specified in the '200 patent.  For example, Dr. Fish admitted during cross-examination that individuals at Carpenter at the time would have known "within their routine level of skill" how to obtain the desired magnetic properties.  (Fish, Tr. 2106:21-25)

324.     The actual timeline of events leading from conception to reduction to practice of the inventions of the '200 patent confirms that persons of ordinary skill in the art at the time

65

would have been able to practice the inventions set forth in the '200 patent without undue experimentation.

325.    Drs. Coffey and Copeland conceived of the inventions of the '200 patent around November 1, 1995.  (Coffey, Tr. 385:1-14; Copeland, Tr. 1426:1-23; DX 256, Feb. 23, 1996 Invention Disclosure (Ex. A); DX 155)

326.    Drs. Coffey and Copeland then contacted three materials vendors – Carpenter Technology, Vacuumschmelze and Arnold Engineering – and requested bias material with abrupt magnetic properties.  (Copeland, Tr. 1429:4-9)   According to Dr. Copeland, "[w]e actually met with them at a meeting on our campus at Sensormatic and we went over and described the properties and specification in general terms and then they went away and proceeded to choose the alloy they were going to use and the processes and deliver the sample, first sample."  (Copeland, Tr. 1429:10-22)

327.    At roughly the same time, Drs. Coffey and Copeland asked Sensormatic employee Dennis Gadonniex to process Metglas 2605SB1 material to obtain the desired magnetic properties set forth in the generic specification.  (Copeland, Tr. 1434:1-19)

328.    Within a "few weeks" time, Carpenter provided Drs. Coffey and Copeland MagneDur 20-4 material having the desired abrupt characteristics.  (Copeland, Tr. 1431:4-6, 1432:7-9)  A December 4, 1995 memo authored by Dr. Copeland sets forth testing results showing that MagneDur 20-4 samples obtained from Carpenter exhibited the desired abrupt magnetic properties.  (Copeland, Tr. 1431:4-22; DX 207)  The magnetization and demagnetization figures in the December 4, 1995 memo are nearly identical to those shown in Figures 4 and 5 of the '200 patent.  (Copeland, Tr. 1431:23-25; *compare* DX 207 pp. 3-4 *with* PX 786, Figs. 4 and 5)

329.    By mid-January 1996, less than three months after conception, Arnold Engineering provided Drs. Copeland and Coffey with Arnokrome 5 samples exhibiting abrupt magnetic characteristics.  (DX 153, Jan. 15, 1996 letter from Arnold enclosing "initial engineering samples"; DX 154 pp. 2-11, Jan. 25, 1996 memo from Dr. Copeland to Dr. Coffey

66

setting forth Arnokrome 5 test results)  This is particularly significant because Dr. Fish admitted that Dr. Neil Manning, who was the individual at Arnold responsible for creating the Arnokrome 5 samples, would have qualified as a person of ordinary skill in the relevant art at the time. (Fish, Tr. 2167:5-7; Manning, Tr. 1128:8-1130:11)

330.    Dennis Gadonniex was also able "in a few weeks" to process the Metglas 2605SB1 material to obtain the desired magnetic properties.  (Copeland, Tr. 1434:1-19; *see also* Coffey, Tr. 493:7-22)

331.    Shortly after obtaining the MagneDur 20-4 and 2605SB1 bias materials, Drs. Coffey and Copeland were able to reduce to practice markers exhibiting the abrupt magnetic properties described in the '200 patent.  (Coffey, Tr. 538:7-14)  For instance, an internal Sensormatic Invention Disclosure authored by Drs. Coffey and Copeland shows that, by January 18, 1996, the inventors had reduced to practice markers using MagneDur 20-4 that exhibited the desired abrupt magnetic properties.  (DX 256 pp. 10, 13-14; Copeland, Tr. 1427:18-1428:1)  The Invention Disclosure further shows that Drs. Copeland and Coffey had reduced to practice an abrupt marker employing Metglas 2605SB1 by at least February 23, 1996 (the date the disclosure was signed).  (DX 256, Feb. 23, 1996 Invention Disclosure (Ex. A); Copeland, Tr. 1432:22-1433:25, discussing reduction to practice of marker with 2605SB1)

### 5.    The Three Preferred Embodiments Also Would Have Allowed A Person Of Ordinary Skill In The Art To Practice The Asserted Claims Of The '200 Patent

332.    While not required to allow a person of skill in the art to practice the inventions of the '200 patent without undue experimentation, the '200 patent discloses three specific preferred embodiments with specific resonator and bias materials identified by trade name.  Defendants contend that the identification of materials by trade name would have been insufficient to allow a person of ordinary skill in the art at the time to practice the inventions of the asserted claims of the '200 patent because the trade names at issue refer to non-invariant materials that exhibit different magnetic properties depending on how they are processed.

333.    The '200 patent discloses not only the trade names of the three bias materials, but

also specific coercivity values for each.  (PX 786, col. 6:1-6 (MagneDur 20-4); PX 786, col.

8:22-31 (Metglas 2605SB1); PX 786, col. 9:45-49 (Vacozet))  The figures and text of the '200

patent provide the magnetization and demagnetization characteristics for each of the three bias

materials.  (PX 786, Figs. 4 & 5, col. 7:18-50 (MagneDur 20-4); PX 786, Fig. 6, col. 8:53-58

(2605SB1); PX 786, Fig. 10, col. 9:50-63 (Vacozet))

      334.    In the case of Metglas 2605SB1, the specification discloses the specific

processing techniques a person of skill in the art would have to follow in order to obtain the

desired magnetic properties:

> A continuous ribbon of the SB1 material is cut into discrete strips in the form of a rectangle, having a length of about 28.6 mm, and a width approximately equal to the active element width.  The cut strips are placed in a furnace at room temperature and a substantially pure nitrogen atmosphere is applied.  The material is heated to about 485° C. and the latter temperature is maintained for one hour to prevent dimensional deformation that might otherwise result from subsequent treatment.  Next the temperature is increased to about 585° C.  After an hour at this temperature, ambient air is allowed to enter the furnace to cause oxidation of the material.  After one hour of oxidation at 585° C., nitrogen gas is again introduced into the furnace to expel the ambient air and end the oxidation stage.  Treatment for another hour at 585° C. and in pure nitrogen then occurs.  At that point, the temperature is raised to 710° C. and treatment with pure nitrogen continues for one hour, after which the furnace is allowed to cool to room temperature.  Only after cooling is completed is exposure to air again permitted.  (In all cases, the temperature figures given above are measured at the samples being treated)

> The resulting annealed material has a coercivity of about 19 Oe and a demagnetization characteristic as show in Fig. 6.  It will be observed from Fig. 6 that even an applied AC field as low as 15 Oe results in substantial demagnetization (to about 70% of a full magnetization level) of the annealed SB1 alloy.

> . . .

> The heat-treatment procedure described above can be changed so that the last hour of annealing is performed at 800° C. rather than 710°, to produce annealed SB1 material having a coercivity of 11 Oe.

(PX 786, col. 8:32-58, 9:40-43)

      335.    Perhaps because of this detailed disclosure, Defendants' technical expert, Dr.

Fish, offered no opinion that the 2605SB1 embodiment of the '200 patent was not enabled, or

that the 2605SB1 embodiment was insufficient to enable any of the asserted claims.  (Fish, Tr.

1887:8-1888:5)

336.    Defendants nevertheless asserted during closing argument that the 2605SB1 embodiment would not have enabled any of the asserted claims of the '200 patent because AM EAS markers employing 2605SB1 "did not work."  (Closing, Tr. 2765:22-2767:5)  Defendants pointed to an internal Sensormatic memorandum from Dr. Copeland dated September 8, 1995, in which Dr. Copeland recommended against pursuing 2605SB1 as an alternative bias material for Sensormatic's high-energy label.  (PX 854)

337.    The memo does not say that 2605SB1 would not work in AM EAS markers. Rather, it says only that there were potential problems in certain high-energy label applications. (PX 854, "[T]he SB1 magnet is not useful in the narrow label (blanked flanged or Winpak) or the blanked flanged wide label.")  Critically, Dr. Copeland wrote the memo almost two months prior to his and Dr. Coffey's conception of the '200 patent inventions (*compare* PX 854 *with* DX 256 pp. 10-17 Invention Disclosure), and before Dennis Gadonniex had processed 2605SB1 to Drs. Copeland's and Coffey's new specification.  (DX 46 pp. 40-41, processing done on January 31, 1996)

338.    Defendants' assertion that markers with 2605SB1 did not work is contradicted by Drs. Copeland's and Coffey's Invention Disclosure, as well as data set forth in the '200 patent itself, both of which show that markers employing 2605SB1 exhibit the abrupt magnetic properties set forth in the '200 patent.  (DX 256 pp. 15-17; PX 786 Figs. 6 & 7)

339.    Defendants failed to show by clear and convincing evidence that a person of ordinary skill in the art could not have practiced the 2605SB1 embodiment without undue experimentation.

340.    With regard to MagneDur 20-4, Dr. Fish testified that MagneDur 20-4, although commercially available, was not an invariant material and that a person of ordinary skill in the art thus would not know how to obtain MagneDur 20-4 exhibiting the magnetic properties disclosed in the '200 patent.  (Fish, Tr. 1867:20-1877:1)  Dr. Fish relied principally on a MagneDur 20-4 product specification sheet dated August 1, 1996, which shows MagneDur 20-4 having a range of coercivities from 45 Oe to 118 Oe.  (Fish, Tr. 1869:25-1870:11; PX 91)

341.    However, the '200 patent specification provides not only the trade name MagneDur 20-4, but also a specific coercivity value of "about 20 Oe."  (PX 786, col. 6:1-6)

342.    A person of ordinary skill in the art armed with the name MagneDur 20-4, the coercivity value and the other properties contained in the '200 patent specification would be able to obtain from MagneDur 20-4 material that exhibited the properties set forth in the '200 patent specification.  (Coffey, Tr. 2470:25-2471:14)  That would particularly have been the case by the time of the '200 patent application, because Carpenter had already processed and provided MagneDur 20-4 with those properties to Drs. Coffey and Copeland.  Dr. Fish admitted:

> Court.  If you have something that has the capacity of developing different characteristics because of some additional treatment that is applied to the material, are you saying, also, there is no problem if you are able simply to say to the vendor, give me this base material but to do to it exactly whatever it is you do to the material that is supplied to Sensormatic?
>
> A.      Yes.  If the specification spells that out, spells out what those properties are, and those can be achieved by the manufacturer, yes, that would be enabled.

(Fish, Tr. 1874:13-23)

343.    It does not matter that the coercivity of MagneDur 20-4 identified in the '200 patent (20 Oe) falls outside of the 45 to 118 Oe range shown in the product specification sheet. Dr. Coffey testified unrebutted that the product capabilities of a material are not limited by what is in the datasheet:

> It was known in the field that these data sheets were not intended at all to be exclusive limitations of what was commercially available.  And so if you had a specific application, you would always go talk to the vendor and see what they could do to meet your application -- to meet your requirement for magnetic properties.

(Coffey, Tr. 2475:9-22)

344.    Drs. Coffey and Copeland were able to obtain lower coercivity, abrupt MagneDur 20-4 within weeks of conceiving of the '200 patent inventions.  (DX 256 pp. 10-17, Feb. 23, 1996 Invention Disclosure)

345.    Defendants failed to show by clear and convincing evidence that a person of ordinary skill in the art could not have practiced the MagneDur 20-4 embodiment without undue experimentation.

346.     Similarly, with regard to Vacozet, the evidence at trial showed that a person of ordinary skill in the art at the time of the '200 patent application could have obtained Vacozet with the desired properties merely requesting from Vacuumschmelze AG a Vacozet exhibiting the desired magnetic characteristics and coercivity.  (Coffey, Tr. 2470:25-2471:14 (discussing process for obtaining MagneDur 20-4))  In light of the fact that Vacuumschmelze had already created such a Vacozet for Sensormatic by the time the '200 patent application was filed in August 1996, Vacuumschmelze would have known already what Vacozet to use and the specific processing techniques to apply to obtain the desired material.

347.     Dr. Fish nevertheless testified that at the time of the '200 patent application, there were multiple different kinds of Vacozet commercially available and that a person of ordinary skill in the art would not know which one was being referred to in the '200 patent specification. Dr. Fish pointed to three Vacuumschmelze AG publications that discuss Vacozet – one from 1979, one from 1990, and one from 1999.  (TAG Dem. 3 (1979 publication, though the exhibit does not include the pages discussing Vacozet); Sensormatic Dem. 88 (1990 publication); PX 100, 1999 publication)

348.     The 1979 publication identifies four different Vacozets materials:  Vacozet 200, Vacozet 258, Vacozet 655, and Vacozet 923.  The 1979 publication provides coercivity ranges for each of the four materials.  The coercivity of 22.7 Oe for Vacozet identified in the '200 patent falls within the range for Vacozet 258 only.  (Fish, Tr. 2179:6-2180:1)  The 1990 publication, identifies only three different Vacozet materials:  Vacozet 200, Vacozet 258, and Vacozet 655.  (Sensormatic Dem. 88)  The 1990 publication sets forth a pictoral graph showing the coercivity ranges for the three Vacozets, as well as a chart describing those ranges numerically.  Accordingly to the chart, the coercivity of 22.7 Oe identified in the '200 patent for Vacozet falls between the coercivity ranges identified for Vacozet 200 and Vacozet 258.  (Fish, Tr. 2263:23-2264:2)  However, according to the graph, the coercivity of 22.7 Oe falls within the range for Vacozet 258.  (Coffey, Tr. 2473:11-2474:13)

349.     While it would have been unnecessary for a person of skill in the art to know

71

which of the various Vacozet materials was used by Vacuumschmelze, both the 1979 and 1990 Vacuumschmelze publications suggest that the Vacozet at issue is Vacozet 258.

350.     Significantly, as discussed above, the inventors themselves were able to obtain Vacozet and MagneDur 20-4 materials from the vendors without undue experimentation shortly after conception of the '200 patent inventions.  (Coffey, Tr. 2470:6-24 (Vacozet and MagneDur 20-4); Coffey. Tr. 2477:2-9, "Q.  In 1995 when you worked at Sensormatic did you or anybody on behalf of you call up Carpenter and ask them to make bias material in accordance with specified properties?  A.  Yes.  Q.  Was Carpenter able to do so without undue experimentation? A.  Yes.")  By contrast, Dr. Fish never called Vacuumschmelze or Carpenter (or any other vendor for that matter) to determine whether, or to what extent, experimentation would have been required to obtain Vacozet or MagneDur 20-4 exhibiting the magnetic properties set forth in the '200 patent.  (Fish, Tr. 2175:12-21, "We did not make such a call.")

351.     Defendants failed to show by clear and convincing evidence that a person of ordinary skill in the art could not have practiced the Vacozet embodiment without undue experimentation.

352.     Having failed to show that a person of ordinary skill in the art would not have been able to practice any of the three preferred embodiments without undue experimentation, Dr. Fish in cross examination opined that the preferred embodiments did not necessarily support every one of the asserted claims.  Dr. Fish testified that it would require a "claim by claim rather careful analysis" to sort out which claims were not supported by which embodiments.  (Fish, Tr. 2189:5-15)  Dr. Fish admitted, however, that he had not performed any such claim by claim analysis and hence provided no testimony as to which claims may or may not be supported by any particular preferred embodiment.  (Fish, Tr. 2189:16-23)

353.     Given that Defendants bear the burden of proving the facts supporting their non-enablement defense by clear and convincing evidence, Dr. Fish's failure to provide a claim-by-claim analysis is fatal to Defendants' contention that one or more of the preferred embodiments do not enable some of the asserted claims.

> **6.     A Person Of Ordinary Skill In The Art Would Have Been Able To Practice The Asserted Claims Specifying Magnetic Properties Of The Final Marker Without Undue Experimentation**

354.     With regard to those asserted claims of the '200 patent that set forth magnetic properties of the final marker rather than just the bias material, Dr. Fish testified that:

> If the properties are those of a final marker, then one has to know something about the final marker.  One has to know something about the resonator material that is to be used because we have had testimony earlier that the invention resides in the marriage of a particular resonator and particular bias material.  Different resonator materials want to operate under different magnetic conditions.  And so what makes for good bias material for one situation is not necessarily what makes for a good bias material for yet another resonator.

(Fish, Tr. 1885:24-1886:15)  Asserted Claims 2, 20, 27, 28 and 43 of the '200 patent set forth the properties of the marker, rather than just the properties of the bias material.  (PX 786 cols. 11-16)

355.     The '200 patent discloses two resonator material alternatives that can be coupled with each of the three bias materials to obtain the desired magnetic properties of the final marker – Metglas 2628CoA and Metglas 2826MB.  (PX 786, cols. 6:6-13, 10:39-43)   The '200 patent discloses the chemical composition of Metglas 2628CoA.  (PX 786, col. 6:12-13)  At the time of the '200 patent application, Metglas 2826MB was a well-known, commercially available resonator material that could be purchased off the shelf from Allied Signal Corporation (a/k/a Metglas).  (Fish, Tr. 2214:17-2215:5)

356.     The '200 patent instructs that a person of ordinary skill in the art needs only to combine the Vacozet, MagneDur 20-4 and 2605SB1 bias materials described in the specification (and the properties of which are set forth in Figs. 4, 5, 6 and 10 of the '200 patent) with either of the two resonator materials and the desired magnetic properties will follow.  Figure 3 of the '200 patent shows the frequency and amplitude shift characteristics of a marker that employs a 2628CoA resonator and "the MagneDur material used as a bias element."  (PX 786, col. 6:66-7:3)  Likewise, Figure 11 of the '200 patent shows the frequency and amplitude shift characteristics of "a marker utilizing the Vacozet material as the bias element and the 2628CoA material as the active element."  (PX 786, col. 9:64-67)  Figure 7 shows the frequency and amplitude shift characteristics of a marker "utilizing the annealed SB1 material as the bias

73

element and the 2628CoA material as the active element."  (PX 786, col. 9:1-4)

### 7. Claim-By-Claim Findings

357.     Defendants have failed to show by clear and convincing evidence that one of ordinary skill in the art at the time the '200 patent application was filed would not have been able to make or use the inventions of any of the asserted claims 2, 6, 10, 11, 18, 19, 20, 27, 28 and 43 of the '200 patent without undue experimentation.

358.     Defendants have failed to show by clear and convincing evidence that one of ordinary skill in the art at the time the '245 patent application was filed would not have been able to make or use the inventions of any of the asserted claims 1, 2, 4, 7, 9, 14, 15 and 17 of the '245 patent without undue experimentation.

### C. Conclusions Of Law

### 1. '200 Patent

359.     Because Defendants have not proven by clear and convincing evidence that one of ordinary skill in the art at the time of filing the '200 patent could not have made or used the inventions of any of the asserted claims without undue experimentation, the Court concludes as a matter of law on this record that the asserted claims of the '200 patent are enabled by the '200 patent specification.

360.     Defendants failed to offer a claim-by-claim analysis in support of their lack of enablement defense.  That alone is fatal.  *See Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1370-71 (Fed. Cir. 2003).

361.     The fact that the asserted claims describe the inventions in terms of desired magnetic characteristics or properties, rather than specific chemical composition, does not alter this Court's analysis.  *Cf. Union Oil Co. of California v. Atlantic Richfield Co.*, 208 F.3d 989, 992 (Fed. Cir. 2000) (rejecting written description challenge to patent claims that described gasoline products in terms of "the chemical properties" rather than "in terms of molecular structures or lists of ingredients" because such descriptions "reflect[ed] the way oil refiners formulate gasoline").

362.    There was substantial evidence in the record that persons of ordinary skill in the art at the time would have understood the magnetic properties described and known how to process materials to obtain those properties without undue experimentation.  Indeed, purchasers of magnetic materials in the EAS industry typically specify desired magnetic properties to their materials vendors, not the processing steps or chemical compositions that yield those properties.

363.    The '200 patent also discloses three different enabling embodiments:  Vacozet, MagneDur 20-4 and Metglas 2605SB1.  A person of ordinary skill in the art at the time, armed with these trade names and the desired magnetic properties, would have been able to obtain bias material exhibiting the desired properties without undue experimentation.

364.    Finally, Defendants do not even attempt to argue that the Metglas 2605SB1 embodiment is not enabled by the '200 patent specification.  As long as one of the disclosed embodiments enables a claim, the enablement requirement of 35 U.S.C. § 112, first paragraph is satisfied.  *See Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1361 (Fed. Cir. 1998) ("'the enablement requirement is met if the description enables any mode of making and using the invention'" (citation omitted)); *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1335 (Fed. Cir. 2003). ("The law makes clear that the specification need teach only one mode of making and using a claimed invention.").

365.    Defendants have not provided any evidence regarding which, if any, of the asserted claims of the '200 patent would not have been enabled by the 2605SB1 embodiment.

**2.    '245 Patent**

366.    Defendants presented no evidence at trial that any of the asserted claims of the '245 patent failed the enablement requirement of 35 U.S.C. § 112, first paragraph.  This Court thus concludes as a matter of law on this record that the asserted claims of the '245 patent are enabled by the '245 patent specification.

75

X.      **Fraudulent Inventorship**

     A.      **Legal Principles Governing Fraudulent Inventorship Analysis**

     367.    A patent applicant must disclose the names of all inventors.  35 U.S.C. § 111.  A patent can be invalidated if the patentee "did not himself invent the subject matter sought to be patented."  35 U.S.C. § 102(f).

     368.    Inventorship is a question of law based on underlying factual determinations. *C.R. Bard, Inc. v. M3 Sys.*, 157 F.3d 1340, 1352 (Fed. Cir. 1998).  "The general rule is that a party alleging . . .  non-joinder of inventors must meet the heavy burden of proving its case by clear and convincing evidence, and must provide evidence to corroborate the alleged joint inventor's conception."  *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir. 2004) (citations omitted).

     369.    "The 'inventor,' in patent law, is the person or persons who conceived the patented invention.  Thus facts relevant to inventorship are those showing the conception of the invention, for others may provide services in perfecting the invention conceived by another without becoming an 'inventor' by operation of law."  *C.R. Bard*, 157 F.3d at 1352.  "'[A]n inventor may use the services, ideas, and aid of others in the process of perfecting his invention without losing his right to a patent.'"  *Id.* (citations omitted).

     370.    "'To be a joint inventor, an individual must make a contribution to the conception of the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention.'  This requires more than merely exercising ordinary skill in the art – 'a person will not be a co-inventor if he or she does no more than explain to the real inventors concepts that are well known [in] the current state of the art.'"  *Caterpillar Inc. v. Sturman Indus.*, 387 F.3d 1358, 1377 (Fed. Cir. 2004) (citations omitted).

     371.    "One may not qualify as a joint inventor . . . by 'merely assisting the actual inventor *after conception* of the claimed invention.'"  *Hoop v. Hoop*, 279 F.3d 1004, 1007 (Fed. Cir. 2002) (emphasis in original) (citations omitted).  "'Depending on the scope of the patent's claim, one of ordinary skill in the art who simply reduced the inventor's idea to practice is not

necessarily a joint inventor," even if the specification discloses that embodiment to satisfy the best mode requirement.  *Id.* at 1008.

372.    "[I]nventorship is determined on a claim-by-claim basis."  *Gemstar-TV Guide Int'l, Inc. v. International Trade Commission*, 383 F.3d 1352, 1381 (Fed. Cir. 2004).

373.    A failure to name an inventor, even if proven, does not automatically invalidate a patent.  Section 256 of the Patent Act, entitled "Correction of named inventor," provides that if an inventor is inadvertently not named, the patent will not be invalidated as long as the error was not done with any "deceptive intent":

> Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent and such error arose without any deceptive intention on his part, the Director may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error.  The error of omitting inventors or naming persons who are inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section.  The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Director shall issue a certificate accordingly.

35 U.S.C. § 256.

374.    "[Section 256] is a savings provision.  If a patentee demonstrates that inventorship can be corrected as provided for in section 256, a district court must order correction of the patent, thus saving it from being rendered invalid."  *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1350 (Fed. Cir. 1998).

**B.    Findings Of Fact**

375.    Defendants contend that all of the claims of the '200 and '245 patents are invalid because Sensormatic, including the inventors, knowingly omitted Dennis Gadonniex as an inventor on both patents with the intent to deceive the PTO.

376.    For the reasons stated below, this Court rejects Defendants' non-joinder contentions.

**1.    Mr. Gadonniex Did Not Conceive Of Any Of The Claimed Inventions Of The Asserted Claims Of The '200 Or '245 Patents**

377.    Defendants rely on the testimony of Mr. Gadonniex as the basis for their

inventorship defense.  Mr. Gadonniex testified that he believes he should have been named an inventor on both the '200 and the '245 patents.  (Gadonniex, Tr. 1633:8-12)

378.    Mr. Gadonniex invented methods for processing Metglas 2605SB1 ("SB1") to be used as a bias material.  Those methods are the subject of *other* patents on which Mr. Gadonniex is named as the inventor, including U.S. Patent Nos. 5,870,021 and 5,767,770.  (DX 18, '021 patent; DX 25, '770 patent)  Those methods are not the invention claimed in the '200 and '245 patent.  Claim 31 of the '200 patent claims using SB1 bias material in a marker, but does not claim the method for processing SB1.  (PX 786, col. 15:12-13)

379.    At trial Mr. Gadonniex identified the claims that he believed he had contributed to as '200 patent claims 1, 2, "maybe" 3, 4-9, 15, and 31 through 33.  (Gadonniex, Tr. 1643:7-1644:23)  Mr. Gadonniex did not identify any particular claims of the '245 patent to which he contends he contributed.

380.    Defendants offered no documentation or other corroboration of Mr. Gadonniex's testimony.  To the contrary, documents contemporaneous to the inventions show that Dr. Coffey and Dr. Copeland were the individuals who conceived of the claimed inventions.  (*See, e.g.*, DX 256, Feb. 23, 1996 Invention Disclosure (Ex. A); DX 155, Nov. 28, 1995 Coffey memo; PX 382, Feb. 28, 1996 Coffey memo; PX 527, Mar. 8, 1996 Coffey memo)

381.    The evidence showed that Mr. Gadonniex did not contribute to the conception of the claimed inventions, but instead assisted the inventors after the invention had been conceived.

382.    Dr. Copeland testified that Mr. Gadonniex played no role in the conception of the inventions of the '200 or '245 patents.  (Copeland, Tr. 1447:2-4)  Dr. Coffey asked Mr. Gadonniex to investigate a lower coercivity range after the November 1995 conception. (Copeland, Tr. 1434:7-16)

383.    Similarly, Dr. Coffey testified that Mr. Gadonniex did not contribute to the conception of the inventions, but worked on making Metglas 2605 SB1 material more abrupt after Drs. Copeland and Coffey's November 1995 conception.  (Coffey, Tr. 411:9-15, 411:20-412:5)

78

384.    Mr. Gadonniex himself admitted that he was "a person that helped apply research development ideas to production."  (Gadonniex, Tr. 1634:14-15)

385.    Even if Mr. Gadonniex were a credible witness, his assertions, uncorroborated and contradicted by contemporaneous records, do not constitute clear and convincing evidence that he was an inventor of the claims of the '200 patent and '245 patent.  With respect to the '245 patent, he did not even identify which claims he contends he contributed to, much less corroborate those contentions.

386.    Furthermore, the Court finds that Mr. Gadonniex's testimony was generally not credible or reliable.  As described in Section IV above, Mr. Gadonniex's testimony was on several occasions contradicted by previous testimony or shown to be inaccurate.

387.    With respect to claims of inventorship, Mr. Gadonniex's position has changed over time.  Mr. Gadonniex admitted that he never told anybody during the time he worked at Sensormatic that he should have been named an inventor on the '200 or '245 patents.  (Gadonniex, Tr. 1752:2-5)  It was only after being named a personal defendant in this suit that he claimed for the first time that he should have been named an inventor.  (Gadonniex, Tr. 1755:14-18)

388.    During Mr. Gadonniex's deposition in January 2008 he identified 8 claims of the '200 patent to which he claimed he had contributed.  (Gadonniex, Tr. 1760:13-1762:11)  During his trial testimony, his list was very different.  At trial he identified 13 claims, only 4 of which were on his list in his deposition.  (Gadonniex, Tr. 1758:18-1760:12; Sensormatic Dem. 203)

389.    Mr. Gadonniex's shifting positions about whether he invented any claims of the '200 patent, and which claims he contributed to, cast doubt on the testimony.  Mr. Gadonniex's trial testimony concerning inventorship lacks credibility and is unreliable.

390.    Defendants have not shown by clear and convincing evidence that Mr. Gadonniex conceived of any of the claimed inventions of any of the asserted claims.

### 2.    There Was No Intent To Deceive The PTO By Omitting Mr. Gadonniex As An Inventor

391.    Defendants offered no evidence that anyone at Sensormatic, much less the inventors Dr. Copeland and Dr. Coffey, omitted Mr. Gadonniex as an inventor with intent to deceive the PTO.

392.    Defense counsel suggested in opening that Mr. Gadonniex had been omitted because of concerns that "Metglas" might also become involved.  (Opening, Tr. 69:1-14) "If you are going to file a fraudulent patent application, you don't want to pull Metglas in this.")) Defendants presented no evidence to support this theory, and did not address the inventorship defense at all in closing argument.

393.    Nobody at Sensormatic had a motive to intentionally omit Mr. Gadonniex as an inventor.  Mr. Gadonniex's employment contract required him to assign his rights to Sensormatic.  (Gadonniex, Tr. 1762:20-1763:2)  There was no evidence that Dr. Copeland or anyone else at Sensormatic was biased against Mr. Gadonniex.  Sensormatic listed Mr. Gadonniex as an inventor on what became the '770 and '021 patents around the same time – both having application dates of July 1, 1996.  (DX 25, '770 patent; DX 18, '021 patent)

394.    Dr. Copeland testified that he did not intentionally leave Mr. Gadonniex off the patent knowing he was an inventor, and that there would have been no reason to leave Mr. Gadonniex off the patent if he had been an inventor.  (Copeland, Tr. 1449:8-13)

### C.    Conclusions Of Law

395.    Defendants failed to prove by clear and convincing evidence that Mr. Gadonniex contributed to the conception of any of the claims of the patents in suit, as is required to prove inventorship.

396.    Defendants also failed to provide corroborating evidence as required by the Federal Circuit.  *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir. 2004) (requiring "evidence to corroborate the alleged joint inventor's conception").

397.    At most, Mr. Gadonniex aided the inventors in reducing their inventions to

practice.  That is not enough to be an inventor under the law.  *See C.R. Bard, Inc. v. M3 Sys.*, 157 F.3d 1340, 1352 (Fed. Cir. 1998); *Hoop v. Hoop*, 279 F.3d 1004, 1007 (Fed. Cir. 2002).

398.    The '200 and '245 patents are not invalid for failure to join an inventor.

399.    Even if Mr. Gadonniex had been an inventor, there was no intent to deceive.  If Defendants had proven that Mr. Gadonniex should have been named an inventor, the Court would order correction of the patent pursuant to 35 U.S.C. § 256.

## XI.    Inequitable Conduct Defenses And Counterclaims

400.    Defendants have asserted that both the '200 and '245 patents are unenforceable due to inequitable conduct in the prosecution of the applications leading to those patents.  (*See* DE 276, Defendants' Answer and Amended Counterclaims to Plaintiff's Fourth Amended Complaint pp. 15-18, 25-35 (inequitable conduct as to both the '200 patent and '245 patent)). For the reasons stated below, this Court rejects Defendants' inequitable conduct contentions.

### A.    Legal Principles Governing Analysis

401.    "A patent will not be held unenforceable due to inequitable conduct unless there is clear and convincing evidence that the patent applicant (1) either 'made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the [PTO].'"  *Pfizer, Inc. v. TevaPharms. USA, Inc.*, 518 F.3d 1353, 1366 (Fed. Cir. 2008).

402.    The duty to disclose material information extends to:  "(1) Each inventor named in the application; (2) Each attorney or agent who prepares or prosecutes the application; and (3) Every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application."  37 C.F.R. § 1.56(c); *accord aaiPharma, Inc. v. Kremers Urban Development Co.*, 361 F. Supp. 2d 770, 776 (N.D. Ill. 2005) (quoting 37 C.F.R. § 1.56(c)).

403.    "Once the threshold levels of materiality and intent have been established, the trial court must weigh materiality and intent to determine whether the equities warrant a

conclusion that inequitable conduct occurred." *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 999 (Fed. Cir. 2007).

404.    A reference is material if "'a reasonable examiner would have considered such prior art important in deciding whether to allow the parent application.'" *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1363 (Fed. Cir. 2003) (citation omitted).

405.    However, a reference is not material if it "is 'simply cumulative to other references,' *i.e.*, if the reference teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the PTO." *Regents of Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1575 (Fed. Cir. 1997) (citation omitted); *accord Honeywell Int'l v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 1000 (Fed. Cir. 2007) ("Information cumulative of other information already before the Patent Office is not material.").

406.    "'[G]iven the ease with which a relatively routine act of patent prosecution can be portrayed as intended to mislead or deceive, clear and convincing evidence of conduct sufficient to support an inference of culpable intent is required.'" *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1181 (Fed. Cir. 1995) (citation omitted).  "[C]lear and convincing evidence must prove that an applicant had the specific intent to accomplish an act that the applicant ought not to have performed, *viz.*, misleading or deceiving the PTO.  In a case involving nondisclosure of information, clear and convincing evidence must show that the applicant made a deliberate decision to withhold a known material reference." *(Id.)*

407.    "[A] finding that particular conduct amounts to 'gross negligence' does not of itself justify an inference of intent to deceive; the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 876 (Fed. Cir. 1988) (*en banc* in relevant part).

408.     "The intent element of the offense is . . . in the main proven by inferences drawn from facts, with the collection of inferences permitting a confident judgment that deceit has occurred." *Akron Polymer Container Corp. v. Exxel Container, Inc.,* 148 F.3d 1380, 1384 (Fed.

Cir. 1998).  "However, inequitable conduct requires not intent to withhold, but rather intent to deceive.  Intent to deceive cannot be inferred simply from the decision to withhold [information] where the reasons given for the withholding are plausible."  *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1367 (Fed. Cir. 2003).

409.    "[T]he inference must not only be based on sufficient evidence and be reasonable in light of that evidence, but it must also be the single most reasonable inference able to be drawn from the evidence to meet the clear and convincing standard."  *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.,* 537 F.3d 1357, 1366 (Fed. Cir. 2008).  "Given the existence of a credible reason for the withholding, the materiality of the references standing alone is not sufficient to establish intent."  *Pfizer, Inc. v. TevaPharms. USA, Inc.*, 518 F.3d 1353, 1367 (Fed. Cir. 2008).

410.    "The need to strictly enforce the burden of proof and elevated standard of proof in the inequitable conduct context is paramount because the penalty for inequitable conduct is so severe, the loss of the entire patent even where every claim clearly meets every requirement of patentability….  Just as it is inequitable to permit a patentee who obtained his patent through deliberate misrepresentations or omissions of material information to enforce the patent against others, it is also inequitable to strike down an entire patent where the patentee only committed minor missteps or acted with minimal culpability or in good faith."  *Star Scientific*, 537 F.3d at 1365-66 (Fed. Cir. 2008).

411.    "[E]ven if the "elevated evidentiary burden" is met as to both materiality and intent to deceive, "the district court must still balance the equities to determine whether the applicant's conduct before the PTO was egregious enough to warrant holding the entire patent unenforceable.  Thus, even if a threshold level of both materiality and intent to deceive are proven by clear and convincing evidence, the court may still decline to render the patent unenforceable."  *Star Scientific,* 537 F.3d at 1365 (Fed. Cir. 2008).

412.    "[I]nequitable conduct with respect to one claim renders the entire patent unenforceable."  *Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1332 (Fed. Cir. 1998).

413.    The Federal Circuit's "inequitable conduct cases do not extend inequitable

conduct in one patent to another patent that was not acquired through culpable conduct."

*Pharmacia Corp. v. Par Pharm.*, 417 F.3d 1369, 1375 (Fed. Cir. 2005).  As a number of district courts applying this standard have held, inequitable conduct as to one patent does not extend to a related patent unless there is an "immediate and necessary relation" between the inequitable conduct and the enforcement of the related patent:

> [W]hen determining whether later-issued descendants of a parent patent that has been found to be unenforceable are themselves unenforceable, a court must determine whether inequitable conduct occurred during the prosecution of the descendant patents or "whether the 'inequitable conduct in prosecuting the [parent] patent had immediate and necessary relation to the . . . enforcement of the [child] patents.'"

Abbott Labs. v. Sandoz, Inc., 500 F. Supp. 2d 807, 819 (N.D. Ill. 2007) (citations omitted); *accord UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*, No. C-04-1268-VRW, 2007 U.S. Dist. LEXIS 16227, at *8-9 (N.D Cal. Feb. 21, 2007)  ("because the allegations in the present action concern statements in grandparent and parent applications, TSMC must prove an 'immediate and necessary relation' between the inequitable conduct in the earlier patents and the enforcement of the descendant patent"); *Arthrocare Corp. v. Smith & Nephew, Inc.*, 310 F. Supp. 2d 638, 675 (D. Del. 2004), *rev'd in part on other grounds,* 406 F.3d 1365 (Fed. Cir. 2005) (same).

### B.    Alleged Failure To Disclose References Material To Original Claim 4 Of The '200 Patent

414.    Defendants' principal inequitable conduct contention is that Sensormatic committed inequitable conduct because individuals involved in the prosecution of the '200 patent intentionally withheld prior art references material to the prosecution of original claim 4 of the '200 patent and that, as a result, the '200 patent is unenforceable.

### 1.    Findings Of Fact

415.    Claim 4 of the '200 patent as originally issued claimed a marker with a bias element having a coercivity of "less than 55 Oe."  (PX 786, col. 12:10-11)

416.    During the Re-examination, the Examiners rejected original claim 4 of the '200 patent as anticipated by the '033 patent because the latter teaches "biasing elements having coercivity Hc values of 18, 20, 32, 50 Oe."  (PX 922, Nov. 9, 2006 Office Action)  The Examiners

pointed to Figure 4 of the '033 patent.  (*Id*.)

417.    Defendants contend that the inventors and others involved in the prosecution of the '200 patent intentionally withheld the '033 patent, as well as other prior art references, that disclosed AM EAS markers employing bias materials with coercivities of less than 55 Oe during the prosecution of the '200 patent with the intent to deceive the PTO.

418.    In particular, Defendants asserted at trial that the following references were material to original claim 4 of the '200 patent and should have been disclosed to the PTO during prosecution of the '200 patent:  the '033 patent (DX 12); the '399 patent (DX 14); the '824 patent (DX 17); the '021 patent (DX 18); the '770 patent (DX 25); and the 1993 article by Robert O'Handley entitled "Magnetic Materials for EAS Markers" ("O'Handley Article") (DX 82).  (*See* Fish, Tr. 2053:19-2056:17, 2056:20-2058:21, 2058:22-2059:15, 2047:5-2048:14, 2063:18-2064:1)

### a)        The Only Reference That Formed A Basis For Rejection During The Re-exam Was The '033 Patent

419.    Defendants cited each of the above references among the many references submitted in their Requests for Re-exam of the '200 and '245 patents.  (PX 922, Feb. 9, 2006 Office Action; PX 923, March 2, 2006 Office Action)

420.    The PTO granted the Requests for Re-exam as to both the '200 and '245 patents, stating:  "[i]t is agreed that at least the above references raise a substantial new question of patentability . . . ."  (*Id.*)

421.    The Examiners did not indicate which references raised a substantial new question of patentability.  (*Id.*)  The Examiners did not explain why any of the references raised a substantial new question of patentability.  (*Id.*)

422.    Of all of the references cited, the only prior art reference that formed the basis for a final rejection of any of the claims of the '200 or '245 patents during Re-examination was the '033 patent.  (*See, e.g.*, PX 922, Nov. 9, 2006 Office Action, Apr. 24, 2007 Office Action; PX 923, May 10, 2007 Office Action)

**b)** **Defendants' Cited Prior Art References Are Cumulative Of The Prior Art Cited In The '200 Patent Prosecution**

423.    To the extent that Defendants' cited prior art references disclose markers with bias materials having coercivities less than 55 Oe, they are cumulative of the prior art cited by the inventors and PTO during the prosecution of the '200 patent.

424.    The "Background of the Invention" of the '200 patent states:

> Conventionally, the bias element 16 is formed of a material which has 'semi-hard' magnetic properties. 'Semi-hard' properties are defined herein as a coercivity in the range of about 10-500 Oersted (Oe), and a remanence, after removal of a DC magnetization field which magnetizes the element substantially to saturation, of about 6 kiloGauss (kG) or higher.

(PX 786, col. 1:53-59)  The "10-500" range includes coercivities of less than 55 Oe.

425.    The inventors disclosed U.S Patent No. 4,510,489 during the prosecution of the '200 and '245 patents.  The '489 patent claims AM EAS markers "wherein said ferromagnetic element [the bias] has coercivity higher than said amorphous material [the resonator]."  (PX 93, col. 13 (claim 18))

426.    It was well known in the art at the time that the resonator was made from "soft" magnetostrictive material having a coercivity of typically less than 1 or 2 Oe.  (Coffey, Tr. 417:6-24; Copeland, Tr. 1513:23-1514:18)  Thus, the bias material disclosed in claim 18 of the '489 patent has a coercivity greater than 1 or 2 Oe.  (Coffey, Tr. 417:6-24; Copeland, Tr. 1514:19-22)  As a result, the '489 patent discloses markers having bias materials with coercivities less than 55 Oe.  (Coffey, Tr. 417:25-418:3)

427.    The Court will now go through each of the asserted prior art references to explain why they are merely cumulative of the prior art of record or not otherwise material.

**(i)** **The '033 Patent**

428.    The '033 patent contains the same definition of semi-hard materials to be used in a bias as in the '200 patent specification:  "a magnetic element having semi-hard magnetic properties which are defined herein as a coercivity in the range of about 10-500 Oersted . . . ."  (DX 12, col. 1:10-13)

429.     Figure 4 of the '033 patent contains a graph (shown below), which plots annealing temperature against coercivity of the resulting semi-hard magnetic material for three different annealing times.  (DX 12)  The points on the graph show semi-hard magnetic materials ranging in coercivity from approximately 5 to 70 Oe, depending on the annealing time and temperature.  (*Id.*)



*FIG. 4*

430.     However, the '033 patent does not teach or suggest using the semi-hard magnetic materials with coercivities under 50 Oe as bias materials in AM EAS markers. The '033 patent specification identifies the "optimum annealing condition" as the one "that yields the maximum coercivity."  (DX 12, col. 5:58-59)  It states, "[i]n order to realize a maximum coercivity, the annealing temperature and time must be suitably selected."  (*Id.*)  The "maximum coercivity" in Figure 4 of the '033 patent is 70 Oe.

431.     Rather than suggesting that TCA material with coercivities less than 50 Oe should be used in AM EAS markers, the additional data points shown in Figure 4 of the '033 patent merely represent coercivity values of TCA material at certain annealing times and temperatures. Dr. Copeland, who is one of the named inventors on the '033 patent, testified that "all the data

87

points on the whole graph starting from the low temperature, 450 degrees, all the way to 750 are a range of interest in the experiment to generate the curve so you could see the region of interest, which is the middle."  (Copeland, Tr. 1500:7-18)

(ii)      The '399 And '824 Patents

432.    The '399 and '824 patents, both assigned to Arnold, are directed to methods for preparing magnetic strips of a certain thickness and carbon content.  (DX 14, abstract; DX 17) They are each a continuation-in-part of the same parent patent.  (*Id*.)

433.    The claims of the '399 patent are not themselves directed to EAS markers, but rather set forth different methods for producing a thin magnetic strip.  (DX 14, col. 11:62-12:61) The '824 patent, by contrast, claims EAS markers utilizing the resulting material as a bias element.  (DX 17, col. 12)

434.    The specification of the '399 patent states:

> The magnetic properties of the finished magnetic strip prepared by the processes set forth herein are such that it has typical coercive levels, $H_c$, of from about 20 to about 100 oersteds, the exact level being application specific.  Preferred levels for $H_c$ for magnetic strips for such uses as in the electronic article surveillance field are from at least 35 to about 70 oersteds, more preferably from at least 40 to about 65 oersteds, and even more preferably from about 45 to about 60 oersteds.

(DX 14, col. 8:37-45)

435.    The '824 patent claims, among other things, an EAS marker employing a bias element made in accordance with the '824 patent specification having a coercivity of "at least 40 oersteds."  (DX 17, col. 12:26-41 (claim 9))

436.    Both the '824 and '399 patents disclose EAS markers using bias materials having coercivities less than 55 Oe, but within the 10 to 500 Oe range set forth in the '200 patent specification.  (PX 786, col. 1:54-59)

(iii)      The '021 And '770 Patents

437.    The '021 and '770 patents, both assigned to Sensormatic, issued after the '200 patent issued, on February 9, 1999 and June 6, 1998 respectively.  (DX 18; DX 25; PX 786)

438.    The '021 and '770 patents claim a two-stage method for annealing and

88

crystallizing a particular type of bias material, as well as markers using that material.  (DX 18; DX 25)

439.     The preferred embodiment disclosed in the '021 and '770 patent specifications is Metglas 2605SB1 (one of the preferred embodiment bias materials set forth in the '200 and '245 patent specifications).  (DX 18; DX 25; PX 786; PX 788)

440.     The '021 and '770 patents define "semi-hard magnetic element" in the same way as the '200 patent:  "a magnetic element having semi-hard magnetic properties which are defined herein as a coercivity in the range of about 10-500 Oersted (Oe) . . . ."  (DX 18, col. 1:7-11; DX 25, col. 1:11-14)

441.     The '021 and '770 patent specifications state that the material resulting from the 2605SB1 processing method contained therein exhibits a coercivity of either 19 Oe or 11 Oe. (DX 18, col. 5:49-57; DX 25, col. 4:46-55)  These coercivities fall within the 10 to 500 Oe coercivity range set forth in the '200 patent specification.  (PX 786, col. 1:54-59)

### (iv)     The O'Handley Article

442.     The 1993 article by Robert O'Handley, entitled "Magnetic Materials for EAS Markers," surveys the various types of EAS systems in existence in 1993.  (DX 82)

443.     The 1993 O'Handley article discloses EAS markers employing bias materials with a range of coercivities that includes values of 50 to 100 Oe, which overlaps the 0 to 55 Oe range of original claim 4 of the '200 patent. (DX 82 p. 6)  The 50 to 100 Oe range of the O'Handley article falls within the 10 to 500 Oe range set forth in the '200 patent specification. (PX 786, col. 1:54-59)

### c)     The Inventions Of The '200 Patent Were Made Prior To The Filing Date Of The '770 And '021 Patents

444.     The applications that matured into the '021 and '770 patents were both filed on July 1, 1996.  (DX 18; DX 25)

445.     The Invention Disclosure corresponding to the '200 and '245 patents was signed by Drs. Copeland and Coffey on February 23, 1996.  (DX 256, Ex. A p. 8)  It indicates a

conception date of November 1, 1995, and a reduction to practice date of January 18, 1996.  (DX 256, Ex. A)

446.    The Invention Disclosure contains data regarding tests performed on bias materials having coercivities less than 55 Oe.  For instance, Figure 5 of the Invention Disclosure "shows the ac demagnetization curve for a very low coercivity, Hc = 19 Oersted, SB1 magnet (annealed Allied 2605SB1 alloy)."  (DX 256, Ex. A p. 6)

447.    Figure 6 of the Invention Disclosure shows "a label demagnetization curve for a 2628CoA Metglas, SB1 magnet label using the bias magnet represented in Figure 5."  (DX 256, Ex. A. pp. 6-7)

448.    Figures 5 and 6 of the Invention Disclosure are identical to Figures 6 and 7 of the '200 and '245 patents.  (PX 786; PX 788; DX 256, Ex. A)

449.    Defendants cited the '021 and '770 patents during the Re-examination of the '200 and '245 patents.  (PX 922, Feb. 9, 2006 Office Action; PX 923, Mar. 2, 2006 Office Action)

450.    Inventors Copeland and Coffey thereafter submitted a Declaration of Prior Invention swearing behind the July 1, 1996 application date of the '021 and '770 patents.  (DX 256)  Drs. Copeland and Coffey attached a copy of their Invention Disclosure.  (DX 256, Ex. A)

451.    The Examiners in the Re-examination subsequently concluded that the declaration was sufficient to overcome the '021 and '770 patents as prior art as to most claims of the '200 and '245 patents, including Claims 4, 6 and 7 of the '200 patent.  (PX 922, Nov. 9, 2006 Office Action; PX 923, May 10, 2007 Office Action)

452.    At trial, both Dr. Copeland and Dr. Coffey testified that they had conceived of the inventions of the '200 and '245 patent before Dennis Gadonniex conceived of the processing steps described in the '021 and '770 patents.  (Copeland, Tr. 1434:1-19, 1348:2-24; Coffey, Tr. 411:9-412:5)  Drs. Copeland and Coffey first tasked Mr. Gadonniex with coming up with a method for processing 2605SB1 to obtain abrupt characteristics after they had conceived of the '200 and '245 patent inventions.  (Copeland, Tr. 1434:1-19, 1348:2-24; Coffey, Tr. 411:9-412:5)

90

Mr. Gadonniex thereafter conceived of those processes, which were the basis for the '021 and '770 patents.  (Copeland, Tr. 1434:1-19, 1348:2-24; Coffey, Tr. 411:9-412:5)

453.    Defendants did not at trial dispute that the '200 and '245 patent inventions pre-date the '021 and '770 patent inventions.

454.    The Examiners during re-examination did not reject any claims of the '200 or '245 patents on the basis of either the '021 or '770 patents.

> **d)    Defendants Have Not Shown That The Inventors Or Prosecuting Attorney Knowingly Withheld These References With The Intent To Deceive The PTO**

455.    Defendants have not provided clear and convincing evidence that the inventors or anyone else substantively involved with the prosecution of the '200 patent knowingly withheld any of the above-cited references with the intent to deceive the PTO.

456.    The only people who were substantively involved in the prosecution of the '200 and '245 patents and preparation of those applications were inventors Richard Copeland and Kevin Coffey, as well as the prosecuting attorney.  (Copeland, Tr. 1502:20-1503:5; Coffey, Tr. 473:10-25)  Mr. Hubert Patterson was not substantively involved in either the prosecution of or preparation of applications for the '200 or '245 patents.  (Patterson, Tr. 311:5-312:2; Copeland, Tr. 1502:20-1503:5; Coffey, Tr. 478:6-12)

457.    On the face of the specifications of the '200 and '245 patents, the inventors disclosed that "conventional" bias materials for EAS markers could have coercivities ranging from 10-500 Oe.  (PX 786, col. 1:53-59; PX 788, col. 1:57-63)

458.    The prosecuting attorney for the '200 and '245 patents disclosed the '033 patent to the PTO during the prosecution of the '021 and '770 patents, both of which were also assigned to Sensormatic.  (DX 18; DX 25)  The prosecuting attorney for the '200 and '245 patents was the same prosecuting attorney for the '021 and '770 patents.  (DX 18; DX 25; PX 786; PX 788)

459.    The '770 and '021 patents were prosecuted at the same time as the '200 and '245 patents.  The applications that matured into the '770 and '021 patent applications were filed on July 1, 1996, less than two months before the filing of the '200 patent application.  (*Id.*)

460.     The Examiner on the '770 and '021 patents was the same examiner – Glenn Swann – who examined the '200 and '245 patent applications.  (*Id*.)  The prosecuting attorney would have had reason to expect Glenn Swann to be the examiner on all of the patents.  Glenn Swann had been the examiner on most of the Sensormatic patents prosecuted and examined during that time period.  In addition to examining the '200, '245, '770 and '021 patent applications, Mr. Swann was the examiner on the '033 patent, the '140 patent, and the '230 patent, all of which were assigned to Sensormatic.  (DX 12; DX 1; DX 24)

461.     Had the prosecuting attorney intended to deceive the PTO by withholding the '033 patent, he would not have submitted the '033 patent during the prosecution of the '021 and '770 patents, which were occurring at the same time before what was likely to be the same examiner.

462.     In addition, the evidence at trial showed that Drs. Coffey and Copeland did not understand original claim 4 of the '200 patent to cover all markers employing bias materials with coercivities less than 55 Oe.  Rather, both inventors understood original claim 4 in the context of the patent to refer only to an abrupt marker.  For instance, Dr. Coffey testified:

> Q.     Did you understand in 1996 that claim four covered any EAS marker with a bias material that had a coercivity of less than 55?
>
> A.     No.
>
> Q.     Why not?
>
> A.     My understanding is that it is describing, this is in the context of the '200  patent, and it is describing  a marker for use in the system in the context of the '200 patent.
>
> Q,     How is it that the '200 patent related to the coercivity less than 55?
>
> A.     The '200 patent talks about abrupt bias material very explicitly, so the marker, as I understand it, would be one using abrupt bias, and the -- for use in a magneto and mechanical article surveillance system in the '200 patent, it is described the issue of low field stability and the need to have that, and so that is how I would interpret that.

(Coffey, Tr. 413:6-23)  Dr. Coffey's testimony regarding his understanding of original claim 4 remained consistent throughout the trial.  (*See, e.g.*, Coffey, Tr. 437:4-17, 438:2-9, 439:6-14, 439:15-441:1, 441:10-23, 441:24-442:8, 443:2-21, 444:6-13, 471:19-472:7, 472:14-22)

463.     Dr. Copeland testified similarly with regard to his understanding of claim 4:

"The way I read the patent claims as an engineer is that all of the claims of the patent refer to an abrupt marker and the various claims, such as claim nine, is an aspect or characteristic of the invention."

"Again, my view when I was one of the inventors reading the claims, my understanding was that in all of the claims when it says a marker, we are talking about the invention or abrupt marker, and claim four was just adding coercivity restriction to that marker."

(Copeland, Tr. 1280:12-15, 1288:5-10)

464.     During the re-examination, Dr. Copeland and Dr. Coffey filed a "Declaration of Prior Invention Under § 1.131" in which they explained that the "Invention" of the '200 patent was "a device and method for a magnetomechanical electronic article surveillance marker using a bias element that has an *abrupt magnetization and deactivation characteristic*."  (DX 256 p. 2 (emphasis added))  Their declaration referred to this "Invention" in the context of claim 4.  (DX 256, ¶ 3)

465.     Dr. Copeland testified that it was not until the PTO rejected claim 4 in the re-examination -- after the declaration was filed -- that he realized there might be a problem with the claim.  (Copeland, Tr. 1518:4-20, 1522:11-21, 1290:4-11)

466.     Like Dr. Coffey, Dr. Copeland's testimony remained consistent throughout the trial, in the face of many hours of cross-examination on the topic.  (Copeland, Tr. 1286:12-19, 1288:19-1289:1, 1289:10-18, 1319:18-24, 1329:22-1330:15, 1336:2-7, 1370:5-9, 1417:8-14, 1550:18-1551:5, 1568:16-1570:7, 1570:20-1571:25)

467.     Defendants assert that Dr. Coffey's and Dr. Copeland's reading of claim 4 was "bizarre," and hence their testimony should not be credited.  (Fish, Tr. 2055:17-2056:2)  This Court disagrees and finds Dr. Coffey's and Dr. Copeland's explanation of their understanding of claim 4 to be credible.

468.     Neither Dr. Coffey nor Dr. Copeland is a lawyer or has any legal training.  (Coffey, Tr. 432:1-6, 1438:14-1439:1)  They did not draft the claims, but instead reviewed them.  (Copeland, Tr. 1501:9-20)

469.     Claim 4 was but one of 47 claims in the original '200 patent application.  (PX 86)
As Dr. Copeland testified, he did not read each claim in isolation, but instead read all 47 of the
claims together for their technical content in the context of the entire patent.  (Copeland, Tr.
1501:24-1502:9)

470.     The title of both patents is:  "Magnetomechanical Electronic Article Surveillance
[sic] Marker With Bias Element Having Abrupt Deactivation/Magnetization Characteristic."
(PX 786; PX 788)  All of the figures in the patents, (except those labeled "prior art") as well as
the three preferred embodiments, exhibit abrupt magnetic properties.  (PX 786)  Lower
coercivity was but one of eight aspects of the invention identified in specification, all of which
focus on various abrupt characteristics.  (PX 786, col. 3:12-4:44)

471.     Drs. Copeland and Coffey would have had no motive to claim a non-abrupt
marker employing a bias material with a coercivity of less than 55 Oe.  The unrebutted evidence
at trial showed that non-abrupt, low coercivity markers are not useful or commercially viable.

472.     Prior to Dr. Coffey's arrival, Sensormatic had attempted but was unable to
develop a low coercivity marker that worked reliably.  (Patterson, Tr. 136:21-137:15; Copeland,
Tr. 1442:17-1443:10)  Dr. Coffey testified that a marker employing a non-abrupt bias material
with a coercivity of less than 55 Oe would not have been useful or workable in commercial
systems.  (Coffey, Tr. 439:6-440:8)  Sensormatic thus did not commercialize low coercivity
markers until after Drs. Coffey and Copeland conceived of the '200 and '245 patent inventions.
Sensormatic stood nothing to gain by claiming a low coercivity marker that did not also exhibit
other abrupt characteristics.

473.     Drs. Copeland and Coffey had no financial motive to deceive the PTO.  The
inventors had no ownership rights in either patent, as both were assigned to Sensormatic.  (PX
786; PX 788)

474.     The Court will now go through each of the asserted prior art references to explain
why Defendants have not shown by clear and convincing evidence that the inventors or
prosecuting attorney withheld the reference with the intent to deceive the PTO.

94

(i)      **The '033 Patent**

475.    The '033 patent is a metal processing patent, which claims a process for making semi-hard magnetic materials and markers using that material.  (DX 12; Copeland, Tr. 1495:14:-18)  The '033 patent did not disclose any abrupt characteristics of bias materials.  (Copeland, Tr. 1496:1-3)

476.    In addition, Drs. Copeland and Coffey understood the '033 patent to teach the use of higher coercivity bias materials in markers in the 70 Oe range, consistent with the high energy bias specification used by Sensormatic at the time the '033 patent was issued.  (Copeland, Tr. 1495:14-1496:17; 1498:20-23, 1500:19-1501:2; Coffey, Tr. 534:4-22)

477.    Drs. Copeland and Coffey's explanation of their understanding of the '033 patent was credible.  The '033 patent states in various places that the optimal annealing conditions are those that result in the highest coercivity material.  (DX 12, col. 5:4-6, 57-59)  The highest coercivity achieved as shown in Figures 4 of the '033 patent is 70 Oe.  (DX 12)

478.    While Drs. Copeland and Coffey knew of the '033 patent, Defendants presented no evidence that either Dr. Copeland or Dr. Coffey ever actually considered whether to disclose the '033 patent during the prosecution of the '200 patent.  For instance, Dr. Coffey testified, "I don't recall the Liu '033 patent being considered, so I don't think the decision to exclude is a correct characterization."  (Coffey, Tr. 476:12-24)  There was thus no evidence that Drs. Copeland or Coffey intentionally withheld the '033 patent.

(ii)      **The '399 And '824 Patents**

479.    Defendants presented no evidence that Dr. Copeland was aware of the '399 or '824 patents during the prosecution of the '200 or '245 patents.  Dr. Copeland testified that he did not know of the '399 patent at any time during the pendency of the '200 patent.  (Copeland, Tr. 1327:10-13)

480.    Defendants presented no evidence that the prosecuting attorney was aware of the '399 or '824 patents during the prosecution of the '200 or '245 patents.

481.    Defendants presented no evidence that Dr. Coffey was aware of the '824 patent

95

during the prosecution of the '200 or '245 patents.  Dr. Coffey was, however, aware of the existence of the '399 patent.  (Coffey, Tr. 500:21-501:6, 501:16-19)

482.    Defendants presented no evidence that Dr. Coffey withheld the '399 patent with an intent to deceive the PTO.  Like the '033 patent, the '399 patent is principally a metallurgy and processing patent disclosing a particular way to process semi-hard magnetic materials.  (DX 14)  It does not in fact claim EAS markers.  (*Id.*)

483.    Dr. Coffey did not recall being familiar with the contents of the '399 patent during the prosecution of the '200 and '245 patents.  (Coffey, Tr. 503:21-504:2, 500:21-501:6, 501:16-19)  Dr. Coffey could not recall ever discussing the '399 patent with Dr. Copeland or whether to disclose the '399 patent to the PTO.  (Coffey, Tr. 503:15-504:14)

### (iii)    The '021 And '770 Patents

484.    Both the '021 and '770 patents were issued after the '200 patent was issued.  (DX 18; DX 25; PX 786)

485.    Drs. Copeland and Coffey conceived of and reduced to practice the inventions of the '200 patent before Mr. Gadonniex filed for the '021 or '770 patents.  (*See supra* Section XI.B.1(c); DX 256, Feb. 23, 1996 Invention Disclosure (Ex. A)

486.    The '770 patent was cited in connection with the prosecution of the '245 patent.  (PX 788)  No claims of the '245 patent were rejected based on the '770 patent.  (PX 87, Notice of Allowability)

487.    There is no evidence that Drs. Copeland or Coffey were aware of the substance of the '770 or '021 patent applications during the prosecution of the '200 patent.  To the extent there was any evidence presented on that issue, Dr. Copeland testified that he was not aware of the '021 patent application at the time the '200 patent was filed.  (Copeland, Tr. 1351:22-1352:4)

488.    Dr. Coffey testified that he did not recall being aware of the '770 patent application.  (Coffey, Tr. 518:13-519:12)

### (iv)    The O'Handley Article

489.    There is no evidence that Dr. Copeland, Dr. Coffey or the prosecuting attorney

was aware of the O'Handley article during the prosecution of the '200 or '245 patents.  Dr. Copeland testified that he did not recall having seen the O'Handley article prior to the litigation. (Copeland, Tr. 1353:17-22)

### 2.   Conclusions Of Law

#### a)   '200 Patent

490.   Defendants have not shown by clear and convincing evidence that the above references were material to the prosecution of original claim 4 of the '200 patent.

491.   To the extent that one or more of the references disclose bias materials having coercivities of less than 55 Oe, such references are not material because they are cumulative of the information already cited during the '200 patent prosecution.  *Regents of Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1574-75 (Fed. Cir. 1997) (cumulative references not material).

492.   While Figure 4 of the '033 patent contains data points with coercivities less than 55 Oe, it does not teach or even suggest that the lower coercivity semi-hard magnetic materials shown in the figure should be used or would even work in an AM EAS marker.  Rather, the '033 patent teaches that the optimal annealing time and temperature are those that produce the *highest coercivity* semi-hard magnetic material, which in the case of Figure 4 is 70 Oe.

493.   The only suggestion in the '033 patent that bias material less than 55 Oe might be used in an AM EAS marker is found in dependent claim 35, which claims a marker having a bias element "the coercivity of said overall second magnetic element is greater than about 50 Oe." (DX 12, col. 11:1-3)  Not only does this confirm that the '033 patent teaches away from using low coercivity bias materials, but the range of "greater than about 50 Oe" in dependent claim 35 of the '033 patent is no more "specific" than the 10 to 500 range identified in the "Background of the Invention" of the '200 patent and hence is cumulative.

494.   Defendants nevertheless assert that Sensormatic has "constructively waived" any argument that the '033 patent and other references are not material because Sensormatic did not appeal the PTO's decision to grant the request for re-examination.  Sensormatic could not have appealed that decision, and did not waive anything by failing to do so.  *See* MPEP § 2246

97

("neither the patent owner nor the requester has a right to petition or request reconsideration of a finding that prior art patents or printed publications raise a substantial new question after a request for re-examination is granted.")

495.    Even if Defendants could show materiality, they have not shown an intent to deceive by clear and convincing evidence.

496.    Defendants have not shown that either of the inventors or the prosecuting attorney were aware of the '824 patent or the 1993 O'Handley article during the prosecution of the '200 patent. The Federal Circuit has "repeatedly reaffirmed the proposition that 'as a general rule, there is no duty to conduct a prior art search, and thus there is no duty to disclose art of which an applicant could have been aware.'"  *Frazier v. Roessel Cine Photo Tech, Inc.*, 417 F.3d 1230, 1238 (Fed. Cir. 2005).

497.    There was no one else substantively involved in the prosecution of the '200 patent besides the inventors and prosecuting attorney.  Therefore, any knowledge of prior art references by Mr. Patterson or others at Sensormatic is irrelevant as a matter of law.  *See* 37 C.F.R. § 1.56(c); *accord aaiPharma, Inc. v. Kremers Urban Development Co.*, 361 F. Supp. 2d 770, 776 (N.D. Ill. 2005) (quoting 37 C.F.R. § 1.56(c).

498.    As for the '021 and '770 patents, they did not issue until *after* the '200 patent had issued.  There is no evidence that Drs. Copeland or Coffey knew of the applications – much less the substance of those applications – that matured into those patents during the prosecution of the '200 patent.

499.    Drs. Copeland and Coffey conceived of and reduced to practice the claimed inventions of the '200 patent prior to the filing of the '021 or '770 patents, meaning that the '021 and '770 applications are not prior art.  (*See supra* ¶ 561)  As the Federal Circuit has recognized

> . . . Once the inventor shows an earlier date of invention, the document is no longer prior art under section 102(a).
>
> Any suggestion that a document is prior art because it appears before the filing date of a patent ignores the requirements of section 102(a). Section 102(a) explicitly refers to invention dates, not filing dates. Thus, under section 102(a), a document is prior art only when

published before the invention date.

*Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1576 (Fed. Cir. 1996)[5]  There would have been no reason for anyone to intentionally withhold the '021 or '770 patent applications.

500.    As for the '399 and '033 patents, Defendants have not shown that the inventors or prosecuting attorney of the '200 patent intentionally withheld those references with an intent to deceive.

501.    Neither the inventors nor the prosecuting attorney had any motive to deceive the PTO to obtain claims to markers with low coercivity bias elements alone.  Markers using such bias materials would not work in the absence of other abrupt characteristics.  There would have been no reason to risk the remaining claims of the '200 patent on claims that were otherwise worthless.

502.    The inventors' and prosecuting attorney's actions in prosecuting the '200 patent confirm there was no intent to deceive.  The same prosecuting attorney disclosed the '033 patent to the PTO during the prosecution of the '021 and '770 patents, which occurred during the same time period as the '200 patent.  The examiner – Glen Swann – was the same for the '021, '770 and '200 patents.  Glenn Swann had been the examiner on most other Sensormatic EAS patents prosecuted during that time period.

503.    Had the prosecuting attorney intended to deceive the PTO, he would not have submitted the '033 patent along with the '021 and '770 patent applications just weeks before submitting the '200 application, particularly where there was a substantial likelihood that the same examiner would be considering the '021, '770, and '200 patent applications.  Disclosure of a reference during a co-pending application, particularly to the same examiner, strongly suggests that there was no intent to deceive.  *See Kimberly-Clark Corp. v. Proctor & Gamble Distrib. Co.*,

---

[5] In addition, §102(e) of the Patent Act in force at the time the '200 patent was prosecuted provided that an invention shall not be patentable if it "was described in a patent granted on an application for patent by another filed in the United States before the invention … the applicant." 35 U.S.C. § 102(e) (2008).  Neither the '770 nor '021 patents issued until *after* the '200 patent had issued, and hence the applications would not have been prior art at any time during the prosecution of the '200 patent.

973 F.2d 911, 918 (Fed. Cir. 1992); *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 106 F. Supp. 2d 667, 680 (D.N.J. 2000).

504.   To the extent that the inventors were aware of any of the asserted prior art references, such as the '033 patent, this Court finds their explanations for not disclosing such references to be credible.  For instance, the inventors' testimony that they understood original claim 4 within the context of the '200 patent to refer to a marker with abrupt properties is credible.  The Federal Circuit itself has "repeatedly stated, 'claims must be read in view of the specification, of which they are a part.'"  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*).

505.   Hence, even if this Court concluded that such references were material, the inventors' credible explanation would defeat any inference of deceptive intent.  *See Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1367 (Fed. Cir. 2003). ("Intent to deceive cannot be inferred simply from the decision to withhold the reference where the reasons given for the withholding are plausible"); *Pfizer, Inc. v. TevaPharms. USA, Inc.*, 518 F.3d 1353, 1367 (Fed. Cir. 2008).  ("Given the existence of a credible reason for the withholding, the materiality of the references standing alone is not sufficient to establish intent").

506.   Because Defendants have not proven materiality or intent to deceive by clear and convincing evidence, this Court does not need to engage in balancing materiality and intent to determine whether inequitable conduct in fact occurred.  *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 999 (Fed. Cir. 2007).

### b)      '245 Patent

507.   There is no argument that prior art references disclosing low coercivity bias materials, without abrupt characteristics, are material to any claims of the '245 patent.  Unlike the '200 patent, the '245 patent never contained any claims arguably limited to a marker with

low coercivity bias material.  All of the claims of the '245 patent expressly include one or more other abrupt characteristics as well.  (PX 788, cols. 11-16)

508.   In addition, the '770 patent was cited by the Examiner during the original prosecution of the '245 patent.  (PX 87)  The fact that it was the Examiner who cited the reference, rather than the inventors, is irrelevant: there cannot be inequitable conduct for failing to disclose a reference when it was cited in the prosecution.  *Molins PLC v. Textron*, 48 F.3d 1172, 1185 (Fed. Cir. 1995) ("'When a reference was before the examiner, whether through the examiner's search or the applicant's disclosure, it cannot be deemed to have been withheld from the examiner.'") (citation omitted).

509.   The '770 patent specification states that the material resulting from the 2605SB1 processing method has a coercivity of either 19 Oe or 11 Oe.  (DX 25, col. 4:46-55)  As a result, each of the references that Defendants contend should have been disclosed to the PTO because they referenced ('033 patent, '399/'824 patents, '021 patent, and the O'Handley article) coercivities less than 55 Oe are cumulative to the '770 patent that was cited in the prosecution of the '245 patent.

510.   In addition, Defendants' contention that inequitable conduct occurred with regard to claim 4 of the '200 patent does not lead to a finding that the '245 patent is unenforceable.  The mere fact that the '245 patent is related to the '200 patent is insufficient to warrant a finding of unenforceability.  *See Pharmacia Corp. v. Par Pharm.*, 417 F.3d 1369, 1375 (Fed. Cir. 2005) (our "inequitable conduct cases do not extend inequitable conduct in one patent to another patent that was not acquired through culpable conduct").

511.   Instead, the alleged inequitable conduct must have an "immediate and necessary relation" to the enforcement of the related patent:

> [W]hen determining whether later-issued descendants of a parent patent that has been found to be unenforceable are themselves unenforceable, a court must determine whether inequitable conduct occurred during the prosecution of the descendant patents or "whether the 'inequitable conduct in prosecuting the [parent] patent had immediate and necessary relation to the . . . enforcement of the [child] patents.'"

*Abbott Labs. v. Sandoz, Inc.*, 500 F. Supp. 2d 807, 819 (N.D. Ill. 2007) (citations omitted); *see*

*also Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1331-32 (Fed. Cir. 1998) (divisional patent not tainted); *UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*, No. C-04-1268-VRW, 2007 U.S. Dist. LEXIS 16227, at *8-9 (N.D Cal. Feb. 21, 2007)  ("because the allegations in the present action concern statements in grandparent and parent applications, TSMC must prove an 'immediate and necessary relation' between the inequitable conduct in the earlier patents and the enforcement of the descendant patent"); *Arthrocare Corp. v. Smith & Nephew, Inc.*, 310 F. Supp. 2d 638, 674 (D. Del. 2004), *rev'd in part on other grounds,* 406 F.3d 1365 (Fed. Cir. 2005) (same).

512.    There is no "immediate and necessary" relation between the alleged inequitable conduct in the prosecution of the '200 patent and any of the claims of the '245 patent.  Unlike the '200 patent, there are no claims of the '245 patent that arguably claim use of low coercivity bias materials alone without expressly claiming other abrupt characteristics.  (PX 788 cols. 11-16)  The fact that the claims of the '245 patent were issued over the '770 patent and its reference to specific coercivies less than 55 Oe demonstrates that the alleged inequitable conduct in the prosecution of the '200 patent had no immediate or necessary relation to the prosecution of the '245 patent.

## C.    Alleged Failure To Disclose Documents Showing Prior Sale Of Markers With Low Coercivity Bias Elements

513.    Defendants contend that Sensormatic, including the inventors, were aware of but intentionally withheld from the PTO documentation showing that Sensormatic sold or publicly used markers (as set forth in 35 U.S.C. § 102(b)) with Arnokrome 4, TCA and/or SemiVac 90 bias materials with coercivities less than 55 Oe prior to the critical date of August 28, 1995.  For the reasons stated below, this Court rejects Defendants' contentions.

### 1.    Findings Of Fact

#### a)    Defendants Did Not Adequately Plead Their Inequitable Conduct Defenses And Counterclaims Based On Failure To Disclose Prior Sales Or Public Use Of Markers With Arnokrome 4 Or TCA Bias Materials

514.    Defendants did not include in their defenses or counterclaims specific allegations

that the inventors or other individuals substantively involved in the prosecution of the '200 or '245 patents committed inequitable conduct by withholding information regarding prior sales or public use of markers containing Arnokrome 4, TCA or SemiVac 90.  (*See* DE 276 pp. 15-18, 29-33)

515.    On April 28, 2008, Defendants moved for leave to amend their inequitable conduct counterclaims to include a catch-all allegation that Sensormatic improperly withheld from the PTO evidence of "prior commercial sales of products" that practice one or more claims of the '200 and '245 patents.  (DE 289-2 pp. 32, 34-35)

516.    On May 28, 2008, this Court denied Defendants' motion for leave to amend because the proposed catch-all provisions did not identify "what commercial sales were undisclosed" and hence fell "short of the heightened pleading standard enforced by the Federal Circuit for inequitable-conduct counterclaims."  (DE 292 p. 2)

517.    Defendants never thereafter moved for leave to amend their counterclaims or defenses to include specific allegations regarding prior undisclosed sales or public uses of markers with Arnokrome 4, TCA or SemiVac 90.

> **b)**    **Defendants Have Not Shown That The Inventors Or Prosecuting Attorney Knew Of Sales Or Public Use Of Markers With Low Coercivity Bias Elements Prior To August 28, 1995**

518.    This Court hereby incorporates by reference its Findings of Fact relating to Defendants' On-Sale Bar invalidity defenses and counterclaims.  (*See supra* Section VII.B.)  As set forth therein, Defendants have not shown that Sensormatic sold, offered for sale or publicly used markers with Arnokrome 4, TCA or SemiVac 90 having a coercivity of less than 55 Oe prior to August 28, 1995.  (*Id.*)

519.    Even if Defendants could show that Sensormatic sold or publicly used markers employing such lower coercivity Arnokrome 4, TCA or SemiVac 90 prior to the critical date of August 28, 1995, they have not shown by clear and convincing evidence that anyone substantively involved in the prosecution of the '200 and '245 patents knew of such sales or

public use.

520.     Dr. Coffey (who began working at Sensormatic <u>after</u> August 28, 1995) testified that he had "no knowledge" as to whether Sensormatic sold markers with coercivities of less than 55 Oe prior to the conception of the '200 and '245 patent inventions.  (Coffey, Tr. 439:15-21)  He testified that he did not know whether such markers were "used or not used" before that date.  (Coffey, Tr. 439:22-440:4)

521.     Dr. Copeland testified that he had "never seen" Sensormatic sell any markers with coercivity less than 55 Oe prior to the conception of the '200 and '245 patents, but that Sensormatic had "experimented internally in engineering and in the factory in evaluations of magnets with coercivity less than 55."  (Copeland, Tr. 1293:25-1294:12, 1371:6-14)

522.     Dr. Copeland could not recall whether Sensormatic even sold markers with TCA bias material, much less what the coercivity of the bias material would have been.  (Copeland, Tr. 1372:2-5, 1489:11-14)  Dr. Copeland testified that he did not believe markers with Arnokrome 4 were ever sold by Sensormatic.  (Copeland, Tr. 1453:19-22, 1525:4-10)  Dr. Copeland testified that he was not aware of any sales of markers with SemiVac 90 bias materials prior to the critical date of August 28, 1995.  (Copeland, Tr. 1461:19-24)

523.     Defendants presented no evidence that the prosecuting attorney was aware of any sales of markers with Arnokrome 4, TCA or SemiVac 90 prior to the critical date.

524.     With regard to prior public uses, Defendants put on no evidence that Dr. Coffey, Dr. Copeland or the prosecuting attorney knew of any prior "public use" of markers with Arnokrome 4, TCA or SemiVac 90 with coercivities of less than 55 Oe.

> **c)**     **Disclosure Of Prior Commercial Sales Or Public Use Of Markers With Low Coercivity Bias Materials Would Have Been Cumulative Of The Prior Art Cited During Prosecution Of The '200 And '245 Patents**

525.     Even if Sensormatic had sold or publicly used markers with low coercivity bias materials prior to the critical date, such information would have been cumulative of the prior art cited by the inventors and PTO during the prosecution of the '200 and '245 patents.

526.    As discussed above, the '200 and '245 patents disclosed markers having bias materials with coercivities in the range of 10 to 500 Oe.  (See PX 786, col. 1:53-59)

### 2.    Conclusions Of Law

#### a)    Defendants Failed Adequately To Plead Inequitable Conduct Defenses Or Counterclaims Based On Failure To Disclose Alleged Prior Sales Of Markers With Arnokrome 4, TCA Or SemiVac 90 Bias Materials

527.    Federal Rule of Civil Procedure 9(b) provides:  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).

528.    "'Inequitable conduct, while a broader concept than fraud, must be pled with particularity.'"  *Central Admixture Pharmacy Sys., Inc. v. Advanced Cardiac Solutions, P.C.*, 482 F.3d 1347, 1356-57 (Fed. Cir. 2007) (citation omitted).  The party claiming inequitable conduct must "identify what relevant and undisclosed prior art was known to the patentee."  *Id.*

529.    Defendants did not include any allegations in their defenses or counterclaims alleging with specificity what prior sales or public uses were allegedly withheld during the prosecution of the '200 or '245 patents with the intent to deceive the PTO.

530.    Defendants had ample opportunity to move for leave to amend their defenses and counterclaims after this Court denied their request for leave to add two catch-all provisions to their counterclaims on May 28, 2008.  Defendants did not do so, and hence are barred from asserting inequitable conduct based on an alleged failure to disclose prior sales or public uses of markers with Arnokrome 4, TCA or SemiVac 90 bias materials.

### b)    '200 And '245 Patents

531.    Even if Defendants were not barred from pursuing these allegations, the Court would reject Defendants' inequitable conduct contentions based on alleged undisclosed prior sales or public uses of markers with Arnokrome 4, TCA or SemiVac 90 bias materials.

532.    The Court hereby incorporates by reference its Conclusions of Law relating to Defendants' On-Sale Bar invalidity defenses and counterclaims.  (*See supra* Section VII.C.)

533.     As indicated therein, Defendants have not shown by clear and convincing that Sensormatic sold markers with bias elements having coercivities of less than 55 Oe prior to the critical date of August 28, 1995.

534.     Defendants have also not shown by clear and convincing evidence that the inventors or prosecuting attorney either (1) knew that Sensormatic had sold or offered for sale or publicly used markers with bias elements having coercivities of less than 55 Oe prior to the critical date, or (2) withheld documentation showing such sales or public use with the intent to deceive the PTO.

535.     The inventors were under no duty to investigate whether or not Sensormatic had ever commercialized or publicly used markers employing low coercivity bias materials prior to August 28, 1995.  *Frazier v. Roessel Cine Photo Tech, Inc.*, 417 F.3d 1230, 1238 (Fed. Cir. 2005). ("The mere possibility that material information may exist will not suffice to give rise to a duty to inquire.") (citation omitted).

536.     Because Defendants have not proven any of the necessary prerequisites, this Court does not need to engage in balancing materiality and intent to determine whether inequitable conduct in fact occurred.  *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 999 (Fed. Cir. 2007).

537.     Even had inequitable conduct occurred with regard to the '200 patent, however, the Court would not find the '245 patent unenforceable.  As discussed above, the mere fact that the '245 patent is related to the '200 patent is insufficient to warrant a finding of unenforceability.  (*See supra* Section XI.B.2(b)

### D.     Alleged Failure To Disclose References Material To Original Claim 9 Of The '200 Patent

538.     In questioning Dr. Copeland at trial, Defendants appeared to suggest that Figure 5 of the '033 patent was material to original claim 9 of the '200 patent, and that Sensormatic, including the inventors, intentionally withheld the '033 patent with the intent to deceive the PTO.  Defendants did not pursue this contention in their closing argument.  As explained below,

it has no merit.  As with Defendants' other inequitable conduct allegations, this one is relevant only to the '200 patent, not the '245 patent.

### 1.    Findings Of Fact

#### a)    Original Claim 9

539.    Claim 9 of the '200 patent as originally issued claimed a marker with a bias element and resonator "wherein said biasing element is formed of a semi-hard magnetic material having a DC magnetization field characteristic such that a DC magnetic field Ha required to achieve saturation of said biasing element is less than 350 Oe."  (PX 786, col. 12:31-40)

540.    During Re-examination, the Examiners rejected claim 9 of the '200 patent as anticipated by the '033 patent.  (PX 922, Nov. 9, 2006 Office Action)  The Examiners relied on Figure 5 of the '033 patent.

541.    Figure 5 of the '033 patent shows two hysteresis loops.  (DX 12)  The first, labeled C1, is the hysteresis loop of unprocessed Metglas 2605TCA material in its "as-cast" state, which has negligible coercivity.  (Copeland, Tr. 1306:2-15)  The second, labeled C2, is the hysteresis loop of Metglas 2605TCA material processed in accordance with the '033 patent. (DX 12, col. 6:43-46)

542.    Rejecting Claim 9 of the '200 patent, the Examiners reasoned that the '033 patent "teaches a semi-hard magnetic element . . . that achieves saturation as shown in Figure 5 of less than 350 Oe. . . . Figure 5 shows a hysteresis loops [sic] which follows a curve up to a point where further increases in magnetic field strength will result in no further change in flux density."  (PX 922, Nov. 9, 2006 Office Action)

543.    The Examiners appear to have based the rejection on loop C2 rather than loop C1. (*See* PX 922, April 24, 2007 Office Action, "The C1 element, however, saturates at less than 50 Oe, however the coercivity was negligible and thus is not suitable as a magnetic 'bias' element for a marker")

544.    Sensormatic did not traverse the rejection, but instead amended the last few words of Claim 9 to read "less than 50 Oe" rather than "less than 350 Oe."  (PX 922, Jan. 9, 2007

Response to Office Action; PX 816, '200 Patent Re-examination Certificate)  The Examiners

thereafter allowed amended Claim 9.  (PX 922, Apr. 24, 2007 Office Action)

> **b)** **Figure 5 Of The '033 Patent Does Not Show Saturation Of The Bias Material In Fields Of Less Than 350 Oe As Required By Original Claim 9 Of The '200 Patent**

545.    Hysteresis loops, such as those in Figure 5, are generated by measuring the

magnetization level of a magnetic material in response to an *applied* AC magnetic field.

(Coffey, Tr. 359:3-16)  In other words, the magnetization level is measured *while the AC field is*

*still on.  (Id.)*

546.    The DC magnetization field characteristic (saturation) of a material, as set forth in

original Claim 9 of the '200 patent, is generated by measuring the *remanent magnetization* of the

material after a DC field is applied to the material *and then removed.*  (Coffey, Tr. 359:3-16)

547.    One cannot reliably extrapolate a material's DC magnetization or saturation

characteristics from a hysteresis loop.  (Coffey, Tr. 358:23-359:16; Copeland, Tr. 1307:20-

1308:15)  A material that appears to be saturated in an applied AC magnetic field of a certain

strength may not remain saturated after application and removal of a DC magnetic field of the

same strength.  (Coffey, Tr. 2462:9-2464:18)

548.    Assuming *arguendo* that one could extrapolate a material's DC magnetization

characteristic or a marker's deactivation characteristic from a hysteresis loop, Figure 5 does not

show saturation of C2 at less than a 350 Oe.  Figure 5 only shows the behavior of C2 up to 250

Oe, at which point it is not clear whether the magnetization level is continuing to increase.  (DX

12)

> **c)** **Defendants Have Not Shown That The Inventors Or Prosecuting Attorney Knowingly Withheld Figure 5 Of The '033 Patent With The Intent To Deceive The PTO**

549.    Prior to and during the prosecution of the '200 patent, Drs. Copeland and Coffey

each believed that a material's DC field magnetization characteristic could not reliably be

extrapolated from a hysteresis loop of the bias material.  (Coffey, Tr. 358:23-359:16; Copeland,

Tr. 1307:10-1308:15)

For instance, in a November 28, 1995 memo describing the abrupt bias invention, Dr. Coffey wrote:

> The relationship between M-H loop properties and the remnant magnetization of materials due to exposure to intermediate fields is not quantitative.  The bias magnet material is always used in the absence of an external applied field, and thus the remnant magnetization is the desired property to specify for control of label properties. . . . [T]he magnetization and demagnetization properties directly relate to label performance while the M-H loop properties do not.  The M-H loop is a convenient measurement to make and is of use, but it does not allow specification of the "gradual" or "abrupt" variation that we desire to control.

(DX 155 p. 2)  The "M-H loop" referred to by Dr. Coffey is a hysteresis loop.  (Coffey, Tr. 358:9-20)

550.    Defendants have provided no contrary evidence to show that the inventors or prosecuting attorney believed that Figure 5 of the '033 patent disclosed a material having a DC field magnetization characteristic such that the material was saturated in a field of less than 350 Oe.  There is no evidence that any of the individuals substantively involved in the prosecution of the '200 patent withheld Figure 5 of the '033 patent with the intent to deceive the PTO.

### 2.    Conclusions Of Law

#### a)    '200 Patent

551.    Defendants have not shown by clear and convincing evidence that 1) Figure 5 of the '033 patent was material to the patentability of original Claim 9 of the '200 patent, or 2) the inventors or prosecuting attorney knowingly withheld Figure 5 of the '033 patent with the intent to deceive the PTO.

552.    Because Defendants have not proven any of the necessary prerequisites, this Court does not need to engage in balancing materiality and intent to determine whether inequitable conduct in fact occurred.  *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 999 (Fed. Cir. 2007).

#### b)    '245 Patent

553.    Even had inequitable conduct occurred with regard to Claim 9 of the '200 patent,

109

however, the Court would not find the '245 patent unenforceable.  As discussed above, the mere fact that the '245 patent is related to the '200 patent is insufficient to warrant a finding of unenforceability.

## XII.    Permanent Injunction For Patent Infringement

### A.    Findings Of Fact

554.    Since the 1980s, Sensormatic made substantial efforts to improve AM EAS technology and "had a large number of people specifically to make improvements" in AM EAS labels.  (Patterson, Tr. 126:23-127:25)

555.    Sensormatic enjoys a reputation as an innovator in the field of AM EAS labels, which enables it to compete against manufacturers of other types of EAS systems.  (Patterson, Tr. 128:17-129:5)

556.    Sensormatic and TAG are currently the only two competitors that sell AM labels in the United States. (Patterson, Tr. 125:8-18, 309:13-18; Bulson 7/30/07 Dep. 9:3-14)

557.    TAG launched its Series 58 labels in September 2006.  In its launch materials, TAG emphasized the Series 58 labels as the sole alternative to Sensormatic's AM labels.  (PX 75)  TAG's goal with the Series 58 labels was "to secure a significant share of the 10 billion unit annual market for EAS labels."  (*Id.*)  The term "annual market" refers to the security label market worldwide, including in the United States.  (Bulson 7/30/07 Dep. 8:11-9:2)

558.    Since September 2006, TAG has sold labels to customers within and outside of the United States and has acquired a share of the AM label market in the United States.  (PX 678, describing Series 58 domestic and international sales revenue for year ending June 30, 2007; PX 951, describing Series 58 domestic and international sales revenue for year ending June 30, 2008; Patterson, Tr. 156:4-8, "We have lost sales to TAG in the Series 58 labels.")

559.    Sensormatic has a reputation in the marketplace for selling reliable EAS labels and systems.  (Patterson, Tr. 128:17-22)

560.    An inability to maintain the high quality of AM labels adversely impacts Sensormatic's reputation in the market for AM EAS systems, which includes sales of pedestals

110

and deactivation pads.  (Patterson, Tr. 155:7-24)

561.    TAG experienced problems with the quality of its Series 58 labels after launching the product in September 2006.  (Bulson 7/30/07 Dep. 117:7-17)  Sensormatic has received complaints from customers who experienced problems with TAG's Series 58 labels and blamed the problems on Sensormatic's AM EAS systems, not TAG's Series 58 labels.  (Patterson, Tr. 156:2-157:18)

562.    Customers have alternative sources for EAS systems, such as the radio frequency technology systems offered by Checkpoint Systems, which is Sensormatic's main competitor. (Patterson, Tr. 125:2-7, 156:9-25)

563.    Sensormatic has only licensed the '200 and '245 patent technology to one third party, Wallace Computer Services, Inc., and that license has expired. (PX 55; Patterson, Tr. 154:5-155:6)  Sensormatic has not licensed the technology since then, because it can satisfy the demand for AM labels itself and can better maintain the high quality of the labels if it does not license the technology to other label manufacturers.  (Patterson, Tr. 154:23-155:6)

564.    AM labels represent a very small percentage of TAG's sales.  (Bulson 10/1/07 Dep. 11:10-13, 70:16-19, 70:22-71:11)  About 98 percent of TAG's business is non-label business, and 70 percent of TAG's business is radio frequency systems.  (Bulson 10/1/07 Dep. 9:25-11:9)

565.    AM labels represent a small percentage of Phenix's revenue.  (Peter Dep. 12:18-25)

566.    Sensormatic is capable of meeting the demand for AM EAS labels in the marketplace. (Patterson, Tr. 154:20-22)

### B.    Conclusions Of Law

567.    A party seeking a permanent injunction must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, including monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest

would not be disserved by a permanent injunction.  *eBay Inc. et al. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

>    **1.    Sensormatic Faces A Threat Of Irreparable Harm**
>
>        **a)    Sensormatic And TAG Are Direct Competitors In A Two-Supplier Market**

568.    Sensormatic and TAG are direct competitors in the AM label marketplace, and they are the only two suppliers of AM labels in the U.S. market.  Since entering the AM label market in September 2006, TAG has captured a portion of Sensormatic's AM label market share in the United States.

569.    Because there are only two companies that sell AM labels in the U.S., TAG's customers would have purchased Sensormatic's AM labels if TAG's labels had not been available and they desired AM labels.  *See Muniauction, Inc. v. Thomson Corp.*, 502 F. Supp.2d 477, 482 (W.D. Pa. 2007), *rev'd in part and vacated in part on other grounds*, 532 F.3d 1318 (Fed. Cir. 2008) (where parties were competitors in two-supplier market, "a sale to defendants is, by logical extension, a lost sale to plaintiff.  Instead of buying plaintiff's patented system, customers are buying defendants' infringing system"); *Johns Hopkins Univ. v. Datascope Corp.*, 513 F. Supp. 2d 578, 586 (D. Md. 2007), *rev'd on other grounds*, No. 2007-1530, 2008 U.S. App. LEXIS 20740 (Fed. Cir. Oct. 2, 2008) ("[Defendant's] product competes directly with the Plaintiff's product.  In fact, it is the only competition and thus, its sale reduces the Plaintiffs' market share.  Continued sales by [Defendant] will irreparably harm the plaintiffs.").

570.    Defendants attempted to reduce Sensormatic's market share through various means, including both patent infringement and tortious conduct.  *See 800 Adept, Inc. v. Murex Securities, Ltd.*, 505 F. Supp. 2d 1327, 1337 (M.D. Fla. 2007), *rev'd in part and vacated in part on other grounds*, 539 F.3d 1354 (Fed. Cir. 2008) (finding irreparable harm where parties are direct competitors and "[t]he evidence presented at trial demonstrated that the [defendants] attempted to reduce the market share of [plaintiff] through various means, some of which were the bases of the jury's verdict of tortious interference.  Such evidence supports a finding of

irreparable harm.").

571.     The threat of future loss of market share to a competitor constitutes irreparable harm.  The principal value of patent ownership is the right to exclude competitors from selling an infringing product.  *See Fresenius Medical Care Holdings, Inc. v. Baxter Int'l, Inc.*, No. C 03-1431 SBA, 2008 WL 928496, at *3 (N.D. Cal. Apr. 4, 2008) ("The law favors [patentee's] right to the full value of its property, particularly the ability to keep it out of its main competitor's hands.  Indeed, the principal value of a patent is the right to exclude arch competitors from making, selling and using an infringing product."); *Visto Corp. v. Seven Networks, Inc.*, No. 03-CV-333-TJW, 2006 U.S. Dist. LEXIS 91453, at *12 (E.D. Tex. Dec. 19, 2006) ("The parties to this case are direct competitors, and this fact weighs heavily in the court's analysis.  Intellectual property enjoys its highest value when it is asserted against a direct competitor in the plaintiff's market.").

572.     Courts in patent infringement cases after the Supreme Court's *eBay* decision have routinely found irreparable harm where the plaintiff and defendant are direct competitors, particularly in a two-supplier market such as this one where the plaintiff faces an inherent loss of market share from the defendant's sales.  *See Fresenius Medical Care Holdings, Inc. v. Baxter Int'l, Inc.*, No. C 03-1431 SBA, 2008 WL 928496, at *3 (N.D. Cal. Apr. 4, 2008) ("Courts routinely find irreparable harm, and therefore grant permanent injunctions where, as here, the infringer and the patentee are direct competitors."); *Muniauction,* 502 F. Supp. 2d at 482 ("Plaintiff and defendants are direct competitors in a two-supplier market.  If plaintiff cannot prevent its only competitor's continued infringement of its patent, the patent is of little value."); *Martek Biosciences Corp. v. Nutrinova Inc*., 520 F. Supp. 2d 537, 558 (D. Del. 2007) (finding irreparable harm where defendant is plaintiff's only competitor in the market and is targeting plaintiff's customers); *Litecubes, L.L.C. v. Northern Light Prods.*, No. 04CV00485 ERW, 2006 U.S. Dist. LEXIS 60575, at *32 (E.D. Mo. Aug. 25, 2006), *aff'd*, 523 F.3d 1353 (Fed. Cir. 2008) ("Potential customers in the United States were buying infringing devices sold and imported by Defendant, instead of purchasing the products sold by Plaintiffs.  Furthermore, damages are

inadequate to compensate Plaintiff.  If the Court fails to grant equitable relief, Defendants will be able to continue to sell and import its products in violation of Plaintiffs' intellectual property rights unless Plaintiffs file another lawsuit to enforce their rights.").

**b)**    **There Is A Risk Of Irreparable Harm To Sensormatic's Reputation**

573.    In addition to facing a loss of market share, Sensormatic also risks a threat of irreparable harm to its reputation for innovation and goodwill.  Sensormatic has spent substantial time and money researching and developing the AM labels and has enhanced its reputation as the leading innovator in the field.  By infringing Sensormatic's patents in order to bring to market their own label, TAG and Phenix threaten to harm Sensormatic's reputation.

574.    "Recognition as the industry innovator is a tangible benefit afforded by a patent." *See Muniauction, Inc. v. Thomson Corp.*, 502 F. Supp. 2d 477, 483 (W.D. Pa. 2007), *rev'd in part and vacated in part on other grounds*, 532 F.3d 1318 (Fed. Cir. 2008).  For this reason, courts have found that patent holders suffer irreparable harm to their reputations when competitors sell an infringing product.  *See 800 Adept, Inc. v. Murex Securities, Ltd.*, 505 F. Supp. 2d 1327, 1337 (M.D. Fla. 2007), *rev'd in part and vacated in part on other grounds*, 539 F.3d 1354 (Fed. Cir. 2008) ("[W]here a company pioneers an invention in the marketplace, irreparable harm flows from a competitor's attempts to usurp the pioneering company's market position and goodwill."); *MPT, Inc. v. Marathon Labels, Inc.*, 505 F. Supp. 2d 401, 420 (N.D. Ohio), *rev'd on other grounds*, Nos. 2007-1183, 1204, 1238, 2007 U.S. App. LEXIS 28911 (Fed. Cir. Dec. 12, 2007) ("MPT invented a method, actively created a market, and established a strong market position and customer goodwill.  Usurping this market by inducing or contributing to infringement will irreparably harm MPT."); *Fresenius Medical Care Holdings, Inc. v. Baxter Int'l, Inc.*, No. C 03-1431 SBA, 2008 WL 928496, at *3 (N.D. Cal. Apr. 4, 2008) ("Allowing Fresenius to continue to infringe would irreparably harm Baxter's reputation and goodwill as an innovator, threaten Baxter's extensive investments in research and development, and potentially encourage other companies to infringe Baxter's intellectual property.").

114

575.     Sensormatic also faces harm to its reputation because TAG's entry into the marketplace took away Sensormatic's ability to control the quality of labels available for purchase.  *See Wald v. Mudhopper Oilfield Servs., Inc.*, No. CIV-04-1693-C, 2006 U.S. Dist. LEXIS 51669, at *16 (W.D. Okla. July 27, 2006) (finding plaintiffs suffered irreparable harm because they lost market share and the ability to maintain their own product as the industry standard).

576.     The inability to maintain the high quality of AM labels also adversely impacts Sensormatic's reputation in the market for AM EAS systems because customers who experience problems with AM labels may decide to abandon AM detection systems altogether.  Courts have found irreparable harm based upon the effect on patent owners' related products.  *See Verizon Serv. Corp. v. Vonage Holdings Corp.*¸ 503 F.3d 1295, 1310 (Fed. Cir. 2007) (upholding irreparable harm finding based in part on "lost opportunities to sell other services to the lost customers"); *Black & Decker Inc. v. Bosch Tool Corp.*, No. 04 C 7955, 2006 U.S. Dist. LEXIS 86990, at *11-12 (N.D. Ill. Nov. 29, 2006) (plaintiff suffered irreparable harm when it lost sales of products it marketed together with the product that was infringed).

### 2.      There Is No Adequate Remedy At Law

577.     Money damages alone will not adequately compensate Sensormatic for the irreparable harm caused by Defendants' infringement.  Sensormatic faces future loss of market share and erosion of the AM label market caused by Defendants' continued infringement.  Neither of these future losses is compensable by damages.  *See 800 Adept, Inc. v. Murex Securities, Ltd.*, 505 F. Supp. 2d 1327, 1337-38 (M.D. Fla. 2007), *rev'd in part and vacated in part on other grounds*, 539 F.3d 1354 (Fed. Cir. 2008) ("[I]njunctive relief operates to protect the interests of a patentee against future infringement, the market effects of which may not be fully compensable in the form of monetary damages."); *Smith & Nephew, Inc. v. Synthes (U.S.A.) et al.*, 466 F. Supp. 2d 978, 984 (W.D. Tenn. 2006) ("Relief in the form of monetary damages alone would not meet the ends of justice here because this remedy would allow the infringement to continue.  Monetary damages generally are not an adequate remedy against

future infringement because the central value of holding a patent is the right to exclude others from using the patented product.").

578.    The inadequacy of monetary damages to compensate future losses is magnified when the parties are direct competitors.  *See Novozymes A/S v. Genencor Int'l, Inc.*, 474 F. Supp. 2d 592, 612-13 (D. Del. 2007) ("[T]he statutory right to exclude represents a benefit that, under these circumstances, cannot be equated by an award of cash.  These are head-to-head competitors, and Novozymes has a right, granted by Congress, not to assist its rival with the use of proprietary technology."); *MPT, Inc. v. Marathon Labels, Inc.*, 505 F. Supp. 2d 401, 420 (N.D. Ohio), *rev'd on other grounds*, Nos. 2007-1183, 1204, 1238, 2007 U.S. App. LEXIS 28911 (Fed. Cir. Dec. 12, 2007) (monetary damages cannot stop erosion of market caused by infringer's competing product).

579.    When a company is unwilling to license its patent to others, as Sensormatic now is, a monetary reward is particularly insufficient.  *See 3M Innovative Props. Co. v. Avery Dennison Corp.*, No. 01-1781 (JRT/FLN), 2006 U.S. Dist. LEXIS 70263, at *4-5 (D. Minn. Sept. 25, 2006) (where plaintiff has been unwilling to license its product, "[t]he Court will not disturb 3M's determination that its business interests will not be served by the licensing of this product.").

580.    Accordingly, the Court finds there is no adequate remedy available to Sensormatic at law.

### 3.    The Balance Of Hardships Favors Injunctive Relief

581.    In weighing the hardship a permanent injunction may cause to Defendants, the Court must only consider hardship to the Defendants that goes beyond the hardship that necessarily accompanies an order to stop their unlawful conduct.  *See Smith & Nephew, Inc. v. Synthes (U.S.A.) et al.*, 466 F. Supp. 2d 978, 984 (W.D. Tenn. 2006) ("The hardship to [defendant] of permanently enjoining its infringing conduct is limited to the injury ordinarily expected when an injunction is imposed.  Only 'hardship to the defendant [that] is not an inseparable part of the plaintiff's right' is cognizable.  Mere hardship incurred in the process of

ceasing operations, however, is not sufficient." (internal quotations and citations omitted)).

582.    Defendants do not face hardship that goes beyond lost profits from the labels that infringe Sensormatic's patents.  This hardship is not sufficient to outweigh the harm to Sensormatic, given that Defendants chose to manufacture and sell an infringing product. *Fresenius Medical Care Holdings, Inc. v. Baxter Int'l, Inc.*, No. C 03-1431 SBA, 2008 WL 928496, at *5 (N.D. Cal. Apr. 4, 2008) (defendant cannot complain of hardship after admitting infringement and not attempting to build a non-infringing product, because it is infringer's burden "to taste the bitter fruit of its own inaction"); *Johns Hopkins Univ. v. Datascope Corp.*, 513 F. Supp. 2d 578, 586 (D. Md. 2007), *rev'd on other grounds*, No. 2007-1530, 2008 U.S. App. LEXIS 20740 (Fed. Cir. Oct. 2, 2008) (Defendant's "loss of sales of the infringing product is not accorded much weight").

583.    In any event, the injunction is unlikely to cause Defendants to go out of business since the majority of their revenues are from products other than the accused Series 58 products. *See MGM Well Servs., Inc. v. Mega Lift Sys., LLC,* 505 F. Supp. 2d 359, 379 (S.D. Tex. 2007), *aff'd*, No. 2007-1367, 2008 U.S. App. LEXIS 3446 (Fed. Cir. Feb. 19, 2008) (where infringing product represented approximately half of defendant's total sales, defendant "is free to focus on the sale of these non-infringing systems and an injunction against selling infringing systems should not impose an unreasonable hardship"); *Canon, Inc. v. GCC Int'l Ltd.*, 450 F. Supp. 2d 243, 256 (S.D.N.Y. 2006) (Court noted that, according to product catalog, defendants sold products other than infringing ones, and "notion that customers would cut them off from all sales of all products simply because they were unable to sell a relatively few types of toner cartridges is based upon nothing more than pure conjecture").

584.    In contrast, Sensormatic faces harm to its market share and reputation in the market for AM labels and EAS systems, which it went to great efforts to research and develop. This harm outweighs any potential harm to Defendants.  *See Muniauction, Inc. v. Thomson Corp.*, 502 F. Supp. 2d 477, 483-84 (W.D. Pa. 2007), *rev'd in part and vacated in part on other grounds*, 532 F.3d 1318 (Fed. Cir. 2008) ("In comparison, without the injunction, plaintiff would

suffer continued encroachment on its patent rights, loss of customers, price erosion, harm to reputation, and diminished market share.  These burdens to plaintiff are real."); *Litecubes, L.L.C. v. Northern Light Prods.*, No. 04CV00485 ERW, 2006 U.S. Dist. LEXIS 60575, at *32 (E.D. Mo. Aug. 25, 2006), *aff'd*, 523 F.3d 1353 (Fed. Cir. 2008) (balance of hardships weighs in favor of injunction where plaintiffs "went through the time and expense of developing the patented device and obtaining legal protections for his invention in the form of a patent, trademark and copyright" and defendant "has no such protection and seeks to poach customers in the United States in violation of Plaintiffs' rights.").

585.    Accordingly, the Court finds that the balance of hardships favors granting injunctive relief.

### 4.    Permanent Injunction Would Not Harm Public Interest

586.    The public interest is served by strong patent protection.  *See Abbott Labs v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006) ("[T]he public is best served by enforcing patents that are likely valid and infringed"); *Tivo, Inc. v. EchoStar Comm. Corp.,* 446 F. Supp. 2d 664, 670 (E.D. Tex. 2006), *rev'd in part on other grounds,* 516 F.3d 1290 (Fed. Cir. 2008) ("The public has an interest in maintaining a strong patent system.  This interest is served by enforcing an adequate remedy for patent infringement – in this case, a permanent injunction.").

587.    Only in rare cases such as where public health or safety is at stake does the public need for an adequate supply of a product outweigh the public's interest in enforcing patents.  *See Commonwealth Sci. & Indus. Research Org. v. Buffalo Tech. Inc.,* 492 F. Supp. 2d 600, 607 (E.D. Tex. 2007).  No such public interest is implicated here.

588.    In any event, Sensormatic can sufficiently meet any public demand for AM labels.  *MPT, Inc. v. Marathon Labels, Inc.*, 505 F. Supp. 2d 401, 420-21 (N.D. Ohio), *rev'd on other grounds*, Nos. 2007-1183, 1204, 1238, 2007 U.S. App. LEXIS 28911 (Fed. Cir. Dec. 12, 2007) (finding no harm to public interest where "there is no critical public need" for product and patentee "is more than willing to provide for customers' needs").

118

**XIII.   TAG's Misappropriation Of Sensormatic's Trade Secrets**

    **A.**    **Findings Of Fact**

        **1.**    **Sensormatic's Research And Development Of Acousto-magnetic EAS Labels**

589.    Sensormatic began its research efforts related to AM EAS labels in the 1980s. (Patterson, Tr. 125:19-127:2)

590.    Since the 1980s, Sensormatic has invested a significant amount of money into researching, developing and improving its AM labels.  (Patterson, Tr. 126:23-127:25)

        **2.**    **TAG's Goal Of Copying Sensormatic's AM EAS Labels**

591.    Mark Krom worked at Sensormatic from June 1992 to April 2000.  (Krom, Tr. 1144:6-19)

592.    Mr. Krom founded TAG Company U.S. LLC in 2003 and is currently responsible for managing all aspects of the business.  (Krom, Tr. 1149:20-1150:22)

593.    Mr. Krom hired other former Sensormatic employees to join TAG, including Kathie Bulson, former Product Manager at Sensormatic.  (Bulson 10/1/07 Dep. 5:25-6:9)  Ms. Bulson is the leader of TAG's development team for the Series 58 labels.  (Bulson, Tr. 2356:7-10)

594.    Mr. Krom also hired former Sensormatic employees to be technical consultants for TAG, including Dennis Gadonniex and Norman Hansen.  (Krom, Tr. 1158:11-1159:5)

595.    Mr. Krom began to investigate opportunities for TAG to develop its own AM EAS label, the Series 58 label, in 2003.  (Krom, Tr. 1151:1-1152:1)  The Series 58 label was launched into the market in September 2006.  (PX 75, TAG 9/11/06 Press Release)

596.    When TAG began developing its own AM EAS label, its goal was to create a label that "met the performance of the Sensormatic label."  (Bulson 10/17/07 Dep. 163:22-164:2)

        **3.**    **Sensormatic's Specifications Are Highly Valuable**

597.    Sensormatic's specifications are the "list[s] of characteristics that are necessary

119

for a particular component to operate properly."  (Patterson, Tr. 158:6-9)

598.    PX 463 contains Sensormatic's specifications for the low energy bias magnet material, revised on November 19, 1998.  (Patterson, Tr. 158:19-159:16)

599.    PX 458 contains Sensormatic's specifications for the Annealed Linear Amorphous Resonator used in Sensormatic's Dual Resonator Ultra*Max labels.  (Patterson, Tr. 173:2-5)  These specifications were revised on April 30, 1999.  (Patterson, Tr. 173:22-25)

600.    Sensormatic gives its specifications to material suppliers so that suppliers can manufacture the materials in accordance with the parameters set forth in the specifications.  (Patterson, Tr. 159:23-160:9)  If the materials do not meet Sensormatic's specifications, the labels constructed using the materials may be of lower quality or may not work at all.  (Patterson, Tr. 160:10-14)  Sensormatic considers the specifications "to be key to [its] manufacturing capability and key to [its] product quality."  (Patterson, Tr. 177:1-2)

601.    The combination of specifications within the bias and resonator specification sheets is valuable to Sensormatic, because "you may change one value and that value may affect something else."  (Patterson, Tr. 171:21-172:2)  The interrelation between the different specifications on the specification sheet would not be readily ascertainable to a competitor.  (Patterson, Tr. 172:7-10)

602.    Sensormatic's specifications are also valuable to its competitors, because they "would allow a competitor to make a label similar to [Sensormatic's] without doing all the experimentation that [Sensormatic] had to go through and the development process [Sensormatic] had to go through."  (Patterson, Tr. 175:3-9)

603.    Even when specification sheets have been revised and updated, the previous versions would still be valuable to competitors because they provide a starting point for competitors from which only a small amount of refinement is needed.  (Patterson, Tr. 177:12-178:5)

604.    Sensormatic's specifications derive independent economic value from the fact that they are not generally known to, and not readily ascertainable by proper means by,

120

others such as competitors who could derive value from them.  (Patterson, Tr. 177:3-6 ("Q: [Is]
part of the value to Sensormatic [of] the specifications in general due to the fact that competitors
do not have this information? A: Yes, they are -- yes, it is."); Patterson, Tr. 163:5-16, 166:19-22,
168:22-169:8, 170:8-11, 172:7-10 (specifications not readily ascertainable by competitors).

605.    Indeed, TAG considered Sensormatic's specifications to be valuable, which is
why TAG decided to use them as a "starting point" for developing an AM label that would
perform like Sensormatic's.  (Bulson 10/17/07 Dep. 163:22-164:5)

### 4.    Sensormatic's Specifications Are Kept Confidential

606.    Sensormatic keeps its specifications confidential.  (Patterson, Tr. 176:22-24)
Sensormatic's specifications are not available to the public.  (Patterson, Tr. 185:1-3)

607.    Sensormatic considers it important to keep its specifications secret from
competitors because the specifications would allow competitors to make competing labels
without having to spend the time Sensormatic spent developing its AM labels.  (Patterson, Tr.
178:6-13)

608.    The specifications state on their face, in capital letters, that they are proprietary
and not to be used: "This drawing may contain patented or proprietary information and must not
be used for manufacturing or any purpose detrimental to Sensormatic Electronics.  Acceptance
of this drawing will be construed as an agreement to and acceptance of the foregoing."  (PX 458;
PX 463)

609.    Sensormatic takes reasonable steps to ensure that its employees do not
disseminate the specifications to the public.  Sensormatic requires its employees to sign
Employment Agreements when they start working at Sensormatic stating that they agree to
preserve Sensormatic's confidential information.  (PX 355, Dennis Gadonniex's Sensormatic
Employment Agreement; Patterson, Tr. 182:6-9)

610.    The Employment Agreement explicitly lists specifications as examples of
confidential information Sensormatic's employees will have access to and must not disclose
unless the employee obtains written consent from Sensormatic's President or Executive Vice

President or the information becomes general public knowledge.  (PX 355, Dennis Gadonniex's Sensormatic Employment Agreement, Art. III, ¶ 1)  Sensormatic's specifications have not become general public knowledge, and Sensormatic has not consented to their disclosure. (Patterson, Tr. 185:1-10)

611.    When employees leave Sensormatic, they are required to return all confidential information and to sign a statement reaffirming their confidentiality obligations under their Employment Agreement.  (Patterson, Tr. 189:13-22; PX 356, Dennis Gadonniex's Separation Checklist)

612.    Sensormatic's Employee Handbook prohibits employees from disclosing confidential information, including specifications.  (PX 446, "All team members are prohibited from using for their own benefit, or disclosing for the use of others, confidential information obtained as a result of their employment with Sensormatic, except as specifically authorized by Sensormatic.  Confidential information includes but is not limited to: . . . specifications") Sensormatic takes steps to ensure that its employees follow this policy.  (Patterson, Tr. 188:8-10)

613.    Sensormatic's employees understand that specifications are confidential.  Mr. Krom and Ms. Bulson both knew Sensormatic considered its specifications to be confidential. (Krom, Tr. 1198:19-21; Bulson 7/9/07 Dep. 50:16-18)

614.    Sensormatic also takes steps to protect the confidentiality of its specifications when it sends them to third parties such as suppliers.  Sensormatic only discloses its specifications to third parties after the third party has signed a Non-Disclosure Agreement. (Patterson, Tr. 178:23-179:8, 181:1-8)  The typical Non-Disclosure Agreement states that the "Recipient agrees to maintain Sensormatic's Proprietary Information in confidence and will not use such information for itself, directly or indirectly, nor will it directly or indirectly disclose such information to others without Sensormatic's prior written permission."  (PX 781, Non-Disclosure Agreement between Sensormatic and Arnold Engineering; Patterson, Tr. 180:11-17, Arnold agreement is "typical of the language that Sensormatic puts in its nondisclosure agreements when it sends specification to suppliers")  The Non-Disclosure Agreement defines

122

"Proprietary Information" to include product specifications.  (PX 781, ¶ 1)

615.    Sensormatic also took steps to protect the confidentiality of its specifications when it provided them to its licensee, Wallace Computer Services ("Wallace").  Sensormatic's License Agreement with Wallace required Wallace to treat Sensormatic's confidential information, including specifications, with the "same degree of care that it gives its own confidential information, but not less than reasonable care" and not to "reveal, report, publish, transfer or otherwise disclose to any person or entity, or use" the confidential information.  (PX 55, pp. 19-20)

616.    Mr. Krom agreed that any information Sensormatic conveyed to Wallace, including the specifications, was "confidential and covered by the license agreement limitations."  (Krom, Tr. 1183:21-25)

### 5.    TAG Acquired And Substantially Copied Sensormatic's Specifications

617.    TAG determined that the best way to meet its goal of developing an AM EAS label that would perform comparably to Sensormatic's was to "copy a Sensormatic specification."  (Bulson 10/17/07 Dep. 163:22-164:5)

618.    To that end, at some point between October and December of 2003, Mr. Krom provided Sensormatic's specifications to TAG employee Jon Marchese.  (Krom, Tr. 1200:11-15; Bulson 10/1/07 Dep. 27:17-21, 63:13-18)

619.    When Mr. Krom was deposed in December 2007, he did not know where he had gotten the Sensormatic specifications he gave to Mr. Marchese.  (Krom, Tr. 1200:22-1201:12) At trial, Mark Hibshman, who currently works for Phenix but previously worked for Wallace, testified that while at Wallace, he received a request from Mr. Krom for the Sensormatic specifications and faxed them to Mr. Krom at TAG.  (Hibshman, Tr. 659:2-660:3)  After Mr. Hibshman testified, Mr. Krom testified at trial that he received the Sensormatic specifications from Mr. Hibshman at Wallace.  (Krom, Tr. 1168:18-25)  However, he acknowledged under cross examination that he had no personal knowledge of where he got the specifications he gave

123

to Mr. Marchese but was relying on what others told him.  (Krom, Tr. 1201:13-1202:3, 1204:13-17)

620.    Even if Mr. Krom had received the Sensormatic specifications from Mr. Hibshman at Wallace, Mr. Krom knew that Sensormatic would have provided those specifications to Wallace "pursuant to the license agreement with confidentiality provisions." (Krom, Tr. 1200:16-21)

621.    After receiving the Sensormatic specifications from Mr. Krom, Mr. Marchese substantially copied the specifications into a new document with TAG's logo on it, which is included within PX 38.  (PX 38; Bulson 10/1/07 Dep. 34:14-36:3)  Many of the numbers in the TAG specification, PX 38, are identical to those in the Sensormatic bias and resonator specifications, PX 458 and PX 463.  (*Compare* PX 458 and PX 463 *with* PX 38)  Mr. Krom admitted that many of the "numbers for key characteristics are the same in the Sensormatic specification and the TAG specification."  (Krom, Tr. 1204:9-12, 1205:14-1206:16) (comparing the numbers in the Sensormatic and TAG specifications))

622.    The TAG specifications state that the authors are Jon Marchese and Mark Krom. (PX 38)  The document is marked "TAG Company International Restricted Document."  (*Id.*) The document is marked "restricted" because TAG considered the copied specifications to be confidential.  (Krom, Tr. 1206:24-1207:18)

623.    TAG's Rule 30(b)(6) witness Kathie Bulson testified that the purpose of creating the TAG bias specifications from the Sensormatic bias specifications was to use them as "a starting point for the development efforts on the Series 58 label."  (Bulson 10/17/07 Dep. 158:18-159:2)  Mr. Krom gave a presentation in December 2004 stating that TAG's new label was a "replica" of Sensormatic's AM label.  (PX 592, p. 2; Krom, Tr. 1209:17-1211:4)

624.    Sensormatic did not consent to TAG's acquisition or copying of the specifications.  (Patterson, Tr. 199:22-24)

**6.    TAG Disclosed The Copied Specifications And Used Them To Develop Its Own Label**

625.    TAG disclosed the TAG specifications to multiple prospective materials suppliers.  On December 15, 2003, Mr. Marchese, acting on behalf of TAG, emailed TAG's substantially copied specifications to Arnold. (PX 38; PX 898, Defendants' Response to Request for Admission No. 213; Krom, Tr. 1211:14-20)

626.    Mr. Krom was aware that Mr. Marchese was sending the copied specifications to Arnold and approved of Mr. Marchese doing so.  (Krom, Tr. 1211:14-1212:1)  Arnold currently supplies the bias material for TAG's Series 58 labels.  (Krom, Tr. 1212:2-5)

627.    TAG and Phenix witnesses testified that Arnold uses its own specification for making the bias material used in TAG's Series 58 labels.  (Krom, Tr. 1212:12-14; Bulson, Tr. 2362:8-13; Hibshman, Tr. 668:9-25)  But other evidence shows that TAG hired consultants to revise the specifications, and these consultants continued to use the copied specifications.  Mr. Krom hired Norm Hansen and Dennis Gadonniex as consultants for TAG in 2003 or early 2004. (Krom, Tr. 1212:15-18)  Mr. Krom assigned Mr. Hansen and Mr. Gadonniex to create the specifications for TAG's label.  (Krom, Tr. 1213:2-4)  Thereafter, Mr. Marchese sent TAG's specifications to Mr. Hansen on December 15, 2003.  (PX 48)  As Ms. Bulson testified, the TAG specification document copied from Sensormatic's "was the document from which all efforts progressed."  (Bulson 10/17/07 Dep. 158:18-22)

628.    TAG continued to reiterate the importance of creating specifications to its consultants in 2004.  (PX 329, p. 4, July 28, 2004 conference call among TAG and Phenix personnel.  "[P]reliminary specifications are a necessary and priority component to the supply agreements with both Arnold Engineering and Metglas.  TAG Company technical team needs to work to finalize these as soon as possible."; PX 49, Oct. 21, 2004 email from Bulson to Hansen and Gadonniex: "I know I have let things fall behind lately, but I would really like to get us back on track and build some momentum. . . . Now we need to get going on the specifications as quickly as possible.")  On November 1, 2004, Mr. Hansen forwarded Mr. Gadonniex the TAG

specifications Mr. Marchese had sent him in December 2003.  (PX 48)  Thus, almost a year after TAG sent the copied specifications to Arnold, TAG's consultants who were assigned to revise the specifications were still using the copied specifications.

629.     In addition, TAG continued to disseminate the copied specifications.  TAG shared the copied specifications with Phenix.  (Bulson 10/1/07 Dep. 66:20-24)  Phenix was responsible for purchasing the resonator and bias materials from suppliers for use in the Series 58 labels.  (Hibshman, Tr. 667:1-7)

630.     On March 9, 2005, Mark Hibshman of Phenix sent bias specifications to Arnold and asked whether Arnold could manufacture material that would meet the specifications for use in the Series 58 labels.  (PX 5; Hibshman, Tr. 698:5-24)  Mr. Hibshman had received those specifications from TAG.  (Fatino Dep. 32:7-16; Hibshman, Tr. 698:25-699:15)  The specification was now marked "Restricted Document Property of Phenix Label."  (PX 5)

631.     The specifications Mr. Hibshman sent to Arnold were identical in almost every way to the TAG specifications Mr. Marchese copied from Sensormatic's bias specifications in December 2003.  (*Compare* PX 5 *with* PX 463)

632.     In March 2005, Mr. Hibshman also sent Phenix's specifications to Carpenter, another potential bias material supplier.  (Fatino Dep. 98:5-11; PX 236)

633.     Mr. Hibshman also sent Phenix's specifications to another potential bias material supplier, Hitachi Metals America Ltd. ("Hitachi").  (Hibshman, Tr. 705:8-11; Fatino Dep. 98:5-11)  An email from John Straub of Hitachi on July 19, 2006 lists three of the specifications Mr. Hibshman sent to Hitachi, all of which were substantially identical to Sensormatic's Bias Specifications.  (*Compare* PX 202 *with* PX 463; Hibshman, Tr. 705:22-706:25)  This email indicates that TAG and Phenix were seeking bias material from Hitachi made according to these same specifications copied from Sensormatic's specifications less than two months before TAG and Phenix launched the Series 58 labels in September 2006.  (PX 202)

634.     Defendants' disclosure of Sensormatic's specifications continues.  As recently as February 2007, Mr. Hibshman, along with others at Phenix and Dennis Gadonniex, disclosed

some of the Sensormatic specifications in a patent application filed with the U.S. Patent and Trademark Office.  (PX 270; Hibshman, Tr. 711:6-15)

635.    Sensormatic did not consent to TAG's use of its specifications or disclosure of the copied specifications to any individual or third party.  (Patterson, Tr. 199:22-24)

## 7.    TAG's Copying, Disclosure And Use Of Sensormatic's Bias Specifications Gave It A Head Start Of Two Years In Developing The Series 58 Label

636.    Sensormatic's engineers spent years developing its specifications.  Sensormatic's bias specifications (PX 463) were the result of eight man-years of effort by Sensormatic's engineers. (Patterson, Tr. 170:22-171:3)  Mr. Krom acknowledged that it took Sensormatic "a couple of years just to develop a revised bias specification" alone.  (Krom, Tr. 1198:16-18)  As part of its effort to develop the specifications, Sensormatic also purchased thousands of pounds of bias materials for testing purposes.  (Patterson, Tr. 171:4-18)

637.    TAG used Sensormatic's specifications as "a starting point for the development efforts on the Series 58 label" in order to bypass this period of research and development. (Bulson 10/17/07 Dep. 158:16-159:2)  Mr. Krom acknowledged that it would have taken TAG more time if TAG had not had access to Sensormatic's specifications.  (Krom, Tr. 1213:20-1214:3)

638.    TAG would have taken at least as long as it took Sensormatic to develop the bias specifications if TAG would have had to start from scratch.  TAG only had two engineers who worked on developing its specifications, Dennis Gadonniex and Norman Hansen, and these engineers were part-time consultants, not full-time employees.  (Bulson 10/1/07 Dep. 15:12-16:1, 17:8-21, 17:24-18:1; Bulson 7/9/07 Dep. 19:22-20:3)

639.    None of Phenix's employees had the expertise to develop label specifications. (Fatino Dep. 27:4-28:7)

## 8.    TAG Profited From Its Head Start

640.    Sensormatic's expert economist John Jarosz reviewed and analyzed TAG's actual and forecasted sales and profit data, along with deposition testimony of TAG's 30(b)(6) witness

Joy Watford, in order to calculate the head start benefit TAG received from its misappropriation. (Jarosz, Tr. 568:16-569:3, 580:17-20; DX 25; PX 678; PX 952; PX 953)

641.    Mr. Jarosz calculated the incremental profits, or amount of head start benefit, TAG would have received if TAG had gotten varying lengths of a head start from its misappropriation of Sensormatic's specifications.  If TAG received a half-year head start, the benefit to TAG is $345,316; for a one year head start, the benefit to TAG is $690,633, for a two year head start, the benefit to TAG is $1,302,736; and for a three year head start, the benefit to TAG is $1,836,809.  (Jarosz, Tr. 583:11-584:22; Sensormatic Dem. 66-67)

642.    If the Court were to enter an injunction on Sensormatic's patent infringement claim prohibiting TAG from selling Series 58 labels in the future, Sensormatic would only be entitled to recover the amount of head start benefit TAG has already received.  Mr. Jarosz testified that the amount of head start benefit TAG has already realized is approximately $200,000.  (Jarosz, Tr. 599:20-600:14)

**B.    Conclusions Of Law**

**1.    Sensormatic's Specifications Are Trade Secrets**

643.    The Florida Uniform Trade Secrets Act ("FUTSA"), FLA. STAT. § 688.001 *et seq.*, defines a trade secret as information that (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.  FLA. STAT. § 688.002 (2008).  The statute gives examples of what can constitute "information" under FUTSA: "a formula, pattern, compilation, program, device, method, technique, or process."  *Id. See also Del Monte Fresh Produce Co. v. Dole Food Co.*, 136 F. Supp. 2d 1271, 1291 (S.D. Fla. 2001).

644.    Sensormatic's specifications are trade secrets.  (PX 458; PX 463)  These specifications provide a detailed formula of mechanical and magnetic characteristics that enables manufacturers to process bias and resonator components for labels that perform like

128

Sensormatic's.  The specifications are a valuable component of Sensormatic's success in the AM

EAS label market and are also valuable to competitors, like TAG and Phenix, who want to make

and sell AM labels that perform as well as Sensormatic's.

645.    Other courts have found similar specifications or combinations of specifications

to be trade secrets.  *See Lee v. Cercoa, Inc.*, 433 So. 2d 1, 4-5 (Fla. Dist. Ct. App. 1983), *petition*

*denied*, 444 So. 2d 417 (1984) (in pre-FUTSA suit brought by employer against former

employee, court found common law misappropriation of trade secrets where employer's trade

secrets were "certain formulations of chemicals and certain techniques in the manufacturing

process"; even though some of the information was published and described in patents, the

"combination of elements into a complicated production process amounted to a trade secret");

*Synergetics, Inc. v. Hurst*, 477 F.3d 949, 957 (8th Cir. 2007) (upholding jury verdict of

misappropriation under the Missouri Uniform Trade Secrets Act[6] where defendants copied

specifications from engineering drawings that included "dimensions and tolerances information

regarding [plaintiff's] adapter/connector system"); *777388 Ontario Ltd. v. Lencore Acoustics*

*Corp.*, 105 F. Supp. 2d 56, 64-65 (E.D.N.Y. 2000) ("Certainly technical specifications and

drawings relating to products that are manufactured under registered patents are trade secrets, if

anything is.") (applying the Restatement's definition of trade secrets).

646.    Sensormatic makes a reasonable effort to maintain the secrecy of its

specifications.  The specifications are not publicly available.  Sensormatic requires its employees

to sign confidentiality agreements when they begin working at Sensormatic and to reaffirm those

confidentiality obligations when they leave.  Its employees are required to maintain the

confidentiality of the specifications after they leave Sensormatic.  (PX 355)  TAG's own

executives acknowledged that Sensormatic's specifications are confidential.  (Krom, Tr.

1198:19-21; Bulson 7/9/07 Dep. 50:16-18)  Sensormatic does not disclose the specifications to

third parties without obtaining a signed agreement from the third party containing a

---

[6] The definitions of trade secret and misappropriation under the Missouri Uniform Trade Secrets Act are identical to
FUTSA's definitions.  MO. ANN. STAT. § 417.453 (West 2008).

confidentiality provision.  These efforts are reasonable under the circumstances.  *See Liberty Am. Ins. Group, Inc. v. Westpoint Underwriters, L.L.C.*, 199 F. Supp. 2d 1271, 1286 (M.D. Fla. 2002) (Plaintiff took reasonable efforts to maintain secrecy of its source code by restricting access to employee programmers and licensed third parties and requiring employees with access to the software to sign confidentiality agreements.)

647.    The combination of specifications in Sensormatic's specifications is valuable and is not publicly known.  Even if certain information were public, a unique combination of information that is not public can be a trade secret.  *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1291 (11th Cir. 2003) ("'The fact that some or all of the components of the trade secret are well-known does not preclude protection for a secret combination, compilation, or integration of the individual elements.'  Hence, even if all of the information is publicly available, a unique combination of that information, which adds value to the information, also may qualify as a trade secret." (Internal citations and quotations omitted)).[7]  Sensormatic's specifications are a unique combination of information and therefore qualify as trade secrets under FUTSA.

### 2.    TAG Misappropriated Sensormatic's Specifications By Acquiring The Specifications By Improper Means

648.    FUTSA defines "misappropriation" of a trade secret to mean: (1) acquisition of another's trade secret by a person[8] who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret without consent by a person who used improper means to acquire the trade secret or knew that the trade secret was improperly acquired.  FLA. STAT. § 688.002 (2008).  TAG committed acts of misappropriation that fall into both categories.

649.    The definition of "improper means" under FUTSA includes "breach or

---

[7] The Eleventh Circuit in *Penalty Kick* was applying the Georgia Trade Secrets Act, which includes an almost identical definition of "trade secret" to FUTSA's.  *Penalty Kick*, 318 F.3d at 1290-91 (quoting the definition of trade secret under the Georgia Trade Secrets Act, O.C.G.A. § 10-1-761(4)).

[8] FUTSA defines "person" to include a corporation or any other legal or commercial entity.  FLA. STAT. § 688.002(3) (2008).

inducement of a breach of a duty to maintain secrecy." FLA. STAT. § 688.002(1) (2008).  TAG CEO Mark Krom acquired Sensormatic's specifications through a breach of a duty to maintain secrecy, either his own or someone else's.  If Mr. Krom requested and received the Sensormatic specifications from Mr. Hibshman at Wallace, Mr. Krom was aware that such a disclosure was a violation of Wallace's License Agreement with Sensormatic. (Krom, Tr. 1200:16-21)

650.    If Mr. Krom brought the specifications from Sensormatic himself, that would be a breach of his own Employment Agreement with Sensormatic.  Mr. Krom's Employment Agreement with Sensormatic (1) obliges him to return all documents to Sensormatic upon leaving the company; and (2) prevents him from disclosing or using Sensormatic's confidential and proprietary information.  (PX 365)  Mr. Krom knew that Sensormatic's specifications were considered confidential.  (Krom, Tr. 1198:19-21)

651.    Regardless of how Mr. Krom obtained the Sensormatic specifications, TAG's acquisition of Sensormatic's specifications was through improper means, in violation of FUTSA. FLA. STAT. § 688.002(2) (2008) (defining "misappropriation" to include "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means").

### 3.    TAG Misappropriated Sensormatic's Specifications By Disclosing Them Without Consent

652.    TAG disclosed Sensormatic's specifications or portions thereof to multiple third parties.  Mr. Krom first disclosed the specifications to Jon Marchese, a TAG employee in England.  Then Mr. Marchese copied Sensormatic's specifications and sent the new version to Arnold, a materials supplier.  (PX 38)  Mr. Marchese also sent the copied Sensormatic specifications to Mr. Hansen on December 15, 2003, who later shared them with Mr. Gadonniex. (PX 48)  TAG also disclosed the copied specifications to Phenix, who then sent them to several potential materials suppliers to obtain bias materials to use in the Series 58 labels manufactured by Phenix and sold by TAG.  (PX 5; PX 202; PX 236)

653.    Sensormatic did not consent to any disclosure of its specifications by TAG.  As

131

discussed above, TAG knew or had reason to know that the specifications were derived from someone who had acquired them through improper means; that they were acquired under circumstances giving rise to a duty to maintain their secrecy; and derived from a person who had a duty to Sensormatic to maintain their secrecy.  FLA. STAT. § 688.002(2)(b)(2) (2008). Accordingly, TAG's disclosure of Sensormatic's specifications to multiple third parties was a misappropriation of trade secrets in violation of FUTSA.

### 4.    TAG Misappropriated Sensormatic's Specifications By Using Them To Get A Head Start In The AM Label Business

654.    TAG copied Sensormatic's specifications, many of them verbatim, and used them as a "starting point" for designing and manufacturing their competing AM labels.  (Bulson 10/17/07 Dep. 163:22-164:5)

655.    When TAG's consultants, Norm Hansen and Dennis Gadonniex, were revising TAG's specifications, Mr. Hansen emailed the copied specifications he had received from Mr. Marchese to Mr. Gadonniex.  (PX 48)

656.    TAG and its partner, Phenix, sent the copied specifications to several potential suppliers of bias materials.  The latest documentary evidence of this disclosure is from July 2006, which was just two months before the launch of the Series 58 label.  (PX 202)  While TAG contends that the suppliers did not need the specifications to supply bias materials to TAG, TAG must have believed the specifications were useful in some way, or TAG and Phenix would not have continued to send them to suppliers.

657.    TAG's actions constitute misappropriation of Sensormatic's trade secrets in violation of FUTSA.  *See Salsbury Labs., Inc. v. Merieux Labs., Inc.*, 908 F.2d 706, 712-13 (11th Cir. 1990) (upholding misappropriation finding under Georgia common law where former employee instructed researchers at new employer to use same formulations and processes as former employer for producing vaccine and disclosed former employer's production outline for vaccine); *Telex Corp. v. International Bus. Mach. Corp.*, 510 F.2d 894, 929-30 (10th Cir. 1975) (upholding trial court's misappropriation finding where defendant hired competitor's employees

and obtained trade secrets from them in order to get a head start and avoid the time and expense of independent investigation and research); *Avery Dennison Corp. v. Four Pillars Enter. Co.*, 45 Fed. Appx. 479, 483, Nos. 00-4020, 4128, 4233, 2002 U.S. App. LEXIS 18370, at *2 (6th Cir. September 3, 2002) (upholding jury verdict of misappropriation where competitor defendant copied plaintiff's specifications and test methods, removed references to plaintiff, and distributed the methods for use in its research and development laboratories).[9]

658.     TAG cannot seek protection from liability by claiming that its Series 58 labels are now made according to different specifications.  A defendant can be liable for "use" of another's trade secrets even if the defendant does not incorporate the trade secrets into a final product sold on the market, but only uses them for assistance with research and development efforts.  The Restatement of Unfair Competition discusses what type of "use" constitutes misappropriation under the Uniform Trade Secrets Act.[10]  RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 40 cmt. c (1995).  Comment c to Restatement section 40 states:

> There are no technical limitations on the nature of the conduct that constitutes "use" of a trade secret for purposes of the rules stated in Subsection (b), [which corresponds to FLA. STAT. § 688.002(2)(b)].  As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a "use" under this Section.  Thus, marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret all constitute "use."  *Id.* (internal citation omitted).

659.     Comment c makes clear that the word "use" does not require a defendant to replicate a trade secret in a final product offered for sale; instead, using the trade secret to assist or accelerate research or development is a sufficient grounds for liability.

660.     Comment c clarifies that "the actor need not use the trade secret in its original form.  Thus, an actor is liable for using the trade secret with independently created

---

[9] The Court in *Avery Dennison* was applying the Ohio Uniform Trade Secrets Act, which has the same definition of misappropriation as FUTSA.  *See* O.R.C. § 1333.61 (2008).

[10] Other Florida Courts have cited to the Restatement of Unfair Competition in analyzing FUTSA.  *See, e.g.*, *Jadael v. Elliott*, No. 6:05-CV-1623-Orl-DAB, 2007 U.S. Dist. LEXIS 63696, at *27-28 n.6 (M.D. Fla. Aug. 29, 2007) (citing *Bestechnologies, Inc. v. Trident Environmental*, 681 So. 2d 1175, 1176 (Fla. Dist. Ct. App. 1996)).

improvements or modifications if the result is substantially derived from the trade secret." RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 40 cmt. c (1995); *see also Jadael v. Elliott*, No. 6:05-CV-1623-Orl-DAB, 2007 U.S. Dist. LEXIS 63696, at *27 (M.D. Fla. Aug. 29, 2007) (denying summary judgment to defendant on grounds that "misappropriation may occur even where the defendant did not use or disclose the alleged trade secret in its original form, and a defendant is liable for use of a trade secret 'with independently created improvements or modifications if the result is substantially derived from the trade secret'" (quoting Restatement Comment c)); *Avery Dennison Corp. v. Four Pillars Enter. Co.*, 45 Fed. Appx. at 487, Nos. 00-4020, 4128, 4233, 2002 U.S. App. LEXIS 18370, at *2 (6th Cir. September 3, 2002) (where defendant did not directly copy plaintiff's products but instead modified plaintiff's manufacturing formulas and used plaintiff's specifications to cut their own research time, plaintiff "presented relevant and admissible evidence showing that [defendant] valued, deciphered, modified, and used [plaintiff's] trade secrets; it was not required to do more.").

661.    Thus, even if TAG's current specifications have been modified from the original copy of Sensormatic's, TAG is liable for misappropriation because they used Sensormatic's specifications as a research shortcut.  Because TAG used Sensormatic's specifications without consent and knew or had reason to know that the specifications were derived from someone who had acquired them through improper means; that they were acquired under circumstances giving rise to a duty to limit their use; and derived from a person who had a duty to Sensormatic to limit their use, TAG's use of Sensormatic's specifications constitutes a misappropriation under FUTSA.  FLA. STAT. § 688.002(2)(b)(2) (2008).

### 5.    Sensormatic Is Entitled To Head Start Damages For TAG's Unjust Enrichment

662.    Sensormatic seeks to recover the benefit TAG earned or will earn as a result of its two-year head start in bringing its Series 58 labels to the market by obtaining, copying and distributing Sensormatic's specifications.  Under FUTSA, "a complainant is entitled to recover damages for misappropriation.  Damages can include both the actual loss caused by

134

misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." FLA. STAT. § 688.004 (2008).  In this case, Sensormatic seeks only to recover the unjust enrichment TAG received from its misappropriation.

663.     The burden of proof for monetary remedies under FUTSA is "liberal."  *Perdue Farms, Inc. v. Hook*, 777 So. 2d 1047, 1052 (Fla. Dist. Ct. App. 2001).   Courts have employed a flexible approach to the calculation of appropriate damages in trade secrets cases. *See University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 538 (5th Cir. 1974) ("Our review of the case law leads us to the conclusion that every case requires a flexible and imaginative approach to the problem of damages."); *Medical Store, Inc. v. AIG Claim Serv., Inc*., No. 02-80513-CIV-JOHNSON, 2003 U.S. Dist. LEXIS 27554, at *23 (S.D. Fla. Oct. 15, 2003); RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 45 cmt. b (1995) ("The courts have recognized the need for flexibility in formulating monetary remedies in order to achieve both compensatory and restitutionary objectives.").

664.     A plaintiff need not prove damages to a certainty; instead, "the plaintiff is required to prove the amount of such loss with only as much certainty as is reasonable under the circumstances." *Med. Store*, 2003 U.S. Dist. LEXIS 27554, at *23 (citing RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 45 cmt. b (1995)).  Thus, "when some damage is proven and 'the uncertainty lies only in the amount of damages, recovery may be had if there is proof of a reasonable basis from which the amount can be inferred or approximated.'" *Perdue Farms, Inc. v. Hook*, 777 So. 2d 1047, 1051 (Fla. Dist. Ct. App. 2001) (quoting *Orkin Exterminating Co. v. Burnett*, 160 N.W.2d 427, 430 (Iowa 1968)).

665.     Disgorgement of a defendant's profits is an appropriate remedy where the disgorgement is limited to the amount of time it would have taken the defendant to independently develop its product without the benefit of the plaintiff's trade secrets – in other words, the "head start" period. *Medical Store, Inc. v. AIG Claim Serv., Inc*., No. 02-80513-CIV-JOHNSON, 2003 U.S. Dist. LEXIS 27554, at *17 (S.D. Fla. Oct. 15, 2003) (damage period is measured by "the amount of time it would have taken the Defendants to get where the Plaintiff

135

brought them without the Plaintiff's help"); *see also Salsbury Labs., Inc. v. Merieux Labs., Inc.*, 908 F.2d 706, 714 (11th Cir. 1990) (plaintiff was entitled to disgorge profits gained from use of trade secrets or savings in research and development costs (calculated from the amount plaintiff spent), but not both); *Khazai v. Watlow Elec. Mfg. Co.*, 201 F. Supp. 2d 967, 975 (E.D. Mo. 2001) (discussing application of head start rule under Missouri Uniform Trade Secrets Act, MO. REV. STAT. § 417.450 (2008) *et seq.*).

666.    Even when a product as ultimately sold does not incorporate any stolen trade secrets, disgorgement of profits representing time saved on research and development is an appropriate remedy.  *See, e.g., Cardiovention, Inc. v. Medtronic, Inc.*, 483 F. Supp. 2d 830, 845 (D. Minn. 2007) (higher profits from sales of a product that does not incorporate trade secrets is a legally sufficient means of measuring cost savings and increased productivity resulting from the use of the trade secret).

667.    Sensormatic met its burden of proving to a reasonable degree of certainty that TAG enjoyed a head start on bringing its Series 58 labels to market.  *See, e.g., Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 975 (9th Cir. 1991) (upholding injunction for head-start period based on plaintiff's testimony about the time it took to develop its materials, dimensions and fabricating process for its product).  Sensormatic's bias specifications (PX 463) were the result of eight man-years of effort by Sensormatic's engineers. (Patterson, Tr. 170:22-171:3)

668.    Plaintiff's economic expert, John Jarosz, calculated TAG's incremental profits from sales of the Series 58 labels during several possible head start periods ranging from six months to three years.  He also calculated the amount of head start benefit TAG had already realized, in the event that the Court entered an injunction that would prohibit future sales of Series 58 labels.  In his calculations, Mr. Jarosz relied on TAG's actual and forecasted profits for the Series 58 labels and the deposition testimony of TAG's 30(b)(6) witness.  The Court concludes that Mr. Jarosz was qualified as an expert on financial analysis and proved his calculations to a reasonable degree of certainty.  Because this Court is granting Sensormatic

136

injunctive relief on its patent infringement claim, Sensormatic is entitled to head start damages in the amount of $200,000.

**6.     Sensormatic Is Entitled To Injunctive Relief Preventing Future Misappropriation By TAG**

669.    Sensormatic is entitled to an injunction prohibiting TAG from using or disclosing Sensormatic's specifications in the future.  Injunctive relief is an appropriate remedy under FUTSA.  FLA. STAT. § 688.003 (2008) ("Actual or threatened misappropriation may be enjoined.").

670.    To obtain a permanent injunction, a party "must demonstrate a clear legal right, the inadequacy of a remedy at law, and that an irreparable injury will occur if such relief is not granted." *Eastern Fed. Corp. v. State Office Supply Co.*, 646 So. 2d 737, 741 (Fla. Dist. Ct. App. 1994).  Sensormatic clearly has a legal right under FUTSA to prevent unauthorized disclosure and use of its trade secrets.  Sensormatic faces irreparable injury from future disclosure of its specifications, and given that a portion of the specifications were published in a patent application as recently as February 2007, the threat of future disclosure is real.  Accordingly, an injunction is appropriate here.

**XIV.   Mr. Gadonniex's Breach Of Contract, Breach Of Fiduciary Duty, And Misappropriation Of Trade Secrets**

**A.     Findings Of Fact**

**1.     Mr. Gadonniex's Contractual And Fiduciary Obligations To Sensormatic**

671.    Dennis Gadonniex worked for Sensormatic from March 14, 1994 to March 22, 2000.  (Gadonniex, Tr. 1585:11-16, 1587:24-1588:3; PX 355, Gadonniex Employment Agreement; PX 356, Gadonniex Separation Checklist)

672.    Mr. Gadonniex entered into an Employment Agreement with Sensormatic when he started work at Sensormatic on March 14, 1994.  (PX 355; Gadonniex, Tr. 1709:8-25)

673.    Article I of Mr. Gadonniex's Employment Agreement provides:

Upon termination of employment for any reason whatsoever, Employee agrees to promptly deliver to [Sensormatic] all materials of a secret or confidential nature

137

(whether or not marked as such), including but not limited to, all drawings, manuals, letters, notes, notebooks, reports, customer and supplier lists, and all copies thereof, relating to [Sensormatic's] business which are in the Employee's possession or control.

(PX 355)

674.    Article III of the Employment Agreement provides:

Employee understands and hereby acknowledges that as a result of Employee's employment with [Sensormatic], Employee will necessarily become informed of, and have access to, confidential information of [Sensormatic] including, but not limited to, inventions, trade secrets, technical information, know-how, plans, specifications, identity of customers and identity of suppliers, and that such information, even though it may be developed or otherwise acquired by Employee, is the exclusive property of [Sensormatic] to be held by Employee in trust and solely for [Sensormatic's] benefit, and Employee hereby agrees that Employee will not at any time, either during or subsequent to employment, reveal, report, publish, transfer or otherwise disclose to any person, corporation, or other entity, or use, any of [Sensormatic's] confidential information, without the written consent of [Sensormatic's] President or Executive Vice President, except for use on behalf of [Sensormatic] in connection with [Sensormatic's] business, and except for such information which legally and legitimately is or becomes general public knowledge from authorized sources other than the Employee.

(PX 355)

675.    Mr. Gadonniex testified that he understood the prohibition against using Sensormatic's confidential information at the time and agreed to the provision in Article III of the Employment Agreement.  (Gadonniex, Tr. 1710:21-1711:6)  When he worked at Sensormatic, he understood that he would be entrusted with the company's confidential information and would be expected to keep that information confidential, and he accepted that responsibility.  (Gadonniex, Tr. 1710:10-20)

676.    The Employment Agreement further provides that Sensormatic is entitled to injunctive relief for any breach of Article III and for reasonable attorney's fees for enforcing that provision.  (PX 355, Article V)

677.    When Mr. Gadonniex resigned from Sensormatic on March 22, 2000, he signed another agreement affirming that he understood his continuing obligations under the Employment Agreement and confirming that he had returned all of Sensormatic's property.  (PX 356; Gadonniex, Tr. 1711:11-1712:1)

2.     **Mr. Gadonniex's Retention, Disclosure, And Use Of Sensormatic Documents**

678.     When he left Sensormatic in 2000, Mr. Gadonniex retained two backup tapes that he made by copying 24,000 pages of documents from his Sensormatic computer onto the tapes. (Gadonniex, Tr. 1720:18-1721:8; DE 308, Joint Pre-trial Stipulation Regarding Certain Bates Ranges)  The backup tapes contained all of Mr. Gadonniex's data files and substantive work that was stored on his Sensormatic computer at the time the tapes were made.  (Gadonniex, Tr. 1719:7-15)

679.     When Mr. Gadonniex made the backup tapes, he knew that he was not free to disseminate the work-related documents on the backup tapes outside of Sensormatic. (Gadonniex, Tr. 1721:9-13)

680.     Mark Krom hired Mr. Gadonniex to be a consultant for TAG in 2003. (Gadonniex, Tr. 1658:13-18)

681.     While Mr. Gadonniex was working as a consultant for TAG, he told Kathie Bulson he had backup tapes that contained information about certain bias materials investigated by Sensormatic.  (Gadonniex, Tr. 1664:18-1665:1)  Ms. Bulson told Mr. Gadonniex it would be helpful if they could establish a timeline for development of certain materials.  (Gadonniex, Tr. 1729:3-6)  Mr. Gadonniex offered to help "build a timeline from 1994 and '95" using documents from his backup tape.  (Gadonniex, Tr. 1729:11-14)  In order to retrieve the documents from the backup tape, he first ordered software from eBay to help him retrieve the documents, and when that did not work, he took the tape to a computer repair store to copy the backup tape onto a compact disk.  (Gadonniex Dep. 81:9-10, 81:12-82:2, 82:5-6; Gadonniex, Tr. 1730:21-1731:1, 1731:15-20)  He then copied the compact disks onto the hard drive of his home computer. (Gadonniex Dep. 84:11-18, 84:22-85:5)

682.     TAG assigned Mr. Gadonniex to review the Sensormatic documents on his backup tape in 2004 and paid him for the time he spent doing it.  (Gadonniex, Tr. 1728:7-21; PX 660, Gadonniex's Time Sheets)

683.     As part of his work for TAG, Mr. Gadonniex created a "Sensormatic Bias Timeline," which was a timeline of events related to Sensormatic's internal development and testing of the bias material in its AM label.  (PX 521G; Gadonniex, Tr. 1740:2-8)  The timeline also included bias specifications and test results for various bias materials.  (PX 521G)

684.     In August 2004, Mr. Gadonniex sent his Sensormatic Bias Timeline and related information, including screenshots of the Sensormatic files from the backup tape, to Ms. Bulson. (Gadonniex, Tr. 1740:6-12; PX 521G)  He told Ms. Bulson that he had looked at the files on his tape of Sensormatic documents to get specific dates for the timeline.  (Gadonniex, Tr. 1740:13-16)

685.     In addition, Mr. Gadonniex gave a copy of the entire contents of his Sensormatic backup tape to Ms. Bulson.  (Gadonniex Dep. 155:18-20, 156:10-11; Gadonniex, Tr. 1744:21-1745:7)  At that time, he had not done a detailed review of the documents on the tape to determine whether they were confidential; he did not do such a review until he was named as a defendant in this lawsuit in 2007.  (Gadonniex, Tr. 1743:13-18)

686.     Mr. Gadonniex's backup tapes contain documents that are proprietary and confidential to Sensormatic.  For example, PX 700 is a document from Mr. Gadonniex's backup tape that contains experimental data from Sensormatic's tests of TCA bias material.  (Patterson, Tr. 195:6-18; Gadonniex, Tr. 1804:7-12; PX 700)  The data within PX 700 is kept secret and is valuable to Sensormatic because it is part of the development process.  (Patterson, Tr. 195:14-196:1)  These data are valuable to Sensormatic's competitors because it shows competitors what did and did not work, and would thereby allow the competitor to avoid spending time re-doing the experiment.  (Patterson, Tr. 196:2-11)  Mr. Gadonniex was not authorized to retain these data when he left Sensormatic or to disclose the data to TAG or any third party.  (Patterson, Tr. 197:11-18)

687.     Mr. Gadonniex's backup tapes also contained Sensormatic's specifications. (Gadonniex, Tr. 1678:13-22)  Mr. Gadonniex referred to the Sensormatic resonator specifications on his backup tape while he was working on issues related to the development of

TAG's resonator specifications.  (Gadonniex, Tr. 1750:3-16)  As discussed above, Sensormatic's specifications were considered valuable, proprietary and confidential and Sensormatic did not consent to their disclosure.

688.     Sensormatic did not consent to Mr. Gadonniex retaining confidential Sensormatic documents or disclosing or using Sensormatic documents and information after his resignation from Sensormatic.  (Patterson, Tr. 197:11-18, 199:9-24)

### B.     Conclusions Of Law

#### 1.     Misappropriation Of Trade Secrets

##### a)     Mr. Gadonniex's Backup Tapes Contained Sensormatic Trade Secrets

689.     Mr. Gadonniex retained backup tapes with Sensormatic documents when he left the company in 2000.  These documents included, *inter alia*, Sensormatic's specifications and test results from experiments with label materials.

690.     Mr. Gadonniex's backup tapes contained Sensormatic trade secrets as defined by FUTSA.  Sensormatic's specifications are trade secrets.  *See* Section VIII(B)(1).  Sensormatic's internal testing results are kept confidential and are valuable to Sensormatic and its competitors. These documents represent the fruits of Sensormatic's costly and time-consuming research and development efforts.  Gaining access to these documents would allow a competitor to bypass the experimentation already done by Sensormatic.  Sensormatic takes reasonable steps to maintain the secrecy of these documents by requiring employees and third parties to sign confidentiality agreements before accessing them.

##### b)     Mr. Gadonniex Misappropriated Sensormatic's Trade Secrets By Acquiring Them By Improper Means

691.     Mr. Gadonniex signed an Employment Agreement with Sensormatic on March 14, 1994.  (PX 355; Gadonniex Dep. 72:25-73:5)  In Article I of the Employment Agreement, Mr. Gadonniex agreed to return confidential Sensormatic materials upon termination of employment.  (PX 355, Art. I)

692.     Mr. Gadonniex's retention and use of the backup tapes was a violation of his

Employment Agreement with Sensormatic and therefore was by "improper means" under FUTSA. FLA. STAT. § 688.002(1) (2008) ("'Improper means' includes . . . breach or inducement of a breach of a duty to maintain secrecy"). He knew or should have known of his obligation to return the documents to Sensormatic when he retained the backup tapes upon leaving the company. While Mr. Gadonniex claims to have inadvertently kept the backup tapes, he later discovered the tapes and made concerted efforts on two separate occasions to recover the documents from them (first by purchasing software from the Internet and, when that failed, by going to a computer repair store to restore the documents). Therefore, his acquisition of the documents from the backup tapes after leaving Sensormatic constitutes misappropriation in violation of FUTSA. FLA. STAT. § 688.002(2)(a) (2008) (defining "misappropriation" to include "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means").

### c) Mr. Gadonniex Misappropriated Sensormatic's Trade Secrets By Disclosing Them

693.    Mr. Gadonniex also misappropriated Sensormatic's trade secrets when he disclosed documents and information from the backup tapes to a third party without Sensormatic's consent.

694.    Mr. Gadonniex disclosed Sensormatic's trade secrets to Kathie Bulson in summer 2004. He sent Ms. Bulson a timeline that he had constructed from documents on the backup tapes, which contains certain bias specifications. He also sent Ms. Bulson a CD that contained a copy of the entire contents of one backup tape.

695.    Sensormatic did not consent to this disclosure by Mr. Gadonniex. At the time he disclosed the documents, Mr. Gadonniex knew or had reason to know that the trade secrets were acquired under circumstances giving rise to a duty to maintain their secrecy and derived from a person (himself) who owed a duty to maintain their secrecy, given his confidentiality obligations under his Employment Agreement with Sensormatic. FLA. STAT. § 688.002(2)(b) (2008). Accordingly, Mr. Gadonniex's disclosures of the trade secret information on the Sensormatic

backup tapes constitute violations of FUTSA.

### d)  Mr. Gadonniex's Misappropriation Harmed Sensormatic And Injunctive Relief Is Appropriate

696.    Sensormatic seeks an injunction preventing Mr. Gadonniex from further misappropriating its trade secrets.  Injunctive relief is appropriate under FUTSA.  FLA. STAT. § 688.003 (2008); *see also Delucca v. GGL Indus., Inc.*, 712 So. 2d 1186, 1187 (Fla. Dist. Ct. App. 1998) (affirming permanent injunction against former employee who had given out copies of former employer's trade secrets, even though he testified he no longer had copies of the documents).

697.    To obtain a permanent injunction, a party "must demonstrate a clear legal right, the inadequacy of a remedy at law, and that an irreparable injury will occur if such relief is not granted." *Eastern Fed. Corp. v. State Office Supply Co.*, 646 So. 2d 737, 741 (Fla. Dist. Ct. App. 1994).  Sensormatic clearly has a legal right to prevent unauthorized disclosure and use of its trade secrets under FUTSA.  There is no adequate remedy at law to compensate Sensormatic for Mr. Gadonniex's past and potential future use and disclosure of the trade secrets, which would cause Sensormatic irreparable injury.  Accordingly, the Court grants Sensormatic's request for injunctive relief.

### 2.  Breach Of Contract

698.    "Under Florida law, the elements of a breach of contract claim are (1) a valid contract, (2) a material breach, and (3) damages." *Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1342 (M.D. Fla. 2006).

### a)  Mr. Gadonniex's Employment Agreement Is Valid And Enforceable

699.    The Employment Agreement Mr. Gadonniex entered into with Sensormatic on March 14, 1994 is a valid and enforceable contract.  Under Article I of the Employment Agreement, Mr. Gadonniex had a duty to return all secret or confidential materials to Sensormatic upon termination of his employment.  (PX 355)  Under Article III of the Employment Agreement, Mr. Gadonniex had a duty not to "reveal, report, publish, transfer or

143

otherwise disclose to any person, corporation, or other entity, or use, any of [Sensormatic's] confidential information" except with Sensormatic's written consent or if such information is public knowledge.  (*Id*.)  This duty existed both during and subsequent to Mr. Gadonniex's employment at Sensormatic.  (*Id*.)

700.     These confidentiality provisions in the Employment Agreement allowed Sensormatic to protect its trade secrets and valuable confidential information.  As the Employment Agreement states, Sensormatic employees are necessarily privy to Sensormatic's "confidential information."  (PX 355, Art. III)  Preserving confidentiality is critical to the functioning of Sensormatic's research group.  (Patterson, Tr. 182:3-5)

701.     Article III of the Employment Agreement allows disclosure only with Sensormatic's written consent or if the information "is or becomes of general public knowledge from authorized sources other than the Employee."  (PX 355)

### b)     Mr. Gadonniex Materially Breached The Employment Agreement

702.     Mr. Gadonniex materially breached the Employment Agreement by retaining two backup tapes that contained over 24,000 pages of Sensormatic documents, including confidential and trade secret information.  Mr. Gadonniex's failure to deliver these tapes to Sensormatic when he left the company in 2000 violated Article I of the Employment Agreement.

703.     Mr. Gadonniex also materially breached the Employment Agreement by disclosing Sensormatic's confidential and trade secret information to TAG after he was hired as a consultant in 2004.  Mr. Gadonniex retrieved and reviewed Sensormatic documents as part of his consulting agreement with TAG.  He disclosed confidential Sensormatic information and documents, including documents related to the development and testing of material components of AM labels, to Sensormatic's competitor.  Additionally, Mr. Gadonniex gave a copy of an entire backup tape to Ms. Bulson.

704.     Many of the documents that Mr. Gadonniex used and disclosed to TAG are considered confidential by Sensormatic, and Sensormatic took reasonable efforts to keep these

documents confidential.  Mr. Gadonniex's retention, use and disclosure of the confidential

information "'relate[] to a matter of vital importance'" for Sensormatic and therefore constitute a

material breach of Article III of the Employment Agreement.  *Gonzalez v. Florida Dep't of

Highway Safety & Motor Vehicles*, 237 F. Supp. 2d 1338, 1361 (S.D. Fla. 2002).

**c)      Mr. Gadonniex's Material Breaches Of The Employment
Agreement Have Damaged And Will Continue To Damage
Sensormatic Unless An Injunction Is Entered**

705.     Mr. Gadonniex's retention, disclosure and use of Sensormatic's confidential and

trade secret information have damaged Sensormatic.  TAG is Sensormatic's sole competitor in

the AM EAS label market, and TAG benefited from Mr. Gadonniex's use and disclosure of

Sensormatic's documents containing confidential and trade secret information.  TAG began

selling its labels to customers in September 2006 and continues today.

706.     In recognition of the inherent damage Sensormatic would face from former

employees' use and disclosure of confidential and trade secret information, Article V of the

Employment Agreement entitles Sensormatic to injunctive relief for Mr. Gadonniex's breach of

Article III.  It states:  "Because the Company does not have an adequate remedy at law to . . .

protect its interests in its trade secrets, privileged, proprietary or confidential information and

similar commercial assets . . . the Company shall be entitled to injunctive relief."  (PX 355)

707.     Permanent injunctive relief is the appropriate remedy under Florida law for Mr.

Gadonniex's breach of his Employment Agreement.  There is no remedy at law that could

adequately prevent further use and disclosure of the documents by Mr. Gadonniex.  Accordingly,

Mr. Gadonniex is permanently enjoined from committing any further breach of the Employment

Agreement.

**d)      Sensormatic Is Entitled To Attorneys' Fees**

708.     Under Article V of the Employment Agreement, Sensormatic is entitled to

"attorneys' fees and disbursements incurred in enforcing" certain provisions of the contract,

including Article III, the confidentiality provision.  (PX 355, Art. V)

709.     Accordingly, Mr. Gadonniex is ordered to reimburse Sensormatic for its

145

reasonable attorneys' fees incurred in enforcing the Employment Agreement.

### 3.    Breach Of Fiduciary Duty

710.    The elements for a breach of fiduciary duty claim under Florida law are (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage to the plaintiff caused by the breach. *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002).

### a)    Mr. Gadonniex Had A Fiduciary Duty To Sensormatic

711.    A fiduciary relationship may be express or implied.  An express fiduciary relationship is created by contract.  *Capital Bank v. MVB, Inc.*, 644 So. 2d 515, 518 (Fla. Dist. Ct. App. 1994) (quoted in *B&M Nat. Automation, LLC v. AMX Corp.*, No. 06-20412 CIV, 2007 WL 809675, at *4 (S.D. Fla. Mar. 15, 2007) (unpublished op.)).  An implied fiduciary relationship is implied from the circumstances surrounding the relationship and exists when one party has reposed confidence in the other party and a trust is accepted by the other party.  *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002) ("If a relation of trust and confidence exists between the parties (that is to say, where confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused), that is sufficient as a predicate for relief." (quoting *Quinn v. Phipps*, 93 Fla. 805 (Fla. 1927)).

712.    Mr. Gadonniex had both an express and implied fiduciary duty to Sensormatic. *See Stateline Power Corp. v. Kremer*, 404 F. Supp. 2d 1373, 1380 (S.D. Fla. 2005) (former employee's fiduciary duties to former employer "arose from his employment status and were not all specifically delineated in the Employment Agreement").  His express duty arose out of his Employment Agreement and prohibited him from disclosing or using confidential information. His implied duty arose out of his status as a Sensormatic engineer in the research department who was entrusted with confidential Sensormatic information.  He therefore had a duty to keep his employer's information confidential and to abide by its confidentiality policy, and he "accepted that responsibility."  (Gadonniex, Tr. 1710:10-20; DE 310, Defendants' 12(c) Reply Brief, p. 6 "[T]he most critical element of an 'implied-in-law' fiduciary relationship [is] that Gadonniex knowingly and voluntarily accepted his purported role")

         **b)**       **Mr. Gadonniex Breached His Fiduciary Duty To Sensormatic**

713.     Mr. Gadonniex breached his fiduciary duty to Sensormatic when he disclosed Sensormatic's confidential information to TAG and used Sensormatic's confidential information to help TAG's efforts to compete with Sensormatic in the market for EAS labels.[11]  When a person has a fiduciary duty to keep information confidential, disclosing that information is a breach of fiduciary duty.  *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002).  ("Florida courts have previously recognized a cause of action for breach of fiduciary duty in different contexts when a fiduciary has allegedly disclosed confidential information to a third party."); *Barnett Bank v. Shirey*, 655 So. 2d 1156, 1158 (Fla. Dist. Ct. App. 1995) (breach of fiduciary duty where bank employee disclosed borrower's confidential financial information); RESTATEMENT (SECOND) OF TORTS § 874, Reporters Notes (1979) ("One breach of fiduciary duty that is more commonly regarded as giving rise to an action in tort is the disclosure of confidential information.").[12]

         **c)**       **Mr. Gadonniex's Breach Harmed Sensormatic, And Sensormatic Is Entitled To Injunctive Relief**

714.     Sensormatic seeks an injunction preventing Mr. Gadonniex from disclosing Sensormatic's confidential information to any third party and from using such information to assist TAG's efforts to compete with Sensormatic in the AM EAS label market.  Injunctive relief is appropriate here because Sensormatic has been irreparably harmed by Mr. Gadonniex's disclosure and use of its sensitive confidential information, in that TAG is now selling its Series 58 labels in competition with Sensormatic's AM labels, and there is no adequate remedy at law for this harm.  In addition, Sensormatic will suffer future irreparable harm if Mr. Gadonniex is allowed to continue to utilize and share confidential Sensormatic information with TAG.

---

[11] Sensormatic's claim against Mr. Gadonniex for breach of fiduciary duty relates to confidential information that does not rise to the level of a trade secret.  Sensormatic recognizes that FUTSA preempts other tort law remedies for misappropriation of trade secrets, with the exception of contractual remedies, unless the claims are factually distinct. FLA. STAT. § 688.008 (2007); *New Lenox Indus., Inc. v. Fenton*, 510 F. Supp. 2d 893, 908 (M.D. Fla. 2007).  Accordingly, Sensormatic seeks relief for Mr. Gadonniex's breach of fiduciary duty based on his disclosure and use of confidential, non-trade secret information.

[12] The Florida Supreme Court cited Section 874 of the RESTATEMENT (SECOND) OF TORTS in *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002).

XV.  **TAG Aided And Abetted The Breach Of Fiduciary Duty By Mr. Dennis Gadonniex And Mr. Norman Hansen And Violated FDUTPA**

    A.  **Findings Of Fact**

        1.  **Mr. Gadonniex's Breach Of His Fiduciary To Sensormatic**

715.   As discussed above, Mr. Gadonniex breached his fiduciary duty to Sensormatic. (*See supra* Section IX.B.(3))

        2.  **Mr. Hansen's Breach Of His Fiduciary Duty To Sensormatic**

716.   Norman Hansen worked for Sensormatic from February 20, 1989 to October 2001 as a Mechanical Engineer.  (PX 359; PX 897, Defendants' Response to Request for Admission No. 130)

717.   Mr. Hansen signed an Employment Agreement with Sensormatic when he started work on February 20, 1989.  (PX 359; PX 897, Defendants' Response to Request for Admission Nos. 128-29)  Mr. Hansen's Employment Agreement required Mr. Hansen to return all confidential and secret materials to Sensormatic upon termination of employment (Article I) and prevented Mr. Hansen from disclosing or using Sensormatic confidential information without consent (Article III).  (PX 359)

718.   When Mr. Hansen's employment at Sensormatic ended in October 2001, he retained two compact disks containing Sensormatic documents (hereinafter "Sensormatic CDs"), which contained over 5,000 pages of documents from his Sensormatic computer. (DE 308, Joint Pre-trial Stipulation regarding certain Bates range)

719.   Mark Krom hired Mr. Hansen to be a consultant for TAG.  (Krom, Tr. 1192:8-10)

720.   TAG assigned Mr. Hansen to create a timeline of Sensormatic's label development.  (PX 329; Bulson, Tr. 2376:11-13)  Mr. Hansen reviewed the Sensormatic CDs and constructed a timeline of Sensormatic's development of its Ultra*Max label.  (PX 521H p. 22; Bulson, Tr. 2374:21-2375:12)  Mr. Hansen sent the timeline along with related Sensormatic documents he retrieved from the Sensormatic CDs to Kathie Bulson at TAG in 2004.  (PX 521H; Bulson, Tr. 2374:11-14, 2374:21-2375:12)

148

721.   The documents Mr. Hansen sent Ms. Bulson included internal memoranda among researchers at Sensormatic describing test data and results of experimentation and Mr. Hansen's monthly reports of his own research and development work at Sensormatic.  (PX 521H; Patterson, Tr. 216:19-217:8)  The development timeline and many of the supporting documents contained confidential and proprietary Sensormatic information.  (Patterson, Tr. 217:13-220:20)

722.   Sensormatic did not give Mr. Hansen permission to retain or use confidential information when he left the company.  (Patterson, Tr. 199:9-18)

### 3.   TAG's Knowledge Of The Fiduciary Duties Owed By Mr. Gadonniex And Mr. Hansen

723.   TAG was aware of Norman Hansen and Dennis Gadonniex's confidentiality obligations to Sensormatic.  Mark Krom knew when he hired Mr. Hansen and Mr. Gadonniex that they were former Sensormatic employees and assumed that they had signed confidentiality agreements with Sensormatic.  (Krom, Tr. 1192:8-25)

724.   After hiring Mr. Hansen and Mr. Gadonniex, Mr. Krom did not instruct them not to use or reveal confidential Sensormatic information when performing work for TAG.  (Krom, Tr. 1193:4-7)

725.   Mr. Krom and Ms. Bulson knew of Mr. Gadonniex's and Mr. Hansen's confidentiality obligations because they had entered into similar confidentiality agreements with Sensormatic when they worked there.  (PX 70, Ms. Bulson's agreement; PX 365, Mr. Krom's agreement; Krom, Tr. 1192:4-7)

726.   Ms. Bulson knew that Sensormatic employees were to keep confidential information confidential and that they were not to remove confidential materials from Sensormatic.  (Bulson, Tr. 2380:13-20)  She was aware that Sensormatic engineers had employment agreements with Sensormatic that had confidentiality provisions.  (Bulson, Tr. 2378:11-20)

727.   In addition, TAG's own lawyer warned TAG of Mr. Gadonniex's confidentiality obligations.  On July 23, 2004, TAG attorney (and former Sensormatic in-house counsel) Paul

149

Kashimba sent a memorandum to Mr. Hansen, Mr. Krom, and Ms. Bulson. (PX 327) This memorandum was written in response to an email Mr. Hansen sent to Mr. Kashimba on July 11, 2004 entitled "TCA123," which discussed Sensormatic's confidential test results related to TCA bias material. (*Id.*; PX 700) In this memorandum, Mr. Kashimba stated, "Dennis G. may have signed a statement that he returned all Sensormatic confidential information to Sensormatic upon his leaving. In all likelihood, Sensormatic would claim that this document is confidential information." (PX 327)

728. After receiving this document, Mr. Krom did not do anything about Mr. Gadonniex's having the confidential Sensormatic document referred to in the memorandum. (Krom, Tr. 1197:11-17)

729. On October 27, 2004, Mr. Kashimba again reminded Ms. Bulson of Mr. Gadonniex's possible liability for providing Sensormatic documents to TAG, Phenix, and Phenix's attorneys. (PX 771) Mr. Kashimba also informed Ms. Bulson that TAG's "involvement in this matter could expose Tag to a charge by Sensormatic/Tyco that Tag has interfered with Mr. Gadonniex's obligations under the Sensormatic/Tyco agreement and caused him to violate those obligations." (*Id.*; Bulson, Tr. 2382:23-2384:18)

### 4. TAG Encouraged And Paid For Mr. Hansen's And Mr. Gadonniex's Review And Disclosure Of Sensormatic Documents

730. Kathie Bulson asked Mr. Hansen and Mr. Gadonniex to create timelines of Sensormatic's use of various materials in its EAS labels based on information found in the documents. (Bulson, Tr. 2375:24-2376:13) The assignment was reiterated during a July 28, 2004 conference call, in which Ms. Bulson and Mr. Krom participated. (PX 329)

731. TAG encouraged Mr. Gadonniex to review his backup tapes. (Gadonniex, Tr. 1728:7-21) TAG indicated to Mr. Gadonniex that his consulting services were useful in part because he had information about Sensormatic's tests of certain bias materials on his backup tapes. (Gadonniex, Tr. 1739:12-21)

732. Mr. Gadonniex and Mr. Hansen sent their timelines and supporting

documentation to Ms. Bulson.  (Bulson, Tr. 2372:22-24, 2374:11-14)  Mr. Gadonniex told Ms. Bulson in 2004 that he created his timeline by consulting a backup tape containing documents he had downloaded from his Sensormatic computer.  (Bulson, Tr. 2372:25-2373:4)  In addition, Ms. Bulson knew Mr. Hansen was using the documents he had obtained from Sensormatic to create his timeline.  (Bulson, Tr. 2375:5-9, 2375:24-2376:6)

733.    TAG paid Mr. Hansen and Mr. Gadonniex for the time they spent reviewing the Sensormatic documents and drafting timelines based on those documents.  (Gadonniex, Tr. 1728:17-21; Bulson, Tr. 2377:20-23)

**B.    Conclusions Of Law**

**1.    Aiding And Abetting Breach Of Fiduciary Duty**

734.    To prove aiding and abetting breach of fiduciary duty, a plaintiff must demonstrate: (1) a fiduciary duty on the part of the primary wrongdoer; (2) a breach of this fiduciary duty; (3) knowledge of the breach by the alleged aider and abettor; and (4) the aider and abettor's substantial assistance or encouragement of the wrongdoing.  *Arwood v. Dunn* (*In re Caribbean K Line, Ltd.*), 288 B.R. 908, 919 (S.D. Fla. 2002) (citations omitted).

**a)    Mr. Hansen And Mr. Gadonniex Breached Their Fiduciary Duties To Sensormatic**

735.    As former Sensormatic employees, Mr. Hansen and Mr. Gadonniex had both an express and an implied fiduciary duty not to use or disclose Sensormatic's confidential or proprietary information.  *See Stateline Power Corp. v. Kremer*, 404 F. Supp. 2d 1373, 1380 (S.D. Fla. 2005).

736.    When Mr. Hansen left Sensormatic, he kept two compact disks of Sensormatic documents.  After becoming a consultant for TAG, he reviewed the Sensormatic CDs and compiled a timeline of Sensormatic's label development and sent the timeline, along with confidential Sensormatic documents, to Ms. Bulson at TAG.  Mr. Hansen's disclosure and use of Sensormatic's confidential information constitute a breach of his fiduciary duty to Sensormatic.

737.    Mr. Gadonniex breached his fiduciary duty to Sensormatic when he retrieved

151

confidential Sensormatic documents from a backup tape he had retained when he left the company, reviewed and used Sensormatic documents in furtherance of his consulting work for TAG, and disclosed confidential information to TAG.

**b)   TAG Knew Of Mr. Hansen's And Mr. Gadonniex's Breach Of Fiduciary Duty**

738.    TAG knew that Mr. Hansen and Mr. Gadonniex owed a fiduciary duty to Sensormatic and an obligation to keep Sensormatic's information and documents confidential. Having signed Employment Agreements themselves, Mr. Krom and Ms. Bulson knew about employees' duty to maintain the confidentiality of Sensormatic's confidential information.  TAG knew that Mr. Hansen and Mr. Gadonniex retained Sensormatic documents when they left Sensormatic, reviewed those documents pursuant to TAG's request, and disclosed them to TAG.

739.    TAG's attorney Paul Kashimba, who was formerly in-house counsel at Sensormatic, warned TAG on more than one occasion that the Sensormatic documents and information Mr. Gadonniex was sharing were likely confidential and could be a violation of Mr. Gadonniex's contractual obligation to Sensormatic.  TAG took no action in response to these warnings.

**c)   TAG Substantially Assisted And Encouraged The Breach**

740.    TAG substantially assisted and encouraged the breach of fiduciary duty by Mr. Hansen and Mr. Gadonniex.  TAG provided this assistance and encouragement with the conscious intent to assist Mr. Hansen's and Mr. Gadonniex's disclosure of Sensormatic confidential information.  *See, e.g., Lancer Offshore, Inc. v. Citco Group, Ltd.*, No. 05-60080-Civ., 2008 WL 926513, at *6 (S.D. Fla. Mar. 31, 2008) (unpublished op.) (when a defendant does not have a duty to disclose the breach of fiduciary duty, it can only be liable if "conscious intent" is shown).

741.    TAG assigned Mr. Hansen and Mr. Gadonniex to review Sensormatic documents and to construct chronologies of Sensormatic's use of various bias materials during the course of

its label development.  TAG paid Mr. Gadonniex and Mr. Hansen for time spent reviewing the Sensormatic documents and creating the chronologies.  Based on these facts, the Court concludes that TAG acted with a conscious and specific intent to aid the breach of fiduciary duty.

### d)    Sensormatic Was Harmed, And Injunctive Relief Is Appropriate

742.    Sensormatic seeks an injunction preventing TAG from making future attempts to aid and abet TAG employees' or consultants' breach of fiduciary duty owed to Sensormatic and from encouraging or assisting Mr. Hansen and Mr. Gadonniex to use or disclose Sensormatic's confidential information.  Injunctive relief is appropriate here because Sensormatic has been harmed by its former employees' disclosure and use of its sensitive confidential information, in that TAG is now competing with Sensormatic for customers, and there is no adequate remedy at law for this harm.  In addition, Sensormatic will suffer irreparable harm if TAG is permitted to continue to encourage former Sensormatic employees to utilize and share confidential Sensormatic information.

### 2.    TAG Violated FDUTPA

743.    Sensormatic seeks injunctive relief under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") for TAG's acquisition, copying and disclosure of its specifications[13] and TAG's payment and encouragement to Sensormatic's former employees to review confidential Sensormatic documents unlawfully retained by the former employees.

744.    FDUTPA makes unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  FLA. STAT. § 501.204(1) (2008).  "An unfair practice is 'one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to

---

[13] Sensormatic brings its FDUTPA claim relating to the specifications as an alternative to its FUTSA claim in the event that the Court concludes that relief under FUTSA is unavailable.  Sensormatic recognizes that FUTSA preempts claims under FDUTPA that are based on the same factual allegations, which is why Sensormatic seeks relief under FDUTPA for TAG's actions relating to the specifications only as an alternative to FUTSA.  *Allegiance Healthcare Corp. v. Coleman*, 232 F. Supp. 2d 1329, 1335-36 (S.D. Fla. 2002).  Sensormatic's FDUTPA claim related to TAG's other activities are not preempted by FUTSA, as they arise out of distinct facts.  *Id.*

consumers.'"  *PNR, Inc. v. Beacon Property Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (internal quotation marks omitted).

745.   TAG engaged in unfair practices in violation of FDUTPA.  In furtherance of the goal of replicating the performance of Sensormatic's labels, Mr. Krom instructed a TAG employee to copy Sensormatic's specifications and disseminate them to potential material suppliers.  TAG instructed its consultants Mr. Hansen and Mr. Gadonniex to review and disclose confidential Sensormatic information and documents.  TAG's actions therefore constitute unfair and deceptive practices.  *See Furmanite America, Inc. v. T.D. Williamson, Inc., et al.*, 506 F. Supp. 2d 1134, 1146-47 (M.D. Fla. 2007) (denying summary judgment to defendants on FDUTPA claim on grounds that "[defendant's] alleged plan to hire all of [plaintiff's] employees away *en masse* and use them to misappropriate [plaintiff's] trade secrets would constitute unlawful and unfair or deceptive acts or practices under the broad reading Florida courts traditionally apply to FDUTPA"); *see also Day v. Le-Jo Enters., Inc.*, 521 So. 2d 175, 178 (Fla. Dist. Ct. App. 1988) (noting that under Florida courts' application of FDUTPA, courts have "found the concept of 'unfair and deceptive' to be extremely broad").

746.   TAG's actions were done in the course of producing and offering labels for sale in the marketplace.  FLA. STAT. § 501.203(8) (2008) (defining "trade or commerce"); *Hinson Elec. Contracting Co. v. BellSouth Telecomms., Inc.*, No. 3:07-CV-598-J-32MCR, 2008 WL 360803, at *3 (M.D. Fla. Feb. 8, 2008) (unpublished op.) ("trade or commerce" requirement satisfied where defendant "is generally involved in the offering of telecommunications services to the general public" and action involved maintenance and repair of cables).  Accordingly, TAG's effort to diminish Sensormatic's AM label market share using unfair trade practices is a violation of FDUTPA.

747.   Injunctive relief is an appropriate remedy under FDUTPA.  FLA. STAT. § 501.211 (2008).  Sensormatic has shown that it was injured by TAG's unfair practices and faces irreparable harm if TAG is not enjoined from engaging in these practices in the future.  Accordingly, the Court finds that injunctive relief is an appropriate remedy in this case.

154

**XVI.   Conclusion**

      The Court enters judgment for plaintiff Sensormatic on the claims set forth on counts 1, 2, 4, 5, 6, 8, and 9 of its Fourth Amended Complaint, as stated in the separate [Proposed] Judgment in Favor of Plaintiff Sensormatic Electronics Corporation, Including Permanent Injunction that accompanies this document.  This Court further enters judgment in favor of Plaintiff Sensormatic and against Defendants as to Counterclaims 1 through 8 of Defendants' Amended Counterclaims.

Dated:  October 31, 2008                    Respectfully submitted,

Of Counsel

Mark L. Levine                             /s Stephen B. Gillman
Mark S. Ouweleen                           Stephen B. Gillman 196734
Sean W. Gallagher                          *Email: sgillman@shutts.com*
Shayna S. Cook                             SHUTTS & BOWEN, LLP
BARTLIT BECK HERMAN PALENCHAR              1500 Miami Center
& SCOTT LLP                                201 South Biscayne Boulevard
54 West Hubbard St., Suite 300             Miami, Florida  33131
Chicago, IL  60654                         Telephone: (305) 358-6300
Telephone: (312) 494-4400                  Facsimile: (305) 381-9982
Facsimile: (312) 494-4440

Sean C. Grimsley
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
1899 Wynkoop Street, 8th Floor
Denver, CO  80212
Telephone: (303) 592-3100
Facsimile: (303) 592-3140

     *Attorneys for Plaintiff Sensormatic Electronics Corporation*

## SERVICE LIST

Sensormatic Electronics Corporation v.
The TAG Company US LLC and Phenix Label Company
Case No. 06-81105 CIV HURLEY/HOPKINS
United States District Court, Southern District of Florida

Of Counsel:

Mark L. Levine
*Email: mark.levine@bartlit-beck.com*
Mark S. Ouweleen
*Email: mark.ouweleen@bartlit-beck.com*
Sean W. Gallagher
*Email: sean.gallagher@bartlit-beck.com*
Shayna S. Cook
*Email: shayna.cook@bartlit-beck.com*
BARTLIT BECK HERMAN
PALENCHAR & SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
Telephone: (312) 494-4400
Facsimile: (312) 494-4440


Sean C. Grimsley
*Email: sean.grimsley@bartlit-beck.com*
BARTLIT BECK HERMAN
PALENCHAR & SCOTT LLP
1899 Wynkoop St., 8th Floor
Denver, CO 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140

Stephen B. Gillman 196734
*Email: sgillman@shutts.com*
SHUTTS & BOWEN, LLP
1500 Miami Center
201 South Biscayne Boulevard
Miami, Florida  33131
Telephone: (305) 358-6300
Facsimile:  (305) 381-9982

*Attorneys for Plaintiff Sensormatic Electronics Corporation*
[Notice of Electronic Filing generated by CM/ECF]


Robert R. Waters
Jason A. Poling
Olen L. York, III
Enrico A. Mazzoli
Benjamin S. Shively
WATERS LAW OFFICE, PLLC
714 Lyndon Lane, Suite #6
Louisville, KY 40222
Tel.: (502) 425-2424
Fax. (502) 425-9724

Leslie J. Lott
(*E-Mail:  ljlott@lott-friedland.com*)
David K. Friedland
(*E-Mail:  dkfriedland@lfiplaw.com*)
LOTT & FRIEDLAND, P.A.
355 Alhambra Circle, Suite 1100
Coral Gables, FL  33134
Tel.: (305) 448-7089
Fax.: (305) 446-6191

*Attorneys for Defendants TAG, Phenix and Dennis Gadonniex*
[Notice of Electronic Filing generated by CM/ECF]

157