UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 06-81105-CIV-HURLEY/HOPKINS

SENSORMATIC ELECTRONICS CORP.,

Plaintiff,

vs.

THE TAG COMPANY US, LLC, et al.,

Defendants.

FILED by _____ D.C.

DEC 19 2008

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.

MEMORANDUM OPINION CONTAINING
FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS CAUSE is before the court following trial in this matter, held from August 12, 2008

to August 28, 2008 and from October 7, 2008 to October 9, 2008. Having reviewed the evidence

admitted at trial and considered the arguments of counsel, the court now makes the following

findings of fact and conclusions of law:

INTRODUCTION

1.     Plaintiff Sensormatic Electronics Corporation ("Sensormatic")has brought this

lawsuit against Defendants The TAG Company US LLC ("TAG") and Phenix Label Company

("Phenix") for infringement of various claims of two of Sensormatic's patents, U.S. Patent No.

5,729,200 ("the '200 patent") and U.S. Patent No. 6,181,245 ("the '245 patent"). Sensormatic seeks

permanent injunctive relief against TAG and Phenix.

2.     TAG and Phenix have asserted counterclaims for invalidity and unenforceability of

the '200 and '245 patents.

3.     In addition to its patent infringement claims, Sensormatic has brought claims against

TAG and former employee Dennis Gadonniex for misappropriation of trade secrets in violation of

the Florida Uniform Trade Secrets Act; against Mr. Gadonniex for breach of contract and breach of

fiduciary duty; and against TAG for aiding and abetting breach of fiduciary duty and violations of the Florida Deceptive and Unfair Trade Practices Act. Sensormatic seeks unjust enrichment relief for TAG's misappropriation of trade secrets, permanent injunctive relief for the remaining claims, and attorneys' fees for the breach of contract claim.

### A.    Parties

4.     Sensormatic is a Nevada corporation with its principal place of business at One Town Center Road, Boca Raton, Florida 33486. Sensormatic designs and manufactures Electronic Article Surveillance ("EAS") systems, which are typically used to detect and deter shoplifting in retail stores.  (PX 786, '200 patent, col. 11:14-16)  This case involves disposable acousto-magnetic ("AM") EAS labels, which are affixed to retail merchandise.

5.     TAG is a limited liability company organized under the laws of Florida and with its principal place of business at 6278 North Federal Highway #318, Fort Lauderdale, Florida 33308. TAG sells AM EAS labels known as the Series 58 labels.

6.     Phenix is a Kansas corporation with its principal place of business at 11610 South Alden Street, Olathe, Kansas 66062.  Phenix manufactures AM EAS labels, including Series 58 labels, for sale by TAG.

7.     Dennis Gadonniex is a resident of Bradenton, Florida.  Gadonniex has been a consultant for TAG and is a former employee of Sensormatic.

### B.    Procedural History

8.     Sensormatic filed this lawsuit against TAG and Phenix on November 29, 2006, alleging patent infringement of multiple Sensormatic patents.

9.     On June 12, 2007, Sensormatic amended its complaint to add Gadonniex as a defendant and to add claims against TAG for misappropriation of trade secrets and deceptive and

unfair trade practices. *See* DE # 45.

10.     On August 12, 2008, the first day of trial in this case, the parties stipulated that TAG and Phenix have infringed the asserted claims of the '200 and '245 patents. *See* DE # 316. TAG and Phenix defended on the ground that the '200 and '245 patents are invalid and/or unenforceable.

JURISDICTION

11.     This court has jurisdiction over Sensormatic's infringement claims and defendants' invalidity and unenforceability claims pursuant to 28 U.S.C. § 1331. The court has supplemental jurisdiction over Sensormatic's state law claims pursuant to 28 U.S.C. § 1367(a).

12.     Venue is proper in this court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in the Southern District of Florida.

DISCUSSION

**A.     Background**

*1.     Acousto-Magnetic Electronic Article Surveillance ("AM EAS") Systems*

13.     An acousto-magnetic electronic article surveillance ("AM EAS") system is generally used to deter and detect the theft of retail merchandise. A typical AM EAS system consists of two components:  (1) "markers" or "labels," which are affixed to retail products and designed to interact with a magnetic field placed at the store exit, and (2) "pedestals," which both create the magnetic field and detect markers that have not been deactivated at the checkout register. (PX 786, '200 patent, col. 1:16-33; Patterson, Tr. 102:3-21).

14.     Markers have magnetic properties that cause an alarm to sound if they are brought within the magnetic field created by the pedestals without having first been deactivated. (PX 786, col. 1:17-20; Patterson, Tr. 104:2-20). The marker is typically deactivated by a store employee at the time of purchase. After being deactivated, the marker may be brought through the magnetic field

3

without sounding an alarm.  (PX 786, col. 1:23-26; Patterson, Tr. 112:22-114:1)

      15.    The markers themselves consist of two principal components – a "resonator" and a "bias," both of which sit inside a plastic housing.  (PX 786, col. 1:27-33; Patterson, Tr. 105:5-23)

      16.    The resonator is formed from a magnetostrictive metallic material which resonates (or vibrates) at a particular frequency when exposed to the alternating magnetic field created by the pedestals.  (PX 786, col. 1:45-50; Patterson, Tr. 106:1-14, 106:24-107:10).

      17.    The bias element is formed from a semi-hard metallic material which, when fully magnetized, causes the resonator to vibrate at a frequency detectable by the pedestals in response to an alternating magnetic field generated by the pedestals.  (PX 786, col. 1:60-2:5; Patterson, Tr. 111:18-112:21)  The standard frequency in the industry is 58 kHz.  (Bulson, Tr. 2312:24-25)

      18.    When the bias element is demagnetized (e.g., by a checkout clerk upon payment for the merchandise), the resonator vibrates at a higher frequency than can be detected by the pedestals.  Thus, after demagnetization of the bias, the marker can pass through the field generated by the pedestals without sounding an alarm.  (PX 786, col. 1:60-2:5; Patterson, Tr. 113:22-114:13)

      2.    *Patent Prosecution History*

      19.    In the fall of 1995, Sensormatic's Dr. Kevin Coffey and Dr. Richard Copeland conceived of the idea of using a low-coercivity bias material that exhibited "abrupt characteristics." (DX 155, 11/28/95 Coffey memo at 3; DX 256, Invention Disclosure (Ex. A) at 3 ("new abrupt magnet"); PX 786, col. 4:45-59; Coffey, Tr. 351:5-352:6, 389:24-390:3; Copeland, Tr. 1445:3-24) "Coercivity" refers to the measure of the strength of an opposing magnetic field (measured in Oersted or Oe) that is needed to reduce the magnetization of a metal, such as the bias element, from full magnetization to zero in the presence of the field.  (Patterson, Tr. 121:3-6)  The abrupt magnetization and demagnetization characteristics of the label were designed to allow "label

4

activation and label deactivation" with "much lower field levels." (DX 256, Invention Disclosure (Ex. A) at 5)

20.     On August 28, 1996, Drs. Coffey and Copeland filed an application for what became the '200 patent. (PX 786) The '200 patent was granted on March 17, 1998. (*Id.*)

21.     The '200 patent application disclosed four prior art references, each of which are cited on the face of the patent: the Anderson '489 patent, the Anderson '490 patent, the Liu '140 patent and the Lian '230 patent. (PX 786)

22.     The Examiner initially rejected all 47 claims in the '200 application on the ground that the specification would not enable a person reasonably skilled in the art to make and/or use the invention, as required by 35 U.S.C. §112, first paragraph. (PX 86, May 16, 1997 Office Action) Sensormatic "traversed" and argued that the rejection was incorrect because, among other things, persons of ordinary skill in the art could make the claimed material based upon the desired properties that are specified in the '200 patent's claims. (PX 86, Aug. 22, 1997 Response to Office Action) The Examiner subsequently withdrew his rejection and allowed all 47 claims as originally written, with a few minor edits to the specification. (PX 86, Sept. 25, 1997 Notice of Allowability)

23.     On December 1, 2005, the firm of Defendants' testifying expert, Dr. Gordon Fish, filed a Request for Re-examination with the PTO. (PX 922, Dec. 1, 2005 Request for Re-examination; Fish, Tr. 2098:17-25)

24.     On February 9, 2006, the PTO granted Defendants' Request for Re-examination, finding that there was "a substantial new question of patentability . . . with respect to the instant claims" under 35 U.S.C. § 102-103. (PX 922, Feb. 9, 2006 Office Action p. 3)

34.     The PTO rejected original Claim 4. (PX 922, Nov. 9, 2006 Office Action) Sensormatic then amended claim 4 to include the additional limitation set forth in dependent claim

5 and cancelled claim 5. (PX 922, Jan. 3, 2007 Summary of Interview; Response to Nov. 9, 2006 Office Action)

35.    On Feb. 12, 2008, the PTO issued a Re-examination Certificate. (PX 816) In all, 42 of the 47 claims withstood re-examination as originally written; two claims were cancelled; and three claims were amended. (*Id.*)

36.    The '245 patent is a continuation-in-part ("CIP") of the '200 patent. (PX 788)

37.    The CIP application for the '245 patent was filed on August 15, 1997. (PX 788) It claimed priority to the '200 patent. The '245 patent issued on January 30, 2001. (*Id.*)

38.    The specification or written description of the '245 patent is largely the same as the '200 patent specification. (PX 788)

39.    In the application for what became the '245 patent, the inventors disclosed the same four prior art references on the face of the '200 patent. (PX 87) The Examiner added the Gadonniex '770 patent (which had issued after the '200 patent issued and after the '245 application was filed) to the list of pertinent art, though he did not reject any of the claims on the basis of that patent. (PX 87, June 16, 2000 Office Action)

40.    On June 16, 2000, the Examiner rejected all of the '245 patent claims based on the judicially created doctrine of double patenting in light of the '200 patent (PX 87, June 16, 2000 Office Action) Sensormatic subsequently filed a "terminal disclaimer" (which defeats a double-patenting rejection based on commonly-owned patents for period of common ownership) to overcome the double patenting rejection pursuant to 37 C.F.R. § 1.321(c). (PX 87, Aug. 11, 2000 Sensormatic Amendment and attached Terminal Disclaimer)

41.    The Examiner then withdrew the rejection and allowed all 19 claims as originally

6

written, with a few minor edits to the specification. (PX 87, Aug. 30, 2000 Notice of Allowability)

42.     On December 14, 2005, Dr. Fish's firm, again acting on behalf of Phenix filed a Request for Re-examination with the PTO. (PX 923, Dec. 14, 2005 Request for Re-examination)

43.     Dr. Fish's firm asserted that all 19 claims of the '245 patent were either anticipated by or obvious in light of the same references they had asserted in the '200 patent re-exam proceedings as well as three additional references. (PX 923, Dec. 14, 2005 Request for Re-examination pp. 1-7)

44.     On March 6, 2006, the PTO granted Defendants' Request for Re-examination, finding that the cited references raised "a substantial new question of patentability . . . with respect to the instant claims" under 35 U.S.C. § 102-103. (PX 923, March 2, 2006 Office Action)

45.     The PTO issued a Re-examination Certificate on March 4, 2008. (PX 815) In all, 16 of the 19 original claims withstood re-examination as originally written, two claims were amended, and one was cancelled. (PX 815)

### B.     Sensormatic's Infringement Claims

46.     Sensormatic contends that Defendants' Series 58 labels infringe Claims 2, 6, 10, 11, 18, 19, 20, 27, 28, and 43 of the '200 patent, and Claims 1, 2, 4, 7, 9, 14, 15, and 17 of the '245 patent. (DE 300, Stipulation on Limiting Asserted Claims and Replevin)

47.     Sensormatic bears the burden of proof to establish infringement by a preponderance of evidence. *Kegel Co. v. AMF Bowling, Inc.*, 127 F.3d 1420, 1425 (Fed. Cir. 1997).

48.     Determination of literal infringement involves a two-step analysis. *Ultra-Tex Surfaces, Inc. v. Hill Bros. Chem. Co.*, 204 F.3d 1360, 1363 (Fed. Cir. 2000). First, each claim must be properly construed, which is an issue of law for the court. *Markman v. Westview Instruments*, 517

7

U.S. 370, 384 (1996); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

Second, each properly construed claim is compared with Defendants' Series 58 Labels and their use

to determine whether the claims read on the allegedly infringing or accused products. *Id.* at 1581-82.

49.    The parties stipulated to the following constructions of certain claim terms:

"magnetomechanical electronic article surveillance system of the type which radiates a marker

interrogation signal in the form of intermittent bursts at a predetermined frequency" means an EAS

system that generates an alternating electromagnetic field as a pulsed interrogation signal at a

predetermined frequency; and "resonance characteristic that is substantially unchanged" means a

resonant frequency that is largely unchanged, or has no appreciable change. *See* DE # 287.

50.    The parties disputed the construction of four other claim terms.  In its Order

Construing Disputed Claim Terms, the court construed the claims as follows: "fully magnetized"

means that the biasing element exhibits virtually no further increase in its magnetization level

retained when the applied magnetic field is further increased; "full magnetization level" means the

level of magnetization at which the biasing element is "fully magnetized," as that term is defined

above; "DC magnetic field Ha required to achieve saturation means that DC magnetic field strength,

the application of which causes the biasing element to become "fully magnetized," as that term is

defined above; and the recited slope in the disputed term "deactivation-field-dependent resonant-

frequency-shift characteristic having a slope that exceeds [100,200] Hz/Oe" refers to the maximum

value of the slope attained by a curve properly fitted to data points representing measured resonant

frequency as a function of the peak amplitude of an applied AC demagnetization field. *See* DE #

304.

51.     The parties stipulated before trial that TAG and Phenix, by making, using, offering for sale, and/or selling Series 58 labels in the United States from 2006 to the present, have practiced the asserted claims. *See* DE # 316.

52.     The court therefore finds that, by making, using, offering for sale, and/or selling Series 58 labels in the United States from 2006 to the present, defendants TAG and Phenix have in fact practiced each of the asserted claims.

### 1.     General Principles Governing Invalidity Defenses

53.     Claims of an issued patent are presumed valid.  35 U.S.C. § 282.

54.     "A party seeking to establish that particular claims are invalid must overcome the presumption of validity in 35 U.S.C. § 282 by clear and convincing evidence." *State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1067 (Fed. Cir. 2003).

55.     "Although an exact definition is elusive, 'clear and convincing evidence' has been described as evidence that 'place[s] in the ultimate factfinder an abiding conviction that the truth of its factual contentions are highly probable.'" *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 n.5 (Fed. Cir. 2007) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).

56.     In conducting an invalidity analysis, each claim must be examined individually. *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1370 (Fed. Cir. 2003). "'[E]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; [and] dependent or multiple dependent claims shall be

presumed valid even though dependent upon an invalid claim.' . . . Where claims differ in scope in an aspect material to the analysis, those claims must be addressed individually." *Id.* at 1370-71 (quoting 35 U.S.C. § 282).

57.   The parties have stipulated that the court need address the validity of only the eighteen asserted claims. *See* DE # 300.

58.   Findings of fact and conclusions of law are set out separately for each defense below.

     2.   *Inherent Anticipation*

     a.   Governing Legal Principles

59.   A patent is valid only if it is not anticipated by prior art in the area.   35 U.S.C. § 102(a).   Invalidation of a patent on anticipation grounds "requires a showing that each element of the claim at issue, properly construed, is found in a single prior art reference." *Zenith Elecs. Corp. v. PDI Commun. Sys.*,   522 F.3d 1348, 1363 (Fed. Cir. 2008).   In other words, a single prior art reference "must disclose each and every feature of the claimed invention, either explicitly or inherently." *Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*, 471 F.3d 1369, 1375 (Fed. Cir. 2006).

60.   Defendants' anticipation argument is based solely upon the doctrine of inherent anticipation.   (Fish, Tr. 2201:16-22)

61.   To show inherent anticipation, Defendants must demonstrate that each and every claim limitation is "necessarily present in the prior art, not merely probably or possibly present." *Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.*, 344 F.3d 1186, 1192 (Fed. Cir. 2003).

Anticipation by inherency "may not be established by probabilities or possibilities." *MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999). The "mere fact that a certain thing may result from a given set of circumstances is not sufficient." *Id.*

b. Findings of Fact

62. Dr. Fish contended that each of the asserted claims, except for claim 18 of the '200 patent, is inherently anticipated by U.S. Patent No. 5,527,399 issued to Manning et al.

63. The claims of the '399 patent are directed not to EAS markers, but rather to different methods for producing a thin semi-hard magnetic strip. (DX 14, col. 11:62-12:61) The '399 patent does acknowledge, however, that the magnetic strips resulting from the claimed methods may be used as the bias element in AM EAS and harmonic anti-theft systems. (DX 14, col. 1:30-32 (referencing patents describing markers for EAS systems))

64. The '399 patent teaches two broad processing methods: a carburization process and a non-carburization process, each of which has a number of steps. (Manning, Tr. 1091:14-24, 1104:25-1105:6, 1110:11-20;) These steps may be performed at a "wide range" of temperatures and for various amounts of time. (Coffey, Tr. 2442:11-23; DX 14, col. 3:50-8:49) Varying the times and temperatures in each of the steps could "affect the magnetic properties" of the resulting magnetic material. (Manning, Tr. 1105:13-17, 1110:21-25; Fish, Tr. 2210:2-11) Thus, the '399 patent discloses a "broad universe of materials," including "a thousand different possible chemical combinations" and "broad ranges of processing techniques" that will "impact the magnetic properties of the ultimate material." (Fish, Tr. 2209:14-2210:1)

11

65.     The '399 patent is silent as to the "abrupt" characteristics claimed in the '200 and '245 patents, such as the slope of the deactivation-field-dependent resonant-frequency shift, strength of DC magnetization field required to magnetize the bias to saturation, and strength of applied AC magnetic field required to cause the magnetization level to drop below 95% of full magnetization level. (DX 14; Coffey, Tr. 508:19-509:2, 510:11-17; Fish, Tr. 2088:16-2090:7)

66.     Defendants' expert Dr. Fish (Phenix's patent agent) testified about three markers that were created at his suggestion. Those are markers M11, M12 and M13 ("Fish Markers"). These markers each contained an Arnokrome 4 bias material and a Metglas 2826 MB resonator. (Fish, Tr. 1974:16-1975:6) Dr. Fish testified that the Fish markers practiced the '399 patent and read on the asserted claims. Thus, according to TAG and Phenix, the '399 patent anticipates the asserted claims of the '200 and '245 patents.

67.     In fact, however, Dr. Fish admitted that for "many of the asserted claims, fewer than all three [Fish] markers read on that claim." (Fish, Tr. 2208:18-2209:4) For example, markers M11 and M12 do not meet the "saturation" limitations in claims 10 and 11 of the '200 patent and claims 7 and 9 of the '245 patent because they had not achieved "saturation," as defined in the court's *Markman* order, at less than 200 or 350 Oe.   (Coffey, Tr. 2434:16-2435:17)

68.     Moreover, there is insufficient evidence that the Fish markers in fact practice the '399 patent. Although the Fish markers used Arnokrome 4 as the bias material, Dr. Fish acknowledged that he had no knowledge of how the Arnokrome 4 in the Fisk markers was processed, let alone whether it was processed according to the teachings of the '399 patent. (Fish, Tr. 2212:2-8)

12

69.     Finally, the court notes that the PTO considered and rejected precisely these anticipation arguments in the re-examination proceedings initiated by Phenix. (Fish, Tr. 2202:4-6; PX 922, April 24, 2007 Office Action at 6-7, 15-16, 18-19; PX 923, May 10, 2007 Office Action at 8-9 and July 20, 2007 Office Action at 3-4)

c.     Conclusions of Law

70.     Even had it been shown that the Fish markers both practiced the '399 patent and contained each of the limitations of one or more of the asserted claims, defendants' inherent anticipation argument would nevertheless fail, because even in that case it would not have been demonstrated that an embodiment of the '399 patent *necessarily* contains the limitations of any asserted claim. In other words, the fact that some embodiments of the '399 patent may contain all the limitations of an asserted claim does not preclude the possibility that some limitations may be absent in other '399 embodiments. Under Federal Circuit case law, this defeats a claim of invalidity due to inherent anticipation. *See Electro Medical Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1052 (Fed. Cir. 1994).

71.     At closing argument, defendants relied on *Titanium Metals Corp. v. Banner*, 778 F.2d 775 (Fed. Cir. 1985). But defendants appear to misunderstand *Banner*. In that case the Federal Circuit said that "when, as by a recitation of ranges or otherwise, a claim covers several compositions, the claim is 'anticipated' if *one* of them is in the prior art." *Id.* at 782. This logically follows from the fact that if the prior art contains a narrow range entirely contained within a later broader range, it is impossible to fall within the prior art's earlier narrow range while avoiding the later, broader one. As the Federal Circuit said in *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991,

13

999 (Fed. Cir. 2006), "*Titanium Metals* stands for the proposition that an earlier species reference anticipates a later genus claim, not that an earlier genus anticipates a narrower species."

72.    Defendants thus have failed to show by clear and convincing evidence that any of the asserted claims are inherently anticipated by the '399 patent.

      3.    *On-Sale Bar*

         a.    Governing Legal Principles

73.    A claim is invalid if a product embodying each and every limitation of the claimed invention was "in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). This rule is commonly known as the "on-sale bar." "The date exactly one year prior to the date of application for the patent is known as the critical date." *Scaltech, Inc. v. Retec/Tetra, L.L.C.,* 269 F.3d 1321, 1327 (Fed. Cir. 2001).

74.    "The ultimate determination of whether a patent is invalid under § 102(b) due to application of an on-sale bar is a question of law. . . . This ultimate determination is based upon underlying factual considerations. . . . . In order to overcome the presumption of validity, such underlying facts supporting a determination of invalidity must be proven by clear and convincing evidence." *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d 1253, 1257 (Fed. Cir. 2001) (quotations and citations omitted).

75.    To invalidate a claim by operation of the on-sale bar, defendants must prove that two conditions were satisfied prior to the critical date. *Pfaff v. Wells Elecs., Inc.,* 525 U.S. 55, 67-68 (1998). "First, the [claimed invention] must [have been] the subject of a commercial offer for sale."

*Id.* "Second, the invention must [have been] ready for patenting." *Id.* "[The second] condition may be satisfied in at least two ways: by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Id.*

76.     When the asserted basis of invalidity is a public use or on-sale bar, the court should determine 'whether the subject of the barring activity met each of the limitations of the claim, and thus was an embodiment of the claimed invention.'" *Dana Corp. v. American Axle & Mfg., Inc.,* 279 F.3d 1372, 1375 (Fed. Cir. 2002) (citation omitted).

77.     "The on-sale bar is evaluated on a claim-by-claim basis, so that some of the claims of a patent may be found to be barred while others are not." *Allen Eng'g Corp. v. Bartell Indus.,* 299 F.3d 1336, 1353 (Fed. Cir. 2002).

78.     If a prior sale or public use is "primarily for experimentation rather than commercial gain, then the sale is not invalidating under § 102(b)." *Electromotive Div. of Gen. Motors Corp. v. Transportation Sys. Div. of Gen. Elec. Co.,* 417 F.3d 1203, 1210 (Fed. Cir 2005).

79.     "'[A] bona fide effort to bring [the] invention to perfection, or to ascertain whether it will answer the purpose intended' does not constitute a 'public use.' . . . [T]he focus of the test is whether the use was truly experimental or in fact commercial." *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.,* 488 F.3d 982, 998 (Fed. Cir. 2007) (citation omitted). "[T]he question is . . . whether the primary purpose of the inventor at the time of the sale, as determined from an objective

15

evaluation of the facts surrounding the transaction, was to conduct experimentation." *Allen Eng'g Corp. v. Bartell Indus.*, 299 F.3d 1336, 1354 (Fed. Cir. 2002).

80.     "[V]arious objective indicia may be considered in determining whether the inventors engaged in experimentation." *Electromotive Div. of Gen. Motors Corp. v. Transportation Sys. Div. of Gen. Elec. Co.*, 417 F.3d 1203, 1212 (Fed. Cir 2005).  These factors include: "(1) the necessity for public testing; (2) the amount of control over the experiment retained by the inventor; (3) the nature of the invention; (4) the length of the test period; (5) whether payment was made; (6) whether there was a secrecy obligation; (7) whether records of the experiment were kept; (8) who conducted the experiment; (9) the degree of commercial exploitation during testing; (10) whether the invention reasonably requires evaluation under actual conditions of use; (11) whether testing was systematically performed; (12) whether the inventor continually monitored the invention during testing; and (13) the nature of the contacts made with potential customers. . . .  This list is not exhaustive, and all of the experimentation factors may not apply in a particular case." *Id.* at 1213.

81.     If the patent challenger makes a prima facie case of public use, the patentee "must simply produce sufficient rebuttal evidence [of experimental use] to prevent the party challenging the patent's validity from meeting its burden of proving by clear and convincing evidence that the invention was in public use." *Lisle Corp. v. A. J. Mfg. Co.*, 398 F.3d 1306, 1316 (Fed. Cir. 2005). A "party challenging a patent's validity has the burden of proving by clear and convincing evidence that the patent is invalid, and that . . . burden does not shift at any time to the patent owner." *Id.*

82.     Defendants contend that each of the asserted claims is invalid because, prior to the critical date, Sensormatic sold or publicly used labels within the United States embodying every

16

element of each of the asserted claims.  (DE # 276;  Opening, Tr. 17-23; Closing, Tr. 2754:10-24).

83.    Defendants argued that the sale of labels employing Metglas 2605 TCA, Arnokrome 4, or SemiVac 90 bias materials constituted a public use or sale of the claimed inventions. (Closing, Tr. 2754:10-24)

b.    Findings of Fact

84.    As defendants acknowledge, the effective filing date of the '245 patent is the filing date of the '200 patent for purposes of the on-sale bar analysis.  Thus, the critical date for both the '200 and '245 patents is August 28, 1995, one year prior to the filing date of the '200 patent.  (PX 786, DE # 276).

85.    Both parties agreed that a semi-hard magnetic material bearing the trade name Arnokrome 4 was commercially available from Arnold prior to the critical date, and that Sensormatic purchased Arnokrome 4 prior to the critical date.  But the parties dispute whether Sensormatic sold labels containing Arnokrome 4 bias material prior to August 28, 1995.

86.    Defendants relied largely on the testimony of Kathie Bulson, TAG Company's Senior Vice President, and a former Sensormatic employee.  Ms. Bulson testified that labels using Arnokrome 4 bias material were sold to Sensormatic customers in early to mid 1994.  (Bulson, Tr. 2351:20-25, 2353:4-5) The court, however, finds this testimony not credible nor worthy of belief.

87.    Furthermore, defendants produced insufficient documentary support for Ms. Bulson's contention that Arnokrome 4 had been approved for use in labels to be sold. (Bulson, Tr. 2396:2-5)

17

Ms. Bulson testified that she was not involved in the decision to approve Arnokrome 4 for use in labels. She testified that for Arnokrome 4 to have been approved for use in labels to be sold, it would first have had to be approved by Mr. Patterson's group. (Bulson, Tr. 2353:17-23, 2395:22-2396:1)

88.    Mr. Patterson in turn testified that without a final specification, a bias material cannot be used in labels to be sold to Sensormatic customers. (Patterson, Tr. 2523:1-4; Copeland, Tr. 1379:19-20) No final specification was ever approved for Arnokrome 4. (Patterson, Tr. 2524:5-10) Mr. Patterson further testified that Arnokrome 4 was never used in Sensormatic labels that were sold or offered for sale. (Patterson, Tr. 2524:5-10) Dr. Copeland also testified that to the best of his knowledge, Sensormatic did not sell labels containing Arnokrome 4. (Copeland, Tr. 1453:19-22)

89.    The court finds the testimony of Mr. Patterson and Dr. Copeland on this point to be accurate. The testimony of Mr. Patterson and Dr. Copeland, along with the documentary evidence, established that from 1993 through 1995 Sensormatic evaluated Arnokrome 4 for potential use in labels, but that for various reasons Sensormatic doubted whether Arnokrome 4 had the necessary magnetic properties to function as bias material in its labels. (Copeland, Tr. 1488:16-1489:3, 1526:3-1527:6; DX 189, Dec. 8, 1993 memo from Copeland stating "[f]irst pilot material [of Arnokrome 4] received at the beginning of December . . . . Test results show this material to be at or below the low limit specification for remanent flux. . . . The specification release will be delayed until these issues about Arnold's capabilities are finalized"; DX 187, Feb. 4, 1994 Krishnasamy memo noting that Arnokrome 4 was still in developmental stage; DX 137, June 10, 1994 memo from Patterson stating "Arnold Engineering still cannot meet our mechanical

18

specifications" for Arnokrome 4; DX 296, Apr. 4, 1995 presentation stating Arnokrome 4 is "where we are heading this coming fiscal year").

90.     During this time, Sensormatic projected future purchases of Arnokrome 4 and purchased some quantities for experimentation.  Defendants rely on Sensormatic documents concerning projected purchases of Arnokrome 4 as support for their contention that Arnokrome 4 was being used in labels sold to the public.  (*See, e.g.*, DX 271, Dec. 3, 1994 "Bias Commitments" showing commitment to 22,500 lbs. of Arnokrome 4; DX 281) However, Ms. Bulson admitted that the bias commitments do not establish that Sensormatic actually purchased those materials, or that Sensormatic ever sold labels with Arnokrome 4 bias materials. (Bulson Tr. 2397:21-25, 2398:11-15)

91.     Defendants relied on documents indicating that Arnokrome 4 had been "issued to production."  But Dr. Copeland testified testimony established that within Sensormatic "issued to production" meant only that the material had been sent to the production department for evaluation and testing.  The product would be put on the market only if it ultimately met specifications. (Copeland, Tr. 1378:13-1379:6)

92.     Defendants also rely on a May 31, 1995 Arnold Engineering document titled "Visit to Sensormatic Electronics Corporation." (DX 156)  Page 2 of the document says the "status" of Arnokrome 4C is "Commercial," while the "status" of Arnokrome 4D is "Development." (DX 156)  Defendants contend that this shows that Sensormatic was selling labels with Arnokrome 4 bias material at that time.  But former Arnold employee Mr. Manning testified that the designation "commercial" meant only that the materials were being offered by Arnold for sale to Sensormatic; not that Sensormatic was selling labels with Arnokrome 4 bias. (Manning, Tr. 1119:20-1120:13).

19

93.    Instead, a document relating to the preparation of the May 31 presentation in DX 156 reveals that as of May 19, 1995 Arnold still had not received "feedback on the final production approvals of Arnokrome 4." (PX 924) The results Arnold was awaiting, namely the Sensormatic Manufacturing Engineering Department's final evaluation of Arnokrome 4, are presented in a May 4, 1995 memorandum, in which Sensormatic concluded that "Arnokrome IV is not a replacement for existing bias material." (PX 927)

94.    The court thus finds that defendants have not proven by clear and convincing evidence that Sensormatic sold labels employing Arnokrome 4 material prior to the critical date.

95.    Sensormatic acknowledged sending some labels using Arnokrome 4 to customers for test purposes.  (Patterson, Tr. 2525:12-18)  Mr. Patterson testified that these tests occurred somewhere in the "'94, '95 time frame." (Patterson, Tr. 2550:16-24) Defendants contend that this use of Arnokrome 4 constitutes "public use" for purposes of the on-sale bar.

96.    However, Sensormatic presented convincing evidence that, even if Arnokrome 4 labels were sent to customers prior to the critical date, the use was experimental rather than commercial, and thus outside the scope of the on-sale bar.

97.    Mr. Patterson testified that public testing of Arnokrome 4 labels was necessary, because without testing in customer sites Sensormatic could not know what kind of issues the customer would have.  It was necessary to test whether issues that appeared in the laboratory are really issues in the field.  Store clerks who behave one way in the laboratory might behave differently in the actual store, facing a long line of customers, which could affect the performance of the labels.

(Patterson, Tr. 2526:16-2527:1, 2528:8-13)

98.     Mr. Patterson's testimony established that Sensormatic conducted and retained control over the experiment with Arnokrome 4 labels. The Arnokrome 4 test labels were controlled lots. (Patterson, Tr. 2525:14-15) Sensormatic created several thousand Arnokrome 4 test labels, compared to millions or even billions of labels Sensormatic typically produces when labels are being produced for commercial purposes. (Patterson, Tr. 2551:15-18, 2568:6-14) Sensormatic employees placed the labels on products in the retail setting, and monitored how they performed. Sensormatic would bring samples of the labels back to the lab for evaluation. (Patterson, Tr. 2556:21-2557:9)

99.     Sensormatic was not paid for the Arnokrome 4 labels used in tests, but gave them to the participating customers. (Patterson, Tr. 2525:3-6)

100.    The evidence therefore shows that Sensormatic's use of Arnokrome 4 labels was experimental, rather than commercial, and thus outside the scope of the on-sale bar.

101.    Even had defendants shown that Arnokrome 4 labels were commercially sold prior to the critical date, defendants did not demonstrate that those labels included each and every element of any of the asserted claims.

102.    Neither Dr. Fish nor Ms. Bulson offered evidence or analysis regarding the properties of Arnokrome 4 labels sold prior to the critical date.

103.    The evidence that was offered showed that Arnokrome 4, prior to the critical date, did not exhibit the abrupt characteristics taught by the '200 and '245 patents. For instance, in May

of 1996, Dr. Copeland experimented with Arnokrome 4 to determine whether it could be used as the bias element in a low energy, abrupt bias marker. He concluded it could not because it was "too gradual." (DX 145, p. 2, May 20, 1996 memo from Copeland to Manning saying the Arnokrome 4S samples were "too gradual"; Copeland, Tr. 1484:19-25)

104.    Defendants next contend that Sensormatic sold labels before the critical date that used SemiVac 90 bias material and that embodied the limitations of the asserted claims of the '200 and '245 patents.

105.    Sensormatic does not dispute that it sold labels with SemiVac 90 bias material, but contends those labels contained high coercivity SemiVac 90. Sensormatic contends that Defendants have failed to prove by clear and convincing evidence that Sensormatic sold labels containing low coercivity (less than 55 Oe) SemiVac 90 prior to the critical date.

106.    As noted above, Sensormatic required a final specification before a bias material could be used in labels to be sold to Sensormatic customers. (Patterson, Tr. 2523:1-4; Copeland, Tr. 1379:19-20) The final specification for SemiVac 90 bias material was dated February 20, 1995, before the August 28, 1995 critical date. (PX 929) But that specification required high coercivity SemiVac 90 – in the range of 60 to 100 Oe, not less than 55 Oe as required by certain claims of the '200 and '245 patents. (PX 929 p. 2) Thus, SemiVac 90 that was approved and sold before the critical date was high coercivity SemiVac 90. Dr. Copeland testified that the SemiVac 90 actually used in markers before the critical date had high coercivity. (Copeland, Tr. 1462:4-10)

107.    Defendants relied on documents from the spring of 1994 showing coercivity values

22

for SemiVac 90 less than 55 Oe. (*E.g.*, DX 250) But these documents concern SemiVac 90 that was in testing and evaluation, but had not been approved for use in labels to be sold.

108.    For example, DX 250 at page 4 indicates that in March of 1994, 50 Oe SemiVac 90 was "issued to production." As discussed above, however, "issued to production" at Sensormatic meant only that material was sent to the production department for testing, not produced for sale to customers. (Copeland, Tr. 1366:21-1367:10) In fact, the first page of DX 250 explains that SemiVac 90 was "tested in Incoming Inspection and a trial production was conducted. The results are described below." (DX 250)Similarly, in April of 1994 Sensormatic's preliminary specification for SemiVac 90 called for coercivities between 40 and 100 Oe. (DX 247) But the same exhibit made clear that further testing was required before Sensormatic would issue a final specification. *Id.* ("Sensormatic will issue a final specification only after completing this evaluation.") Materials shipped pursuant to this specification were used for evaluation. (Copeland, Tr. 1466:1-8) In short, although these documents indicate that some SemiVac 90 in 1994 may have had coercivity less than 55 Oe, they do not show that Sensormatic sold labels with that lower coercivity SemiVac 90.

109.    Sensormatic's testing of SemiVac 90 was not complete, and SemiVac 90 was not released for use in AM labels, until January 1995. (PX 933, Jan. 24, 1995 email from Bob DiMarzio: "SemiVac can be released for use.") The first specification for SemiVac 90 after it was released for use required 60 to 100 Oe coercivity. (PX 929, p. 2 (Feb. 20, 1995 first commercial SemiVac 90 specification shows 60-100 Oe; Copeland Tr. 1361:22-1362:9)

110.    Thus, the evidence regarding the properties of the SemiVac 90 that was sold in labels prior to the critical date is at best equivocal. Defendants failed to show by clear and convincing

23

evidence that labels containing SemiVac 90 having coercivities less than 55 Oe were sold or offered for sale prior to August 28, 1995.

111.    Even had defendants shown that low-coercivity SemiVac 90 was used in labels sold prior to the critical date, defendants nevertheless have failed to show that the SemiVac 90 exhibited the abrupt characteristics taught by the '200 and '245 patents.  The evidence of record shows that SemiVac 90 did not exhibit the abrupt characteristics of the asserted claims.  (PX 382 p. 1, Feb. 28, 1996 memo from Coffey to Patterson saying current SemiVac 90 does not meet new abrupt bias specifications; Coffey, Tr. 390:12-15)

112.    In fact, Figure 2 of the '200 patent, labeled "Prior Art," depicts actual data from a marker utilizing SemiVac 90 as the bias material.  Figure 2 shows that SemiVac 90 has a demagnetization curve that is not abrupt.  (PX 786, Copeland, Tr. 1468:23-1469:10) In short, SemiVac 90 was a gradual, not an abrupt, material.  (Copeland, Tr. 1470:9-10)

113.    Finally, defendants contend that, prior to the critical date, Sensormatic sold labels using Metglas 2605 TCA ("TCA") bias material that embodied the asserted claims of the '200 and '245 patents.

114.    Defendants failed to set forth a claim by claim analysis showing that any labels containing TCA met each limitation of any of the asserted claims.

115.    As discussed above, Sensormatic required a final specification before a bias material could be used in labels to be sold.  The only specification for TCA bias material was for coercivities of 65 +/- 15 Oe.  (DX 274) Dr. Copeland testified that he would have expected the actual range of

24

coercivities of the TCA to be centered on 65, and tighter than the range specified. (Copeland, Tr. 1495:4-9)

116.    Defendants relied on the testimony of defendant Mr. Dennis Gadonniex to establish that Sensormatic sold labels containing TCA with coercivity below 55 Oe. Mr. Gadonniex admitted that the specification required TCA bias material to have a coercivity of 65 +/- 15 Oe. (Gadonniex, Tr. 1601:24-1602:2) He testified, however, that in 1994 the coercivities of TCA bias material were "all over the place. . . . between 30 and 80." (Gadonniex, Tr. 1614:1-4)

117.    Mr. Gadonniex's testimony is partially corroborated by PX 700, a document showing coercivity values for TCA. However, PX 700 cannot establish the coercivity of any TCA bias materials included in labels sold before August 28, 1995 with any certainty, because it is undated, and Mr. Gadonniex testified he had no way of dating the document. (PX 700; Gadonniex, Tr. 1804:7-9)

118.    Mr. Gadonniex testified that the purpose of the testing he did of TCA bias materials was to ensure compliance with specifications. (Gadonniex, Tr. 1803:17-19) He also admitted that all but 17 of the 75 samples reflected in PX 700 were out of specification. (Gadonniex, Tr. 1804:19-1805:5) His testimony that the material was used in labels sold to customers, despite the fact that the overwhelming majority of that material was out of specification, is not credible or worthy of belief.

119.    Even if Sensormatic had sold labels containing TCA with coercivity below 55 Oe before the critical date, defendants have not shown that such labels would have embodied all of the

limitations of the any of the asserted claims, because each of the asserted claims includes more than just the coercivity of the bias material.

120.    At closing, defendants acknowledged that Mr. Gadonniex's testimony is the sole basis for defendants' contention that labels containing TCA bias met any of the asserted claims' abruptness limitations before the critical date.  (Closing, Tr. 2763:16-18)

121.    Although Mr. Gadonneix testified that he monitored the TCA production line and that the material generally exhibited abrupt characteristics, he did not testify that they met the specific abruptness requirements in the asserted claims. (Gadonniex, Tr. 1615:15:-17)

122.    In fact, Mr. Gadonneix conceded that he had no data concerning any properties of TCA other than coercivity.  (Gadonniex, Tr. 1813:7-1814:2, 1814:3-16)

123.    Mr. Gadonneix's testimony thus failed to address at least one limitation of each of the asserted claims.  Because defendants' on-sale bar argument as it relates to TCA rests entirely on Mr. Gadonneix's testimony, defendants have failed to show by clear and convincing evidence that the on-sale bar invalidates any of the asserted claims of the '200 or '245 patent.

c.    Conclusions of Law

124.    Because defendants have not met their burden of proving by clear and convincing evidence that labels embodying each and every limitation of any of the asserted claims were on sale or in public use prior to August 28, 1995, the on-sale bar defense must be rejected.

4.    *Enablement*

26

a.      Governing Legal Principles

125.    A patent is not valid unless it contains "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same . . . ." 35 U.S.C. § 112.

126.    The enablement requirement is satisfied if "the specification teaches those in the art enough that they can make and use the invention without 'undue experimentation.'" *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1334 (Fed. Cir. 2003).

127.    In determining whether undue experimentation is required, the court should consider "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims." *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

128.    In order to invalidate a claim on lack of enablement grounds, Defendants must show "that all of the disclosed alternative modes are insufficient to enable the claims, because 'the enablement requirement is met if the description enables any mode of making and using the invention.'" *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1361 (Fed. Cir. 1998) (quoting *Engel Indus., Inc. v. Lockformer Co.*, 946 F.2d 1528, 1533 (Fed. Cir. 1991)). "The law makes clear that the specification need teach only one mode of making and using a claimed invention." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1335 (Fed. Cir. 2003).

27

b.      Findings of Fact

129.    Defendants contended that the preferred embodiments set forth in each of the patent's specification were not enabling because: (1) the specification identifies the relevant bias materials by trade name only, (2) the trade names at issue do not refer to so-called "invariant" materials, and (3) the specification does not set forth the steps for processing the bias materials to obtain the desired magnetic properties.

130.    Defendants put on their non-enablement defense principally through their technical expert Dr. Gordon Fish. Dr. Fish admitted during cross examination that he had not disclosed in his expert reports an opinion that the asserted claims of the '245 patent are invalid for failure to satisfy the enablement requirement of 35 U.S.C. § 112. (Fish, Tr. 2127:16-21) As a result, this Court struck Dr. Fish's testimony to the extent it included opinions and evidence that any of the asserted claims of the '245 patent are invalid on non-enablement grounds. Defendants adduced no additional evidence at trial regarding lack of enablement and the asserted claims of the '245 patent.

131.    During the original prosecution of the '200 patent, the Examiner initially rejected all 47 claims in the application on non-enablement grounds. (PX 86, May 16, 1997 Office Action) Sensormatic traversed the rejection, upon which the Examiner withdrew the rejection and allowed all of the claims as originally written. (PX 86, Sept. 25, 1997 Notice of Allowability) Thus the PTO has already considered and rejected the precise non-enablement arguments made by defendants in this case.

132.    Many of the asserted claims set forth specific magnetic properties of the bias material.

28

(PX 786, cols. 11-16) Others set forth specific magnetic properties of the marker, which includes the bias and resonator. (*Id.*) The evidence at trial showed that a person of ordinary skill in the field of magnetics or materials science in August 1996 would have known how to obtain these magnetic properties without undue experimentation either by processing an alloy him- or herself, or simply by specifying the magnetic characteristics to commercial suppliers of such alloys with expertise in such processing.

133.    Defendants' own technical expert, Dr. Fish, admitted that, "[i]f the specification spells that out, spells out what [the magnetic] properties are, and those can be achieved by the manufacturer, yes, that would be enabled." (Fish, Tr. 1874:20)

134.    The '200 patent specification spells out in detail the desired magnetic properties of the bias and marker in the claims, the text and the figures.   The claims themselves specify numerically the desired magnetic properties. (PX 786, cols. 11-16) The figures of the '200 patent also provide graphical representations of the claimed magnetic properties. (PX 786)

135.    The evidence at trial showed that a person armed with these figures and the desired magnetic properties could simply have provided that information to magnetic materials vendors, who, using existing knowledge of how to process magnetic materials, could process materials to the desired properties without undue experimentation.  In response to a question posed by the court, Dr. Copeland testified that "We [Sensormatic] give [vendors] direction as to what the end properties need to be, and then they have to, you know, figure out how they adapt their processes for that material to obtain that."  (Copeland, Tr. 1392:15-24 ) The court finds Dr. Copeland's testimony credible on this point.

136.    It was thus well known in the art at the time the '200 patent was filed how to process materials to obtain the magnetic properties specified in the '200 patent. For example, Dr. Fish admitted during cross-examination that individuals at Carpenter at the time would have known "within their routine level of skill" how to obtain the desired magnetic properties. (Fish, Tr. 2106:21-25) The court finds this statement by Dr. Fish to be accurate.

c.       Conclusions of Law

137.    Based upon these findings, the court concludes that defendants have not shown by clear and convincing evidence that any of the asserted claims are invalid because a person of ordinary skill in the art would not have been able to make or use the inventions asserted therein.

5.      *Fraudulent Inventorship*

a.       Governing Legal Principles

138.    A patent applicant must disclose the names of all inventors. 35 U.S.C. § 111. A patent can be invalidated if the patentee "did not himself invent the subject matter sought to be patented." 35 U.S.C. § 102(f).

139.    Inventorship is a question of law based on underlying factual determinations. *C.R. Bard, Inc. v. M3 Sys.*, 157 F.3d 1340, 1352 (Fed. Cir. 1998). "The general rule is that a party alleging . . . non-joinder of inventors must meet the heavy burden of proving its case by clear and convincing evidence, and must provide evidence to corroborate the alleged joint inventor's conception." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir. 2004) (citations

30

omitted).

140.    "The 'inventor,' in patent law, is the person or persons who conceived the patented invention.  Thus facts relevant to inventorship are those showing the conception of the invention, for others may provide services in perfecting the invention conceived by another without becoming an 'inventor' by operation of law." *C.R. Bard*, 157 F.3d at 1352.  "'[A]n inventor may use the services, ideas, and aid of others in the process of perfecting his invention without losing his right to a patent.'"  *Id.* (citations omitted).

141.    "'To be a joint inventor, an individual must make a contribution to the conception of the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention.'  This requires more than merely exercising ordinary skill in the art – 'a person will not be a co-inventor if he or she does no more than explain to the real inventors concepts that are well known [in] the current state of the art.'" *Caterpillar Inc. v. Sturman Indus.*, 387 F.3d 1358, 1377 (Fed. Cir. 2004) (citations omitted).

142.    "One may not qualify as a joint inventor . . . by 'merely assisting the actual inventor *after conception* of the claimed invention.'" *Hoop v. Hoop*, 279 F.3d 1004, 1007 (Fed. Cir. 2002) (emphasis in original) (citations omitted).  "'Depending on the scope of the patent's claim, one of ordinary skill in the art who simply reduced the inventor's idea to practice is not necessarily a joint inventor," even if the specification discloses that embodiment to satisfy the best mode requirement. *Id.* at 1008.

143.    "[I]nventorship is determined on a claim-by-claim basis." *Gemstar-TV Guide Int'l*,

*Inc. v. International Trade Commission*, 383 F.3d 1352, 1381 (Fed. Cir. 2004).

144.    A failure to name an inventor, even if proven, does not automatically invalidate a patent.  35 U.S.C. § 256, entitled "Correction of named inventor," provides that if an inventor is inadvertently not named, the patent will not be invalidated as long as the error was not done with any "deceptive intent."

145.    "[Section 256] is a savings provision.  If a patentee demonstrates that inventorship can be corrected as provided for in section 256, a district court must order correction of the patent, thus saving it from being rendered invalid." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1350 (Fed. Cir. 1998)

           b.     Findings of Fact

146.    Defendants contend that all of the claims of the '200 and '245 patents are invalid because Sensormatic, including the inventors, knowingly omitted Dennis Gadonniex as an inventor on both patents with the intent to deceive the PTO.  Defendants rested this contention on the testimony of Mr. Gadonniex himself.

147.    Mr. Gadonniex testified that he believes he should have been named an inventor on both the '200 and the '245 patents.  (Gadonniex, Tr. 1633:8-12)  Mr. Gadonniex identified the following as claims he had contributed to: '200 patent claims 1, 2, "maybe" 3, 4-9, 15, and 31 through 33.  (Gadonniex, Tr. 1643:7-1644:23).

148.    The court finds Mr. Gadonniex's testimony on this point not credible nor worthy of

belief. Defendants offered no documentation or other corroboration of Mr. Gadonniex's testimony. To the contrary, documents contemporaneous to the inventions show that Dr. Coffey and Dr. Copeland – and not Mr. Gadonniex – were the individuals who conceived of the claimed inventions. (*See, e.g.*, DX 256, Feb. 23, 1996 Invention Disclosure (Ex. A); DX 155, Nov. 28, 1995 Coffey memo; PX 382, Feb. 28, 1996 Coffey memo; PX 527, Mar. 8, 1996 Coffey memo)

149.    Dr. Copeland testified that Mr. Gadonniex played no role in the conception of the inventions of the '200 or '245 patents. (Copeland, Tr. 1447:2-4) Dr. Coffey asked Mr. Gadonniex to investigate a lower coercivity range after the November 1995 conception. (Copeland, Tr. 1434:7-16) Similarly, Dr. Coffey testified that Mr. Gadonniex did not contribute to the conception of the inventions, but worked on making Metglas 2605 SB1 material more abrupt after Drs. Copeland and Coffey's November 1995 conception.   (Coffey, Tr. 411:9-15, 411:20-412:5) The court finds the testimony of Dr. Copeland and Dr. Coffey to be credible and accurate on these points.

150.    Even had the court concluded that Mr. Gadonniex qualified as an inventor of some of the claims contained in the '200 patent, invalidation would nevertheless be inappropriate because defendants offered no evidence whatsoever that Mr. Gadonniex was omitted as an inventor with intent to deceive the PTO.

151.    Dr. Copeland testified that he did not intentionally leave Mr. Gadonniex off the patent knowing he was an inventor, and that there would have been no reason to leave Mr. Gadonniex off the patent if he had been an inventor. (Copeland, Tr. 1449:8-13) Sensormatic listed Mr. Gadonniex as an inventor on what became the '770 and '021 patents around the same time – both having application dates of July 1, 1996. (DX 25, '770 patent; DX 18, '021 patent)

152.    The court finds that neither Dr. Copeland, Dr. Coffey, nor anyone at Sensormatic, omitted Mr. Gadonneix's name from the '200 patent application with intent to deceive the PTO.

c.    Conclusions of Law

153.    The defendants have failed to prove by clear and convincing evidence that Mr. Gadonneix contributed to the conception of any of the asserted claims.

154.    By extension, defendants have further failed to prove that there was any intent to deceive the PTO in this regard.

155.    Thus, the '200 and '245 patents are not invalid for failure to join an inventor.

6.    *Obviousness*

a.    Governing Legal Principles

156.    A claim is invalid if the subject matter of the claimed invention "as a whole would have been obvious at the time the invention was made to a person of ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a).

157.    Obviousness is a question of law, based on underlying factual findings that must be proven by clear and convincing evidence. *Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 767 (Fed. Cir. 1988).

158.    "The factual determinations underpinning the legal conclusion of obviousness include: 1) the scope and content of the prior art; 2) the level of ordinary skill in the art; 3) the

34

differences between the claimed invention and the prior art, and 4) evidence of secondary factors, also known as objective indicia of non-obviousness." *Eisai Co. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353, 1356 (Fed. Cir. 2008).

159.    Secondary considerations or objective indicia of non-obviousness include, among other things, "commercial success, long-felt but unresolved need, failure of others, copying and unexpected results." *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 662-63 (Fed. Cir. 2000) (citing *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966)).

160.    "Evidence of secondary considerations may often be the most probative and cogent evidence in the record.  It may often establish that an invention appearing to have been obvious in light of the prior art was not." *Ruiz*, 234 F.3d at 667 (citation omitted).  Objective indicia of non-obviousness is "not just a cumulative or confirmatory part of the obviousness calculus but constitutes independent evidence of nonobviousness."  *Ortho-McNeil Pharmaceutical, Inc. v. Mylan Laboratories, Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008).

161.    Evidence of secondary considerations "should when present always be considered as an integral part of the analysis." *W.L. Gore & Assocs. v. Garlock, Inc.*, 721 F.2d 1540, 1555 (Fed. Cir. 1983).  "'[A] nexus between the merits of the claimed invention and evidence of secondary considerations is required in order for the evidence to be given substantial weight in an obviousness decision.'" *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1327 (Fed. Cir. 2008) (citations omitted)

162.    As with other invalidity issues, obviousness must be examined on a claim-by-claim

basis. *See Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1370 (Fed. Cir. 2003)

163.    "[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art. . . . [I]nventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, ___, 127 S.Ct. 1727, 1741 (2007).

164.    Meeting the standard required to invalidate a patent as nonobvious is "especially difficult when the prior art was before the PTO examiner during prosecution of the application." *Hewlett-Packard Co. v. Bausch & Lomb,* 909 F.2d 1464, 1467 (Fed. Cir. 1990) (citations omitted).

b.      Findings of Fact

165.    Defendants' obviousness challenge, presented through Dr. Fish, was based primarily on U.S. Patent No. 5,527,399 and U.S. Patent No. 5,653,824, both awarded to Manning et al.  (Fish, Tr. 2026:10-2027:8) Dr. Fish also referred to U.S. Patent No. 5,351,033, the MagneDur 20-4 datasheet, and a graph in a prior printed publication (the Bozorth text). (Fish, Tr. 1897:9-1901:5; 2027:9-20)

166.    The '033 patent and Bozorth text are prior art to the '200 and '245 patents. The '033 patent was issued in September 1994, before the invention of the '200 and '245 patents. (DX 12) The Bozorth text is a prior printed publication within the meaning of 35 U.S.C. § 102(a).  (DX 39)

167.    Dr. Fish claimed Figures 4 and 5 of the '200 and '245 patents were obvious in light

36

of a graph from the Bozorth textbook.  (Fish, Tr. 1899:24-1901:15)

168.    However, the Bozorth graph shows something very different than the demagnetization and magnetization characteristics described in the asserted claims of the '200 and '245 patents.  Dr. Coffey explained the Bozorth graph showed magnetization values with a magnetic field applied, whereas the demagnetization curve in Figure 4 of the '200 and '245 patents shows magnetization values only at remanance (i.e., with no magnetic field applied).   (Coffey, Tr. 2462:9-2464:5; Sensormatic Dem. 86)  This difference is significant because the marker put to its intended use – affixed to merchandise on a shelf in a store – is in a remanance condition, with no magnetic field being applied. (Coffey, Tr. 2464:6-18)  The same is true with respect to Figure 5 of the '200 patent. (Coffey, Tr. 2464:21-2465:25)

169.    As Dr. Coffey explained, there were no patent publications or memos before 1995 concerning "the desirability of square BH loops in the performance of markers" or that "square BH loops would affect the behavior of demagnetization slope for an EAS marker." (Coffey, Tr. 2467:9-24)

170.    Dr. Coffey concluded that there was no evidence that a person of ordinary skill in the art at the time of the invention would find the specific abrupt properties in the asserted claims obvious based upon a general knowledge of B-H loops.  The court finds Dr. Coffey's testimony in this regard credible and persuasive. (Coffey, Tr. 2468:10-20)

171.    The '399 patent and the '824 patent are prior art to the '200 and '245 patents under 35 U.S.C. § 102(e)(2) because they were based upon an application that predated the invention of

the '200 and '245 patents. (DX 12)

172.     However, the properties that Dr. Fish contends were inherent in the '399 patent were not known to a person of ordinary skill in the art in 1995-1996. Dr. Coffey explained that he had not seen any evidence that "a person of ordinary skill in the art knew of the properties that Dr. Fish claims were inherent in Arnokrome 4." (Coffey, Tr. 2468:5-9) Similarly, Dr. Copeland testified that he was not aware of anyone who had "thought about" EAS markers in terms of "abruptness properties." (Copeland, Tr. 1418:7-11) Neither did defendants adduce any evidence either that: 1) any person knew of properties that Dr. Fish claims were inherent in Arnokrome 4 in 1995-1996; or 2) even if there was such a person, whether that person had considered or reasonably would have considered those properties as they might apply to a bias material for use in an EAS marker.

173.     In any event, the only evidence concerning the properties of Arnokrome 4 in 1995 or 1996 (other than coercivity) demonstrates that it in fact did not have abrupt characteristics – that it was a gradual material that did not meet the Sensormatic demagnetization and magnetization requirements developed after the conception of the '200 and '245 inventions. (DX 145; Coffey, Tr. 2454:18-22, 2455:8-2456:9; Copeland, Tr. 1479:3-11, 1481:10-19, 1483:4-1486:14)

174.     Moreover, none of the prior art references discussed by Dr. Fish ('399 patent, '824 patent, and '033 patent) discusses any of the abrupt characteristics set forth in the asserted claims of the '200 and '245 patents. (Coffey, Tr. 466:19-467:2; DX 12; DX 14; DX 17)

175.     Before Dr. Coffey joined Sensormatic, there was no consideration of abrupt properties of a bias material as relevant characteristics, and Sensormatic had not specified abrupt characteristics

38

to bias suppliers. (Copeland, Tr. 1418:7-17; Coffey, Tr. 388:24-389:12) Even Mr. Gadonniex testified that he did not recognize "abruptness" as a "good thing" or "positive attribute" until after Dr. Coffey came to Sensormatic. (Gadonniex, Tr. 1620:25-1621:11, 1627:13-16)

176. The court will not consider the MagneDur 20-4 datasheet as evidence of defendants' obviousness claims because Dr. Fish did not in his expert report disclose reliance on the MagneDur 20-4 datasheet as prior art in support of his obviousness opinions. (Fish, Tr. 2234:1-2235:18) Even if it had been disclosed, it would be irrelevant because it is not prior art to the '200 and '245 patents. The MagneDur 20-4 datasheet is dated August 1, 1996, prior to the November 1995 conception and January 1996 reduction to practice of the inventions described in the '200 and '245 patents (PX 91; Coffey, Tr. 383:16-24, 395:9-18; Copeland, Tr. 1425:20-1427:21)

177. Although the application for the '200 patent was not filed until later in August 1996, the PTO found, after considering the arguments of Phenix to the contrary, that a Declaration of Prior Invention established an invention date for the asserted claims that predates the August 1, 1996 MagneDur 20-4 datasheet. (PX 922, Nov. 9, 2006 Office Action at 2; PX 923, May 10, 2007 Office Action at 2) There is no basis for this court to disturb this determination by the PTO.

178. Moreover, the PTO considered defendants' obviousness claims more generally during re-examination, and rejected them. (PX 922, Dec. 7, 2005 Request for Re-examination pp. 5-6; PX 923, Dec. 12, 2005 Request for Re-examination at pp. 5-6; Fish, Tr. 2109:1-14, 2151:3-7; PX 815; PX 816)

179. Finally, the relevant objective indicia of non-obviousness militate against a finding

of invalidity on obviousness grounds. In particular, the court finds that the following secondary considerations are present: (1) solving a long-felt, but unresolved need; (2) the failure of others to address the need; (3) commercial success; (4) copying by others; and (5) licensing by others.

180.    There was a long-felt but unresolved need for the inventions prior to their conception in November 1995. Prior to that time, AM labels were "high energy," using bias materials having a coercivity of 60 to 100 Oe in order to prevent inadvertent demagnetization when in contact with "incidental magnetic fields." (Patterson, Tr. 131:4-132:24) The use of these high-coercivity labels was then necessary to avoid accidental demagnetization that led to "labels that don't work at all" or "wounded labels" that are "partially demagnetized" and could not be relied upon to set off the alarm at the pedestal. (Patterson, Tr. 133:3-9)

181.    However, the high-energy labels with high coercivity bias elements did not deactivate reliably. The labels had to be very close to the demagnetization pad in order to deactivate. (Patterson, Tr. 134:15-135:5; Copeland, Tr. 1442:2-16)  As a result, when the high energy labels were used in "source tagging" (placing labels inside the packaging), the labels could not be relied upon *not* to set off the alarm at the pedestal.  There were false alarms due to "tags not properly deactivated." (Patterson, Tr. 135:15-23)

182.    Sensormatic looked at addressing the problems with reliable deactivation with the use of lower coercivity bias material that could deactivate at a greater distance from the pads. (DX 139; Patterson, Tr. 136:18-137:8)  However, prior to Dr. Coffey's arrival at Sensormatic in fall 1995, Sensormatic was not able to make labels with low coercivity bias material that functioned properly. (Patterson, Tr. 137:9-15)  The labels with low-coercivity bias material would deactivate more

40

reliably but would be subject to demagnetization by accidental demagnetization by magnets from forklifts or from other labels. (DX 139; Patterson, Tr. 141:21-142:21) Sensormatic "experimented with many labels and many materials" in order to obtain a low-coercivity bias material that did not tend to become inadvertently demagnetized, spending "eight to ten man years of effort working on that particular problem," but these efforts failed. (Patterson, Tr. 144:1-11)

183.   Drs. Coffey and Copeland solved the problem by utilizing markers and bias materials with abrupt magnetic characteristics. (Patterson, Tr. 146:12-147:12; Copeland, Tr. 1444:10-24)

184.   Sensormatic's labels exhibiting the abrupt characteristics of the asserted claims of the '200 and '245 patents have been commercially successful. Sensormatic has shifted entirely to abrupt, low energy AM labels. (Patterson, Tr. 152:2-152:13) Sensormatic has sold "between five and seven billion" labels that embody the invention. (Patterson, Tr. 152:9-23) The inventions of the '200 and '245 patents have "contributed to the success of the Ultramax labels" "because of the enhanced performance." (Patterson, Tr. 153:1-11) "The problems of the early '90's were solved by this invention to a large extent." (Patterson, Tr. 153:10-11) The invention of the '200 and '245 patents helped Sensormatic compete with other types of EAS markers and helped make Sensormatic "the leader in the whole electronic surveillance industry in the USA." (Patterson, Tr. 153:20-25)

185.   Another indicium of non-obviousness is copying. Substantial evidence indicates that defendants copied the inventions of the '200 and '245 patents as reflected in the magnetic properties section of the bias specifications. TAG's report to its 20% owner explained that TAG's new label is a "replica of the ULTRA-Strip AM Label produced by Tyco and sold by ADT." (PX 592) A number of the magnetic properties relevant to the inventions that were contained in Tag's initial bias

specification were identical to those in Sensormatic's bias specification, including DC magnetization test, low field stability and high field demagnetization. (Krom, Tr. 1206:11-16) Kathy Bulson, TAG's corporate representative, admitted that the "best way" to move towards TAG's goal of meeting the performance of the Sensormatic label "was to copy a Sensormatic specification." (Bulson Dep. 10/17/07 163:22-164:5)

186.    Finally, another indicium of non-obviousness is licensing. Sensormatic licensed the '200 and '245 patents to Wallace in 1997. (Patterson, Tr. 154:5-12; PX 55, Feb. 10, 1997 license agreement)  The agreement was later terminated after Wallace was taken over by another entity. (Patterson, Tr. 154:13-19)

c.    Conclusions of Law

187.    Based on the above findings of fact, the court concludes as a matter of law that none of the inventions of asserted claims 2, 6, 10, 11, 18, 19, 20, 27, 28 and 43 of the '200 patent or asserted claims 1, 2, 4, 7, 9, 14, 15 and 17 of the '245 patent would have been obvious to a person of skill in the art at the time the inventions were made.  Thus, none of the asserted claims of either the '200 or '245 patent is invalid under 35 U.S.C. § 103(a).

188.    This conclusion is not altered by the Supreme Court's recent decision in *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007).  In *KSR,* the Supreme Court explained that "[w]hen there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp.  If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense.  In that instance the fact that a combination was

42

obvious to try might show that it was obvious under § 103." 127 S.Ct. at 1742.

189.    This is not a case for the application of *KSR*. In *Ortho-McNeil Pharmaceutical, Inc. v. Mylan Laboratories, Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008), the Federal Circuit stated: "*KSR* posits a situation with a finite, and in the context of the art, small or easily traversed, number of options that would convince an ordinarily skilled artisan of obviousness." In the court's view – particularly in light of the objective indicia of non-obviousness discussed *supra* – the number of options facing Sensormatic in the early 1990s, as it confronted the practical limitations of high-energy labels, was not "small or easily traversed." *KSR* therefore does not alter the court's conclusion that defendants have failed to meet their burden to show that the asserted claims should be invalidated as obvious.

### 7.    Inequitable Conduct

#### a.    Governing Legal Principles

190.    A patent is unenforceable due to inequitable conduct only if there is "clear and convincing evidence that the patent applicant (1) either 'made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the [PTO].'" *Pfizer, Inc. v. TevaPharms. USA, Inc.*, 518 F.3d 1353, 1366 (Fed. Cir. 2008).

191.    The duty to disclose material information extends to: "(1) Each inventor named in the application; (2) Each attorney or agent who prepares or prosecutes the application; and (3) Every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application." 37 C.F.R. § 1.56(c).

192.    "Once the threshold levels of materiality and intent have been established, the trial court must weigh materiality and intent to determine whether the equities warrant a conclusion that inequitable conduct occurred." *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 999 (Fed. Cir. 2007).

193.    A reference is material if "'a reasonable examiner would have considered such prior art important in deciding whether to allow the parent application.'" *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1363 (Fed. Cir. 2003) (citation omitted).

194.    However, a reference is not material if it "is 'simply cumulative to other references,' *i.e.*, if the reference teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the PTO." *Regents of Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1575 (Fed. Cir. 1997) (citation omitted); *accord Honeywell*, 488 F.3d at 1000 ("Information cumulative of other information already before the Patent Office is not material.").

195.    "'[G]iven the ease with which a relatively routine act of patent prosecution can be portrayed as intended to mislead or deceive, clear and convincing evidence of conduct sufficient to support an inference of culpable intent is required.'" *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1181 (Fed. Cir. 1995) (citation omitted). "[C]lear and convincing evidence must prove that an applicant had the specific intent to accomplish an act that the applicant ought not to have performed, *viz.*, misleading or deceiving the PTO. In a case involving nondisclosure of information, clear and convincing evidence must show that the applicant made a deliberate decision to withhold a known material reference." *Id.*

196.    "The intent element of the offense is . . . in the main proven by inferences drawn from facts, with the collection of inferences permitting a confident judgment that deceit has occurred."

*Akron Polymer Container Corp. v. Exxel Container, Inc.,* 148 F.3d 1380, 1384 (Fed. Cir. 1998). "However, inequitable conduct requires not intent to withhold, but rather intent to deceive. Intent to deceive cannot be inferred simply from the decision to withhold [information] where the reasons given for the withholding are plausible." *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1367 (Fed. Cir. 2003).

197.    "[T]he inference must not only be based on sufficient evidence and be reasonable in light of that evidence, but it must also be the single most reasonable inference able to be drawn from the evidence to meet the clear and convincing standard." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.,* 537 F.3d 1357, 1366 (Fed. Cir. 2008). "Given the existence of a credible reason for the withholding, the materiality of the references standing alone is not sufficient to establish intent." *Pfizer, Inc. v. TevaPharms. USA, Inc.*, 518 F.3d 1353, 1367 (Fed. Cir. 2008).

198.    "The need to strictly enforce the burden of proof and elevated standard of proof in the inequitable conduct context is paramount because the penalty for inequitable conduct is so severe, the loss of the entire patent even where every claim clearly meets every requirement of patentability.... Just as it is inequitable to permit a patentee who obtained his patent through deliberate misrepresentations or omissions of material information to enforce the patent against others, it is also inequitable to strike down an entire patent where the patentee only committed minor missteps or acted with minimal culpability or in good faith." *Star Scientific*, 537 F.3d at 1365-66 (Fed. Cir. 2008).

199.    "[E]ven if the "elevated evidentiary burden" is met as to both materiality and intent to deceive, "the district court must still balance the equities to determine whether the applicant's conduct before the PTO was egregious enough to warrant holding the entire patent unenforceable.

45

Thus, even if a threshold level of both materiality and intent to deceive are proven by clear and convincing evidence, the court may still decline to render the patent unenforceable." *Star Scientific,* 537 F.3d at 1365 (Fed. Cir. 2008).

200.    "[I]nequitable conduct with respect to one claim renders the entire patent unenforceable." *Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1332 (Fed. Cir. 1998).

b.    Findings of Fact

201.    Defendants have asserted that both the '200 and '245 patents are unenforceable due to inequitable conduct in the prosecution of the applications leading to those patents. (*See* DE 276, Defendants' Answer and Amended Counterclaims to Plaintiff's Fourth Amended Complaint pp. 15-18, 25-35).

202.    Defendants' principal inequitable conduct contention is that Sensormatic committed inequitable conduct because individuals involved in the prosecution of the '200 patent intentionally withheld prior art references material to the prosecution of original claim 4 of the '200 patent and that, as a result, the '200 patent is unenforceable.

203.    Claim 4 of the '200 patent as originally issued claimed a marker with a bias element having a coercivity of "less than 55 Oe." (PX 786, col. 12:10-11)

204.    During the Re-examination, the Examiners rejected original claim 4 of the '200 patent as anticipated by the '033 patent because the latter teaches "biasing elements having coercivity Hc values of 18, 20, 32, 50 Oe." (PX 922, Nov. 9, 2006 Office Action)  The Examiners pointed to Figure 4 of the '033 patent. (*Id.*)

205.    Defendants contend that the inventors and others involved in the prosecution of the '200 patent intentionally withheld the '033 patent, as well as other prior art references, that disclosed

46

AM EAS markers employing bias materials with coercivities of less than 55 Oe during the prosecution of the '200 patent with the intent to deceive the PTO.

206.    In particular, Defendants asserted at trial that the following references were material to original claim 4 of the '200 patent and should have been disclosed to the PTO during prosecution of the '200 patent: the '033 patent (DX 12); the '399 patent (DX 14); the '824 patent (DX 17); the '021 patent (DX 18); the '770 patent (DX 25); and the 1993 article by Robert O'Handley entitled "Magnetic Materials for EAS Markers" ("O'Handley Article") (DX 82).  (*See* Fish, Tr. 2053:19-2056:17, 2056:20-2058:21, 2058:22-2059:15, 2047:5-2048:14, 2063:18-2064:1)

207.    Of all of the references cited by defendants in their requests for re-examination of the '200 and '245 patents – those just described, among many others – the only prior art reference that formed the basis for a final rejection of any of the claims of the '200 or '245 patents during Re-examination was the '033 patent.  (*See, e.g.*, PX 922, Nov. 9, 2006 Office Action, Apr. 24, 2007 Office Action; PX 923, May 10, 2007 Office Action)

208.    The court finds that the prior art referenced cited by defendants in the requests for re-examination are either cumulative of the prior art cited by the inventors and the PTO during the prosecution of the '200 patent, or not otherwise material.  The "Background of the Invention" of the '200 patent states:

> Conventionally, the bias element 16 is formed of a material which has 'semi-hard' magnetic properties.  'Semi-hard' properties are defined herein as a coercivity in the range of about 10-500 Oersted (Oe), and a remanence, after removal of a DC magnetization field which magnetizes the element substantially to saturation, of about 6 kiloGauss (kG) or higher.

(PX 786, col. 1:53-59)

i.    '489 patent

47

209.    During prosecution, the inventors disclosed prior art referencing bias materials with coercivities less than 55 Oe.  For example, the inventors disclosed U.S Patent No. 4,510,489 during the prosecution of the '200 and '245 patents.  The '489 patent claims AM EAS markers "wherein said ferromagnetic element [the bias] has coercivity higher than said amorphous material [the resonator]."  (PX 93, col. 13 (claim 18))

210.    It was well known in the art at the time that the resonator was made from "soft" magnetostrictive material having a coercivity of typically less than 1 or 2 Oe.  (Coffey, Tr. 417:6-24; Copeland, Tr. 1513:23-1514:18)  Thus, the bias material disclosed in claim 18 of the '489 patent has a coercivity greater than 1 or 2 Oe.  (Coffey, Tr. 417:6-24; Copeland, Tr. 1514:19-22)  As a result, the '489 patent discloses markers having bias materials with coercivities less than 55 Oe.  (Coffey, Tr. 417:25-418:3)

ii.    '033 patent

211.    Figure 4 of the '033 patent contains a graph which plots annealing temperature against coercivity of the resulting semi-hard magnetic material for three different annealing times.  (DX 12)  The points on the graph show semi-hard magnetic materials ranging in coercivity from approximately 5 to 70 Oe, depending on the annealing time and temperature. (Id.)

212.    However, the '033 patent does not teach or suggest using the semi-hard magnetic materials with coercivities under 50 Oe as bias materials in AM EAS markers. The '033 patent specification identifies the "optimum annealing condition" as the one "that yields the maximum coercivity." (DX 12, col. 5:58-59) It states, "[i]n order to realize a maximum coercivity, the annealing temperature and time must be suitably selected." (Id.) The "maximum coercivity" in

48

Figure 4 of the '033 patent is 70 Oe.

213.    Rather than suggesting that TCA material with coercivities less than 50 Oe should be used in AM EAS markers, the additional data points shown in Figure 4 of the '033 patent merely represent coercivity values of TCA material at certain annealing times and temperatures. Dr. Copeland, who is one of the named inventors on the '033 patent, testified that "all the data points on the whole graph starting from the low temperature, 450 degrees, all the way to 750 are a range of interest in the experiment to generate the curve so you could see the region of interest, which is the middle." (Copeland, Tr. 1500:7-18) Thus the '033 patent was not material to the prosecution of the '200 patent.

iii.    '399 and '824 patents

214.    The '399 and '824 patents, both assigned to Arnold, are directed to methods for preparing magnetic strips of a certain thickness and carbon content. (DX 14, abstract; DX 17) They are each a continuation-in-part of the same parent patent. (*Id.*)

215.    The claims of the '399 patent are not themselves directed to EAS markers, but rather set forth different methods for producing a thin magnetic strip. (DX 14, col. 11:62-12:61) The '824 patent, by contrast, claims EAS markers utilizing the resulting material as a bias element. (DX 17, col. 12)

216.    The specification of the '399 patent states:

> The magnetic properties of the finished magnetic strip prepared by the processes set forth herein are such that it has typical coercive levels, $H_c$, of from about 20 to about 100 oersteds, the exact level being application specific. Preferred levels for $H_c$ for magnetic strips for such uses as in the electronic article surveillance field are from at least 35 to about 70 oersteds, more preferably from at least 40 to about 65 oersteds, and even more preferably from about 45 to about 60 oersteds.

(DX 14, col. 8:37-45)

49

217.    The '824 patent claims, among other things, an EAS marker employing a bias element made in accordance with the '824 patent specification having a coercivity of "at least 40 oersteds." (DX 17, col. 12:26-41 (claim 9))

218.    Both the '824 and '399 patents disclose EAS markers using bias materials having coercivities less than 55 Oe, but within the 10 to 500 Oe range set forth in the '200 patent specification.  (PX 786, col. 1:54-59)

iv.    '021 and 770 patents

219.    The '021 and '770 patents, both assigned to Sensormatic, issued after the '200 patent issued, on February 9, 1999 and June 6, 1998 respectively.   (DX 18; DX 25; PX 786)

220.    The '021 and '770 patents claim a two-stage method for annealing and crystallizing a particular type of bias material, as well as markers using that material.  (DX 18; DX 25)

221.    The preferred embodiment disclosed in the '021 and '770 patent specifications is Metglas 2605SB1 (one of the preferred embodiment bias materials set forth in the '200 and '245 patent specifications).  (DX 18; DX 25; PX 786; PX 788)

222.    The '021 and '770 patents define "semi-hard magnetic element" in the same way as the '200 patent: "a magnetic element having semi-hard magnetic properties which are defined herein as a coercivity in the range of about 10-500 Oersted (Oe) . . . ."  (DX 18, col. 1:7-11; DX 25, col. 1:11-14)

223.    The '021 and '770 patent specifications state that the material resulting from the 2605SB1 processing method contained therein exhibits a coercivity of either 19 Oe or 11 Oe.  (DX 18, col. 5:49-57; DX 25, col. 4:46-55)  These coercivities fall within the 10 to 500 Oe coercivity range set forth in the '200 patent specification.  (PX 786, col. 1:54-59)

50

224.    Defendants cited the '021 and '770 patents during the Re-examination of the '200 and '245 patents. (PX 922, Feb. 9, 2006 Office Action; PX 923, Mar. 2, 2006 Office Action)

225.    Inventors Copeland and Coffey thereafter submitted a Declaration of Prior Invention swearing behind the July 1, 1996 application date of the '021 and '770 patents. (DX 256) Drs. Copeland and Coffey attached a copy of their Invention Disclosure. (DX 256, Ex. A)

226.    The Examiners in the Re-examination subsequently concluded that the declaration was sufficient to overcome the '021 and '770 patents as prior art as to most claims of the '200 and '245 patents, including Claims 4, 6 and 7 of the '200 patent. (PX 922, Nov. 9, 2006 Office Action; PX 923, May 10, 2007 Office Action)

227.    At trial, both Dr. Copeland and Dr. Coffey testified that they had conceived of the inventions of the '200 and '245 patent before Dennis Gadonniex conceived of the processing steps described in the '021 and '770 patents. (Copeland, Tr. 1434:1-19, 1348:2-24; Coffey, Tr. 411:9-412:5) The court finds this testimony to be credible and worthy of belief. Drs. Copeland and Coffey first tasked Mr. Gadonniex with coming up with a method for processing 2605SB1 to obtain abrupt characteristics after they had conceived of the '200 and '245 patent inventions. (Copeland, Tr. 1434:1-19, 1348:2-24; Coffey, Tr. 411:9-412:5)

228.    Mr. Gadonniex thereafter conceived of those processes, which were the basis for the '021 and '770 patents. (Copeland, Tr. 1434:1-19, 1348:2-24; Coffey, Tr. 411:9-412:5)

229.    Defendants did not at trial dispute that the '200 and '245 patent inventions pre-date the '021 and '770 patent inventions.

230.    The Examiners during re-examination did not reject any claims of the '200 or '245 patents on the basis of either the '021 or '770 patents.

51

v.     The O'Handley article

231.    The 1993 article by Robert O'Handley, entitled "Magnetic Materials for EAS Markers," surveys the various types of EAS systems in existence in 1993.  (DX 82)

232.    The 1993 O'Handley article discloses EAS markers employing bias materials with a range of coercivities that includes values of 50 to 100 Oe, which overlaps the 0 to 55 Oe range of original claim 4 of the '200 patent. (DX 82 p. 6)  The 50 to 100 Oe range of the O'Handley article falls within the 10 to 500 Oe range set forth in the '200 patent specification. (PX 786, col. 1:54-59)

233.    Even if some of the nondisclosed prior art references were material, defendants have not shown by clear and convincing evidence that the inventors omitted them during prosecution with the intent to mislead the PTO.

234.    The only people who were substantively involved in the prosecution of the '200 and '245 patents and preparation of those applications were inventors Richard Copeland and Kevin Coffey, as well as the prosecuting attorney. (Copeland, Tr. 1502:20-1503:5; Coffey, Tr. 473:10-25) Mr. Hubert Patterson was not substantively involved in either the prosecution of or preparation of applications for the '200 or '245 patents.  (Patterson, Tr. 311:5-312:2; Copeland, Tr. 1502:20-1503:5; Coffey, Tr. 478:6-12)

235.    On the face of the specifications of the '200 and '245 patents, the inventors disclosed that "conventional" bias materials for EAS markers could have coercivities ranging from 10-500 Oe. (PX 786, col. 1:53-59; PX 788, col. 1:57-63)

236.    The prosecuting attorney for the '200 and '245 patents disclosed the '033 patent to the PTO during the prosecution of the '021 and '770 patents, both of which were also assigned to Sensormatic. (DX 18; DX 25) The prosecuting attorney for the '200 and '245 patents was the same

prosecuting attorney for the '021 and '770 patents.  (DX 18; DX 25; PX 786; PX 788)

237.    The '770 and '021 patents were prosecuted at the same time as the '200 and '245 patents.  The applications that matured into the '770 and '021 patent applications were filed on July 1, 1996, less than two months before the filing of the '200 patent application.  (*Id.*)

238.    The Examiner on the '770 and '021 patents was the same examiner – Glenn Swann – who examined the '200 and '245 patent applications.  (*Id.*)  The prosecuting attorney would have had reason to expect Glenn Swann to be the examiner on all of the patents.  Glenn Swann had been the examiner on most of the Sensormatic patents prosecuted and examined during that time period.  In addition to examining the '200, '245, '770 and '021 patent applications, Mr. Swann was the examiner on the '033 patent, the '140 patent, and the '230 patent, all of which were assigned to Sensormatic.  (DX 12; DX 1; DX 24)

239.    It is likely that, had the prosecuting attorney intended to deceive the PTO by withholding the '033 patent, he would not have submitted the '033 patent during the prosecution of the '021 and '770 patents, which were occurring at the same time before what was likely to be the same examiner.

240.    In addition, the evidence at trial showed that Drs. Coffey and Copeland did not understand original claim 4 of the '200 patent to cover all markers employing bias materials with coercivities less than 55 Oe.  Rather, both inventors testified that they understood original claim 4 in the context of the patent to refer only to an abrupt marker. (Coffey, Tr. 413:6-23; Copeland, Tr. 1280:12-15, 1288:5-10).  The court finds this testimony to be credible and worthy of belief.

241.    Drs. Copeland and Coffey had no financial motive to deceive the PTO.  The inventors had no ownership rights in either patent, as both were assigned to Sensormatic.  (PX 786; PX 788)

c.    Conclusions of Law

242.    Defendants have not shown by clear and convincing evidence that the above references were material to the prosecution of original claim 4 of the '200 patent.

243.    To the extent that one or more of the references disclose bias materials having coercivities of less than 55 Oe, such references are not material because they are cumulative of the information already cited during the '200 patent prosecution. *Regents of Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1574-75 (Fed. Cir. 1997).

244.    Defendants have not shown that either of the inventors or the prosecuting attorney were aware of the '824 patent or the 1993 O'Handley article during the prosecution of the '200 patent. The Federal Circuit has "repeatedly reaffirmed the proposition that 'as a general rule, there is no duty to conduct a prior art search, and thus there is no duty to disclose art of which an applicant could have been aware.'" *Frazier v. Roessel Cine Photo Tech, Inc.*, 417 F.3d 1230, 1238 (Fed. Cir. 2005).

245.    As for the '021 and '770 patents, they did not issue until after the '200 patent had issued. There is no evidence that Drs. Copeland or Coffey knew of the applications – much less the substance of those applications – that matured into those patents during the prosecution of the '200 patent. Moreover, Drs. Copeland and Coffey conceived of and reduced to practice the claimed inventions of the '200 patent prior to the filing of the '021 or '770 patents. Thus the '021 and '770 applications are not prior art.

246.    As for the '399 and '033 patents, Defendants have not shown that the inventors or prosecuting attorney of the '200 patent intentionally withheld those references with an intent to deceive.

54

247.    For all of the above reasons, the court finds that defendants have not carried their burden to show that either the '200 or 245 patent is unenforceable due to inequitable conduct.

### 8.    *Remedy*

248.    In light of defendants' stipulation that the Series 58 labels practice the asserted claims of the '200 and '245 patents, and having rejected each of defendants' claims of invalidity and unenforceability, the court concludes that the Series 58 labels infringe the asserted claims. The court must therefore consider the nature of the remedy to be fashioned.

249.    A party seeking a permanent injunction in a patent-infringement case must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, including monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. et al. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Accumed LLC v. Stryker Corp.*, 483 F.3d 800, 811 (Fed. Cir. 2007).

250.    Sensormatic faces irreparable injury if defendants are not enjoined from making and selling Series 58 labels. Because only two companies sell AM EAS labels in the United States, each sale of a Series 58 label is likely a foregone sale of a Sensormatic label. *Johns Hopkins Univ. v. Datascope Corp.*, 513 F. Supp. 2d 578, 586 (D. Md. 2007), *rev'd on other grounds*, 543 F.3d 1342 (Fed. Cir. 2008) ("[Defendant's] product competes directly with the Plaintiff's product. In fact, it is the only competition and thus, its sale reduces the Plaintiffs' market share. Continued sales by [Defendant] will irreparably harm the plaintiffs."); *Muniauction, Inc. v. Thomson Corp.*, 502 F. Supp.2d 477, 482 (W.D. Pa. 2007), *rev'd in part and vacated in part on other grounds*, 532 F.3d

1318 (Fed. Cir. 2008) ("Plaintiff and defendants are direct competitors in a two-supplier market. If plaintiff cannot prevent its only competitor's continued infringement of its patent, the patent is of little value."). Without injunctive relief, defendants will be able to continue to sell labels with infringing components in direct violation of Sensormatic's intellectual property rights.

251. Sensormatic has no adequate remedy at law because money damages alone likely would not adequately compensate Sensormatic for the irreparable harm caused by Defendants' infringement. Sensormatic faces future loss of market share and erosion of the AM label market caused by Defendants' continued infringement. Neither of these future losses is compensable by damages. *See 800 Adept, Inc. v. Murex Securities, Ltd.*, 505 F. Supp. 2d 1327, 1337-38 (M.D. Fla. 2007), *rev'd in part and vacated in part on other grounds*, 539 F.3d 1354 (Fed. Cir. 2008) ("[I]njunctive relief operates to protect the interests of a patentee against future infringement, the market effects of which may not be fully compensable in the form of monetary damages."); *Smith & Nephew, Inc. v. Synthes (U.S.A.) et al.*, 466 F. Supp. 2d 978, 984 (W.D. Tenn. 2006) ("Relief in the form of monetary damages alone would not meet the ends of justice here because this remedy would allow the infringement to continue. Monetary damages generally are not an adequate remedy against future infringement because the central value of holding a patent is the right to exclude others from using the patented product.").

252. The balance of hardships favors injunctive relief because the burden placed on defendants by an injunction would consist only of the cost of forgoing infringing conduct. This can hardly be accorded substantial weight in an equitable balancing of factors. On the other hand, Sensormatic faces harm to its market share and reputation in the market for AM labels and EAS systems, which it went to great efforts to research and develop. This harm easily outweighs any

potential harm to defendants.

253.    Finally, a permanent injunction against infringement in this case would not harm the public interest. The Federal Circuit has recognized that the public interest is served by strong patent protection. *See Abbott Labs v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006).

254.    The court thus concludes that injunctive relief is appropriate and will enter a permanent injunction.

### C.    *Sensormatic's Non-Patent Claims*

#### 1.    *Misappropriation of Trade Secrets*

##### a.    Findings of Fact

255.    Mark Krom worked at Sensormatic from June 1992 to April 2000.  (Krom, Tr. 1144:6-19)

256.    Mr. Krom founded TAG Company U.S. LLC in 2003 and is currently responsible for managing all aspects of the business.  (Krom, Tr. 1149:20-1150:22)

257.    Mr. Krom hired other former Sensormatic employees to join TAG, including Kathie Bulson, former Product Manager at Sensormatic. (Bulson 10/1/07 Dep. 5:25-6:9) Ms. Bulson is the leader of TAG's development team for the Series 58 labels.  (Bulson, Tr. 2356:7-10)

258.    Mr. Krom also hired former Sensormatic employees to be technical consultants for TAG, including Dennis Gadonniex and Norman Hansen. (Krom, Tr. 1158:11-1159:5)

259.    Mr. Krom began to investigate opportunities for TAG to develop its own AM EAS label, the Series 58 label, in 2003.  (Krom, Tr. 1151:1-1152:1)  The Series 58 label was launched into the market in September 2006.  (PX 75, TAG 9/11/06 Press Release)

260.    When TAG began developing its own AM EAS label, its goal was to create a label

57

that "met the performance of the Sensormatic label." (Bulson 10/17/07 Dep. 163:22-164:2)

261.    Sensormatic's specifications are valuable. Sensormatic gives its specifications to material suppliers so that suppliers can manufacture the materials in accordance with the parameters set forth in the specifications.   (Patterson, Tr. 159:23-160:9)   If the materials do not meet Sensormatic's specifications, the labels constructed using the materials may be of lower quality or may not work at all. (Patterson, Tr. 160:10-14) Sensormatic considers the specifications "to be key to [its] manufacturing capability and key to [its] product quality." (Patterson, Tr. 177:1-2)

262.    Sensormatic's specifications are also valuable to its competitors, because they "would allow a competitor to make a label similar to [Sensormatic's] without doing all the experimentation that [Sensormatic] had to go through and the development process [Sensormatic] had to go through." (Patterson, Tr. 175:3-9)

263.    Sensormatic keeps its specifications confidential.   (Patterson, Tr. 176:22-24) Sensormatic's specifications are not available to the public. (Patterson, Tr. 185:1-3)

264.    Sensormatic takes reasonable steps to ensure that its employees do not disseminate the specifications to the public. Sensormatic requires its employees to sign Employment Agreements when they start working at Sensormatic stating that they agree to preserve Sensormatic's confidential information. (PX 355, Dennis Gadonniex's Sensormatic Employment Agreement; Patterson, Tr. 182:6-9) at some point between October and December of 2003, Mr. Krom provided Sensormatic's specifications to TAG employee Jon Marchese. (Krom, Tr. 1200:11-15; Bulson 10/1/07 Dep. 27:17-21, 63:13-18)

265.    When Mr. Krom was deposed in December 2007, he did not know where he had gotten the Sensormatic specifications he gave to Mr. Marchese. (Krom, Tr. 1200:22-1201:12) At

58

trial, Mark Hibshman, who currently works for Phenix but previously worked for Wallace, testified that while at Wallace, he received a request from Mr. Krom for the Sensormatic specifications and faxed them to Mr. Krom at TAG. (Hibshman, Tr. 659:2-660:3) After Mr. Hibshman testified, Mr. Krom testified at trial that he received the Sensormatic specifications from Mr. Hibshman at Wallace. (Krom, Tr. 1168:18-25) However, he acknowledged under cross examination that he had no personal knowledge of where he got the specifications he gave to Mr. Marchese but was relying on what others told him. (Krom, Tr. 1201:13-1202:3, 1204:13-17)

266.    Even if Mr. Krom had received the Sensormatic specifications from Mr. Hibshman at Wallace, Mr. Krom knew that Sensormatic would have provided those specifications to Wallace "pursuant to the license agreement with confidentiality provisions."

267.    After receiving the Sensormatic specifications from Mr. Krom, Mr. Marchese substantially copied the specifications into a new document with TAG's logo on it, which is included within PX 38. (PX 38; Bulson 10/1/07 Dep. 34:14-36:3) Many of the numbers in the TAG specification, PX 38, are identical to those in the Sensormatic bias and resonator specifications, PX 458 and PX 463. (*Compare* PX 458 and PX 463 *with* PX 38) Mr. Krom admitted that many of the "numbers for key characteristics are the same in the Sensormatic specification and the TAG specification." (Krom, Tr. 1204:9-12, 1205:14-1206:16) (comparing the numbers in the Sensormatic and TAG specifications))

268.    Sensormatic did not consent to TAG's acquisition or copying of the specifications. (Patterson, Tr. 199:22-24)

269.    TAG disclosed the TAG specifications to multiple prospective materials suppliers. On December 15, 2003, Mr. Marchese, acting on behalf of TAG, emailed TAG's substantially

copied specifications to Arnold. (PX 38; PX 898, Defendants' Response to Request for Admission No. 213; Krom, Tr. 1211:14-20)

270.    Mr. Krom was aware that Mr. Marchese was sending the copied specifications to Arnold and approved of Mr. Marchese doing so. (Krom, Tr. 1211:14-1212:1) Arnold currently supplies the bias material for TAG's Series 58 labels. (Krom, Tr. 1212:2-5)

271.    On March 9, 2005, Mark Hibshman of Phenix sent bias specifications to Arnold and asked whether Arnold could manufacture material that would meet the specifications for use in the Series 58 labels. (PX 5; Hibshman, Tr. 698:5-24) Mr. Hibshman had received those specifications from TAG. (Fatino Dep. 32:7-16; Hibshman, Tr. 698:25-699:15)  The specification was now marked "Restricted Document Property of Phenix Label." (PX 5)

272.    The specifications Mr. Hibshman sent to Arnold were identical in almost every way to the TAG specifications Mr. Marchese copied from Sensormatic's bias specifications in December 2003. (*Compare* PX 5 *with* PX 463)

273.    In March 2005, Mr. Hibshman also sent Phenix's specifications to Carpenter, another potential bias material supplier. (Fatino Dep. 98:5-11; PX 236)

274.    Mr. Hibshman also sent Phenix's specifications to another potential bias material supplier, Hitachi Metals America Ltd. ("Hitachi"). (Hibshman, Tr. 705:8-11; Fatino Dep. 98:5-11) An email from John Straub of Hitachi on July 19, 2006 lists three of the specifications Mr. Hibshman sent to Hitachi, all of which were substantially identical to Sensormatic's Bias Specifications. (*Compare* PX 202 *with* PX 463; Hibshman, Tr. 705:22-706:25) This email indicates that TAG and Phenix were seeking bias material from Hitachi made according to these same specifications copied from Sensormatic's specifications less than two months before TAG and

60

Phenix launched the Series 58 labels in September 2006. (PX 202)

275.    TAG used Sensormatic's specifications as "a starting point for the development efforts on the Series 58 label" in order to bypass this period of research and development. (Bulson 10/17/07 Dep. 158:16-159:2) Mr. Krom acknowledged that it would have taken TAG more time if TAG had not had access to Sensormatic's specifications. (Krom, Tr. 1213:20-1214:3)

276.    Sensormatic's expert economist John Jarosz reviewed and analyzed TAG's actual and forecasted sales and profit data, along with deposition testimony of TAG's 30(b)(6) witness Joy Watford, in order to calculate the head start benefit TAG received from its misappropriation. (Jarosz, Tr. 568:16-569:3, 580:17-20; DX 25; PX 678; PX 952; PX 953)

277.    If the Court were to enter an injunction on Sensormatic's patent infringement claim prohibiting TAG from selling Series 58 labels in the future, Sensormatic would be entitled to recover the amount of head start benefit TAG has already received. Mr. Jarosz testified that the amount of head start benefit TAG has already realized is approximately $200,000. (Jarosz, Tr. 599:20-600:14) The court finds Mr. Jarosz's testimony credible in this regard.

b.    Conclusions of Law

278.    The Florida Uniform Trade Secrets Act ("FUTSA"), Fla. Stat. § 688.001 *et seq.*, defines a trade secret as information that (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Fla. Stat. § 688.002.

279.    Sensormatic's specifications are trade secrets. (PX 458; PX 463) These specifications provide a detailed formula of mechanical and magnetic characteristics that enables

61

manufacturers to process bias and resonator components for labels that perform like Sensormatic's. The specifications are a valuable component of Sensormatic's success in the AM EAS label market and are also valuable to competitors, like TAG and Phenix, who want to make and sell AM labels that perform as well as Sensormatic's.

280.    Sensormatic makes a reasonable effort to maintain the secrecy of its specifications. The specifications are not publicly available.   Sensormatic requires its employees to sign confidentiality agreements when they begin working at Sensormatic and to reaffirm those confidentiality obligations when they leave.   Its employees are required to maintain the confidentiality of the specifications after they leave Sensormatic. (PX 355) TAG's own executives acknowledged that Sensormatic's specifications are confidential.  (Krom, Tr. 1198:19-21; Bulson 7/9/07 Dep. 50:16-18)  Sensormatic does not disclose the specifications to third parties without obtaining a signed agreement from the third party containing a confidentiality provision.  These efforts are reasonable under the circumstances.

281.    FUTSA defines "misappropriation" of a trade secret to mean: (1) acquisition of another's trade secret by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret without consent by a person who used improper means to acquire the trade secret or knew that the trade secret was improperly acquired.  Fla. Stat. § 688.002.  TAG committed acts of misappropriation that fall into both categories.

282.    The definition of "improper means" under FUTSA includes "breach or inducement of a breach of a duty to maintain secrecy." Fla. Stat. § 688.002(1) (2008). TAG CEO Mark Krom acquired Sensormatic's specifications through a breach of a duty to maintain secrecy, either his own

62

or someone else's. If Mr. Krom requested and received the Sensormatic specifications from Mr. Hibshman at Wallace, Mr. Krom was aware that such a disclosure was a violation of Wallace's License Agreement with Sensormatic. (Krom, Tr. 1200:16-21)

283.    If Mr. Krom brought the specifications from Sensormatic himself, that would be a breach of his own Employment Agreement with Sensormatic. Mr. Krom's Employment Agreement with Sensormatic (1) obliges him to return all documents to Sensormatic upon leaving the company; and (2) prevents him from disclosing or using Sensormatic's confidential and proprietary information. (PX 365)   Mr. Krom knew that Sensormatic's specifications were considered confidential. (Krom, Tr. 1198:19-21)

284.    Regardless of how Mr. Krom obtained the Sensormatic specifications, TAG's acquisition of Sensormatic's specifications was through improper means, in violation of FUTSA.

285.    TAG disclosed Sensormatic's specifications or portions thereof to multiple third parties. Mr. Krom first disclosed the specifications to Jon Marchese, a TAG employee in England. Then Mr. Marchese copied Sensormatic's specifications and sent the new version to Arnold, a materials supplier. (PX 38) Mr. Marchese also sent the copied Sensormatic specifications to Mr. Hansen on December 15, 2003, who later shared them with Mr. Gadonniex. (PX 48) TAG also disclosed the copied specifications to Phenix, who then sent them to several potential materials suppliers to obtain bias materials to use in the Series 58 labels manufactured by Phenix and sold by TAG. (PX 5; PX 202; PX 236)

286.    Sensormatic did not consent to any disclosure of its specifications by TAG. As discussed above, TAG knew or had reason to know that the specifications were derived from someone who had acquired them through improper means; that they were acquired under

63

circumstances giving rise to a duty to maintain their secrecy; and derived from a person who had a duty to Sensormatic to maintain their secrecy. Fla. Stat. § 688.002(2)(b)(2) (2008). Accordingly, TAG's disclosure of Sensormatic's specifications to multiple third parties was a misappropriation of trade secrets in violation of FUTSA.

287. TAG also misappropriated Sensormatic's specifications by using them to catch up to Sensormatic in the AM EAS label business. TAG and its partner, Phenix, sent the copied specifications to several potential suppliers of bias materials. The latest documentary evidence of this disclosure is from July 2006, which was just two months before the launch of the Series 58 label. (PX 202) While TAG contends that the suppliers did not need the specifications to supply bias materials to TAG, TAG must have believed the specifications were useful in some way, or TAG and Phenix would not have continued to send them to suppliers.

288. TAG's actions constitute misappropriation of Sensormatic's trade secrets in violation of FUTSA. *See Salsbury Labs., Inc. v. Merieux Labs., Inc.*, 908 F.2d 706, 712-13 (11th Cir. 1990) (upholding misappropriation finding under Georgia common law where former employee instructed researchers at new employer to use same formulations and processes as former employer for producing vaccine and disclosed former employer's production outline for vaccine).

289. Under FUTSA, "a complainant is entitled to recover damages for misappropriation. Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." Fla. Stat. § 688.004 (2008). In this case, Sensormatic seeks only to recover the unjust enrichment TAG received from its misappropriation.

290. Disgorgement of a defendant's profits is an appropriate remedy where the

64

disgorgement is limited to the amount of time it would have taken the defendant to independently develop its product without the benefit of the plaintiff's trade secrets – in other words, the "head start" period. *Medical Store, Inc. v. AIG Claim Serv., Inc.*, No. 02-80513-CIV-JOHNSON, 2003 U.S. Dist. LEXIS 27554, at *17 (S.D. Fla. Oct. 15, 2003).

291.    Plaintiff's economic expert, John Jarosz, calculated TAG's incremental profits from sales of the Series 58 labels during several possible head start periods ranging from six months to three years. He also calculated the amount of head start benefit TAG had already realized, in the event that the Court entered an injunction that would prohibit future sales of Series 58 labels. In his calculations, Mr. Jarosz relied on TAG's actual and forecasted profits for the Series 58 labels and the deposition testimony of TAG's 30(b)(6) witness. The Court concludes that Mr. Jarosz was qualified as an expert on financial analysis and proved his calculations to a reasonable degree of certainty. Because this Court is granting Sensormatic injunctive relief on its patent infringement claim, Sensormatic is entitled to head start damages in the amount of $200,000.

292.    Sensormatic is also entitled to an injunction prohibiting TAG from using or disclosing Sensormatic's specifications in the future. Injunctive relief is an appropriate remedy under FUTSA. Fla. Stat. § 688.003 (2008) ("Actual or threatened misappropriation may be enjoined.").

293.    To obtain a permanent injunction, a party "must demonstrate a clear legal right, the inadequacy of a remedy at law, and that an irreparable injury will occur if such relief is not granted." *Eastern Fed. Corp. v. State Office Supply Co.*, 646 So. 2d 737, 741 (Fla. 1st DCA. 1994). Sensormatic clearly has a legal right under FUTSA to prevent unauthorized disclosure and use of its trade secrets. Sensormatic faces irreparable injury from future disclosure of its specifications, and given that a portion of the specifications were published in a patent application as recently as

February 2007, the threat of future disclosure is real. Accordingly, an injunction is appropriate here.

> 2.    *Breach of Contract, Breach of Fiduciary Duty and Misappropriation of Trade Secrets (Gadonniex)*
>
>> a.    Findings of Fact

294.    Dennis Gadonniex worked for Sensormatic from March 14, 1994 to March 22, 2000. (Gadonniex, Tr. 1585:11-16, 1587:24-1588:3; PX 355, Gadonniex Employment Agreement; PX 356, Gadonniex Separation Checklist)

295.    Mr. Gadonniex entered into an Employment Agreement with Sensormatic when he started work at Sensormatic on March 14, 1994. (PX 355; Gadonniex, Tr. 1709:8-25)

296.    Article I of Mr. Gadonniex's Employment Agreement provides:

Upon termination of employment for any reason whatsoever, Employee agrees to promptly deliver to [Sensormatic] all materials of a secret or confidential nature (whether or not marked as such), including but not limited to, all drawings, manuals, letters, notes, notebooks, reports, customer and supplier lists, and all copies thereof, relating to [Sensormatic's] business which are in the Employee's possession or control.

(PX 355)

297.    Article III of the Employment Agreement provides:

Employee understands and hereby acknowledges that as a result of Employee's employment with [Sensormatic], Employee will necessarily become informed of, and have access to, confidential information of [Sensormatic] including, but not limited to, inventions, trade secrets, technical information, know-how, plans, specifications, identity of customers and identity of suppliers, and that such information, even though it may be developed or otherwise acquired by Employee, is the exclusive property of [Sensormatic] to be held by Employee in trust and solely for [Sensormatic's] benefit, and Employee hereby agrees that Employee will not at any time, either during or subsequent to employment, reveal, report, publish, transfer or otherwise disclose to any person, corporation, or other entity, or use, any of [Sensormatic's] confidential information, without the written consent of [Sensormatic's] President or Executive Vice President, except for use on behalf of [Sensormatic] in connection with [Sensormatic's] business, and except for such

66

information which legally and legitimately is or becomes general public knowledge from authorized sources other than the Employee.

(PX 355)

298.    Mr. Gadonniex testified that he understood the prohibition against using Sensormatic's confidential information at the time and agreed to the provision in Article III of the Employment Agreement. (Gadonniex, Tr. 1710:21-1711:6) When he worked at Sensormatic, he understood that he would be entrusted with the company's confidential information and would be expected to keep that information confidential, and he accepted that responsibility. (Gadonniex, Tr. 1710:10-20)

299.    When Mr. Gadonniex resigned from Sensormatic on March 22, 2000, he signed another agreement affirming that he understood his continuing obligations under the Employment Agreement and confirming that he had returned all of Sensormatic's property. (PX 356; Gadonniex, Tr. 1711:11-1712:1)

300.    When he left Sensormatic in 2000, Mr. Gadonniex retained two backup tapes that he made by copying 24,000 pages of documents from his Sensormatic computer onto the tapes. (Gadonniex, Tr. 1720:18-1721:8; DE 308, Joint Pre-trial Stipulation Regarding Certain Bates Ranges) The backup tapes contained all of Mr. Gadonniex's data files and substantive work that was stored on his Sensormatic computer at the time the tapes were made. (Gadonniex, Tr. 1719:7-15)

301.    When Mr. Gadonniex made the backup tapes, he knew that he was not free to disseminate the work-related documents on the backup tapes outside of Sensormatic. (Gadonniex, Tr. 1721:9-13)

302.    Mark Krom hired Mr. Gadonniex to be a consultant for TAG in 2003. (Gadonniex, Tr. 1658:13-18)

303.    While Mr. Gadonniex was working as a consultant for TAG, he told Kathie Bulson he had backup tapes that contained information about certain bias materials investigated by Sensormatic. (Gadonniex, Tr. 1664:18-1665:1) Ms. Bulson told Mr. Gadonniex it would be helpful if they could establish a timeline for development of certain materials. (Gadonniex, Tr. 1729:3-6) Mr. Gadonniex offered to help "build a timeline from 1994 and '95" using documents from his backup tape. (Gadonniex, Tr. 1729:11-14) In order to retrieve the documents from the backup tape, he first ordered software from eBay to help him retrieve the documents, and when that did not work, he took the tape to a computer repair store to copy the backup tape onto a compact disk. (Gadonniex Dep. 81:9-10, 81:12-82:2, 82:5-6; Gadonniex, Tr. 1730:21-1731:1, 1731:15-20) He then copied the compact disks onto the hard drive of his home computer. (Gadonniex Dep. 84:11-18, 84:22-85:5)

304.    TAG assigned Mr. Gadonniex to review the Sensormatic documents on his backup tape in 2004 and paid him for the time he spent doing it. (Gadonniex, Tr. 1728:7-21; PX 660, Gadonniex's Time Sheets)

305.    As part of his work for TAG, Mr. Gadonniex created a "Sensormatic Bias Timeline," which was a timeline of events related to Sensormatic's internal development and testing of the bias material in its AM label. (PX 521G; Gadonniex, Tr. 1740:2-8) The timeline also included bias specifications and test results for various bias materials. (PX 521G)

306.    In August 2004, Mr. Gadonniex sent his Sensormatic Bias Timeline and related information, including screenshots of the Sensormatic files from the backup tape, to Ms. Bulson. (Gadonniex, Tr. 1740:6-12; PX 521G) He told Ms. Bulson that he had looked at the files on his tape of Sensormatic documents to get specific dates for the timeline. (Gadonniex, Tr. 1740:13-16)

307.    In addition, Mr. Gadonniex gave a copy of the entire contents of his Sensormatic

68

backup tape to Ms. Bulson. (Gadonniex Dep. 155:18-20, 156:10-11; Gadonniex, Tr. 1744:21-1745:7) At that time, he had not done a detailed review of the documents on the tape to determine whether they were confidential; he did not do such a review until he was named as a defendant in this lawsuit in 2007. (Gadonniex, Tr. 1743:13-18)

308.    Mr. Gadonniex's backup tapes contain documents that are proprietary and confidential to Sensormatic. For example, PX 700 is a document from Mr. Gadonniex's backup tape that contains experimental data from Sensormatic's tests of TCA bias material. (Patterson, Tr. 195:6-18; Gadonniex, Tr. 1804:7-12; PX 700) The data within PX 700 is kept secret and is highly valuable to Sensormatic and its competitors. (Patterson, Tr. 195:14-196:11) Mr. Gadonniex was not authorized to retain these data when he left Sensormatic or to disclose the data to TAG or any third party. (Patterson, Tr. 197:11-18)

309.    Mr. Gadonniex's backup tapes also contained Sensormatic's specifications. (Gadonniex, Tr. 1678:13-22) Mr. Gadonniex referred to the Sensormatic resonator specifications on his backup tape while he was working on issues related to the development of TAG's resonator specifications. (Gadonniex, Tr. 1750:3-16) As discussed above, Sensormatic's specifications were considered valuable, proprietary and confidential and Sensormatic did not consent to their disclosure.

311.    Sensormatic did not consent to Mr. Gadonniex retaining confidential Sensormatic documents or disclosing or using Sensormatic documents and information after his resignation from Sensormatic. (Patterson, Tr. 197:11-18, 199:9-24)

312.    At all times, Mr. Gadonniex either knew or had reason to know that the documents he retained from Sensormatic contained confidential and proprietary information.

b.      Conclusions of Law

69

313.     The specifications in the backup tapes retained by Mr. Gadonniex when he left Sensormatic in 2000 are trade secrets. *See supra* ¶ 279. 313.Mr. Gadonniex violated Article I of his Employment Agreement with Sensormatic by retaining the specifications.  (PX 355) Thus, he acquired Sensormatic's trade secrets by "improper means." *See* Fla. Stat. § 688.002(1) ("'Improper means' includes . . . breach or inducement of a breach of a duty to maintain secrecy.").

314.     While Mr. Gadonniex claimed to have inadvertently kept the backup tapes, he later discovered the tapes and made concerted efforts on two separate occasions to recover the documents from them (first by purchasing software from the Internet and, when that failed, by going to a computer repair store to restore the documents).  Therefore, his acquisition of the documents from the backup tapes after leaving Sensormatic constitutes misappropriation in violation of FUTSA.

315.     Mr. Gadonniex also misappropriated Sensormatic's trade secrets by disclosing them to Kathie Bulson without Sensormatic's consent.   Mr. Gadonniex disclosed Sensormatic's trade secrets to Kathie Bulson in summer 2004.  He sent Ms. Bulson a timeline that he had constructed from documents on the backup tapes, which contains certain bias specifications.  He also sent Ms. Bulson a CD that contained a copy of the entire contents of one backup tape.  Sensormatic did not consent to this disclosure by Mr. Gadonniex.  These acts independently constitute misappropriation of trade secrets under FUTSA.

316.     "Under Florida law, the elements of a breach of contract claim are (1) a valid contract, (2) a material breach, and (3) damages." *Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1342 (M.D. Fla. 2006).

317.     The Employment Agreement Mr. Gadonniex entered into with Sensormatic on March 14, 1994 is a valid and enforceable contract.  Article I of the Agreement obligated Mr. Gadonniex

to return all secret or confidential materials to Sensormatic upon termination of his employment. (PX 355) Article II required Mr. Gadonniex not to "reveal, report, publish, transfer or otherwise disclose to any person, corporation, or other entity, or use, any of [Sensormatic's] confidential information" except with Sensormatic's written consent or if such information is public knowledge. (*Id.*) This duty existed both during and subsequent to Mr. Gadonniex's employment at Sensormatic. (*Id.*)

318.   Mr. Gadonniex materially breached the Employment Agreement by retaining two backup tapes that contained over 24,000 pages of Sensormatic documents, including confidential and trade secret information. Mr. Gadonniex's failure to deliver these tapes to Sensormatic when he left the company in 2000 violated Article I of the Employment Agreement.

319.   Mr. Gadonniex also materially breached the Employment Agreement by disclosing Sensormatic's confidential and trade secret information to TAG after he was hired as a consultant in 2004. Mr. Gadonniex retrieved and reviewed Sensormatic documents as part of his consulting agreement with TAG. He disclosed confidential Sensormatic information and documents, including documents related to the development and testing of material components of AM labels, to Sensormatic's competitor. Additionally, Mr. Gadonniex gave a copy of an entire backup tape to Ms. Bulson.

320.   These acts damaged Sensormatic. TAG is Sensormatic's sole competitor in the AM EAS label market, and TAG benefited from Mr. Gadonniex's use and disclosure of Sensormatic's documents containing confidential and trade secret information. TAG began selling its labels to customers in September 2006 and continues today.

321.   The elements for a breach of fiduciary duty claim under Florida law are (1) the

existence of a fiduciary duty; (2) breach of that duty; and (3) damage to the plaintiff caused by the breach. *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002).

322.    Mr. Gadonniex had both an express and implied fiduciary duty to Sensormatic. *See Stateline Power Corp. v. Kremer*, 404 F. Supp. 2d 1373, 1380 (S.D. Fla. 2005) (former employee's fiduciary duties to former employer "arose from his employment status and were not all specifically delineated in the Employment Agreement"). His express duty arose out of his Employment Agreement and prohibited him from disclosing or using confidential information. His implied duty arose out of his status as a Sensormatic engineer in the research department who was entrusted with confidential Sensormatic information.

323.    Mr. Gadonniex breached his fiduciary duty to Sensormatic when he disclosed Sensormatic's confidential information to TAG and used Sensormatic's confidential information to help TAG's efforts to compete with Sensormatic in the market for EAS labels. When a person has a fiduciary duty to keep information confidential, disclosing that information is a breach of fiduciary duty. *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002). ("Florida courts have previously recognized a cause of action for breach of fiduciary duty in different contexts when a fiduciary has allegedly disclosed confidential information to a third party."). The breach of duty irreparably harmed Sensormatic by revealing valuable confidential information to competitors.

324.    Sensormatic is entitled to injunctive relief as to each of its claims against Mr. Gadonniex. Injunctive relief is appropriate under FUTSA. Fla. Stat. § 688.003. The Employment Agreement also specifically provides for injunctive relief as a remedy for breach. (PX 355, Art. V). Finally, injunctive relief is appropriate on the fiduciary duty claim in order to prevent Mr. Gadonniex from further disclosing Sensormatic's confidential proprietary information, thereby causing

72

Sensormatic further irreparable harm.

325.    Sensormatic is also entitled to attorneys' fees on its breach of contract claim against Mr. Gadonniex; these are specifically provided for in Mr. Gadonniex's Employment Agreement (PX 355, Art. V).

> 3.    *Aiding and Abetting Breach of Fiduciary Duty*

> a.    Findings of Fact

326.    As described above, Mr. Gadonniex breached a fiduciary duty to Sensormatic. *See supra* ¶ 321-323.

327.    TAG was aware of Dennis Gadonniex's confidentiality obligations to Sensormatic. Mark Krom knew when he hired Mr. Gadonniex that he was a former Sensormatic employee and assumed that Mr. Gadonniex was a party to a confidentiality agreement with Sensormatic.  (Krom, Tr. 1192:8-25) 328.    After hiring Mr. Gadonniex, Mr. Krom did not instruct him not to use or reveal confidential Sensormatic information when performing work for TAG. (Krom, Tr. 1193:4-7)

328.    Mr. Krom and Ms. Bulson knew of Mr. Gadonniex's confidentiality obligations because they had entered into similar confidentiality agreements with Sensormatic when they worked there.  (PX 70, Ms. Bulson's agreement; PX 365, Mr. Krom's agreement; Krom, Tr. 1192:4-7)

329.    Ms. Bulson knew that Sensormatic employees were to keep confidential information confidential and that they were not to remove confidential materials from Sensormatic.  (Bulson, Tr. 2380:13-20)  She was aware that Sensormatic engineers had employment agreements with Sensormatic that had confidentiality provisions.  (Bulson, Tr. 2378:11-20)

330.    In addition, TAG's own lawyer warned TAG of Mr. Gadonniex's confidentiality obligations.  On July 23, 2004, TAG attorney (and former Sensormatic in-house counsel) Paul

73

Kashimba sent a memorandum to Mr. Hansen, Mr. Krom, and Ms. Bulson. (PX 327) This memorandum was written in response to an email Mr. Hansen sent to Mr. Kashimba on July 11, 2004 entitled "TCA123," which discussed Sensormatic's confidential test results related to TCA bias material. (*Id.*; PX 700) In this memorandum, Mr. Kashimba stated, "Dennis G. may have signed a statement that he returned all Sensormatic confidential information to Sensormatic upon his leaving. In all likelihood, Sensormatic would claim that this document is confidential information." (PX 327)

331.    After receiving this document, Mr. Krom did not do anything about Mr. Gadonniex's having the confidential Sensormatic document referred to in the memorandum. (Krom, Tr. 1197:11-17)

332.    On October 27, 2004, Mr. Kashimba again reminded Ms. Bulson of Mr. Gadonniex's possible liability for providing Sensormatic documents to TAG, Phenix, and Phenix's attorneys. (PX 771) Mr. Kashimba also informed Ms. Bulson that TAG's "involvement in this matter could expose Tag to a charge by Sensormatic/Tyco that Tag has interfered with Mr. Gadonniex's obligations under the Sensormatic/Tyco agreement and caused him to violate those obligations." (*Id.*; Bulson, Tr. 2382:23-2384:18).

334. Notwithstanding these warnings, TAG directed Mr. Gadonniex to review and disclose confidential Sensormatic documents. Kathie Bulson asked Mr. Gadonniex to create timelines of Sensormatic's use of various materials in its EAS labels based on information found in the documents. (Bulson, Tr. 2375:24-2376:13)

335.    Mr. Gadonniex did so and sent a timeline and supporting documentation to Ms. Bulson. (Bulson, Tr. 2372:22-24, 2374:11-14) Mr. Gadonniex told Ms. Bulson in 2004 that he

created his timeline by consulting a backup tape containing documents he had downloaded from his Sensormatic computer. (Bulson, Tr. 2372:25-2373:4)

336. TAG paid Mr. Gadonniex for the time spent reviewing the Sensormatic documents and drafting timelines based on those documents. (Gadonniex, Tr. 1728:17-21; Bulson, Tr. 2377:20-23)

> b. Conclusions of Law

337. To prove aiding and abetting breach of fiduciary duty, a plaintiff must demonstrate: (1) a fiduciary duty on the part of the primary wrongdoer; (2) a breach of this fiduciary duty; (3) knowledge of the breach by the alleged aider and abettor; and (4) the aider and abettor's substantial assistance or encouragement of the wrongdoing. *Arwood v. Dunn (In re Caribbean K Line, Ltd.)*, 288 B.R. 908, 919 (S.D. Fla. 2002) (citations omitted).

338. TAG substantially assisted and encouraged the breach of fiduciary duty by Mr. Gadonniex. TAG provided this assistance and encouragement with the conscious intent to assist Mr. Gadonniex's disclosure of Sensormatic confidential information.

339. Sensormatic was harmed by TAG's actions, and is entitled to injunctive relief against TAG to prevent further irreparable injury.

> 4. *FDUTPA*

340. Sensormatic seeks injunctive relief under the Florida Deceptive and Unfair Trade Practices Act for TAG's acquisition, copying and disclosure of its non-trade-secret confidential information.

341. FDUTPA makes unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla.

Stat. § 501.204(1) (2008). "An unfair practice is 'one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *PNR, Inc. v. Beacon Property Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (internal quotation marks omitted).

342.    TAG engaged in unfair practices in violation of FDUTPA. In furtherance of the goal of replicating the performance of Sensormatic's labels, Mr. Krom instructed a TAG employee to copy Sensormatic's specifications and disseminate them to potential material suppliers. TAG instructed Mr. Gadonniex to review and disclose confidential Sensormatic information and documents. TAG's actions therefore constitute unfair and deceptive practices within the meaning of FDUTPA. *See* Fla. Stat. § 501.204(1) (deceptive and unfair trade practices include "[u]nfair methods of competition").

343.    Injunctive relief is an appropriate remedy for a FDUTPA violation. Fla. Stat. § 501.211. Sensormatic has shown that it was injured by TAG's unfair practices and faces irreparable harm if TAG is not enjoined from engaging in these practices in the future. Accordingly, the Court finds that injunctive relief is an appropriate remedy in this case.

## CONCLUSION

344.    For the reasons given above, the court finds that judgment is due to be entered in favor of Sensormatic on counts 1, 2, 4, 5, 6, 8, and 9 of the Fourth Amended Complaint.

345.    The court further finds that judgment is due to be entered in favor of Sensormatic as to counterclaims 1 through 8 of defendants' Amended Counterclaims.

346.    Pursuant to Fed. R. Civ. P. 58(a), the court will enter final judgment by separate order.

Findings of Fact and Conclusions of Law
Sensormatic Electronics Corp. v. The TAG Company US LLC et al.
Case No. 06-81105-CIV-HURLEY/HOPKINS

347.    There being nothing further for the court to resolve in this matter, the Clerk is directed

to **DENY** all pending motions as moot and mark this case as **CLOSED**.

**DONE** and **SIGNED** in Chambers in West Palm Beach, Florida, this _19_ day of December,

2008.

Daniel T. K. Hurley
U.S. District Judge

*Copies provided to counsel of record*